# Exhibit 1



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JERIES SALEH, Individually and on Behalf of All Others Similarly Situated, ) | Case No. 2:24-cv-11021 |
| Plaintiff, ) | SUPPLEMENTAL DECLARATION OF CATHY ARENDT |
| vs. ) | |
| ASTRAZENECA PLC, PASCAL SORIOT, and ARADHANA SARIN, ) | |
| Defendants. ) x | |

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

I, Cathy Arendt, declare that the following is true and correct:

1. I am a founding partner at OSCH & ARENDT in Luxembourg and have been registered as a lawyer with the Luxembourg Bar since 1991.

2. I have been asked by Universal Invest (Universal Invest Dynamic, Universal Invest High, Universal Invest Medium, and Universal Invest Low) to provide an opinion regarding the joint signatory authority of Mr. Gilles Wéra and Mr. Pierre Kempeneer to legally bind and represent Universal Invest under Luxembourg law and to further opine on the legal status and structure of Universal Invest under Luxembourg law.

3. As a Luxembourg licensed attorney with over 30 years of experience in commercial law and corporate law, covering counselling, assistance with incorporation of companies, and Court litigation in matters involving investment funds, I regularly analyse questions pertaining to the legal status, legal personality, and structure of companies and other entities and am thus qualified to make this declaration. Attached as Exhibit A is my curriculum vitae.

4. Universal Invest is a Luxembourg public limited company ("société anonyme" or "SA"), qualifying as an investment company with variable capital ("SICAV") organized as an undertaking for collective investment in transferable securities ("UCITS") subject to Part I of the Luxembourg Law of 17 December 2010 relating to undertakings for collective (the "UCI Law"), registered with the Luxembourg register of commerce and companies ("Registre de Commerce et des Sociétés, Luxembourg" or "RCS") under number B47025. Attached as Exhibit B is the official company registry extract for Universal Invest.

5. Under Luxembourg law, more specifically article 1300-1 of the law of 10 August 1915 on commercial companies, a legal person whose registered office is located in Luxembourg is Luxembourgish and subject to Luxembourg law, Universal Invest, with its registered office in Luxembourg (287 route d'Arlon, 1150 Luxembourg), is thus governed by Luxembourg law.

1

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

6.    Under Luxembourg law, article 441-5 of the law of 10 August 1915 on commercial companies provides that a public limited company is represented in relation to third parties by its Board of Directors. Signatory authority may be delegated by the Board of Directors to some of its members or to other persons according to the articles of incorporation of the company.

7.    The registry extract for Universal Invest (Exhibit B) contains that statutory signatory authority language:

> *Statutory signature regime*
>
> *With regard to third parties, the Company will be validly bound by the joint signature of two directors or by the sole signature of anyone to whom such signing authority has been delegated by the Board of Directors.*

A copy of the certified translation of the registry extract is attached as Exhibit C.

8.    Further, the articles of incorporation of Universal Invest (coordinated version), which I retrieved from the RCS, a copy of which is attached as Exhibit D, state the following regarding the representation of Universal Invest:

> Art 17 Company Commitments to Third Parties
>
> With regard to third parties, the Company will be validly bound by the joint signature of two directors or *by the sole signature of anyone to whom such signing powers have been delegated by the Board of Directors.*
>
> Art. 18. Delegation of Authority
>
> *The Board of Directors may appoint and empower, from time to time, Company representatives, including a managing director, a secretary, and assistant managing directors, assistant secretaries or other authorized representatives deemed necessary to conduct the operations and management of the Company.* The Board may revoke such appointments at any time. Authorized representatives need not be directors or shareholders of the Company. *Unless otherwise provided in these articles of*

2

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

*association, authorized representatives will have the powers and duties conferred upon them by the Board.*

The Board may appoint one or more directors or one or more other agents, who need not be shareholders of the Company, to manage the day-to-day business of the Company, subject to compliance with the provisions of Section 60 of the amended law of August 10, 1915 on business partnerships (the "1915 Law").

A copy of the certified translation of the articles of incorporation is attached as Exhibit E.

9.    Under both Luxembourg law, and the articles of incorporation of Universal Invest, the Universal Invest Board of Directors may thus lawfully appoint representatives to legally bind Universal Invest.

10.    I have received and reviewed a copy of a delegation of power from Universal Invest's board of directors to CADELUX S.A., which gives signatory powers to two directors of CADELUX S.A. to legally bind Universal Invest, a copy of which is attached hereto as Exhibit F, and a certified translation of which is attached as Exhibit G.

11.    I have received and reviewed a copy of a delegation of power from the Board of Directors of CADELUX S.A. to Mr Gilles Wéra and Mr Pierre Kempeneer, as employees with category B powers, to legally bind CADELUX S. A. which is attached as Exhibit H.

12.    Under Luxembourg law, and pursuant to the delegation of power from Universal Invest to CADELUX S.A. and from CADELUX S.A. to Mr. Gilles Wéra and Mr. Pierre Kempeneer, the joint signature of Mr. Gilles Wéra and Mr. Pierre Kempeneer thus legally binds Universal Invest.

13.    As stated in paragraph 6 of my declaration dated February 19, 2025, "The main feature of a UCITS SICAV is the segregation of assets between the compartments or sub-funds. Assets of each compartment or sub-funds are indeed segregated by law so that the rights of investors and creditors concerning a

3

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

compartment or sub-fund, or in connection with the creation, the operation, or the liquidation of that compartment or sub-fund, are limited to the assets of that compartment or sub-fund pursuant to the protected cell concept."

14.    As stated in paragraph 7 of my declaration dated February 19, 2025, "Within a UCITS SICAV, each compartment or sub-fund is treated as a separate entity having its own name, funding, capital gains, losses, and expenses, although compartments or sub-funds do not have a legal personality distinct from the UCITS SICAV."

15.    Each compartment or sub-fund of a SICAV operates as an independent and distinct entity with respect to investors, assets, liabilities, and legal claims. Consequently, if a compartment or sub-fund incurs a loss on an investment, the corresponding legal claim belongs solely to that specific compartment or sub-fund. Each compartment's financial position remains independent of the results of other compartments – meaning that gains or losses in one compartment do not and, in fact, cannot offset gains or losses in another. This also means that the gains and/or losses of the compartments are not and cannot be consolidated at the SICAV level. The compartments are the beneficial owners of their own assets, but the compartments act legally through the SICAV, which, in this instance, is Universal Invest.

16.    Compartments or sub-funds of a SICAV do not have legal personality. This means that while each compartment is treated as independent and separate in terms of investors, assets, liabilities, and legal claims, any legal action must be taken in the name of the SICAV itself for and on behalf of the specific compartment or sub-fund that is the beneficial owner of the legal claim.

17.    I have received and reviewed the Certification executed on 19/2/2025 by Mr. Wéra and on 20/2/2025 by Mr. Kempeneer, attached hereto as Exhibit I, as well as the delegations of power (Exhibit F and Exhibit H) mentioned under point 10 and 11 of this declaration and, while I express no opinion on U.S. law, under

4

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

Luxembourg law the Certification is properly and legally executed by authorized representatives.

Pursuant to the laws of the United States of America (28 U.S.C. §1746), I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge.  Executed this day in Luxembourg, Luxembourg.

OSCH & ARENDT

Dated:                          Signed:

*March 10th, 2025*            Cathy Arendt, Founding Partner

---

5

SUPPLEMENTAL DECLARATION OF CATHY ARENDT

# Exhibit A

# CURRICULUM VITAE



**Personal date :**

| | |
|---|---|
| Name : | **ARENDT** |
| First name : | Cathy |
| Nationality : | luxembourgish |
| Professional address : | 25C, Boulevard Royal |
| | L-2449 Luxembourg |

| | |
|---|---|
| Phone : | + 352 22 48 22 |
| Fax : | + 352 22 48 24 |
| E-mail : | arendt@oanda.lu |

| | |
|---|---|
| Date of birth : | 01 June 1966 |
| Birthplace : | Luxembourg |

**Schools :**

| | |
|---|---|
| 1972 – 1979 : | Primary school Ecole Privée Notre Dame St. Sophie Luxembourg |
| 1979 – 1985 : | Secondary education at Ecole Privée Notre Dame St. Sophie |
| 1985 – 1986 : | First year of university law studies Centre Univers    itaire de Luxembourg |
| 1986 – 1989 : | Law studies at the University Robert Schumann in Strasbourg, Degree Maîtrise en Droit Privé (Private Law) |
| 1990 : | D.E.A. in Private International Law – University Robert Schumann in Strasbourg |
| October 1990 – January 1991 : | Additional studies in Luxembourg law in Luxembourg |
| 19 March 1991 : | Sworn in as a lawyer, registered at the Luxembourg Bar Association |
| 1993 : | After two years of apprenticeship, successful completion with the bar exam |

**Professional career :**

| | |
|---|---|
| February 1991 – July 1997 : | Worked as a lawyer in the law firm NEU & UNSEN in Luxembourg, first as an apprentice, then as a lawyer. |
| 1997 : | Cofounder of the law firm OSCH & ARENDT together with Mr Gerry OSCH |
| 2000 – 2001 : | Member of the Supervisory Board of the Luxembourg Bar Association |
| 1997 – 2024 : | Partner in the law firm OSCH & ARENDT |

**Focal points of the work :**

Counselling and Litigation in :

Civil Law
Commercial and Corporate Law
Employment Law
Administrative Law

**Languages :**

| | |
|---|---|
| Mother tongue : | Luxembourgish |
| Professional languages: | French, English and German |

Luxembourg, 16th August 2024

Signature :

# Exhibit B

RCS
REGISTRE DE COMMERCE
ET DES SOCIÉTÉS

# EXTRAIT

## UNIVERSAL INVEST

Numéro d'immatriculation : **B47025**

## Date d'immatriculation

24/03/1994

## Dénomination

UNIVERSAL INVEST

## Forme juridique

Société d'investissement à capital variable

## Siège social

Numéro     Rue
287        Route d'Arlon
Code postal   Localité
1150        Luxembourg

## Objet social

La Société a pour objet exclusif de placer les fonds dont elle dispose en valeurs mobilières, instruments du marché monétaire et autres actifs autorisés par la Partie I de la Loi de 2010, dans le but de répartir les risques d'investissement et de faire bénéficier ses actionnaires des résultats de la gestion de son portefeuille. La Société peut prendre toutes mesures et faire toutes opérations qu'elle jugera utiles à l'accomplissement et au développement de son but au sens le plus large dans le cadre de la Partie I de la Loi de 2010. La Société est un organisme de placement collectif en valeurs mobilières (ci-après "OPCVM") au sens de la Loi de 2010.

## Capital social / Fonds social

Type
Variable

## Date de constitution

02/03/1994

## Durée

Illimitée

## Exercice social

| **Premier exercice ou exercice raccourci** | | **Exercice social** | |
|---|---|---|---|
| Du | Au | Du | Au |
| 01/04/2019 | 31/12/2019 | 01/01 | 31/12 |

## Code NACE [1]

64.302
Sociétés d'investissement à capital variable (SICAV)



## Administrateur(s) / Gérant(s)

Régime de signature statutaire
Vis-à-vis des tiers, la Société sera valablement engagée par la signature conjointe de deux administrateurs ou par la seule signature de toutes personnes auxquelles pareils pouvoirs de signature auront été délégués par le conseil d'administration.

### BLONDEAU Thierry

| Nom | Prénom(s) |
|---|---|
| BLONDEAU | Thierry |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 3 | Avenue des Myrtilles |

| Code postal | Localité | Pays |
|---|---|---|
| 1950 | Kraainem | Belgique |

**Type de mandat**

| Organe | Fonction |
|---|---|
| Conseil d'Administration | Administrateur |

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 03/05/2024 | Déterminée | 2025 |

### CAMMAERT Serge

| Nom | Prénom(s) |
|---|---|
| CAMMAERT | Serge |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 287 | Route d'Arlon |

| Code postal | Localité | Pays |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

**Type de mandat**

| Organe | Fonction |
|---|---|
| Conseil d'administration | Administrateur |

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 03/05/2024 | Déterminée | 2025 |

### HAVAUX Olivier

| Nom | Prénom(s) |
|---|---|
| HAVAUX | Olivier |

**Adresse privée ou professionnelle**

| Numéro | Rue |
|---|---|
| 287 | Route d'Arlon |

| Code postal | Localité | Pays |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

**Type de mandat**

| Organe | Fonction |
|---|---|
| Conseil d'Administration | Administrateur |

**Durée du mandat**

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 03/05/2024 | Déterminée | 2025 |

### HAVAUX Philippe

| Nom | Prénom(s) |
|---|---|
| HAVAUX | Philippe |



**RCS**

REGISTRE DE COMMERCE
ET DES SOCIÉTÉS

Page 3 / 5
B47025

**Adresse privée ou professionnelle**

Numéro     Rue
2              rue des Bleuets
Code postal   Localité     Pays
8448          Steinfort    Luxembourg

**Type de mandat**

Organe                          Fonction
Conseil d'administration        Administrateur

**Durée du mandat**

Date de nomination    Durée du mandat    jusqu'à l'assemblée générale qui se tiendra en l'année
03/05/2024           Déterminée         2025

## Délégué(s) à la gestion journalière

Régime de signature statutaire
Vis-à-vis des tiers, la Société sera valablement engagée par la signature conjointe de deux administrateurs ou par la seule signature de toutes personnes auxquelles pareils pouvoirs de signature auront été délégués par le conseil d'administration.

### BRUYNSEELS Chris

Nom            Prénom(s)
BRUYNSEELS     Chris

**Adresse privée ou professionnelle**

Numéro     Rue
178           Jan Van Rijswijklaan
Code postal   Localité     Pays
2020          Anvers       Belgique

**Type de mandat**

Fonction
Dirigeant

**Durée du mandat**

Date de nomination    Durée du mandat    jusqu'à l'assemblée générale qui se tiendra en l'année
05/06/2013           Déterminée         2014

### VAN DOOSSELAERE Arnaud

Nom                  Prénom(s)
VAN DOOSSELAERE      Arnaud

**Adresse privée ou professionnelle**

Numéro     Rue
72            Avenue de Tervueren
Code postal   Localité     Pays
1040          Bruxelles    Belgique

**Type de mandat**

Fonction
Dirigeant

**Durée du mandat**

Date de nomination    Durée du mandat    jusqu'à l'assemblée générale qui se tiendra en l'année
05/06/2013           Déterminée         2014

## Directeur général / Comité de direction

Régime de signature statutaire
Vis-à-vis des tiers, la Société sera valablement engagée par la signature conjointe de deux administrateurs ou par la seule signature de toutes personnes auxquelles pareils pouvoirs de signature auront été délégués par le conseil d'administration.

## Personne(s) chargée(s) du contrôle des comptes



## [2] **Deloitte Audit**

| N° d'immatriculation au RCS | Dénomination |
|---|---|
| B67895 | Deloitte Audit |

Forme juridique
Société à responsabilité limitée

### Siège social

| Numéro | Rue |
|---|---|
| 20 | Boulevard de Kockelscheuer |

| Code postal | Localité | Pays |
|---|---|---|
| 1821 | Luxembourg | Luxembourg |

### Type de mandat

Réviseur d'entreprises agréé

### Durée du mandat

| Date de nomination | Durée du mandat | jusqu'à l'assemblée générale qui se tiendra en l'année |
|---|---|---|
| 03/05/2024 | Déterminée | 2025 |

## Fusion / Scission

| Type d'opération | Forme |
|---|---|
| Fusion | Par absorption |

### J. VAN BREDA BEHEERSFONDS

| N° d'immatriculation au RCS | Dénomination |
|---|---|
| B58971 | J. VAN BREDA BEHEERSFONDS |

Forme juridique
Société d'investissement à capital variable

### Siège social

| Numéro | Rue |
|---|---|
| 287 | route d'Arlon |

| Code postal | Localité | Pays |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

### UNIVERSAL INVEST

| N° d'immatriculation au RCS | Dénomination |
|---|---|
| B47025 | UNIVERSAL INVEST |

Forme juridique
Société d'investissement à capital variable

### Siège social

| Numéro | Rue |
|---|---|
| 287 | Route d'Arlon |

| Code postal | Localité | Pays |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

### PORTFOLIO MULTI-MANAGER FUND

| N° d'immatriculation au RCS | Dénomination |
|---|---|
| B46872 | PORTFOLIO MULTI-MANAGER FUND |

Forme juridique
Société d'investissement à capital variable

### Siège social

| Numéro | Rue |
|---|---|
| 287 | Route d'Arlon |

| Code postal | Localité | Pays |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

**RCS**
REGISTRE DE COMMERCE
ET DES SOCIÉTÉS

**Pour extrait conforme** [3]

**Luxembourg, le 04/03/2025**

**Pour le gestionnaire du registre de commerce et des sociétés** [4]



Digitally signed by

Luxembourg Business Registers, g.i.e.

Claimed Signing Time: 2025-03-04 19:26:49
Commitment Type: Proof of Approval
Serial Number: 0019918185553403965l
Signature Policy: 1.3.171.1.4.1.3.2

eSign

[1] Information mise à jour mensuellement sur base de l'article 12§3 de la loi modifiée du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises.

[2] L'inscription a été faite suite à la loi du 27/05/2016 portant réforme du régime de publication légale relatif aux sociétés et associations

[3] En application de l'article 21 paragraphe 2 de la loi modifiée du 19 décembre 2002 concernant le registre de commerce et des sociétés ainsi que la comptabilité et les comptes annuels des entreprises et l'article 21 du règlement grand-ducal modifié du 23 janvier 2003 portant exécution de la loi du 19 décembre 2002, le présent formulaire reprend au moins la situation à jour des données communiquées au registre de commerce et des sociétés jusqu'à un jour avant la date d'émission dudit formulaire. Si une modification a été notifiée au registre de commerce et des sociétés entre temps, il se peut qu'elle n'ait pas été prise en compte lors de l'émission de ce formulaire.

[4] Le présent extrait est établi et signé électroniquement. Le gestionnaire du registre de commerce et des sociétés ne garantit l'authenticité de l'origine et l'intégrité des informations contenues sur le présent extrait par rapport aux informations inscrites au registre de commerce et des sociétés que si le présent extrait comporte une signature électronique émise par le gestionnaire du registre de commerce et des sociétés.

# Exhibit C

**RCS**

[logo]

TRADE AND
COMPANIES REGISTER

# EXTRACT

## UNIVERSAL INVEST

Registration number: **B47025**

## Registration date

03/24/1994

## Name

UNIVERSAL INVEST

## Legal form

Investment company with variable capital

## Headquarters

| Number | Street |
|---|---|
| 287 | Route d'Arlon |
| Zip code | City |
| 1150 | Luxembourg |

## Corporate purpose

The Company's exclusive purpose is to invest the funds at its disposal in transferable securities, money market instruments, and other assets authorized by Part I of the Law of 2010, with the aim of spreading investment risk and allowing its shareholders to benefit from the results of its portfolio management. The Company may take any measures and carry out any transactions that it deems useful to achieve and develop its purpose in the broadest sense within the framework of Part I of the Law of 2010. The Company is an undertaking for collective investment in transferable securities (hereinafter "UCITS") within the meaning of the Law of 2010.

## Share capital / Corporate funds

Type
Variable

## Date of incorporation

03/02/1994

## Duration

Unlimited

## Financial year

| First or shortened financial year | | Financial year | |
|---|---|---|---|
| From | To | From | To |
| 04/01/2019 | 12/31/2019 | 01/01 | 12/31 |

## NACE (Nomenclature statistique des activités économiques dans la Communauté européenne [Statistical Classification of Economic Activities in the European Community]) code [1]

64.302
Sociétés d'investissement à capital variable [Investment company with variable capital (SICAV)]

**LUXEMBOURG BUSINESS REGISTERS G.I.E.** T. {+352} 26 42 81 F. {+352} 26 42 85 55 WWW.LBR.LU
MAILING ADDRESS: L-2961 LUXEMBOURG | HEADQUARTERS: 31, AVENUE DE LA GARE L-1611 LUXEMBOURG | R.C.S. (Registre du Commerce et des Sociétés [Trade and Companies Register]) LUXEMBOURG 024

**RCS**

[logo]

TRADE AND
COMPANIES REGISTER

## Director(s) / Manager(s)

Statutory signature regime

With regard to third parties, the Company will be validly bound by the joint signature of two directors or by the sole signature of anyone to whom such signing authority has been delegated by the Board of Directors.

### BLONDEAU Thierry

| Last Name | First Name(s) | |
|---|---|---|
| BLONDEAU | Thierry | |

**Private or business address**

| Number | Street | |
|---|---|---|
| 3 | Avenue des Myrtilles | |
| ZIP Code | City | Country |
| 1950 | Kraainem | Belgium |

**Type of office**

| Body | | Position |
|---|---|---|
| Board of Directors | | Director |

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 05/03/2024 | Fixed | 2025 |

### CAMMAERT Serge

| Last Name | First Name(s) | |
|---|---|---|
| CAMMAERT | Serge | |

**Private or business address**

| Number | Street | |
|---|---|---|
| 287 | Route d'Arlon | |
| ZIP Code | City | Country |
| 1150 | Luxembourg | Luxembourg |

**Type of office**

| Body | | Position |
|---|---|---|
| Board of Directors | | Director |

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 05/03/2024 | Fixed | 2025 |

### HAVAUX Olivier

| Last Name | First Name(s) | |
|---|---|---|
| HAVAUX | Olivier | |

**Private or business address**

| Number | Street | |
|---|---|---|
| 287 | Route d'Arlon | |
| ZIP Code | City | Country |
| 1150 | Luxembourg | Luxembourg |

**Type of office**

| Body | | Position |
|---|---|---|
| Board of Directors | | Director |

**Term of office**

**RCS**

[logo]

TRADE AND
COMPANIES REGISTER

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 05/03/2024 | Fixed | 2025 |

### HAVAUX Philippe

| Last Name | First Name(s) |
|---|---|
| HAVAUX | Philippe |

**Private or business address**

| Number | Street | |
|---|---|---|
| 2 | Rue des Bleuets | |
| ZIP Code | City | Country |
| 8448 | Steinfort | Luxembourg |

**Type of office**

| Body | Position |
|---|---|
| Board of Directors | Director |

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 05/03/2024 | Fixed | 2025 |

## Operations manager(s)

Statutory signature regime

With regard to third parties, the Company will be validly bound by the joint signature of two directors or by the sole signature of anyone to whom such signing authority has been delegated by the Board of Directors.

### BRUYNSEELS Chris

| Last Name | First Name(s) |
|---|---|
| BRUYNSEELS | Chris |

**Private or business address**

| Number | Street | |
|---|---|---|
| 178 | Jan Van Rijswijklaan | |
| ZIP Code | City | Country |
| 2020 | Antwerp | Belgium |

**Type of office**

| Position |
|---|
| Manager |

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 06/05/2013 | Fixed | 2014 |

### VAN DOOSSELAERE Arnaud

| Last Name | First Name(s) |
|---|---|
| VAN DOOSSELAERE | Arnaud |

**Private or business address**

| Number | Street | |
|---|---|---|
| 72 | Avenue de Tervueren | |
| ZIP Code | City | Country |

## RCS

[logo]

TRADE AND
COMPANIES REGISTER

**Page 1 /5**
**B47025**

| 1040 | Brussels | Belgium |
|---|---|---|

**Type of office**

Position
Manager

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 06/05/2013 | Fixed | 2014 |

## Managing Director / Management Committee

Statutory signature regime

With regard to third parties, the Company will be validly bound by the joint signature of two directors or by the sole signature of anyone to whom such signing authority has been delegated by the Board of Directors.

## Statutory auditor(s)

[2] **Deloitte Audit**

| RCS registration no. | Name |
|---|---|
| B67895 | Deloitte Audit |

Legal form
Limited liability company

**Headquarters**

| Number | Street |
|---|---|
| 20 | Boulevard de Kockelscheuer |

| ZIP Code | City | Country |
|---|---|---|
| 1821 | Luxembourg | Luxembourg |

**Type of office**

Certified public accountant

**Term of office**

| Date appointed | Term of office | until the general meeting to be held in the year |
|---|---|---|
| 05/03/2024 | Fixed | 2025 |

## Merger / Demerger

| Type of operation | Form |
|---|---|
| Merger | Absorption |

**J. VAN BREDA BEHEERSFONDS**

| RCS registration no. | Name |
|---|---|
| B58971 | J. VAN BREDA BEHEERSFONDS |

Legal form
Investment company with variable capital

**Headquarters**

| Number | Street |
|---|---|
| 287 | Route d'Arlon |

| ZIP Code | City | Country |
|---|---|---|
| 1150 | Luxembourg | Luxembourg |

**UNIVERSAL INVEST**

| RCS registration no. | Name |
|---|---|
| B47025 | UNIVERSAL INVEST |

## RCS

[logo]
**Page 1 /5**
**B47025**

TRADE AND
COMPANIES REGISTER

Legal form
Investment company with variable capital
**Headquarters**

| Number | Street | |
|---|---|---|
| 287 | Route d'Arlon | |
| ZIP Code | City | Country |
| 1150 | Luxembourg | Luxembourg |

**UNIVERSAL INVEST**

| RCS registration no. | Name |
|---|---|
| B46872 | PORTFOLIO MULTI-MANAGER FUND |

Legal form
Investment company with variable capital
**Headquarters**

| Number | Street | |
|---|---|---|
| 287 | Route d'Arlon | |
| ZIP Code | City | Country |
| 1150 | Luxembourg | Luxembourg |

---

**Certified extract** [3]

**Luxembourg, 03/04/2025**

**For the manager of the Trade and Companies Register** [4]

Digitally signed by

Luxembourg Business Registers, g.i.e.

**Claimed Signing Time:** 2025-03-04 1 9:24:59 a.m.
**Commitment Type:** Proof of Approval
**Serial Number:** 001 99181 85553403965'
**Signature Policy:** 1.3.171.1.4.1.3.2

[logo:] *eSign*

[1]  Information updated monthly on the basis of Article 12, Section 3 of the amended Law of December 19, 2002 on the Trade and Companies Register, company accounts and annual financial statements.

[2]  Registration was done pursuant to the Law of 05/27/2016 reforming the legal announcement regime for corporations and associations.

[3]  Pursuant to Article 21, paragraph 2 of the amended Law of December 19, 2002 on the Trade and Companies Register, company accounts and annual financial statements and Article 21 of the amended Grand Ducal Regulation of January 23, 2003 implementing the Law of December 19, 2002, this form includes at least the current information reported to the Trade and Companies Register up to one day prior to the date on which this form is issued. If a change has been reported to the Trade and Companies Register in the meantime, it may not have been taken into account when this form was issued.

[4]  This extract has been prepared and signed electronically. The manager of the trade and companies register guarantees the authenticity of the origin and the integrity of the information contained in this extract with respect to the information recorded in the Trade and Companies Register only if this extract includes an electronic signature issued by the manager of the trade and companies register.

---

**LUXEMBOURG BUSINESS REGISTERS G.I.E.** T. {+352} 26 42 81 F. {+352} 26 42 85 55 WWW.LBR.LU
MAILING ADDRESS: L-2961 LUXEMBOURG | HEADQUARTERS: 31, AVENUE DE LA GARE L-1611 LUXEMBOURG | R.C.S. (Registre du Commerce et des Sociétés [Trade and Companies Register]) LUXEMBOURG 024



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Universal Invest RCS Extract**" is, to the best of my knowledge and belief, a true and accurate translation from Italian into English.

Jacqueline Yorke

Sworn to before me this
March 10, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

# Exhibit D

Document émis électroniquement

**Registre de Commerce et des Sociétés**

Numéro RCS : B47025
Référence de dépôt : L120028139
Déposé le 16/02/2012

---

**«UNIVERSAL INVEST»**

Société d'Investissement à Capital Variable

**<u>287, route d'Arlon,</u>**

**<u>L-1150 Luxembourg</u>**

R.C.S. Luxembourg, section B numéro 47 025

---

Statuts coordonnés déposés au Registre de Commerce et des Sociétés à Luxembourg, le

Pour mention afin de publication au Mémorial, Recueil des Sociétés et Associations.

Luxembourg, le 15 février 2012..

Document émis électroniquement

**Registre de Commerce et des Sociétés**

Numéro RCS : B47025
Référence de dépôt : L120028139
Déposé et enregistré le 16/02/2012

**STATUTS COORDONNES**
**à la date du 30 décembre 2011**

---

**«UNIVERSAL INVEST»**

Société d'Investissement à Capital Variable

**287, route d'Arlon,**

**L-1150 Luxembourg**

R.C.S. Luxembourg, section B numéro 47 025

---

Constituée suivant acte reçu par Maître Jacques Delvaux, alors notaire de résidence à Esch-sur-Alzette, en date du 2 mars 1994, publié au Mémorial, Recueil des Sociétés et Associations (le "Mémorial") numéro 156 du 21 avril 1994.

Les statuts de la Société ont été modifiés à plusieurs reprises et pour la dernière fois suivant acte notarié, en date du 2 mai 2006, publié au Mémorial numéro 1393 du 19 juillet 2006,

et suivant acte du notaire Gérard LECUIT, de résidence à Luxembourg, en date du 30 décembre 2011 (contenant refonte globale des statuts), en cours de publication au Mémorial,

**PAGE 1**

**Document émis électroniquement**

### Art 1er. Dénomination

Il existe entre les souscripteurs et tous ceux qui deviendront actionnaires par la suite une société anonyme fonctionnant sous la forme d'une société d'investissement à capital variable (SICAV) sous la dénomination UNIVERSAL INVEST (la "Société"). La Société est soumise aux dispositions de la Partie I de la loi du 17 décembre 2010 concernant les organismes de placement collectif (la "Loi de 2010").

### Art. 2. Siège social

Le siège social est établi à Luxembourg-Ville, Grand-Duché de Luxembourg. La Société peut établir, par simple décision du Conseil d'Administration de la Société (le "Conseil d'Administration") des filiales entièrement détenues, des succursales ou des bureaux tant dans le Grand-Duché de Luxembourg qu'à l'étranger. A l'intérieur de la commune de Luxembourg, le siège social peut être déplacé sur simple décision du Conseil d'Administration. Si et dans la mesure où la loi le permet, le Conseil d'Administration peut décider de transférer le siège social de la Société en tout autre endroit du Grand-Duché de Luxembourg.

Au cas où le Conseil d'Administration estimerait que des événements extraordinaires d'ordre politique ou militaire, de nature à compromettre l'activité normale au siège social ou la communication aisée avec ce siège ou de ce siège avec l'étranger se présentent ou paraissent imminents, il pourra transférer provisoirement le siège à l'étranger, jusqu'à cessation complète de ces circonstances anormales ; cette mesure provisoire n'aura toutefois aucun effet sur la nationalité de la Société, laquelle, nonobstant ce transfert provisoire, restera luxembourgeoise.

La déclaration de transfert du siège social sera faite et portée à la connaissance des tiers par l'un des organes exécutifs de la Société ayant qualité de l'engager pour les actes de gestion courante.

### Art. 3. Durée

La Société est établie pour une durée illimitée. Elle peut être dissoute par décision de l'assemblée générale des actionnaires (ci-après "l'Assemblée Générale") statuant dans les formes prescrites pour les modifications des statuts.

### Art. 4. Objet

La Société a pour objet exclusif de placer les fonds dont elle dispose en valeurs mobilières, instruments du marché monétaire et autres actifs autorisés par la Partie I de la Loi de 2010, dans le but de répartir les risques d'investissement et de faire bénéficier ses actionnaires des résultats de la gestion de son portefeuille.

La Société peut prendre toutes mesures et faire toutes opérations qu'elle jugera utiles à l'accomplissement et au développement de son but au sens le plus large dans le cadre de la Partie I de la Loi de 2010.

La Société est un organisme de placement collectif en valeurs mobilières (ci-après "OPCVM") au sens de la Loi de 2010.

### Titre II.  Capital social  Caractéristiques des actions

### Art. 5. Capital social    Compartiments d'actifs par catégories d'actions

Le capital social de la Société est représenté par des actions entièrement libérées sans mention de valeur nominale et il sera à tout moment égal à l'équivalent en euros de l'actif net de tous les compartiments réunis de la Société tel que défini à l'article 12 des présents statuts. Le capital minimum de la Société est à tout moment

Document émis électroniquement

égal au minimum prescrit par la Loi de 2010.Les actions peuvent, sur décision du Conseil d'Administration, appartenir à des catégories différentes, le produit de l'émission des actions de chaque catégorie étant investi, conformément à l'article 4 des présents statuts, principalement dans des valeurs mobilières, instruments du marché monétaire ou autres avoirs dans les limites de la Loi de 2010 correspondant à des zones géographiques, des secteurs économiques, des zones monétaires ou à un type spécifique d'investissement à déterminer par le Conseil d'Administration pour chacune des catégories d'actions. Les actifs relatifs à chaque catégorie d'actions constituent un compartiment distinct. Aux fins de clarification, toute référence à un "compartiment" telle que prévue ci-dessus est à comprendre comme une référence à un "compartiment" au sens de l'article 181 de la Loi de 2010.

### Art. 6. Classes d'actions

Le Conseil d'Administration peut décider, pour tout compartiment, de créer des classes d'actions de capitalisation et de distribution ainsi que des classes d'actions dont les caractéristiques sont décrites dans les documents de vente de la Société (ci-après le "Prospectus").

Une action de distribution est une action qui confère en principe à son détenteur le droit de recevoir un dividende en espèces.

Une action de capitalisation est une action qui en principe ne confère pas à son détenteur le droit de toucher un dividende.

Les actions des différentes classes confèrent à leurs détenteurs les mêmes droits, notamment en ce qui concerne le droit de vote aux Assemblées Générales. Selon les dispositions de l'Article 7, le droit de vote ne peut être exercé que pour un nombre entier d'actions.

Les dispositions des présents statuts applicables aux compartiments s'appliquent également, mutatis mutandis, aux classes d'actions.

### Art. 7. Forme des actions

Les actions sont émises sans mention de valeur nominale et entièrement libérées. Toute action, quel que soit le compartiment et la classe d'actions dont elle relève, pourra être émise:

1. Soit sous forme nominative au nom du souscripteur, matérialisée par une inscription du souscripteur dans le registre des actionnaires de la Société (le "Registre"), auquel cas un certificat d'inscription nominative pourra être remis à la demande expresse de l'actionnaire. Si un actionnaire désire que plus d'un certificat nominatif soit émis pour ses actions, le coût de ces certificats additionnels pourra être mis à sa charge.

Le Registre sera tenu par la Société ou par une ou plusieurs personnes désignées à cet effet par la Société. L'inscription doit indiquer le nom de chaque propriétaire d'actions nominatives, sa résidence ou son domicile élu, le nombre d'actions et de fractions d'actions nominatives qu'il détient et le montant payé sur chacune des actions. Tout transfert, entre vifs ou à cause de mort, d'actions nominatives sera inscrit au Registre, pareille inscription devant être signée par un ou plusieurs directeurs ou fondés de pouvoir de la Société, ou par une ou plusieurs autres personnes désignées à cet effet par le Conseil d'Administration.

Le transfert d'actions nominatives se fera par la remise à la Société des certificats représentant ces actions, ensemble avec tous autres documents de transfert exigés par la Société, ou bien, s'il n'a

Document émis électroniquement

pas été émis de certificats, par une déclaration de transfert écrite portée au Registre, datée et signée par le cédant et le cessionnaire ou par leurs mandataires justifiant des pouvoirs requis.

Chaque titulaire d'actions nominatives devra fournir à la Société une adresse à laquelle toutes les notifications et avis émanant de la Société pourront être envoyés. Cette adresse sera également inscrite au Registre.

Au cas où un actionnaire nominatif ne fournit pas d'adresse à la Société, mention pourra en être faite au Registre, et l'adresse de l'actionnaire sera censée être au siège social de la Société ou à telle autre adresse qui sera fixée par la Société, ceci jusqu'à ce qu'une autre adresse soit fournie à la Société par l'actionnaire. L'actionnaire pourra à tout moment faire changer l'adresse portée au Registre par une déclaration écrite envoyée à la Société à son siège social, ou à telle autre adresse qui pourra être fixée par la Société de temps à autre.

2. Soit sous forme d'actions au porteur. Elles sont émises sans mention de valeur nominale et entièrement libérées. Les certificats physiques représentatifs de ces actions sont disponibles dans des formes et coupures à déterminer par le Conseil d'Administration et renseignées dans le Prospectus. Les frais inhérents à la livraison physique de ces actions au porteur pourront être facturés au demandeur. Si un propriétaire d'actions au porteur demande l'échange de ses certificats contre des certificats de coupures différentes, le coût d'un tel échange pourra être mis à sa charge.

Un actionnaire peut demander, et cela à n'importe quel moment, l'échange de son action au porteur en action nominative, ou vice-versa. Dans ce cas, la Société sera en droit de faire supporter à l'actionnaire les dépenses encourues.

Les certificats d'actions seront signés par deux administrateurs. Les deux signatures pourront être soit manuscrites, soit imprimées, soit apposées au moyen d'une griffe. Toutefois, l'une des signatures pourra être apposée par une personne déléguée à cet effet par le Conseil d'Administration ; en ce cas, elle devra être manuscrite. La Société pourra émettre des certificats provisoires sous les formes qui seront déterminées par le Conseil d'Administration.

Les actions ne sont émises que sur acceptation de la souscription et réception du prix conformément à l'article 8 des présents statuts.

Les actions peuvent être émises en fractions d'actions jusqu'au dix-millième d'une action, en titres unitaires ou être représentées par des certificats représentatifs de plusieurs actions. Les parts fractionnées au porteur ne peuvent pas être livrées physiquement et seront en dépôt auprès de la Banque Dépositaire (tel que défini ci-après) sur un compte-titre à ouvrir à cet effet.

Les droits relatifs aux fractions d'actions sont exercés au prorata de la fraction détenue par l'actionnaire, excepté le droit de vote, qui ne peut être exercé que pour un nombre entier d'actions.

Lorsqu'un actionnaire peut justifier à la Société que son certificat d'actions a été égaré ou détruit, un duplicata peut être émis à sa demande aux conditions et garanties que la Société déterminera, notamment sous forme d'une assurance, sans préjudice de toute autre forme de garantie que la Société pourra choisir. Dès l'émission du nouveau certificat sur lequel sera mentionné qu'il s'agit d'un duplicata, le certificat original n'aura plus aucune valeur.

**PAGE 4**

Document émis électroniquement

Les certificats d'actions endommagés peuvent être échangés par la Société. Les certificats endommagés seront remis à la Société et annulés sur-le-champ. La Société peut à son gré mettre en compte à l'actionnaire le coût du duplicata ou du nouveau certificat ainsi que toutes les dépenses justifiées encourues par la Société en relation avec l'émission et l'inscription au registre ou avec la destruction de l'ancien certificat.

La Société ne reconnaît qu'un propriétaire par action. S'il y a plusieurs propriétaires par action, la Société aura le droit de suspendre l'exercice de tous les droits y attachés jusqu'à ce qu'une seule personne ait été désignée comme étant propriétaire à son égard.

**Art. 8. Emission des actions**

A l'intérieur de chaque compartiment, le Conseil d'Administration est autorisé, à tout moment et sans limitation, à émettre des actions supplémentaires, entièrement libérées, sans réserver aux actionnaires anciens un droit préférentiel de souscription.

Lorsque la Société offre des actions en souscription, le prix par action offerte, quels que soient le compartiment et la classe d'actions au titre desquels cette action est émise, sera égal à la Valeur Nette d'Inventaire de cette action telle que cette valeur est déterminée conformément à l'article 12 des présents statuts, augmenté d'une somme que le Conseil d'Administration considère comme appropriée pour couvrir les impôts et frais (y compris tous les droits de timbre et autres impôts, taxes gouvernementales, frais bancaires et de courtage, frais de transfert, d'enregistrement et autres frais et taxes incluant toute commission de dilution ("dilution levy")) ("frais de transaction") qui devraient être payés si tous les avoirs de la Société pris en considération pour l'évaluation de ses avoirs devaient être acquis et prenant en considération encore tous les facteurs qui, de l'avis du Conseil d'Administration, agissant prudemment et de bonne foi, doivent être considérés, plus telles commissions qui seront prévues dans le Prospectus, le prix ainsi déterminé pouvant être arrondi selon les modalités prévues au Prospectus.

A moins qu'il n'en soit autrement disposé dans le Prospectus, les souscriptions sont acceptées sur base du prix du premier Jour d'Evaluation, défini à l'article 13 des présents statuts, qui suit le jour de réception de la demande de souscription. Le prix déterminé sera payable endéans la période fixée par le Conseil d'Administration et mentionné dans le Prospectus après la date à laquelle la Valeur Nette d'Inventaire applicable aura été déterminée.

Les actions ne sont émises que sur acceptation de la souscription et réception du prix conformément à l'article 8 des présents statuts. A la suite de l'acceptation de la souscription et de la réception du prix, les actions souscrites sont attribuées au souscripteur.

Sous réserve de la réception de l'intégralité du prix de souscription, la livraison des titres, s'il y a lieu, interviendra normalement dans les quinze jours.

Les souscriptions peuvent également être effectuées par apport de valeurs mobilières et autres avoirs autorisés autres qu'en numéraire, sous réserve de l'accord du Conseil d'Administration et conformément aux lois et à la règlementation applicables. Ces valeurs mobilières et autres avoirs autorisés doivent satisfaire à la

Document émis électroniquement

politique et aux restrictions d'investissement, telles que définies pour chaque compartiment. Ils sont évalués conformément aux principes d'évaluation prévus dans le Prospectus. Un rapport spécial du Réviseur d'Entreprises Agréé de la Société confirmant la valeur de tout apport en nature sera établi dans la mesure requise par la loi ou le Conseil d'Administration, aux frais de l'actionnaire souscrivant à moins que le Conseil d'Administration n'estime cet apport comme étant dans l'intérêt du compartiment concerné, auquel cas tout ou partie de ces coûts pourront être supportés par le compartiment en question.

Le Conseil d'Administration peut déléguer à tout administrateur ou à tout directeur ou autre fondé de pouvoir de la Société, dûment autorisé à cette fin, la charge d'accepter les souscriptions, remboursements ou conversions et de payer ou recevoir en paiement le prix des actions nouvelles à émettre ou à racheter.

Toute souscription d'actions nouvelles doit, sous peine de nullité, être entièrement libérée et les actions émises portent même jouissance que les actions existantes le jour de l'émission.

### Art. 9. Remboursement des actions

Selon les modalités fixées ci-après et permises par le Prospectus, tout actionnaire a le droit de demander à tout moment à la Société qu'elle lui rachète tout ou partie des actions qu'il détient.

Le prix de remboursement d'une action, suivant le compartiment dont elle relève, sera égal à sa Valeur Nette d'Inventaire, telle que cette valeur est déterminée pour chaque classe d'actions, conformément à l'article 12 des présents statuts. Les remboursements sont basés sur le prix au premier Jour d'Evaluation qui suit le jour de réception de la demande de remboursement. Le prix de remboursement pourra être réduit de telles commissions de rachat à déterminer par le Conseil d'Administration, déduction faite encore d'une somme que le Conseil d'Administration considère comme appropriée pour couvrir les impôts et frais (y compris tous droits de timbre et autres impôts, taxes gouvernementales, frais bancaires et de courtage, frais de transfert, d'enregistrement et de certification et autres impôts et frais similaires en ce compris toute commission de dilution ("dilution levy") ("frais de transaction") qui devraient être payés si tous les avoirs de la Société pris en considération pour l'évaluation de ses avoirs devaient être réalisés et prenant en considération encore tous les facteurs qui, de l'avis du Conseil d'Administration, agissant prudemment et de bonne foi, doivent être considérés, le prix pouvant être arrondi vers le bas selon les modalités prévues au Prospectus dans la devise dans laquelle la classe d'actions concernée est libellée, cet arrondissement étant retenu par la Société.

Au cas où une demande de rachat d'actions aurait pour effet de réduire le nombre ou la Valeur Nette d'Inventaire totale des actions qu'un actionnaire détient dans un compartiment ou classe d'actions en-dessous de tel nombre ou de telle valeur déterminée par le Conseil d'Administration, ou si la demande de rachat porte sur des actions d'une valeur inférieure à un montant fixé par le Conseil d'Administration, la Société pourra obliger cet actionnaire au rachat de toutes ses actions relevant de ce compartiment ou classe d'actions.

En outre, si à une date déterminée, les demandes de rachat faites conformément à cet article et les demandes de conversion

**PAGE 6**

Document émis électroniquement

faites conformément à l'article 10 des présents statuts dépassent un certain seuil déterminé par le Conseil d'Administration par rapport au nombre d'actions en circulation dans un compartiment d'actions déterminé, le Conseil d'Administration peut décider que le rachat ou la conversion de tout ou partie de ces actions sera reporté pendant une période et aux conditions déterminées par le Conseil d'Administration, eu égard à l'intérêt de la Société. Ces demandes de rachat et de conversion seront traitées, lors du Jour d'Evaluation suivant cette période, prioritairement aux demandes introduites postérieurement.

En cas de demandes importantes de remboursement et/ou conversion au titre d'un compartiment, la Société se réserve en outre le droit de traiter ces remboursements au prix de remboursement tel qu'il aura été déterminé après qu'elle aura pu vendre les valeurs nécessaires dans les plus brefs délais et qu'elle aura pu disposer des produits de ces ventes. Une seule Valeur Nette d'Inventaire sera calculée pour toutes les demandes de remboursement ou conversion présentées au même moment. Ces demandes seront traitées prioritairement à toute autre demande.

Toute demande de remboursement doit être présentée par l'actionnaire par écrit au siège social de la Société à Luxembourg ou auprès d'une autre personne juridique mandatée pour le remboursement des actions. Elle doit préciser le nom de l'investisseur, le compartiment, la classe, le nombre de titres ou le montant à rembourser, ainsi que les instructions de paiement du prix de remboursement.

Le prix de remboursement sera payé au plus tard cinq jours ouvrables après la date à laquelle la Valeur Nette d'Inventaire applicable aura été déterminée, ou à la date à laquelle les certificats d'actions ont été reçus par la Société, si cette date est postérieure. Toute demande de remboursement est irrévocable, sauf en cas de suspension du calcul de la Valeur Nette d'Inventaire des actions.

La demande de remboursement doit être accompagnée du ou des certificats d'actions en bonne et due forme et des pièces nécessaires pour opérer leur transfert avant que le prix de remboursement ne puisse être payé.

Les actions rachetées par la Société seront annulées.

Le Conseil d'Administration peut décider d'effectuer le remboursement du prix de rachat à un actionnaire demandant le rachat de n'importe quelles de ses actions (pourvu que l'accord de l'actionnaire ait été obtenu) par un paiement en nature par attribution de valeurs provenant du portefeuille correspondant au(x) compartiment(s) concerné(s) dont la contre-valeur (déterminée de la manière prescrite à l'article douze) correspond à celle des actions à racheter. La nature ou le type d'avoirs à transférer en pareil cas seront déterminés sur une base équitable et raisonnable sans préjudicier les intérêts des autres détenteurs d'actions du ou des compartiment(s) en question et l'évaluation dont il sera fait usage sera confirmée par un rapport spécial du réviseur d'entreprises agréé de la Société dans la mesure requise par la loi applicable ou le Conseil d'Administration.

**Art. 10. Conversion des actions**

Chaque actionnaire a le droit, sous réserve des restrictions éventuelles du Conseil d'Administration, de passer d'un compartiment ou d'une classe d'actions à un autre compartiment ou à une autre

Document émis électroniquement

classe d'actions et de demander la conversion des actions qu'il détient au titre d'un compartiment ou d'une classe d'actions donné en actions relevant d'un autre compartiment ou d'une classe d'actions.

La conversion est basée sur les valeurs nettes d'inventaire, telles que ces valeurs sont déterminées conformément à l'article 12 des présents statuts, de la ou des classes d'actions des compartiments concernés au premier Jour d'Evaluation en commun qui suit le jour de réception des demandes de conversion et en tenant compte, le cas échéant, du taux de change en vigueur entre les devises des deux compartiments au Jour d'Evaluation. Le Conseil d'Administration pourra fixer telles restrictions qu'il estimera nécessaires à la fréquence des conversions et il pourra soumettre les conversions au paiement des frais et commissions dont il déterminera raisonnablement le montant.

Toute demande de conversion doit être présentée par l'actionnaire par écrit au siège social de la Société à Luxembourg ou auprès d'une autre personne juridique mandatée pour la conversion des actions. Elle doit préciser le nom de l'actionnaire, le compartiment et la classe des actions détenues, le nombre d'actions ou le montant à convertir, ainsi que le compartiment et la classe des actions à obtenir en échange. Elle doit être accompagnée des certificats d'actions éventuellement émis. Si des certificats d'actions nominatives ont été émis pour les actions de la classe d'origine, les nouveaux certificats ne seront établis aussi longtemps que les anciens certificats ne seront pas parvenus à la Société.

Le Conseil d'Administration pourra décider d'attribuer des fractions d'actions produites par le passage ou de payer les liquidités correspondantes à ces fractions aux actionnaires ayant demandé la conversion.

Les actions dont la conversion en d'autres actions a été effectuée, seront annulées.

### Art. 11. Restrictions à la propriété des actions

Le Conseil d'Administration pourra édicter les restrictions qu'il juge utiles, en vue d'assurer qu'aucune action de la Société ne sera acquise ou détenue par (a) une personne en infraction avec les lois ou les exigences d'un quelconque pays ou autorité gouvernementale ou (b) toute personne dont la situation, de l'avis du Conseil d'Administration, pourra amener la Société à encourir des charges fiscales ou d'autres désavantages financiers qu'autrement elle n'aurait pas encourus, y inclus l'obligation d'être enregistrée sous les lois relatives aux titres, aux investissements ou sous des lois similaires, ou en vertu de prescriptions étatiques ou réglementaires.

La Société pourra ainsi restreindre ou mettre obstacle à la propriété d'actions de la Société par toute personne physique ou morale et sans limite aucune par des ressortissants des Etats-Unis d'Amérique tels que définis ci-après (une « Personne Prohibée »).

A cet effet :

1. La Société pourra refuser l'émission d'actions et l'inscription du transfert d'actions lorsqu'il apparaît que cette émission ou ce transfert aurait ou pourrait avoir pour conséquence d'attribuer la propriété économique de l'action à une Personne Prohibée.

2. La Société pourra demander à toute personne figurant au Registre ou à toute autre personne qui demande à faire inscrire un transfert d'actions dans le Registre de lui fournir tous renseignements et certificats qu'elle estime nécessaires, éventuellement appuyés

Document émis électroniquement

d'une déclaration sous serment, en vue de déterminer si ces actions appartiennent ou vont appartenir en propriété effective à une Personne Prohibée.

3. La Société pourra procéder au remboursement forcé de toutes les actions détenues par une Personne Prohibée s'il apparaît que cette Personne Prohibée, soit seul, soit ensemble avec d'autres personnes, est le propriétaire effectif d'actions de la Société. Dans ce cas, la procédure suivante sera appliquée :

a) La Société enverra un préavis (appelé ci-après « l'avis de remboursement ») à l'actionnaire possédant les titres ou apparaissant au Registre comme étant le propriétaire des actions à racheter; l'avis de remboursement spécifiera les titres à racheter, le prix de remboursement à payer et l'endroit où ce prix sera payable. L'avis de remboursement peut être envoyé à l'actionnaire par lettre recommandée adressée à sa dernière adresse connue ou à celle inscrite au Registre. L'actionnaire en question sera obligé de remettre sans délai à la Société le ou les certificats, s'il y en a, représentant les actions spécifiées dans l'avis de remboursement.

Dès la fermeture des bureaux au jour spécifié dans l'avis de remboursement, l'actionnaire en question cessera d'être le propriétaire des actions spécifiées dans l'avis de remboursement; s'il s'agit d'actions nominatives, son nom sera rayé du registre; s'il s'agit d'actions au porteur, le ou les certificats représentatifs de ces actions seront annulés dans les livres de la Société.

b) Le prix auquel les actions spécifiées dans l'avis de remboursement seront rachetées (ci-après le « prix de remboursement ») sera égal à la Valeur Nette d'Inventaire des actions de la Société précédant immédiatement l'avis de remboursement. A partir de la date de l'avis de remboursement, l'actionnaire concerné perdra tous les droits d'actionnaire.

c) Le paiement sera effectué en la devise que déterminera le Conseil d'Administration. Le prix sera déposé par la Société auprès d'une banque, à Luxembourg ou ailleurs, spécifiée dans l'avis de remboursement, qui le transmettra à l'actionnaire en question contre remise du ou des certificats indiqués dans l'avis de remboursement. Dès après le paiement du prix effectué dans les conditions précitées, aucune personne intéressée dans les actions mentionnées dans l'avis de remboursement ne pourra faire valoir de droit à l'égard de ces actions ni ne pourra exercer aucune action contre la Société et ses avoirs, sauf le droit de l'actionnaire apparaissant comme étant le propriétaire des actions de recevoir le prix déposé (sans intérêts) à la banque contre remise des certificats.

d) L'exercice par la Société des pouvoirs conférés au présent article ne pourra en aucun cas être mis en question ou invalidé pour le motif qu'il n'y aurait pas preuve suffisante de la propriété des actions dans le chef d'une personne, ou qu'une action appartenait à une autre personne que ne l'avait admis la Société en envoyant l'avis de remboursement, à la seule condition que la Société exerce ses pouvoirs de bonne foi.

4. La Société pourra refuser, lors de toute Assemblée Générale d'actionnaires, le droit de vote à toute Personne Prohibée et à tout actionnaire ayant fait l'objet d'un avis de remboursement de ses actions.

Le terme «ressortissant des Etats-Unis d'Amérique» tel qu'il est utilisé dans les présents statuts a la même signification que dans la

**PAGE 9**

Document émis électroniquement

Regulation S, telle que modifiée, du United States Securities Act de 1933, tel que modifié (le "1933 Act") , dans le Foreign Account Tax Compliance Act, tel que modifié (le "FATCA") ou que dans toute autre réglementation ou loi qui deviendront applicables aux Etats-Unis d'Amérique et qui, dans le futur, remplaceront la Regulation S ,le 1933 Act ou le FATCA. Le Conseil d'Administration définira les termes "Personne des Etats-Unis d'Amérique" sur la base de ces dispositions et publiera cette définition dans le Prospectus.

En outre, le Conseil d'Administration peut restreindre l'émission et le transfert d'actions d'une classe d'actions à des investisseurs institutionnels au sens de l'article 174 de la Loi de 2010 ("Investisseur(s) Institutionnel(s)"). Le Conseil d'Administration peut discrétionnairement retarder l'acceptation de toute demande de souscription d'actions d'une classe d'actions réservée à des Investisseurs Institutionnels jusqu'à ce que la Société ait reçu une preuve suffisante que le demandeur soit un Investisseur Institutionnel. S'il apparaît, à n'importe quel moment, qu'un détenteur d'actions d'une classe d'actions réservée à des Investisseurs Institutionnels n'est pas un Investisseur Institutionnel, le Conseil d'Administration pourra convertir les actions concernées en actions d'une classe qui n'est pas réservée à des Investisseurs Institutionnels (sous réserve qu'il existe une classe avec des caractéristiques similaires) ou procéder au rachat forcé des actions des classes concernées, conformément aux dispositions prévues ci-dessus à cet article. Le Conseil d'Administration peut refuser de rendre effectif un transfert d'actions et par conséquent refuser que le transfert d'actions ne soit inscrit au Registre dans l'hypothèse où un tel transfert résulterait dans une situation où les actions d'une classe d'actions réservée à des Investisseurs Institutionnels seraient, suite au transfert, détenues par une personne n'étant pas un Investisseur Institutionnel. En sus de toute responsabilité découlant de la loi applicable, chaque actionnaire qui n'est pas un Investisseur Institutionnel et qui détient des actions d'une classe réservée à des Investisseurs Institutionnels devra réparer et indemniser la Société, le Conseil d'Administration, les autres actionnaires de la classe d'actions concernée et les agents de la Société pour tout dommage, perte ou dépense résultant de ou en connexion avec une telle détention lorsque l'actionnaire concerné a produit une documentation trompeuse ou fausse ou donné des informations trompeuses ou fausses pour établir faussement son statut d'Investisseur Institutionnel ou a manqué de notifier à la Société la perte de ce statut.

### Art. 12. Calcul de la Valeur Nette d'Inventaire des actions

La Valeur Nette d'Inventaire d'une action, quels que soient le compartiment ou la classe d'actions au titre desquels elle est émise, sera déterminée dans la devise choisie par le Conseil d'Administration par un chiffre obtenu en divisant, au Jour d'Evaluation défini à l'article 13 des présents statuts, les avoirs nets du compartiment concerné par le nombre d'actions émises au titre de ce compartiment et de cette classe, ajustée pour prendre en compte toutes commissions de souscription, les techniques de "swing pricing" ou dépenses fiscales que le Conseil d'Administration considère appropriées.  Le prix ainsi obtenu pourra être arrondi vers le haut ou le bas selon les modalités prévues au Prospectus.

Document émis électroniquement

L'évaluation des avoirs nets des différents compartiments se fera de la manière suivante :

Les actifs nets de la Société seront constitués par les avoirs de la Société tels que définis ci-après, moins les engagements de la Société tels que définis ci-après au Jour d'Evaluation auquel la Valeur Nette d'Inventaire des actions est déterminée.

I. Les avoirs de la Société comprennent :

a) toutes les espèces en caisse ou en dépôt y compris les intérêts courus et non échus;

b) tous les effets et billets payables à vue et les comptes exigibles, y compris les résultats de la vente de titres dont le prix n'a pas encore été encaissé;

c) tous les titres, parts, actions, obligations, droits d'option ou de souscription, et autres investissements et valeurs mobilières qui sont la propriété de la Société;

d) tous les dividendes et distributions à recevoir par la Société en espèces ou en titres dans la mesure où la Société pouvait raisonnablement en avoir connaissance (la Société pourra toutefois faire des ajustements en considération des fluctuations de la valeur marchande des valeurs mobilières occasionnées par des pratiques telles que la négociation ex-dividende ou ex-droit);

e) tous les intérêts courus et non échus produits par les titres qui sont la propriété de la Société, sauf toutefois si ces intérêts sont compris dans le principal de ces valeurs;

f) les frais de constitution de la Société dans la mesure où ils n'ont pas été amortis;

g) tous les autres avoirs de quelque nature qu'ils soient, y compris les dépenses payées d'avance.

La valeur de ces avoirs sera déterminée de la façon suivante:

a) La valeur des espèces en caisse ou en dépôt, des effets et des billets payables à vue et des comptes à recevoir, des dépenses payées d'avance, des dividendes et intérêts annoncés ou venus à échéance et non encore touchés est constituée par la valeur nominale de ces avoirs, sauf toutefois s'il s'avère improbable que cette valeur puisse être encaissée ; dans ce dernier cas, la valeur sera déterminée en retranchant un tel montant que la Société estimera adéquat en vue de refléter la valeur réelle de ces avoirs.

b) La valeur de toutes valeurs mobilières, instruments du marché monétaire et/ou instruments financiers dérivés qui sont cotées ou négociées sur une bourse de valeur officielle est déterminée suivant leur dernier cours de clôture disponible.

c) La valeur de toutes valeurs mobilières, instruments du marché monétaire et/ou instruments financiers dérivés qui sont négociés sur un autre marché réglementé, en fonctionnement régulier, reconnu et ouvert au public est déterminée suivant le dernier cours de clôture disponible.

d) Les instruments du marché monétaire et titres à revenu fixe pourront être évalués sur base du coût amorti, méthode qui consiste après l'achat à prendre en considération un amortissement constant pour atteindre le prix de remboursement à l'échéance du titre.

e) Les swaps sont évalués de bonne foi, sur base des titres sous-jacents (au cours de clôture ou au cours du moment) ainsi que sur base des caractéristiques des engagements sous-jacents.

f) La valeur de liquidation de tous les contrats à termes, forward, et contrats d'options (ou tout autre instrument financier

Document émis électroniquement

dérivé) qui ne sont pas négociés sur des bourses de valeurs ou d'autres marchés réglementés correspond à leur valeur de liquidation nette déterminée conformément aux politiques établies de bonne foi par le Conseil d'Administration et de manière consistante en fonction de chaque variété de contrats. La valeur de liquidation les contrats à termes, forward et contrats d'options (ou tout autre instrument financier dérivé) négociés sur des bourses de valeurs ou d'autres marchés réglementés sera basée sur le dernier prix disponible de ces contrats sur les bourses de valeurs et marchés réglementés sur lesquels ces contrats à termes, forward et contrats d'options (ou tout autre instrument financier dérivé) sont négociés par la Société; à condition que si un contrat à terme, un forward ou un contrat d'option (ou tout autre instrument financier dérivé) ne peut pas être liquidé au jour auquel les avoirs nets sont déterminés, la base qui servira à déterminer la valeur de liquidation de ce contrat sera déterminée par le Conseil d'Administration de façon juste et raisonnable.

g) La valeur des titres représentatifs de tout organisme de placement collectif sera déterminée suivant la dernière valeur nette d'inventaire officielle par part ou suivant la dernière valeur nette d'inventaire estimative si cette dernière est plus récente que la valeur nette d'inventaire officielle, à condition que la Société ait l'assurance que la méthode d'évaluation utilisée pour cette estimation est cohérente avec celle utilisée pour le calcul de la valeur nette d'inventaire officielle.

h) Dans la mesure où les valeurs mobilières, instruments du marché monétaire et/ou instruments financiers dérivés en portefeuille au Jour d'Evaluation ne sont cotées ou négociées ni à une bourse, ni sur un autre marché réglementé, en fonctionnement régulier, reconnu et ouvert au public ou au cas où, pour des valeurs cotées et négociées en bourse ou à un tel autre marché, le prix déterminé suivant les alinéas b) et c) n'est pas représentatif de la valeur réelle de ces valeurs mobilières, instruments du marché monétaire et/ou instruments financiers dérivés l'évaluation se base sur la valeur probable de réalisation, laquelle sera estimée avec prudence et bonne foi.

i) Les valeurs exprimées en une autre devise que celle des compartiments respectifs sont converties au dernier cours moyen connu.

Dans l'hypothèse où des circonstances extraordinaires rendraient une telle évaluation impraticable ou inadéquate, d'autres méthodes d'évaluation peuvent être employées si le Conseil d'Administration considère qu'une autre méthode reflète mieux la valeur ou la valeur liquidative des investissements et est conforme à la pratique comptable, de manière à obtenir une évaluation sincère des avoirs de la Société.

II. Les engagements de la Société comprennent :

a) tous les emprunts, effets échus et comptes exigibles,

b) tous les frais d'administration, échus ou dus, y compris mais non limités à la rémunération des Conseillers en Investissements, des Gestionnaires, du dépositaire, des mandataires et agents de la Société,

c) toutes les obligations connues et échues ou non échues, y compris toutes les obligations contractuelles venues à échéance qui ont pour objet des paiements soit en espèces, soit en biens, y compris le montant des dividendes annoncés par la Société mais non

**PAGE 12**

Document émis électroniquement

encore payés lorsque le Jour d'Evaluation coïncide avec la date à laquelle se fera la détermination de la personne qui y a ou aura droit,

d) une provision appropriée pour impôts sur le capital et sur le revenu, courus jusqu'au Jour d'Evaluation et fixée de temps à autre par le Conseil d'Administration et d'autres provisions autorisées ou approuvées par le Conseil d'Administration,

e) toutes autres obligations de la Société, de quelque nature que ce soit, à l'exception des engagements représentés par les moyens propres de la Société. Pour l'évaluation du montant de ces engagements, la Société prendra en considération toutes les dépenses à supporter par la Société y compris les frais de constitution, les commissions payables à ses conseillers en investissement ou gestionnaires, comptables, dépositaires, agents de transfert, agents payeurs et représentants permanents au lieu d'enregistrement, et tous autres agents employés par la Société, les honoraires pour conseils juridiques et services de vérification des comptes, les frais de promotion, d'impression et de publication, y compris le prix de publication ou de préparation et d'impression des Prospectus et des informations clés pour l'investisseur ou notices de dépôt, taxes ou charges gouvernementales, et toutes autres dépenses de fonctionnement, y compris le coût d'achat et de vente des avoirs, les intérêts, les frais de banque et de courtier, frais de timbres, de téléphone, de fax et de télex. La Société pourra calculer les dépenses administratives et autres, qui ont un caractère régulier ou périodique, par une estimation pour l'année ou toute autre période en répartissant le montant au prorata des fractions de cette période.

III. Les actifs nets attribuables à l'ensemble des actions d'un compartiment seront constitués par les actifs du compartiment moins les engagements du compartiment à la clôture du Jour d'Evaluation auquel la Valeur Nette d'Inventaire des actions est déterminée.

Lorsqu'à l'intérieur d'un compartiment donné, des souscriptions ou des remboursements d'actions ont lieu par rapport à des actions d'une classe spécifique, les actifs nets du compartiment attribuables à l'ensemble des actions de cette classe seront augmentés ou réduits des montants nets reçus ou payés par la Société en raison de ces souscriptions ou remboursements d'actions.

IV. Le Conseil d'Administration établira pour chaque compartiment une masse d'avoirs qui sera attribuée, de la manière qu'il est stipulé ci-après, aux actions émises au titre du compartiment et de la classe concernés conformément aux dispositions du présent article. A cet effet:

1. Les produits résultant de l'émission des actions relevant d'un compartiment donné seront attribués dans les livres de la Société à ce compartiment, et les avoirs, engagements, revenus et frais relatifs à ce compartiment, seront attribués à ce compartiment.

2. Lorsqu'un avoir découle d'un autre avoir, ce dernier avoir sera attribué, dans les livres de la Société, au même compartiment auquel appartient l'avoir dont il découle, et à chaque réévaluation d'un avoir, l'augmentation ou la diminution de valeur sera attribuée au compartiment auquel cet avoir appartient.

3. Lorsque la Société supporte un engagement qui est en relation avec un avoir d'un compartiment déterminé ou avec une opération effectuée en rapport avec un avoir d'un compartiment déterminé, cet engagement sera attribué à ce compartiment.

**PAGE 13**

4. Au cas où un avoir ou un engagement de la Société ne peut pas être attribué à un compartiment déterminé, cet avoir ou cet engagement sera attribué à tous les compartiments au prorata des valeurs nettes des actions émises au titre des différents compartiments. La Société constitue une seule et même entité juridique.

5. A la suite du paiement de dividendes à des actions de distribution relevant d'un compartiment donné, la valeur d'actif net de ce compartiment attribuable à ces actions de distribution sera réduite du montant de ces dividendes.

V. Pour les besoins de cet article :

1. chaque action de la Société qui sera en voie d'être rachetée suivant l'article 9 des présents statuts sera considérée comme action émise et existante jusqu'à la clôture du Jour d'Evaluation s'appliquant au remboursement de cette action et son prix sera, à partir de ce jour et jusqu'à ce que le prix en soit payé, considéré comme engagement de la Société;

2. chaque action à émettre par la Société en conformité avec des demandes de souscription reçues sera traitée comme étant émise à partir de la clôture du Jour d'Evaluation lors duquel son prix d'émission a été déterminé, et son prix sera traité comme un montant dû à la Société jusqu'à ce qu'il ait été reçu par elle;

3. tous investissements, soldes en espèces ou autres avoirs de la Société exprimés autrement qu'en la devise respective de chaque compartiment seront évalués en tenant compte des taux de change en vigueur à la date et à l'heure de la détermination de la Valeur Nette d'Inventaire des actions ; et

4. il sera donné effet, au Jour d'Evaluation, à tout achat ou vente de valeurs mobilières contracté par la Société, dans la mesure du possible.

VI. Dans la mesure et pendant le temps où, parmi les actions correspondant à un compartiment déterminé, des actions de différentes classes auront été émises et seront en circulation, la valeur de l'actif net de ce compartiment, établie conformément aux dispositions sub I à V du présent article, sera ventilée entre l'ensemble des actions de chaque classe.

Lorsqu'à l'intérieur d'un compartiment donné, des souscriptions ou des remboursements d'actions auront lieu par rapport à une classe d'actions, les avoirs nets du compartiment attribuables à l'ensemble des actions de cette classe seront augmentés ou réduits des montants nets reçus ou payés par la Société en raison de ces souscriptions ou remboursements d'actions. A tout moment donné, la Valeur Nette d'Inventaire d'une action relevant d'un compartiment et d'une classe déterminés sera égale au montant obtenu en divisant les avoirs nets de ce compartiment alors attribuables à l'ensemble des actions de cette classe, par le nombre total des actions de cette classe alors émises et en circulation.

**Art. 13. Fréquence et suspension temporaire du calcul de la Valeur Nette d'Inventaire des actions, des émissions, remboursements et conversions d'actions**

**I**. Fréquence du calcul de la Valeur Nette d'Inventaire

Dans chaque compartiment, la Valeur Nette d'Inventaire des actions, y compris le prix d'émission, de conversion et de remboursement qui en relève sera déterminé périodiquement par la Société ou par un tiers désigné par la Société, en aucun cas moins

**PAGE 14**

de deux fois par mois, à la fréquence que le Conseil d'Administration décidera (chaque tel jour au moment du calcul de la Valeur Nette d'Inventaire des avoirs étant désigné dans les présents statuts comme "Jour d'Evaluation").

Si un Jour d'Evaluation tombe sur un jour férié légal ou bancaire à Luxembourg, la Valeur Nette d'Inventaire des actions sera déterminée au Jour tel que précisé dans le Prospectus. Selon le volume des émissions, des rachats ou des conversions demandés par les actionnaires, la Société se réserve le droit de permettre un ajustement de la Valeur Nette d'Inventaire par action en prenant en compte des frais de transaction et autres coûts et charges fiscales dus lors de l'acquisition effective ou de la cession d'actifs de la catégorie concernée si le mouvement de capital net excède, en conséquence de l'ensemble de toutes les émissions, rachats ou conversions d'actions d'un tel compartiment, un seuil, tel que déterminé de temps en temps par la Société, du total des actifs nets des actions du compartiment à un Jour d'Evaluation donné (défini comme une technique de "swing pricing").

II. Suspension temporaire du calcul de la Valeur Nette d'Inventaire

Sans préjudice des causes légales de suspension, la Société peut suspendre le calcul de la Valeur Nette d'Inventaire des actions et l'émission, le remboursement et la conversion de ses actions, d'une manière générale, ou en rapport avec un ou plusieurs compartiments seulement, lors de la survenance des circonstances suivantes :

- pendant toute ou partie d'une période pendant laquelle l'une des principales bourses ou autres marchés auxquels une partie substantielle du portefeuille d'un ou de plusieurs compartiments est cotée, est fermée pour une autre raison que pour congé normal ou pendant laquelle les opérations y sont restreintes ou suspendues,

- lorsqu'il existe une situation d'urgence par suite de laquelle la Société ne peut pas disposer des avoirs d'un ou de plusieurs compartiments ou les évaluer,

- lorsque les moyens de communication nécessaires à la détermination du prix, de la valeur des avoirs ou des cours de bourse pour un ou plusieurs compartiments, dans les conditions définies ci-avant au premier tiret, sont hors de service,

- lors de toute période où la Société est incapable de rapatrier des fonds dans le but d'opérer des paiements sur le remboursement d'actions d'un ou de plusieurs compartiments ou pendant laquelle les transferts de fonds concernés dans la réalisation ou l'acquisition d'investissements ou de paiements dus pour le remboursement d'actions ne peuvent, dans l'opinion du Conseil d'Administration, être effectués à des taux de change normaux,

- en cas de publication de l'avis de réunion de l'Assemblée Générale à laquelle sont proposées (i) la dissolution et la liquidation de la Société ou d'un compartiment ou d'une classe d'action donnée ou, la décision du Conseil d'Administration de liquider un ou plusieurs compartiment(s), (ii) ou dans la mesure où une telle suspension est justifiée par la protection des actionnaires, suite à la publication de la convocation de l'Assemblée Générale devant se prononcer sur la fusion de la Société ou d'un compartiment, ou suite à la décision du Conseil d'Administration de fusionner un ou plusieurs compartiment(s), ou

- pendant toute période pendant laquelle, de l'avis du Conseil d'Administration, il existe des circonstances hors du contrôle de la Société qui rendraient impraticable ou inéquitable à l'égard des actionnaires la continuation des transactions portant sur un compartiment de la Société.

Une telle suspension du calcul de la Valeur Nette d'Inventaire sera portée pour les compartiments concernés par la Société à la connaissance des actionnaires désirant la souscription, le remboursement ou la conversion d'actions, lesquels pourront annuler leur ordre. Les autres actionnaires seront informés par un avis de presse. Pareille suspension n'aura aucun effet sur le calcul de la Valeur Nette d'Inventaire, l'émission, le remboursement ou la conversion des actions des compartiments non visés.

### TITRE III.    ADMINISTRATION ET SURVEILLANCE DE LA SOCIETE

#### Art. 14. Administrateurs

La Société est administrée par un Conseil d'Administration composé de trois membres au moins, actionnaires ou non. Les administrateurs sont nommés par l'Assemblée Générale pour une période d'un an renouvelable et resteront en fonction jusqu'à ce que leurs successeurs aient été élus.

Tout administrateur pourra être révoqué avec ou sans motif ou être remplacé à tout moment par décision de l'Assemblée Générale des actionnaires.

En cas de décès ou de démission d'un administrateur, il pourra être pourvu provisoirement à son remplacement en observant à ce sujet les formalités prévues par la loi. Dans ce cas, l'Assemblée Générale lors de sa première réunion procède à l'élection définitive.

#### Art. 15. Réunions du Conseil d'Administration

Le Conseil d'Administration choisira parmi ses membres un président, qui doit obligatoirement être une personne physique et qui pourra  désigner un ou plusieurs vice-présidents. Il peut également choisir un secrétaire qui ne fait pas obligatoirement partie du Conseil d'Administration et qui sera chargé de dresser les procès-verbaux des réunions du Conseil d'Administration et de l'Assemblée Générale.

Le Conseil d'Administration se réunit sur la convocation du président ou, à son défaut, de deux administrateurs, aussi souvent que l'intérêt de la Société l'exige, à l'endroit désigné dans les avis de convocation. Le président présidera toutes les Assemblées Générales des actionnaires et les réunions du Conseil d'Administration, mais en son absence, les actionnaires ou le Conseil d'Administration pourront désigner une autre personne comme président à titre temporaire par un vote pris à la majorité des voix exprimées ou des administrateurs présents à cette réunion, respectivement.

Avis écrit de toute réunion du Conseil d'Administration est donné à tous les administrateurs au moins vingt-quatre heures avant l'heure prévue pour la réunion, sauf s'il y a urgence, auquel cas la nature et les motifs de cette urgence sont mentionnés dans l'avis de convocation.  Il peut être passé outre à cette convocation sur accord écrit ou par télécopie ou tout autre moyen de télécommunication pouvant prouver le renoncement de chaque administrateur. Une convocation spéciale n'est pas requise pour une réunion du Conseil d'Administration se tenant à une heure et un endroit déterminés dans une résolution préalablement adoptée par le Conseil d'Administration.

Document émis électroniquement

Des administrateurs constituant au moins le tiers des membres du Conseil d'Administration peuvent, en indiquant l'ordre du jour de la séance, convoquer le conseil si celui-ci ne s'est pas réuni depuis plus de deux mois.

Le Conseil d'Administration ne peut valablement délibérer et statuer que si la moitié au moins de ses membres est présente ou représentée.

Tout administrateur peut donner par écrit, par télégramme, par e-mail ou par tout autre moyen approuvé par le Conseil d'Administration mandat à un de ses collègues pour le représenter à une réunion du Conseil d'Administration et y voter en ses lieu et place sur les points prévus à l'ordre du jour de la réunion. Un administrateur peut représenter plusieurs de ses collègues.

Un administrateur pourra également participer à toute réunion du Conseil d'Administration par vidéoconférence ou par tous autres moyens de télécommunication permettant l'identification de l'administrateur. De tels moyens de télécommunications doivent permettre à l'administrateur de participer effectivement à une telle réunion du Conseil d'Administration, dont le déroulement doit être retransmis de manière continue à un tel administrateur. Une telle réunion du Conseil d'Administration qui s'est tenue à distance par de tels moyens de communication est réputée avoir eu lieu au siège social de la Société. Les décisions sont prises à la majorité des voix des administrateurs présents ou représentés à une telle réunion. Pour le calcul du quorum et de la majorité, les administrateurs qui participent à la réunion du Conseil d'Administration par vidéoconférence ou par des moyens de télécommunication permettant leur identification seront réputés présents. En cas de partage, la voix de celui qui préside la réunion est prépondérante.

Les décisions du Conseil d'Administration peuvent également être prises par résolutions circulaires. Les décisions prises par voie circulaire de l'accord de tous les administrateurs sont valables et produisent effet au même titre que les décisions prises à une réunion dûment convoquée et tenue et peuvent résulter d'un seul ou de plusieurs écrits.

Les délibérations du Conseil d'Administration sont constatées par des procès verbaux signés par le président ou, à son défaut, par celui ayant présidé la réunion. Les copies ou extraits à produire en justice ou ailleurs sont signés par le président ou par deux administrateurs.

### Art. 16. Pouvoirs du Conseil d'Administration

Le Conseil d'Administration jouit des pouvoirs les plus étendus pour gérer les affaires sociales et pour effectuer les actes de disposition et d'administration qui rentrent dans l'objet social, sous réserve de l'observation de la politique d'investissement conformément à l'article 4 des présents statuts.

Tout ce qui n'est pas expressément réservé à l'Assemblée Générale des actionnaires par la loi ou par les statuts est de la compétence du Conseil d'Administration.

Le Conseil d'Administration, appliquant le principe de la répartition des risques, a le pouvoir de déterminer la politique d'investissement de chaque compartiment, la devise dans laquelle les actifs de chaque compartiment ou classe d'actions seront libellés ainsi que les lignes de conduite à suivre dans la gestion des actifs

Document émis électroniquement

relatifs à chaque compartiment dans les limites des restrictions d'investissement prévues par les lois et règlements applicables.

Le Conseil d'Administration fixera également toutes les restrictions d'investissements qui seront périodiquement applicables aux investissements des actifs  de la Société conformément à la Partie I de la Loi de 2010.

En tenant compte des restrictions décidées par le Conseil d'Administration en conformité avec les lois et règlements applicables et mentionnés dans le Prospectus, le Conseil d'Administration peut décider que les investissements de la Société soient faits (i) en valeurs mobilières et instruments du marché monétaire cotés ou négociés sur un marché réglementé tel que défini par la Loi de 2010, (ii) en valeurs mobilières et instruments du marché monétaire négociés sur un autre marché dans un Etat Membre de l'Union Européenne qui est réglementé, opère régulièrement, est reconnu et ouvert au public, (iii) en valeurs mobilières et instruments du marché monétaire admis à la cote officielle d'une bourse de valeurs en Europe de l'Est et de l'Ouest, Afrique, sur les continents Américains, Asie, Australie et Océanie ou négociés sur un autre marché dans les pays sub-mentionnés, sous condition qu'un tel marché soit réglementé, opère régulièrement et soit reconnu et ouvert au public, (iv) en valeurs mobilières et instruments du marché monétaire nouvellement émis, sous réserve que les conditions d'émission comportent l'engagement que la demande d'admission à la cote officielle d'une bourse de valeurs ou à un autre marché réglementé sus-mentionné, soit introduite et pour autant que cette admission soit effectuée endéans une année après l'émission; ainsi que (v) en tous autres titres, instruments ou autres valeurs endéans les restrictions déterminées par le Conseil d'Administration en accord avec les lois et réglementations applicables et prévues dans le Prospectus.

Un compartiment peut, dans la plus grande mesure permise par les lois et les règlements luxembourgeois, mais conformément aux dispositions figurant dans le Prospectus, investir dans un ou plusieurs autres compartiment(s) de la Société. Dans un tel cas, conformément aux lois et règlements en vigueur et au Prospectus, le droit de vote éventuellement attaché à de telles actions sera suspendu aussi longtemps qu'elles seront détenues par le compartiment en question. En toutes hypothèses, et aussi longtemps que les compartiments seront détenus par le compartiment concerné, leur valeur ne sera pas prise en compte pour le calcul de l'actif net de la Société aux fins de vérification du seuil minimum des actifs nets imposé par la Loi de 2010.

Le Conseil d'Administration de la Société peut décider d'investir jusqu'à cent pour cent du total des avoirs nets de chaque compartiment de la Société dans différents valeurs mobilières et instruments du marché monétaire émis ou garantis par tout Etat membre (au sens de la Loi de 2010), les autorités locales, un Etat non-Membre de l'Union Européenne tel qu'accepté par l'autorité de contrôle luxembourgeoise et mentionné dans le Prospectus de la Société (y compris, mais non limité aux pays membres de l'Organisation de Coopération et Développement Economique ("l'OCDE"), Brésil, l'Afrique du Sud, l'Indonésie, la Russie, et Singapour), ou organismes internationaux à caractère public dont font partie un ou plusieurs Etats membres de l'Union Européenne, à condition que, dans l'hypothèse où la Société décide de faire usage

**PAGE 18**

Document émis électroniquement

de cette disposition, elle détienne, pour ce compartiment, des valeurs appartenant à six émissions différentes au moins sans que les valeurs appartenant à une même émission puissent excéder les trente pourcent du total des avoirs nets du compartiment concerné.

Le Conseil d'Administration peut décider que les investissements de la Société soient faits en instruments financiers dérivés, y compris des instruments assimilables donnant lieu à un règlement en espèces, négociés sur un marché réglementé tel que défini par la Loi de 2010 et/ou des instruments financiers dérivés négociés de gré à gré à condition, entre autres, que le sous-jacent consiste en instruments relevant de l'article 41(1) de la Loi de 2010, en indices financiers, taux d'intérêts, taux de change ou en devises, dans lesquels la Société peut effectuer des placements conformément à ses objectifs d'investissement, tels qu'ils ressortent du Prospectus. En particulier, la Société pourra investir dans des instruments dérivés de crédit de tout type.

Le Conseil d'Administration peut décider que les investissements d'un compartiment soient faits de manière à ce qu'ils reproduisent la composition d'un indice d'actions ou d'obligations sous réserve que l'indice concerné soit reconnu par l'autorité de contrôle luxembourgeoise comme étant suffisamment diversifié, qu'il soit un étalon représentatif du marché auquel il se réfère et fasse l'objet d'une publication appropriée.

Le Conseil d'Administration peut à tout moment qu'il juge approprié et dans la plus large mesure permise par la législation et la réglementation luxembourgeoises, mais tout en conformité avec les dispositions énoncées dans le Prospectus, (i) créer un compartiment se qualifiant soit d'un OPCVM nourricier soit d'un OPCVM maître, (ii) convertir tout compartiment existant en un compartiment se qualifiant d'OPCVM nourricier ou (iii) remplacer l'OPCVM maître de chacun de ses compartiments se qualifiant d'OPCVM nourricier.

### Art. 17. Engagement de la Société vis-à-vis des tiers

Vis-à-vis des tiers, la Société sera valablement engagée par la signature conjointe de deux administrateurs ou par la seule signature de toutes personnes auxquelles pareils pouvoirs de signature auront été délégués par le Conseil d'Administration.

### Art. 18. Délégation de pouvoirs

Le Conseil d'Administration peut nommer, de temps à autre, des fondés de pouvoir de la Société, dont un directeur général, un secrétaire et des directeurs généraux adjoints, des secrétaires adjoints ou d'autres fondés de pouvoir jugés nécessaires pour conduire les opérations et la gestion de la Société. Pareilles nominations peuvent être révoquées à tout moment par le Conseil d'Administration. Les fondés de pouvoir n'ont pas besoin d'être administrateurs ou actionnaires de la Société. A moins que les présents statuts n'en disposent autrement, les fondés de pouvoir auront les pouvoirs et les charges qui leur auront été attribuées par le Conseil d'Administration.

Le Conseil d'Administration peut déléguer les pouvoirs relatifs à la gestion journalière des affaires de la Société, soit à un ou plusieurs administrateurs, soit à un ou plusieurs autres agents, qui ne doivent pas nécessairement être actionnaires de la Société, sous l'observation des dispositions de l'article 60 de la loi modifiée du 10 août 1915 sur les sociétés commerciales (la "Loi de 1915").

Document émis électroniquement

### Art. 19. Banque Dépositaire

La Société conclura une convention avec une banque luxembourgeoise, aux termes de laquelle cette banque assurera les fonctions de dépositaire des avoirs de la Société (la « Banque Dépositaire »), conformément à la Loi de 2010. Toutes les valeurs mobilières et autres avoirs de la Société seront détenues par ou pour compte du Dépositaire qui assumera vis-à-vis de la Société et de ses actionnaires les responsabilités prévues par la Loi de 2010. Au cas où la Banque Dépositaire souhaiterait démissionner, le Conseil d'Administration emploiera tous ses efforts pour trouver une société pour agir en remplacement de celle-ci et les administrateurs désigneront ainsi cette société en qualité de Banque Dépositaire à la place de la Banque Dépositaire démissionnaire. Les administrateurs pourront mettre fin aux fonctions de la Banque Dépositaire à moins que et jusqu'à ce qu'un successeur aura été désigné en qualité de Banque Dépositaire conformément à cette disposition et agira à sa place.

### Art. 20. Intérêt personnel des administrateurs

Aucun contrat ou autre transaction entre la Société et d'autres sociétés ou firmes ne sera affecté ou invalidé par le fait qu'un ou plusieurs administrateurs ou fondés de pouvoir de la Société y seront intéressés, ou en seront administrateur, associé, fondé de pouvoir ou employé. Un administrateur ou fondé de pouvoir de la Société qui remplira en même temps des fonctions d'administrateur, d'associé, de fondé de pouvoir ou d'employé d'une autre société ou firme avec laquelle la Société contractera ou entrera autrement en relations d'affaires, ne sera pas, pour le motif de cette appartenance à cette société ou firme, empêché de donner son avis et de voter ou d'agir quant à toutes questions relatives à un tel contrat ou opération.

Au cas où un administrateur ou fondé de pouvoir de la Société aurait un intérêt personnel dans une opération de la Société, il en informera le Conseil d'Administration et mention de cette déclaration sera faite au procès-verbal de la séance. Il ne donnera pas d'avis ni ne votera sur une telle opération. Cette opération et l'intérêt personnel lié à celle-ci seront portés à la connaissance des actionnaires lors de la prochaine Assemblée Générale des actionnaires.

Le terme «intérêt personnel», tel qu'énoncé dans la phrase qui précède, ne s'appliquera pas aux relations, ni aux intérêts qui pourraient exister, de quelque manière, en quelque qualité ou à quelque titre que ce soit, en rapport avec toute société ou entité juridique que le Conseil d'Administration pourra déterminer de temps à autre, discrétionnairement à moins que cet « intérêt personnel » ne soit considéré comme un intérêt conflictuel selon la loi et règlementation applicable.

### Art. 21. Indemnisation des administrateurs

La Société pourra indemniser tout administrateur ou fondé de pouvoir ainsi que leurs héritiers, exécuteurs testamentaires ou administrateurs légaux des dépenses raisonnablement encourues par eux en relation avec toute action, procédure ou procès auxquels ils seront partie prenante ou dans lesquels ils auront été impliqués en raison de la circonstance qu'ils sont ou ont été administrateur ou fondé de pouvoir de la Société, ou en raison du fait qu'ils l'ont été à la demande de la Société dans une autre société, dans laquelle la Société est actionnaire ou créancière, dans la mesure où ils ne sont

Document émis électroniquement

pas en droit d'être indemnisés par cette autre entité, sauf relativement à des matières dans lesquelles ils seront finalement condamnés pour négligence grave ou mauvaise administration dans le cadre d'une pareille action ou procédure ; en cas d'arrangement extrajudiciaire, une telle indemnité ne sera accordée que si la Société est informée par son conseil que la personne à indemniser n'a pas commis un tel manquement à ses devoirs. Le droit à indemnisation prédécrit n'exclura pas d'autres droits individuels dans le chef de ces personnes.

### Art. 22. Surveillance des comptes de la Société

Conformément à la Loi de 2010, tous les éléments de la situation patrimoniale de la Société seront soumis au contrôle d'un réviseur d'entreprises agréé. Celui-ci sera nommé par l'Assemblée Générale pour une période prenant fin le jour de la prochaine Assemblée Générale annuelle des actionnaires et il restera en fonction jusqu'à l'élection de son successeur. Le Réviseur d'Entreprises Agréé peut être remplacé à tout moment, par l'Assemblée Générale dans les conditions prévues par la législation et la règlementation luxembourgeoises.

## TITRE IV.   ASSEMBLEE GENERALE

### Art. 23. Représentation

L'Assemblée Générale représente l'universalité des actionnaires. Elle a les pouvoirs les plus larges pour ordonner, exécuter ou ratifier tous les actes relatifs aux opérations de la Société.

### Art. 24. Assemblée Générale annuelle

L'Assemblée Générale est convoquée par le Conseil d'Administration. Elle peut l'être sur demande d'actionnaires représentant le dixième du capital social de la Société.

L'Assemblée Générale annuelle se réunit conformément à la loi luxembourgeoise à Luxembourg au siège social de la Société ou à tout autre endroit indiqué dans la convocation, le premier mercredi du mois de juin à 14.00 heures. Si ce jour est férié, l'Assemblée Générale annuelle se réunira le premier jour ouvrable bancaire suivant. L'Assemblée Générale annuelle pourra se tenir à l'étranger si le Conseil d'Administration constate souverainement que des circonstances exceptionnelles le requièrent.

Dans la mesure permise et les conditions prévues par la législation et la réglementation luxembourgeoises, l'Assemblée Générale annuelle des actionnaires pourra se tenir à une autre date ou heure ou à un autre lieu que ceux prévus dans le paragraphe précédent, ces date, heure et place étant décidées par le Conseil d'Administration.

L'Assemblée Générale est convoquée dans les délais prévus par la Loi de 1915, par lettre adressée à chacun des actionnaires nominatif. Si des actions au porteur sont en circulation, la convocation fera l'objet d'avis dans les formes et délais prévus par la Loi de 1915.

L'avis de convocation de l'Assemblée Générale peut préciser que le quorum et la majorité applicables seront déterminés pas référence aux actions émises et en circulation à une certaine date et à une heure qui précèdent la convocation de l'Assemblée Générale

**Document émis électroniquement**

("Date d'Enregistrement"), considérant que le droit d'un actionnaire de participer à l'assemblée générale des actionnaires et le droit de vote attaché à ses actions sera déterminé par référence aux actions détenues par l'actionnaire à la Date d'Enregistrement. En outre, les actionnaires de chaque compartiment peuvent être constitués en Assemblée Générale séparée, délibérant et décidant aux conditions de présence et de majorité de la manière déterminée par la loi alors en vigueur pour les points suivants:

l. l'affectation du solde bénéficiaire annuel de leur compartiment;

2. dans les cas prévus par l'article 33 des statuts.

Les affaires traitées lors d'une Assemblée Générale des actionnaires seront limitées aux points contenus dans l'ordre du jour et aux affaires se rapportant à ces points.

### Art. 25. Réunions sans convocation préalable

Chaque fois que tous les actionnaires sont présents ou représentés et qu'ils déclarent se considérer comme dûment convoqués et avoir eu connaissance de l'ordre du jour soumis à leurs délibérations, l'Assemblée Générale peut avoir lieu sans convocations préalables.

### Art. 26. Votes

Chaque action, quel que soit le compartiment dont elle relève et quelle que soit sa Valeur Nette d'Inventaire dans le compartiment au titre duquel elle est émise, donne droit à une voix. Le droit de vote ne peut être exercé que pour un nombre entier d'actions.

Tout actionnaire peut prendre part aux Assemblées Générales en désignant par écrit, par e-mail, télécopieur, ou tout autre moyen de télécommunication permettant d'identifier un tel actionnaire, un autre actionnaire comme son mandataire, dans les délais et formes à fixer par le Conseil d'Administration.

Une telle procuration est considérée comme valable, à moins qu'elle n'ait été révoquée, pour toute Assemblée Générale reconvoquée ou ajournée.

Sur décision souveraine du Conseil d'Administration, un actionnaire peut également participer à toute assemblée par vidéoconférence ou tout autre moyen de communication permettant l'identification d'un tel actionnaire. De tels moyens doivent mettre l'actionnaire en mesure de participer de manière effective à une telle Assemblée Générale dont le déroulement doit être retransmis de manière continue à l'actionnaire concerné.

Le Conseil d'Administration peut déterminer toutes autres conditions à remplir par les actionnaires pour prendre part à l'Assemblée Générale.

### Art. 27. Quorum et conditions de majorité

L'Assemblée Générale délibère conformément aux prescriptions de la Loi de 1915.

Dans la mesure où il n'en est pas autrement disposé par la loi ou par les présents statuts, les résolutions de l'Assemblée Générale dûment convoquée sont prises à la majorité simple de voix exprimées. Les voix exprimées ne prennent pas en compte les voix des actions représentées à l'Assemblée Générale, pour lesquelles les actionnaires n'ont pas pris part au vote ou se sont abstenus ou ont retourné un vote en blanc ou nul.

**PAGE 22**

**TITRE V.    ANNEE SOCIALE    REPARTITION DES BENEFICES**

### Art. 28. Exercice social et monnaie de compte

L'exercice social de la Société commence le premier avril de chaque année et se termine le trente-et-un mars de l'année suivante.

Au cas où il existera différents compartiments, tel que prévu à l'article 5 des présents statuts, et si les comptes de ces compartiments sont exprimés en devises différentes, ces comptes seront convertis en euros et additionnés en vue de la détermination des comptes de la Société. Les comptes de la Société sont exprimés en euro.

### Art. 29. Répartition des bénéfices annuels

Dans tout compartiment, l'Assemblée Générale, sur proposition du Conseil d'Administration, déterminera le montant des dividendes à distribuer aux actions de distribution, dans les limites prévues par la Loi de 2010.

L'Assemblée Générale des actionnaires peut décider, pour chaque compartiment, de distribuer leur quote-part des revenus nets ainsi que les plus-values en capital réalisées ou non réalisées sous déductions des moins-values en capital réalisées ou non réalisées. De plus, les dividendes peuvent inclure une distribution de capital jusqu'à la limite du capital minimum légal prévu par la Loi de 2010. En tout état de cause et en ce qui concerne les actions de distribution, la Société distribuera annuellement, au minimum, l'ensemble des revenus d'intérêts recueillis, déduction faite des rémunérations, commissions et frais qui s'y rapportent proportionnellement.

La quote-part des revenus et gains en capital attribuable aux actions de capitalisation sera capitalisée.

Dans tous les compartiments, des dividendes intérimaires pourront être déclarés et payés par le Conseil d'Administration par rapport aux actions de distribution, sous l'observation des conditions légales alors en application.

Les dividendes pourront être payés dans la devise choisie par le Conseil d'Administration, en temps et lieu qu'il appréciera et au taux de change en vigueur à la date de mise en paiement. Tout dividende déclaré qui n'aura pas été réclamé par son bénéficiaire dans les cinq ans à compter de son attribution ne pourra plus être réclamé et reviendra à la Société. Aucun intérêt ne sera payé sur un dividende déclaré par la Société et conservé par elle à la disposition de son bénéficiaire.

### Art 30. Frais à charge de la Société

La Société supportera l'intégralité de ses frais d'exploitation, notamment :

- les honoraires et remboursements de frais du Conseil d'Administration ;

- la rémunération de la société de gestion, qui pourra être désignée par la Société et qui sera précisée dans ce cas dans le Prospectus, ainsi que la rémunération des gestionnaires, des conseillers en investissements, de la Banque Dépositaire, de l'administration centrale, des agents chargés du service financier, des agents payeurs, du réviseur d'entreprises agréé, des conseillers juridiques de la Société ainsi que d'autres conseillers ou agents auxquels la Société pourra être amenée à faire appel ;

- les frais de courtage ;

**PAGE 23**

Document émis électroniquement

- les frais de confection, d'impression et de diffusion du prospectus, des informations clés pour l'Investisseur et des rapports annuels et semestriels ;

- l'impression des certificats d'actions ;

- les frais et dépenses engagés pour la formation de la Société;

- les impôts, taxes et droits gouvernementaux en relation avec son activité ;

- les honoraires et frais liés à l'inscription et au maintien de l'inscription de la Société auprès des organismes gouvernementaux et des bourses de valeurs luxembourgeois et étrangers ;

- les frais de publication de la Valeur Nette d'Inventaire et du prix de souscription et de remboursement ;

- les frais en relation avec la commercialisation des actions de la Société.

La Société constitue une seule et même entité juridique. Les actifs d'un compartiment déterminé ne répondent que des dettes, engagements et obligations qui concernent ce compartiment. Les frais qui ne sont pas directement imputables à un compartiment sont répartis sur tous les compartiments au prorata des avoirs nets de chaque compartiment et sont imputés sur les revenus des compartiments en premier lieu.

Si le lancement d'un compartiment intervient après la date de lancement de la Société, les frais de constitution en relation avec le lancement du nouveau compartiment seront imputés à ce seul compartiment et pourront être amortis sur un maximum de cinq ans à partir de la date de lancement de ce compartiment.

**TITRE VI.   LIQUIDATION DE LA SOCIETE**

**Art. 31. Dissolution - Liquidation**

La Société pourra être dissoute, par décision d'une Assemblée Générale statuant suivant les dispositions de l'article 27 des statuts.

Dans le cas où le capital social de la Société est inférieur aux deux tiers du capital minimum, les administrateurs doivent soumettre la question de la dissolution de la Société à l'Assemblée Générale délibérant sans condition de présence et décidant à la majorité simple des actions représentées à l'Assemblée.

Si le capital social de la Société est inférieur au quart du capital minimum, les administrateurs doivent soumettre la question de la dissolution de la Société à l'Assemblée Générale délibérant sans condition de présence ; la dissolution pourra être prononcée par les actionnaires possédant un quart des actions représentées à l'Assemblée.

La convocation doit se faire de façon que l'Assemblée soit tenue dans le délai de quarante jours à partir de la constatation que l'actif net est devenu inférieur respectivement aux deux tiers ou au quart du capital minimum.

Les décisions de l'Assemblée Générale ou du tribunal prononçant la dissolution et la liquidation de la Société sont publiées au Mémorial et dans deux journaux à diffusion adéquate dont au moins un journal luxembourgeois. Ces publications sont faites à la diligence du ou des liquidateurs.

En cas de dissolution de la Société, il sera procédé à la liquidation par un ou plusieurs liquidateurs nommé conformément à la Loi de 2010 et aux statuts de la Société. Le produit net de la liquidation de chacun des compartiments sera distribué aux détenteurs d'actions de la classe concernée en proportion du nombre

**PAGE 24**

Document émis électroniquement

d'actions qu'ils détiennent dans cette classe. Les montants qui n'ont pas été réclamés par les actionnaires lors de la clôture de la liquidation seront consignés auprès de la Caisse de Consignation à Luxembourg par le compte de bénéficiaires conformément aux lois et à la règlementation en vigueur.

### Art. 32. Liquidation et fusion des compartiments

I. Liquidation d'un compartiment.

Le Conseil d'Administration pourra décider de la liquidation d'un ou de plusieurs compartiments (i) en vue d'une rationalisation de la gamme des compartiments offerts dans la Société ou (ii) si les actifs nets de ce compartiment deviennent inférieurs à un montant figurant dans le Prospectus ou (iii) si des changements importants dans la situation politique ou économique ou (iv) si l'intérêt des actionnaires rendent, dans l'esprit du Conseil d'Administration, cette décision nécessaire.

Dans les autres cas, l'Assemblée des Actionnaires d'un compartiment peut décider la liquidation d'un compartiment par l'annulation de toutes les actions de ce compartiment et le remboursement aux actionnaires de l'actif net de ce compartiment. Une telle décision n'est soumise à aucune exigence de quorum et sera prise à la majorité simple. Sauf décision contraire du Conseil d'Administration justifiée afin de sauvegarder l'intérêt ou le traitement égalitaire des actionnaires, la Société pourra, en attendant la mise à exécution de la décision de liquidation, continuer à racheter les actions du compartiment dont la liquidation est décidée.

Pour ces remboursements, la Société se basera sur la Valeur Nette d'Inventaire, qui sera établie de façon à tenir compte des frais de liquidation, mais sans déduction d'une commission de remboursement ou d'une quelconque autre retenue.

Les frais d'établissement activés sont à amortir intégralement dès que la décision de liquidation est prise.

Les montants qui n'ont pas été réclamés par les actionnaires ou ayants droit lors de la clôture de la liquidation du ou des compartiments seront consignés auprès de la Caisse de Consignation à Luxembourg pour compte de leurs bénéficiaires conformément aux lois et à la règlementation en vigueur. A défaut de réclamation endéans la période de prescription légale, les montants consignés ne pourront plus être retirés.

Lorsqu'elle est valablement prise par le Conseil d'Administration ou par l'Assemblée Générale, la décision de liquidation doit faire l'objet d'une publication selon les règles de publicité prévues en ce qui concerne les avis aux actionnaires dans le Prospectus de la Société.

Le Conseil d'Administration dans les hypothèses prévues ci-dessus ou à défaut, l'Assemblée Générale des détenteurs d'actions d'un compartiment ou d'une classe d'actions, peuvent décider, sans exigence de quorum et à la majorité simple, du fractionnement des actions de ce compartiment ou classe d'actions.

Toute fusion d'un compartiment pourra être décidée par le Conseil d'Administration à moins que le Conseil d'Administration ne décide de soumettre la décision sur la fusion à l'Assemblée Générale des actionnaires du compartiment concerné. Les dispositions relatives aux fusions d'OPCVM prévues par la Loi de 2010 et la réglementation y relative seront d'application. Aucun quorum n'est requis pour la décision de l'Assemblée Générale et les décisions sont

Document émis électroniquement

approuvées à la majorité simple des voix exprimées. Si à la suite d'une fusion d'un compartiment la Société devait cesser d'exister, la fusion devra être décidée par l'Assemblée Générale des actionnaires statuant conformément aux exigences en matière de majorité et de quorum requis pour la modification des statuts.

## TITRE VII.    MODIFICATION DES STATUTS    LOI APPLICABLE

### Art. 33. Modification des statuts

Les présents statuts pourront être modifiés par une Assemblée Générale soumise aux conditions de quorum et de majorité requises par la loi luxembourgeoise. Toute modification des statuts affectant les droits des actions relevant d'un compartiment donné par rapport aux droits des actions relevant d'autres compartiments, de même que toute modification des statuts affectant les droits des actions d'une classe d'actions par rapport aux droits des actions d'une autre classe d'actions, sera soumise aux conditions de quorum et de majorité telles que prévues par l'article 68 de la Loi de 1915.

### Art. 34. Loi applicable

Pour tous les points non spécifiés dans les présents statuts, les parties se réfèrent et se soumettent aux dispositions de la Loi de 1915  ainsi qu'à la Loi de 2010.

POUR COPIE CONFORME DES STATUTS COORDONNES
Luxembourg, le 15 février 2012.

**PAGE 26**

# Exhibit E

**Document issued electronically**

**Trade and Companies Register**
RCS number: B47025
Filing number: L120028139
Filed on 02/16/2012

> **"UNIVERSAL INVEST"**
>
> Investment Company with Variable Capital
>
> **287 Route d'Arlon,**
>
> **L-1150 Luxembourg**
>
> Luxembourg R.C.S. (Registre du Commerce et des Sociétés [Trade and Companies Register]), section B number 47 025

Consolidated Articles of Association filed with the Trade and Companies Register in Luxembourg, on

For annotation and publication in the Mémorial, Recueil des Sociétés et Associations. [Directory of Companies and Associations].

Luxembourg, February 15, 2012.

**Document issued electronically**

**Trade and Companies Register**
Trade and Companies Register
RCS number: B47025
Filing number: L120028139 Filed on 02/16/2012

---

### "UNIVERSAL INVEST"

Investment Company with Variable Capital

### **287 Route d'Arlon,**

### **L-1150 Luxembourg**

Luxembourg R.C.S. (Registre du Commerce et des Sociétés [Trade and Companies Register]), section B number 47 025

---

Incorporated pursuant to an act recorded by Mr. Jacques Delvaux, then notary residing in Esch-sur-Alzette, dated March 2, 1994, published in the Mémorial, Recueil des Sociétés et Associations (the "Mémorial") number 156 of April 21, 1994.

The Company's articles of association have been amended several times, most recently pursuant to a notarial act dated May 2, 2006, published in Mémorial No, 1393 of July 19, 2006,

and pursuant to a notarial act recorded by Gérard Lecuit, notary residing in Luxembourg, dated December 30, 2011 (containing an overall revision of the articles of association), currently pending publication in the Mémorial,

**CONSOLIDATED ARTICLES OF ASSOCIATION as of December 30, 2011**

**Document issued electronically**

### Art. 1. Name

A limited company operating as a société d'investissement à capital variable [investment company with variable capital (SICAV)] under the name UNIVERSAL INVEST (the "Company") has been formed between the subscribers and all subsequent shareholders. The Company is governed by the provisions of Part I of the Law of December 17, 2010 concerning collective investment undertakings (the "Law of 2010").

### Art. 2. Headquarters

Its headquarters are in Luxembourg-City, Grand Duchy of Luxembourg. By simple decision of the Company's Board of Directors (the "Board"), the Company may establish wholly-owned subsidiaries, branches or offices both in the Grand Duchy of Luxembourg and abroad. The headquarters may be relocated within the municipality of Luxembourg by simple decision of the Board. If and to the extent permitted by law, the Board may decide to transfer the Company's headquarters to any other location in the Grand Duchy of Luxembourg.

Should the Board find that exceptional political or military events of such a nature as to jeopardize regular business operations at the headquarters or normal communication between said headquarters and other countries are occurring or appear imminent, it may provisionally transfer the headquarters abroad until such abnormal circumstances have ceased; this provisional measure will have no effect on the Company's nationality, which, notwithstanding this provisional transfer, will remain Luxembourgish.

The transfer of the Company's headquarters will be announced and notified to third parties by one of the Company's executive bodies empowered to bind the Company for day-to-day management purposes.

### Art. 3. Term

The Company is incorporated for an unlimited term. It may be dissolved by a resolution of the general meeting of shareholders (hereinafter referred to as the "General Meeting") adopted in accordance with the statutory procedure for amending the articles of association.

### Art. 4. Purpose

The Company's exclusive purpose is to invest the funds at its disposal in transferable securities, money market instruments, and other assets authorized by Part I of the Law of 2010, with the aim of spreading investment risk and allowing its shareholders to benefit from the results of its portfolio management.

The Company may take any measures and carry out any transactions that it deems useful to achieve and develop its purpose in the broadest sense within the framework of Part I of the Law of 2010.

The Company is an undertaking for collective investment in transferable securities (hereinafter "UCITS") within the meaning of the Law of 2010.

### Section II. Share Capital Description of Shares
### Art. 5. Share Capital  Sub-Funds by Share Class

The Company's share capital consists of fully paid-up shares with no par value and will at all times be equal to the euro equivalent of the net assets of all the Company's sub-funds combined, as defined in Article 12 of these articles of association. The Company's minimum capital is at all times equal

**PAGE 2**

**Document issued electronically**

to the minimum prescribed by the Law of 2010. The Board may decide that shares belong to different classes, the income from the issue of shares of each class being invested, in accordance with Article 4 of these articles of association, mainly in transferable securities, money market instruments or other assets within the limits of the Law of 2010 corresponding to geographical areas, economic sectors, currency zones or a specific type of investment to be determined by the Board for each class of shares. The assets relating to each class of shares constitute a separate sub-fund. For clarification purposes, any reference to a "sub-fund" as provided for above is to be understood as a reference to a "sub-fund" within the meaning of Section 181 of the Law of 2010.

### Art. 6. Share Classes

For any sub-fund, the Board may decide to create accumulation and distribution share classes, as well as share classes of which the particulars are outlined in the Company's prospectus (hereinafter the "Prospectus").

A distribution share is a share that, in principle, entitles its holder to a cash dividend.

An accumulation share is a share that does not, in principle, entitle its holder to a dividend.

The shares in the various classes confer the same rights on their holders, particularly with regard to voting rights at General Meetings. In accordance with the provisions of Article 7, voting rights may only be exercised in respect of a whole number of shares.

The provisions of these articles of association applicable to the sub-funds also apply, mutatis mutandis, to the share classes.

### Art. 7. Types of Shares

Shares are issued with no par value and are fully paid up. All shares, regardless of the sub-fund or share class to which they belong, may be issued:

1. Either as registered shares in the name of the subscriber, evidenced by a record of the subscriber in the Company's shareholder register (the "Register"), in which case a certificate of registration may be issued at the express request of the shareholder. Shareholders wishing to have more than one registered certificate issued for their shares may be charged for the cost of these additional certificates.

The Register will be kept by the Company or by one or more people appointed for this purpose by the Company. The registration must state the name of each owner of registered shares, his or her residential address or address for service, the number of shares and fractions of registered shares held and the amount paid on each share. All transfers of registered shares, whether inter vivos or mortis causa, must be recorded in the Register and signed by one or more of the Company's directors or authorized signatories, or by one or more other people duly appointed by the Board.

Transfers of registered shares will take place by delivery to the Company of the certificates for such shares, together with any other transfer documents required by the Company, or, if no certificates have been issued, by a written statement of transfer entered in the Register, dated and signed by the transferor and the transferee or by their agents with the requisite authority.

**PAGE 3**

**Document issued electronically**

Each holder of registered shares must provide the Company with an address to which all notifications and notices from the Company may be sent. This address will also be recorded in the Register.

If a registered shareholder does not provide the Company with an address, a note to this effect may be made in the Register and the shareholder's address will be deemed to be that of the Company's headquarters or such other address as may be determined by the Company, until such time as the shareholder provides the Company with another address. Shareholders may at any time change their address of record in the Register by written notice to the Company at its headquarters, or at any other address as may be designated by the Company from time to time.

2. Or as bearer shares. These shares are issued with no par value and are fully paid up. Physical certificates for these shares are available in forms and denominations to be determined by the Board and detailed in the Prospectus. The costs associated with the physical delivery of these bearer shares may be charged to the requester. Owners of bearer shares who wish to exchange their certificates for certificates of different denominations may be charged for the cost of such exchange.

Shareholders may request the exchange of their bearer shares for registered shares, or vice versa, at any time. In this case, the Company will be entitled to charge the shareholder for the expenses incurred.

Share certificates will be signed by two directors. Both signatures may be handwritten, printed or affixed by means of a stamp. However, one of the signatures may be affixed by someone appointed for this purpose by the Board; in this case, the signature must be handwritten. The Company may issue provisional certificates in the forms determined by the Board of Directors.

Shares are issued only upon acceptance of the subscription and receipt of the price in accordance with Article 8 of these articles of association.

Shares may be issued in fractions of shares up to one ten-thousandth of a share, in unit securities, or be represented by certificates representing several shares. Fractional bearer shares cannot be physically delivered and will be deposited with the Depository Bank (as defined below) in a securities account to be opened for this purpose.

Rights relating to fractions of shares are exercised in proportion to the fraction held by the shareholder, with the exception of voting rights, which can only be exercised for a whole number of shares.

If a shareholder can prove to the Company that his or her share certificate has been lost or destroyed, a duplicate may be issued at the shareholder's request, subject to such conditions and guarantees as the Company may determine, in particular in the form of insurance, without prejudice to any other form of guarantee that the Company may choose. Upon issuance of the new certificate, which will be marked as a duplicate, the original certificate will no longer have any value.

**PAGE 4**

**Document issued electronically**

The Company may exchange damaged share certificates. Damaged certificates are to be returned to the Company and will be cancelled immediately. The Company may, at its discretion, charge the shareholder for the cost of the duplicate or new certificate as well as any substantiated expenses incurred by the Company in connection with the issuance and registration in the Register or with the destruction of the old certificate.

The Company recognizes only one owner per share. If there is more than one owner per share, the Company will be entitled to suspend the exercise of all rights attached thereto until such time as a single person has been named as the owner of such share.

### Art. 8. Issuance of Shares

Within each sub-fund, the Board of Directors is authorized, at any time and without limitation, to issue additional fully paid-up shares, without granting preferential subscription rights to existing shareholders.

When the Company offers shares for subscription, the price per share offered, irrespective of the sub-fund and share class for which such share is issued, will be equal to the Net Asset Value of such share as determined in accordance with Article 12 of these articles of association, increased by an amount that the Board considers appropriate to cover taxes and fees (including all stamp duties and other taxes, government taxes, bank and brokerage fees, transfer fees, registration and other fees and taxes, including any dilution levy) ("transaction fees") that would be payable if all of the Company's assets taken into consideration for the valuation of its assets were to be acquired, and further considering all factors which, in the opinion of the Board, acting prudently and in good faith, must be considered, increased by such commissions as will be provided for in the Prospectus, the price so determined being subject to rounding as provided for in the Prospectus.

Unless otherwise stipulated in the Prospectus, subscriptions are accepted on the basis of the price on the first Valuation Day, as defined in Article 13 of these articles of association, following the day on which the subscription request is received. The price set will be payable within the period set by the Board and listed in the Prospectus after the date on which the applicable Net Asset Value has been determined.

Shares are issued only upon acceptance of the subscription and receipt of the price in accordance with Article 8 of these articles of association. After acceptance of the subscription and receipt of the price, the subscribed shares are allocated to the subscriber.

Subject to receipt of the full subscription price, the securities will normally be delivered within two weeks.

Subscriptions may also be made through the contribution of transferable securities and other authorized assets other than cash, subject to the approval of the Board and in accordance with applicable laws and

**PAGE 5**

**Document issued electronically**

regulations. These transferable securities and other authorized assets must comply with the investment policy and restrictions defined for each sub-fund. They are valued in accordance with the valuation principles set out in the Prospectus. A special report by the Company's Certified Public Accountant confirming the value of any contribution in kind will be drawn up to the extent required by law or by the Board, at the expense of the subscribing shareholder unless the Board considers such contribution to be in the interest of the sub-fund concerned, in which case all or part of such costs may be met by the sub-fund in question.

The Board may appoint any director, manager or other duly authorized Company officer to accept subscriptions, redemptions or conversions and to pay or receive payment of the price of new shares to be issued or redeemed.

All subscriptions for new shares must be fully paid up, failing which they will be null and void. The shares issued carry the same dividend rights as existing shares on the date of issue.

### Art. 9. Share Buybacks

In accordance with the terms and conditions set out below and permitted by the Prospectus, any shareholder has the right to ask the Company at any time to buy back all or part of the shares he or she holds.

Depending on the sub-fund to which it belongs, the buyback price of a share will be equal to its net asset value, as determined for each share class in accordance with Article 12 of these articles of association. Buybacks are based on the price on the first Valuation Day following the day on which the buyback request is received. The buyback price may be reduced by such buyback charges as may be determined by the Board of Directors, less such other amounts as the Board deems appropriate to cover taxes and fees (including all stamp duties and other taxes, government levies, banking and brokerage fees, transfer fees, registration and certification fees and other similar taxes and fees, including any dilution levy ("transaction fees") that would be payable if all of the Company's assets taken into consideration for the valuation of its assets were to be realized, and further considering all factors which, in the opinion of the Board, acting prudently and in good faith, must be considered, the price being subject to downward rounding in accordance with the terms of the Prospectus in the currency in which the relevant share class is denominated, such rounding being applied by the Company.

If a share buyback request reduces the total number or Net Asset Value of the shares held by a shareholder in a sub-fund or share class to below a number or value determined by the Board, or if the buyback request concerns shares with a value below an amount set by the Board, the Company may require the shareholder to redeem all of his or her shares in that sub-fund or share class.

Moreover, if on a given date, buyback requests made in accordance with this article and conversion requests made in accordance with Article 10

**PAGE 6**

Document issued electronically

of these articles of association exceed a certain threshold determined by the Board in relation to the number of outstanding shares in a given sub-fund of shares, the Board may decide that the buyback or conversion of all or part of these shares will be postponed for a period and under conditions determined by the Board, in consideration of the Company's interest. These buyback and conversion requests will be processed on the Valuation Day following this period, with priority given to requests submitted subsequently.

In the event of substantial buyback and/or conversion requests in respect of a sub-fund, the Company further reserves the right to process such buybacks at the buyback price as determined after it has been able to sell the necessary securities as quickly as possible and has the income from such sales at its disposal. A single Net Asset Value will be calculated for all buyback or conversion requests submitted at the same time. These requests will be processed with priority over any other request.

All buyback requests must be sent by the shareholder in writing to the Company's headquarters in Luxembourg or to another legal entity authorized to redeem the shares. The request must include the investor's name, the sub-fund, the class, the number of securities or the amount to be redeemed, as well as instructions for payment of the buyback price.

The buyback price will be paid no later than five business days after the date on which the applicable Net Asset Value is determined, or the date on which the share certificates are received by the Company, whichever is the later. All buyback requests are irrevocable, unless the calculation of the Net Asset Value of the shares is suspended.

Buyback requests must include the share certificate(s) in due and proper form and the documents required to transfer them before the buyback price can be paid.

Shares redeemed by the Company will be canceled.

The Board of Directors may decide to reimburse the buyback price to a shareholder requesting the buyback of any of his or her shares (provided the shareholder's consent has been obtained) by a payment in kind through the allocation of securities from the portfolio corresponding to the sub-fund(s) concerned, the equivalent value of which (determined in the manner prescribed in Article 12) corresponds to the value of the shares to be redeemed. The nature or type of assets to be transferred in such cases will be determined on a fair and reasonable basis without prejudice to the interests of other holders of shares in the sub-fund(s) in question, and the valuation used will be confirmed in a special report from the Company's statutory auditor insofar as required by applicable law or by the Board.

### Art. 10. Share Conversions

Subject to any restrictions imposed by the Board of Directors, each shareholder may transfer from one sub-fund or share class to another sub-fund or share class, and may request the conversion of shares held in a given

**PAGE 7**

**Document issued electronically**

sub-fund or share class into shares of another sub-fund or share class.

Conversion is based on the net asset values, as determined in accordance with Article 12 of these articles of association, of the share class or classes of the sub-funds concerned on the first common Valuation Day following the day on which conversion requests are received, taking account, where applicable, of the going exchange rate between the currencies of the two sub-funds on the Valuation Day. The Board may set such restrictions on the frequency of conversions as it deems necessary, and may subject conversions to the payment of such fees and commissions as it may reasonably determine.

All conversion requests must be sent by the shareholder in writing to the Company's headquarters in Luxembourg or to another legal entity authorized to convert shares. The request must include the shareholder's name, the sub-fund and class of shares held, the number of shares or amount to be converted, and the sub-fund and class of shares to be obtained in exchange. It must include any share certificates that may have been issued. If registered share certificates have been issued for the shares in the original class, new certificates will not be issued until the old certificates have been received by the Company.

The Board may decide to allocate fractions of shares produced by the conversion or to pay the cash corresponding to these fractions to shareholders who requested conversion.

Shares that have been converted to other shares will be canceled.

### Art. 11. Restrictions on Share Ownership

The Board of Directors may enact such restrictions as it sees fit, with a view to ensuring that no Company shares are acquired or held by (a) anyone in breach of the laws or regulations of any country or governmental authority, or (b) anyone whose situation, in the opinion of the Board, may cause the Company to incur tax charges or other financial liabilities that it would not otherwise have incurred, including the obligation to register pursuant to securities, investment or similar laws, or pursuant to national or regulatory requirements.

The Company may therefore restrict or prohibit the ownership of Company shares by any natural person or legal entity and without limitation by U.S. Persons as defined below (a "Prohibited Person").

To this end:

1. The Company may refuse to issue shares or register share transfers where it appears that such issue or transfer would or could result in the beneficial ownership of the share being attributed to a Prohibited Person.

2. The Company may require any person appearing in the Register or any other person seeking to have a share transfer entered in the Register to

**PAGE 8**

**Document issued electronically**

provide it with any information and certificates it deems necessary, backed, as appropriate, by a sworn statement, with a view to determining whether such shares are or will be beneficially owned by a Prohibited Person.

3. The Company may proceed with the compulsory buyback of all shares held by a Prohibited Person if it appears that such Prohibited Person, either alone or together with other persons, is the beneficial owner of Company shares. In this case, the following procedure will be applied:

a) The Company will send a notice (hereinafter referred to as the "notice of redemption") to the shareholder owning the securities or appearing in the Register as the owner of the shares to be redeemed; the notice of redemption will specify the securities to be redeemed, the redemption price to be paid and the place where such price will be payable. The notice of redemption may be sent to the shareholder by certified mail to the shareholder's last known address or to the address recorded in the Share Register. The shareholder in question will be required to promptly return to the Company the certificate(s), if any, for the shares listed in the notice of redemption.

As of the close of business on the day indicated in the notice of redemption, the shareholder in question will cease to be the owner of the shares listed in the notice of redemption; in the case of registered shares, his or her name will be struck from the register; in the case of bearer shares, the certificate(s) representing such shares will be cancelled in the Company's books.

b) The price at which the shares listed in the notice of redemption will be redeemed (hereinafter the "redemption price") will be equal to the Net Asset Value of the Company's shares immediately preceding the notice of redemption. The shareholder concerned will lose all shareholder rights as of the date of the redemption notice.

c) Payment will be made in the currency determined by the Board of Directors. The price will be deposited by the Company with a bank, in Luxembourg or elsewhere, designated in the notice of redemption; this bank will transfer it to the shareholder in question against delivery of the certificate(s) listed in the notice of redemption. Once the price has been paid in accordance with the aforementioned conditions, no one interested in the shares listed in the notice of redemption will be able to assert any right in respect of these shares or take any action against the Company and its assets, except for the right of the shareholder appearing to be the owner of the shares to receive the price deposited (without interest) at the bank against the return of the certificates.

d) The Company's exercise of the powers conferred by this article may under no circumstances be called into question or invalidated by anyone on grounds of insufficient proof of ownership of the shares or that a share was owned by someone other than the person admitted by the Company in sending the notice of redemption, on the sole condition that the Company exercises its powers in good faith.

4. The Company may refuse to grant voting rights at any General Meeting of Shareholders to any Prohibited Person and to any shareholder who has received a notice of redemption in respect of his or her shares.

**PAGE 9**

**Document issued electronically**

The term "U.S. Person" as used in these articles of association has the same meaning as in Regulation S, as amended, of the United States Securities Act of 1933, as amended (the "1933 Act"), in the Foreign Account Tax Compliance Act, as amended (the "FATCA") or in any other regulation or law that becomes applicable in the United States of America and that, in the future, will replace Regulation S, the 1933 Act or the FATCA. The Board of Directors will define the term "U.S. Person" based on these provisions and will publish this definition in the Prospectus.

In addition, the Board may restrict the issue and transfer of shares in a share class to institutional investors within the meaning of Article 174 of the Law of 2010 ("Institutional Investor(s)").. The Board may, at its discretion, defer acceptance of any request to subscribe for shares in a share class reserved for Institutional Investors until the Company has received sufficient proof that the applicant is an Institutional Investor. If it appears at any time that a holder of shares in a class of shares reserved for Institutional Investors is not an Institutional Investor, the Board may convert the shares concerned into shares of a class not reserved for Institutional Investors (provided that a class with similar characteristics exists) or compulsorily redeem the shares in the classes concerned, in accordance with the provisions set out above in this article. The Board may refuse to effect a transfer of shares and consequently refuse to register the share transfer in the Register in the event that such a transfer would result in the shares in a share class reserved for Institutional Investors being held, after the transfer, by someone who is not an Institutional Investor. In addition to any liability arising under applicable law, every shareholder who is not an Institutional Investor and who holds shares in a class reserved for Institutional Investors will be required to indemnify and hold harmless the Company, the Board of Directors, the other shareholders in the class of shares concerned and the Company's agents from and against any and all damages, losses or expenses arising from or in connection with such holding if the shareholder concerned produced misleading or false documentation or gave misleading or false information to misrepresent his or her status as an Institutional Investor or failed to notify the Company of the loss of such status.

### Art. 12. Calculation of the Net Asset Value of Shares

The Net Asset Value of a share, regardless of the sub-fund or share class for which it is issued, will be established in the currency chosen by the Board of Directors by a figure obtained by dividing, on the Valuation Day set out in Article 13 of these articles of association, the net assets of the sub-fund concerned by the number of shares issued for that sub-fund and that class, adjusted to take account of any subscription fees, swing pricing techniques or taxes that the Board deems appropriate. The price thus obtained may be rounded up or down in accordance with the terms set out in the Prospectus.

**Document issued electronically**

The net assets of the various sub-funds will be valued as follows:

The Company's net assets will consist of the Company's assets as defined below, less the Company's liabilities as defined below on the Valuation Day on which the Net Asset Value of the shares is determined.

I.  The Company's assets include:

a) all cash on hand or on deposit, including accrued and unpaid interest;

b) all bills and notes payable on demand and accounts receivable, including income from the sale of securities for which payment has not yet been received;

c) all securities, units, shares, bonds, option or subscription rights, and other investments and transferable securities owned by the Company;

d) all dividends and distributions receivable by the Company in cash or in securities to the extent reasonably known to the Company (however, the Company may make adjustments to reflect fluctuations in the market value of transferable securities resulting from practices such as ex-dividend or ex-rights trading);

e) all accrued and unmatured interest on securities owned by the Company, unless such interest is included in the principal amount of such securities;

f) the Company's incorporation expenses to the extent that they have not been amortized;

g) all other assets of any kind, including prepaid expenses.

The value of these assets will be determined as follows:

a)  The value of cash on hand or on deposit, of bills and demand bills and of accounts receivable, of prepaid expenses, and of dividends and interest announced or accrued and not yet received, is constituted by the face value of such assets, except where it is unlikely that such value can be collected; in the latter case, the value will be determined by deducting such amount as the Company deems adequate to reflect the actual value of such assets.

b)  The value of all transferable securities, money market instruments and/or derivative financial instruments listed or traded on an official stock exchange is determined according to their last available closing price.

c)  The value of all transferable securities, money market instruments and/or derivative financial instruments traded on another regulated market that operates regularly and is recognized and open to the public is determined according to the last available closing price.

d)  Money market instruments and fixed-income securities may be valued according to the amortized cost method, which consists of taking into account straight-line amortization after purchase to reach the redemption price at maturity of the security.

e)  Swaps are valued in good faith, on the basis of the underlying securities (at the closing or current price) and the characteristics of the underlying liabilities.

f)  The liquidation value of all futures, forwards and options contracts (or any other derivative financial instruments) that are not traded on stock exchanges or other regulated markets corresponds to their net liquidation

**Document issued electronically**

value, determined in accordance with policies established in good faith by the Board of Directors and on a consistent basis for each variety of contract. The liquidation value of futures, forwards and options contracts (or any other derivative financial instruments) traded on stock exchanges or other regulated markets will be based on the last available price of these contracts on the stock exchanges and regulated markets on which these futures, forwards and options contracts (or any other derivative financial instruments) are traded by the Company; provided that if a futures, forwards or options contract (or any other derivative financial instrument) cannot be liquidated on the day on which the net assets are determined, the basis for determining the liquidation value of that contract will be determined by the Board in a fair and reasonable manner.

g) The value of securities held in any mutual fund will be determined on the basis of the last official net asset value per unit, or on the basis of the last estimated net asset value if the latter is more recent than the official net asset value, provided that the Company is satisfied that the valuation method used for this estimate is consistent with the one used to calculate the official net asset value.

h) Insofar as the transferable securities, money market instruments and/or derivative financial instruments in the portfolio on the Valuation Day are not listed or traded on a stock exchange or any other regulated market that operates regularly, is recognized and open to the public, or if, for securities listed and traded on a stock exchange or other such market, the price determined in accordance with paragraphs b) and c) is not representative of the real value of these transferable securities, money market instruments and/or derivative financial instruments, the valuation will be based on the expected realizable value, which will be estimated prudently and in good faith.

i) Values expressed in currencies other than those of the respective sub-funds are converted at the last known average rate.

Should extraordinary circumstances render such a valuation impracticable or inadequate, other valuation methods may be applied if the Board considers that another method better reflects the value or net asset value of the investments and is consistent with accepted accounting practice, so as to obtain a fair valuation of the Company's assets.

II. The Company's liabilities include:

a) all loans, matured bills and accounts payable,

b) all administrative expenses, due or accrued, including but not limited to the remuneration of the Company's Investment Advisors, Managers, depository, authorized representatives and agents,

c) all known obligations, whether due or not, including all contractual obligations that have fallen due for payment either in cash or in kind, including the amount of dividends announced by the Company but not yet paid if the Valuation Day coincides with the date on which the determination of who is or will be entitled to them is made,

**PAGE 12**

**Document issued electronically**

d)  an appropriate provision for capital and income taxes, accrued up to the Valuation Day and set from time to time by the Board, and other provisions authorized or approved by the Board,

e)  all other Company liabilities of any kind whatsoever, with the exception of liabilities represented by the Company's own resources. In valuing the amount of these liabilities, the Company will take account of all expenses to be met by the Company, including incorporation fees, fees payable to its investment advisors or managers, accountants, depositaries, transfer agents, paying agents and permanent representatives at the place of registration, and any other agents employed by the Company, fees for legal advice and auditing services, advertising, printing and publication costs, including the cost of publishing or preparing and printing prospectuses and key investor information or deposit notices, taxes or government levies, and all other operating expenses, including the cost of buying and selling assets, interest, bank and broker fees, postage, telephone, fax and telex expenses. The Company may calculate administrative and other regular or periodic expenses by estimating the amount for the year or any other period and prorating the amount over the fractions of that period.

III. The net assets attributable to all the shares in a sub-fund will consist of the assets in the sub-fund less the liabilities in the sub-fund at the close of the Valuation Day on which the Net Asset Value of the shares is determined.

Within a given sub-fund, if shares are subscribed or redeemed in respect of shares in a specific class, the sub-fund's net assets attributable to all the shares in this class will be increased or reduced by the net amounts received or paid by the Company as a result of these share subscriptions or redemptions.

IV. For each sub-fund, the Board of Directors will draw up a pool of assets that will be allocated, in the manner set out below, to the shares issued in respect of the sub-fund and class concerned in accordance with the provisions of this article. To this end:

1.  The income from the issue of shares in a given sub-fund will be allocated in the Company's books to that sub-fund, and the assets, liabilities, income and expenses relating to that sub-fund will be allocated to that sub-fund.

2.  If one asset is derived from another, the latter asset will be allocated in the Company's books to the same sub-fund to which the asset from which it is derived belongs, and each time an asset is revalued, the increase or decrease in value will be allocated to the sub-fund to which the asset belongs.

3.  If the Company has a liability in connection with the assets of a particular sub-fund or with a transaction carried out in connection with the assets of a particular sub-fund, the liability will be attributed to that sub-fund.

**Document issued electronically**

4.  If a Company asset or liability cannot be allocated to a particular sub-fund, that asset or liability will be allocated to all sub-funds in proportion to the net values of the shares issued under the various sub-funds. The Company constitutes a single legal entity.

5.  Following the payment of dividends to the distribution shares of a given sub-fund, the net asset value of this sub-fund that can be attributed to these distribution shares will be reduced by the amount of these dividends.

V.  For the purposes of this article:

1.  Each Company share that is in the process of being bought back in accordance with Article 9 of these articles of association will be considered an issued and existing share until the close of the Valuation Day applicable to the buyback of that share, and its price will, from that day until the price is paid, be considered a Company liability;

2.  Each share to be issued by the Company in response to subscription requests received will be treated as having been issued as of the close of the Valuation Day on which its issue price was set, and its price will be treated as an amount owed to the Company until it has been received by it;

3.  All investments, cash balances or other Company assets expressed in currencies other than the respective currency of each sub-fund will be valued at the going exchange rates on the date and at the time the Net Asset Value of the shares is determined; and

4.  All purchases and sales of transferable securities contracted by the Company will become effective on the Valuation Day, insofar as possible.

VI. Insofar as and for as long as shares in different classes have been issued and are in circulation in a given sub-fund, the net asset value of that sub-fund, determined in accordance with the provisions of sub-clauses I to V of this article, will be broken down between all the shares in each class.

When shares in a given sub-fund are subscribed or redeemed in respect of a share class, the sub-fund's net assets attributable to all the shares in that class will be increased or reduced by the net amounts received or paid by the Company as a result of such subscriptions or redemptions. At any given time, the Net Asset Value of a share in a given sub-fund and class will be equal to the amount obtained by dividing the net assets of that sub-fund then attributable to all the shares in that class, by the total number of shares in that class then issued and outstanding.

**Art. 13. Frequency and Temporary Suspension of the Calculation of the Net Asset Value of Shares, Share issues, Redemptions and Conversions**

i.  Frequency of the Net Asset Value Calculation

In each sub-fund, the Net Asset Value of the shares, including the related share issue, conversion and redemption prices, will be determined periodically by the Company or by a third party appointed by the Company, in no case less than twice a month, at the frequency decided by the Board of

**PAGE 14**

Document issued electronically

Directors (when calculating the Net Asset Value of the assets, each such day is referred to in these articles of association as the "Valuation Day").

If a Valuation Day falls on a statutory or bank holiday in Luxembourg, the Net Asset Value of the shares will be determined on the Day as stated in the Prospectus. Depending on the volume of share issues, redemptions or conversions requested by the shareholders, the Company reserves the right to allow the Net Asset Value per share to be adjusted to take account of transaction fees and other costs and tax liabilities due upon the actual acquisition or disposal of assets of the relevant class if the net capital movement exceeds, as a result of all share issues, redemptions or conversions of such sub-fund, a certain threshold, as determined from time to time by the Company, of the total net assets of the shares in the sub-fund on a given Valuation Day (defined as a "swing pricing" technique).

II.  Temporary Suspension of the Net Asset Value Calculation

Without prejudice to the legal grounds for suspension, the Company may suspend the calculation of the Net Asset Value of the shares and the issue, redemption and conversion of its shares, either generally or in relation to one or more sub-funds only, if any of the following circumstances arise:

-   during all or part of a period when one of the main stock exchanges or other markets on which a substantial part of the portfolio of one or more sub-funds is listed is closed for any reason other than normal vacations, or during which trading is restricted or suspended,

-   in an emergency situation that prevents the Company from disposing of or valuing the assets of one or more sub-funds,

-   if the means of communication required to determine the price of or value the assets or the stock market prices for one or more sub-funds, under the conditions defined in the first sub-paragraph above, are not in service,

-   at any time in which the Company is unable to repatriate funds for the purpose of making payments for share buybacks in one or more sub-funds, or in which the transfers of funds involved in the realization or acquisition of investments or payments due on share buybacks cannot, in the opinion of the Board, be made at normal exchange rates,

-   in the event of publication of the notice convening the General Meeting at which it is proposed (i) to dissolve and liquidate the Company or a given sub-fund or share class, or the Board's decision to liquidate one or more sub-fund(s), (ii) or, insofar as such suspension is justified by the need to protect shareholders, following the publication of the notice of the General Meeting convened to vote on the merger of the Company or a sub-fund, or following the Board's decision to merge one or more sub-fund(s), or

**PAGE 15**

**Document issued electronically**

in any period in which, in the Board's opinion, there are circumstances beyond the Company's control that would make it impracticable or unfair to shareholders to continue trading in any of the Company's sub-funds.

Shareholders wishing to subscribe, redeem or convert shares in the sub-funds concerned will be informed by the Company of any such suspension of the calculation of the Net Asset Value and may cancel their order. The other shareholders will be informed via a press release. Such suspension will have no effect on the calculation of the Net Asset Value or on the issue, redemption or conversion of shares of the unaffected sub-funds.

### SECTION III. COMPANY ADMINISTRATION AND OVERSIGHT

### Art. 14. Directors

The Company is administered by a Board of Directors composed of at least three members, who may or may not be shareholders. The directors are appointed at the General Meeting for a renewable one-year term and will remain in office until their successors have been elected.

Any director may be dismissed with or without cause or be replaced at any time by decision of the General Meeting of Shareholders.

In the event of the death or resignation of a director, a provisional replacement may be appointed in accordance with the applicable legal formalities. In this case, the General Meeting will hold its final election at its first meeting.

### Art. 15. Meetings of the Board of Directors

The Board of Directors will choose from among its members a chairman, who must be a natural person and who may appoint one or more vice-chairmen. It may also choose a secretary who is not necessarily a member of the Board and who will be responsible for drawing up the minutes of the Board meetings and the General Meeting.

The Board meets when convened by the Chairman or, in his absence, by two directors, as often as the Company's interests require, at the venue indicated in the meeting notices. The Chairman will chair all General Meetings of Shareholders and Board meetings, but in his absence, the shareholders or the Board may appoint another person as temporary chairman by a majority of the votes cast or of the directors present at that meeting, respectively.

Written notice of any Board meeting is sent to all directors at least twenty-four hours before the scheduled time of the meeting, except in the event of an emergency, in which case the nature of the emergency and the reasons for it are stated in the meeting notice. Such notice may be waived by written agreement or by fax or any other means of telecommunication capable of evidencing each director's waiver. Special notice is not required for a Board meeting held at a time and place specified in a resolution previously adopted by the Board. If the Board has not met for more than two months, it may be convened by directors representing at least one-third of Board members, who will set out the agenda for the meeting.

**PAGE 16**

**Document issued electronically**

The Board may only validly deliberate and rule if at least half of its members are present or represented.

Any director may give one of his or her colleagues a proxy to represent him or her at a Board meeting, in writing, by telegram, by e-mail or by any other means approved by the Board, to vote in his or her place on the items on the meeting agenda. A director may act as proxy for several of his or her colleagues.

Directors may also take part in any Board meeting by videoconference or any other means of telecommunication enabling the director to be identified. Such telecommunications means must enable the director to participate effectively in such a Board meeting, the proceedings of which must be relayed live to the director. Any such Board meeting held remotely by such means of communication is deemed to have taken place at the Company's headquarters. Decisions are taken by a majority of the votes of the directors present or represented at such a meeting. For the purposes of calculating quorum and majority, directors who take part in Board meetings by videoconference or other means of telecommunication enabling them to be identified will be deemed to be present. In the event of a tie, the acting chair of the meeting has the casting vote.

Board decisions may also be taken by circular resolutions. Circular resolutions adopted by the unanimous consent of all directors are just as valid and effective as resolutions adopted at a duly convened and held meeting, and may be the result of one or more written communications.

The Board's deliberations are recorded in minutes signed by the Chairman or, in his absence, by the person chairing the meeting. Copies or extracts to be produced in court or elsewhere are signed by the Chairman or by two directors.

### Art. 16. Powers of the Board of Directors

The Board of Directors is vested with the broadest powers to manage the Company's affairs and to carry out all acts of disposal and administration falling within the corporate purpose, subject to compliance with the investment policy set out in Article 4 of these articles of association.

All matters not expressly reserved to the General Meeting of Shareholders by law or by the articles of association fall within the remit of the Board.

Applying the risk spreading principle, the Board has the power to determine the investment policy of each sub-fund, the currency in which the assets of each sub-fund or share class will be denominated, and the

**Document issued electronically**

guidelines to be followed in managing the assets relating to each sub-fund within the limits of the investment restrictions set out in the applicable laws and regulations.

The Board will also decide on any investment restrictions that may periodically apply to the investment of the Company's assets in accordance with Part I of the Law of 2010.

Taking into consideration the restrictions decided by the Board in accordance with the applicable laws and regulations and referenced in the Prospectus, the Board may decide that the Company's investments are to be made in (i) transferable securities and money market instruments listed or traded on a regulated market as defined by the Law of 2010, (ii) in transferable securities and money market instruments traded on another market in a Member State of the European Union which is regulated, operates regularly, is recognized and open to the public, (iii) in transferable securities and money market instruments officially listed on a stock exchange in Eastern and Western Europe, Africa, the Americas, Asia, Australia and Oceania, or traded on another market in the aforementioned countries, provided that such market is regulated, operates regularly and is recognized and open to the public, (iv) in newly issued transferable securities and money market instruments, provided that the terms of issue include a commitment that application will be made for admission to official listing on a stock exchange or other above-mentioned regulated market, and provided that such admission is effected within one year of issue; as well as (v) in any other securities, instruments or other assets within the restrictions set by the Board in accordance with the applicable laws and regulations and provided for in the Prospectus.

A sub-fund may, to the fullest extent permitted by Luxembourg laws and regulations but in accordance with the provisions outlined in the Prospectus, invest in one or more of the Company's other sub-fund(s). In such a case and in accordance with the applicable laws and regulations and with the Prospectus, any voting rights attached to such shares will be suspended for as long as they are held by the sub-fund in question. In all cases, and for as long as the sub-funds are held by the sub-fund in question, their value will not be taken into account when calculating the Company's net assets for the purposes of verifying the minimum net asset threshold imposed by the Law of 2010.

The Company's Board of Directors may decide to invest up to one hundred percent of the total net assets in each of the Company's sub-funds in various transferable securities and money market instruments issued or guaranteed by any Member State (within the meaning of the Law of 2010), local governments, a non-Member State of the European Union as accepted by the Luxembourg Supervisory Authority and as mentioned in the Company's Prospectus (including, but not limited to, member countries of the Organisation for Economic Co-operation and Development (("OECD")), Brazil, South Africa, Indonesia, Russia and Singapore), or international public institutions to which one or more member states of the European Union

**PAGE 18**

**Document issued electronically**

belong, provided that, should the Company decide to make use of this provision, it holds securities from at least six different issues for this sub-fund, and that the securities from any one issue may not exceed thirty percent of the total net assets of the sub-fund in question.

The Board may decide that the Company's investments are to be made in derivative financial instruments, including equivalent cash-settled instruments, traded on a regulated market as defined by the Law of 2010 and/or over-the-counter derivative financial instruments, provided that, among other things, the underlying assets consist of instruments covered by Section 41(1) of the Law of 2010, of financial indices, interest rates, exchange rates or currencies, in which the Company may invest in accordance with its investment objectives as set out in the Prospectus. In particular, the Company may invest in credit derivatives of any kind.

The Board may decide that the investments of a sub-fund are to be made in such a way as to reproduce the composition of an equity or bond index, provided that the index in question is recognized by the Luxembourg Supervisory Authority as being sufficiently diversified, that it is a representative benchmark for the market to which it refers, and that it is published in an appropriate manner.

The Board may at any time it deems appropriate and to the fullest extent permitted by Luxembourg law and regulations, but in accordance with the provisions outlined in the Prospectus, (i) create a sub-fund qualifying as either a feeder UCITS or a master UCITS, (ii) convert any existing sub-fund into a sub-fund qualifying as a feeder UCITS or (iii) replace the master UCITS of each of its sub-funds qualifying as a feeder UCITS.

### Art. 17. Company Commitments to Third Parties

With regard to third parties, the Company will be validly bound by the joint signature of two directors or by the sole signature of anyone to whom such signing authority has been delegated by the Board of Directors.

### Art. 18. Delegation of Authority

The Board of Directors may appoint and empower, from time to time, Company representatives, including a managing director, a secretary, and assistant managing directors, assistant secretaries or other authorized representatives deemed necessary to conduct the operations and management of the Company. The Board may revoke such appointments at any time. Authorized representatives need not be directors or shareholders of the Company. Unless otherwise provided in these articles of association, authorized representatives will have the powers and duties conferred upon them by the Board.

The Board may appoint one or more directors or one or more other agents, who need not be shareholders of the Company, to manage the day-to-day business of the Company, subject to compliance with the provisions of Section 60 of the amended law of August 10, 1915 on business partnerships (the "1915 Law").

**PAGE 19**

**Document issued electronically**

### Art. 19. Depository Bank

The Company will enter into an agreement with a Luxembourg bank, under the terms of which this bank will act as depository for the Company's assets (the "Depository Bank"), in accordance with the Law of 2010. All of the Company's transferable securities and other assets will be held by or on behalf of the Depository, which will assume vis-à-vis the Company and its shareholders the responsibilities set out in the Law of 2010. Should the Depository Bank wish to resign, the Board will make every effort to find a company to take its place, and the directors will appoint this company as Depository Bank in replacement of the resigning Depository Bank. The directors may put an end to the duties of the Depository Bank unless and until a successor has been appointed as Depository Bank in accordance with this provision and will act in its place.

### Art. 20. Directors' Self-Interest

No contract or other transaction between the Company and other companies or firms will be affected or invalidated by the fact that one or more directors or authorized representatives of the Company have a personal interest therein, or are directors, partners, authorized representatives or employees thereof. A Company director or authorized representative who is also a director, partner, authorized representative or employee of another company or firm with which the Company contracts or otherwise enters into business relations will not, by reason of his affiliation with such company or firm, be prevented from giving his opinion and voting or acting on any matters relating to such contract or transaction.

Should a Company director or authorized representative have a personal interest in a Company transaction, he or she will inform the Board thereof and this disclosure will be recorded in the minutes of the meeting. He or she will give no opinion and will not vote on such a transaction. The shareholders will be informed of this transaction and the personal interest therein at the next General Meeting.

The term "personal interest" as used in the preceding sentence, will not apply to any dealings or interests that may arise, in any manner, capacity or respect whatsoever, in relation to any company or legal entity that the Board may determine from time to time, at its discretion, unless such "personal interest" is deemed to be a conflict of interest within the meaning of applicable law and regulations.

### Art. 21. Indemnification of Directors

The Company may indemnify any director or authorized representative and their lawful heirs, executors or administrators for expenses they may reasonably incur in connection with any action, proceeding or litigation to which they are a party or in which they may be involved as a result of their being or having been a Company director or authorized representative, or because they have acted as such at the Company's request in another company in which the Company is a

**PAGE 20**

**Document issued electronically**

shareholder or creditor, to the extent that they are not entitled to be indemnified by said other entity, except in matters in which they are ultimately convicted of gross negligence or maladministration in connection with such action or proceedings; in the event of an out-of-court settlement, such indemnity will only be paid if the Company is informed by its counsel that the person to be indemnified has not committed such a breach of his or her obligations. The aforementioned right to indemnification does not prevent these people from exercising other individual rights.

### Art. 22. Oversight of Company Accounts

In accordance with the Law of 2010, a Certified Public Accountant will be appointed Statutory Auditor for all Company assets and liabilities. The Statutory Auditor will be appointed by the General Meeting for a period ending on the date of the next Annual General Meeting of Shareholders, and will remain in office until his or her successor is elected. The Statutory Auditor may be replaced at any time by the General Meeting under the conditions set out by Luxembourg law and regulations.

### SECTION IV. GENERAL MEETING

### Art. 23. Representation

The General Meeting represents all shareholders. It has the broadest powers to order, enforce or ratify all acts relating to the Company's operations.

### Art. 24. Annual General Meeting

The General Meeting is convened by the Board of Directors. It may be convened at the request of shareholders representing one-tenth of the Company's share capital.

In accordance with Luxembourg law, the Annual General Meeting is held in Luxembourg at the Company headquarters, or at any other venue specified in the meeting notice, on the first Wednesday of June at 2.00 p.m. If this day is a public holiday, the Annual General Meeting will be held on the next bank business day. The Annual General Meeting may be held abroad if the Board of Directors determines that exceptional circumstances require it.

To the extent permitted and under the conditions set out in Luxembourg law and regulations, the Annual General Meeting of Shareholders may be held on a date or at a time or place other than the ones provided for in the preceding paragraph; such date, time and place will be decided by the Board.

The General Meeting is convened within the time period prescribed by the Law of 1915, by mail addressed to each registered shareholder. If bearer shares have been issued, the meeting notice will be sent out in the form and within the deadlines prescribed by the Law of 1915.

The notice convening the General Meeting may specify that the applicable quorum and majority will be determined by reference to the shares issued and in circulation at a certain date and time prior to the convocation of the General Meeting ("Registration Date"), on the understanding that a

**Document issued electronically**

shareholder's right to participate in the General Meeting of Shareholders and the voting rights attached to his or her shares will be determined by reference to the shares held by the shareholder on the Registration Date. In addition, the shareholders of each sub-fund may be convened as separate General Meetings, deliberating and deciding under the attendance and majority conditions determined by the law then in force for the following items:

1.  allocation of their sub-fund's annual profit balance;

2.  in the cases provided for by Article 33 of the articles of association.

Business conducted at a General Meeting of Shareholders will be limited to items on the agenda and matters relating to those items.

### Art. 25. Unannounced Meetings

Whenever all of the shareholders are present or represented and have declared that they consider themselves duly convened and have been informed of the agenda put to their deliberations, a General Meeting may be held without prior notice.

### Art. 26. Votes

Each share, regardless of the sub-fund to which it belongs and regardless of its Net Asset Value in the sub-fund under which it is issued, entitles the holder to one vote. Voting rights may only be exercised for a whole number of shares.

Any shareholder may take part in General Meetings by appointing in writing, by e-mail, fax, or any other means of telecommunication enabling the shareholder to be identified, another shareholder as his or her proxy, within the deadlines and forms to be decided by the Board.

Any such proxy is considered valid, unless revoked, for any reconvened or adjourned General Meeting.

By sovereign decision of the Board of Directors, a shareholder may also participate in any meeting by videoconference or any other means of communication allowing the identification of such a shareholder. Such means must enable the shareholder to effectively take part in the General Meeting, the proceedings of which must be relayed live to the shareholder in question.

The Board of Directors may determine any other conditions to be met by shareholders to take part in the General Meeting.

### Art. 27. Quorum and majority conditions

The General Meeting deliberates in accordance with the provisions of the Law of 1915.

Unless otherwise provided by law or by the articles of association, resolutions of the duly convened General Meeting are adopted by a simple majority of the votes cast. The votes cast do not account for the votes of shares represented at the General Meeting whose holders did not take part in the vote, abstained or returned a blank or invalid vote.

Document issued electronically

### TITLE V. FINANCIAL YEAR DISTRIBUTION OF PROFITS
### Art. 28. Financial year and accounting currency

The Company's financial year begins on April 1 of each year and ends on March 31 of the following year.

If there are different sub-funds, as provided for in Article 5 of these articles of association, and if the accounts of these sub-funds are expressed in different currencies, these accounts will be converted into euros and added together to determine the Company's accounts. The Company's accounts are expressed in euros.

### Art. 29. Distribution of Annual Profits

In any sub-fund, the General Meeting, on a proposal from the Board of Directors, will decide on the amount of dividends to be distributed to the distribution shares, within the limits provided for under the

Law of 2010.

For each sub-fund, the General Meeting of Shareholders may decide to distribute their share of net income as well as realized or unrealized capital gains, after deductions of any realized or unrealized capital losses. Furthermore, dividends may include a capital distribution up to the legal minimum capital limit set by the Law of 2010. In any case, and as far as distribution shares are concerned, the Company will distribute annually, as a minimum, all interest income received, less the remuneration, fees and expenses proportionally related thereto.

The share of income and capital gains attributable to accumulation shares will be capitalized.

In all sub-funds, interim dividends may be announced and paid by the Board of Directors for the distribution shares, subject to compliance with the legal conditions then in force.

Dividends may be paid in the currency chosen by the Board, at the time and place of its choosing and at the going exchange rate on the payment date. Any dividend announced but unclaimed by the beneficiary within five years of its allocation can no longer be claimed and reverts to the Company. No interest will be paid on any dividend announced by the Company and kept by the latter at the disposal of its beneficiary.

### Art. 30. Company Expenses

The Company will assume all its operating costs, including:

- the Board fees and expense reimbursements;

- the remuneration of the management company, which may be appointed by the Company and which will in this case be referenced in the Prospectus, as well as the remuneration of managers, investment advisors, the Depository Bank, the central administration, financial service agents, paying agents, the statutory auditor, the Company's legal advisors and other advisors or agents that the Company may call upon;

- the brokerage fees;

**PAGE 23**

**Document issued electronically**

- the costs of preparing, printing and distributing the prospectus, key investor information and annual and half-yearly reports;

- the printing of share certificates;

- the fees and expenses incurred in the incorporation of the Company;

- the taxes, duties, and government fees relating to its activity;

- the fees and expenses for registering and maintaining the Company listing with Luxembourg and foreign government agencies and stock exchanges;

- the fees for publishing the Net Asset Value and the subscription and redemption prices;

- the fees in connection with the marketing of the Company shares.

The Company constitutes a single legal entity. The assets of a specific sub-fund only cover the debts, commitments, and obligations relating to that sub-fund. Expenses not directly attributable to a sub-fund are allocated to all sub-funds in proportion to the net assets of each sub-fund, and are charged against the sub-funds' income first.

If a sub-fund is created after the Company's opening date, the set-up fees incurred in connection with the creation of the new sub-fund will be charged to that sub-fund only and may be written off over a maximum of five years from the date on which the sub-fund was created.

## SECTION VI. LIQUIDATION OF THE COMPANY

### Art. 31. Dissolution - Liquidation

The Company may be dissolved by decision of a General Meeting ruling in accordance with the provisions of Article 27 of the Articles of Association.

If the Company's share capital falls below two-thirds of the minimum, the directors must put the matter of the Company's dissolution to the General Meeting which deliberates regardless of attendance and decides by a simple majority of the shares represented at the Meeting.

If the Company's share capital falls below one-quarter of the minimum, the directors must put the matter of the Company's dissolution to the General Meeting which deliberates regardless of attendance; dissolution may be decided by shareholders holding one-quarter of the shares represented at the Meeting.

The meeting must be convened so that it is held within forty days of determining that the net assets have fallen below two-thirds or one-quarter of the minimum capital, respectively.

The decisions of the General Meeting or of the court pronouncing the dissolution and liquidation of the Company are published in the Mémorial and in two newspapers with adequate circulation, of which at least one is a Luxembourg newspaper. The liquidator(s) will be responsible for such publications.

In the event of dissolution of the Company, liquidation will be carried out by one or more liquidators appointed in accordance with the Law of 2010 and the Company's articles of association. The net proceeds of the liquidation

**Document issued electronically**

of each sub-fund will be distributed to the holders of shares in the relevant class in proportion to the number of shares they hold in that class. Amounts unclaimed by shareholders at the close of liquidation will be deposited with the Deposits and Consignments Fund in Luxembourg on behalf of the beneficiaries in accordance with applicable laws and regulations.

### Art. 32. Liquidation and Merger of Sub-Funds

I.    Liquidation of a Sub-Fund.

The Board of Directors may decide to liquidate one or more sub-funds (i) for the purpose of streamlining the range of sub-funds offered by the Company, or (ii) if the net assets of such sub-fund fall below an amount stated in the Prospectus, or (iii) if there are significant changes in the political or economic situation, or (iv) if the shareholders' interest makes such a decision necessary, in the opinion of the Board.

In all other cases, a sub-fund's Shareholders' Meeting may decide to liquidate the sub-fund by cancelling all its shares and returning the sub-fund's net assets to its shareholders. Such a decision is not subject to any quorum requirement and will be adopted by a simple majority. Unless the Board decides otherwise, in order to safeguard the interests or equal treatment of shareholders, the Company may continue to buy back the shares of the sub-fund whose liquidation has been decided, pending the implementation of the liquidation decision.

For such redemptions, the Company will base itself on the Net Asset Value, which will be determined in such a way as to take account of the liquidation costs, but with no deduction of a redemption fee or any other withholding.

Capitalized start-up costs are written off in full as soon as the liquidation decision is adopted.

Amounts unclaimed by the shareholders or their successors at the close of liquidation of the sub-fund(s) will be deposited with the Deposits and Consignments Fund in Luxembourg on behalf of their beneficiaries in accordance with applicable laws and regulations. If no claim is filed within the statutory limitation period, the amounts deposited can no longer be withdrawn.

Once validly adopted by the Board of Directors or by the General Meeting, the liquidation decision must be published in accordance with the rules governing notices to shareholders in the Company's Prospectus.

In the above circumstances, the Board, or otherwise the General Meeting of Shareholders of a sub-fund or share class, may decide to split the shares in this sub-fund or share class, with no quorum requirement and by a simple majority vote.

Any merger of a sub-fund may be decided by the Board of Directors unless the Board decides to put the decision on the merger to the General Meeting of Shareholders of the sub-fund in question. The provisions relating to UCITS mergers set out in the Law of 2010 and the related regulations will apply. No quorum is required for the General Meeting's decision, and decisions are approved by a simple majority of the votes cast. If, following a

**Document issued electronically**

merger of a sub-fund, the Company ceases to exist, the merger must be decided by the General Meeting of Shareholders ruling in accordance with the majority and quorum requirements for amending the articles of association.

## SECTION VII. AMENDMENTS TO THE ARTICLES OF ASSOCIATION APPLICABLE LAW

### Art. 33. Amendments to the Articles of Association

These articles of association may be amended at a General Meeting provided that the quorum and majority requirements under Luxembourg law are met. Any amendment to the articles of association affecting the rights of shares in a given sub-fund in relation to the rights of shares in other sub-funds, and any amendment to the articles of association affecting the rights of shares in one class of shares in relation to the rights of shares in another class of shares, will be subject to the quorum and majority requirements set out in Section 68 of the Law of 1915.

### Art. 34. Applicable Law

For all matters not specified in these articles of association, the parties refer to and abide by the provisions of the Law of 1915 and the Law of 2010.

CERTIFIED COPY OF THE CONSOLIDATED ARTICLES OF ASSOCIATION

Luxembourg, February 15, 2012.

**PAGE 26**



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Universal Invest Consolidated Articles of Association**" is, to the best of my knowledge and belief, a true and accurate translation from Italian into English.

_____
Jacqueline Yorke

Sworn to before me this
March 10, 2025

_____
Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

_____
Stamp, Notary Public

LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.400.8840  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Exhibit F

# UNIVERSAL INVEST
**Société d'Investissement à Capital Variable**
**287, route d'Arlon L-1150 Luxembourg**
**R.C.S. Luxembourg B 47.025**

Le CA **EST INFORME** que la Caisse d'Epargne des Hauts de France (Natixis Life) a effectué des premiers investissements durant le deuxième trimestre de 2022 (environ 5 millions d'€).

PH demande à suivre l'évolution des investissements via ce nouveau distributeur au niveau de la rentabilité .

Le CA **EST INFORME** que nous avons fait part à Deutsche Bank de notre décision de ne pas donner suite à la demande de contrat de distribution. Les clients détenant des parts D ont été transférés dans des parts A.

## 12.    Points d'action

Le CA **NOTE** les points d'action à considérer pour le prochain Conseil :

| Points d'action | Status |
|---|---|
| Faire le point sur la relation de distributeur avec ING | A voir après la visite sur place |
| Contrôler le prix de l'obligation EIB (page 8 des minutes) | A contrôler |

## 13.    Divers

### 13.1.    Délégation de pouvoirs

Le CA **NOTE** que selon les statuts, la Société sera liée par la signature conjointe de deux administrateurs ou par la signature conjointe ou unique de tout administrateur ou dirigeant à qui le pouvoir a été délégué par le conseil.

EN CONSEQUENCE le CA **DECIDE** que deux Dirigeants de CADELUX S.A. agissant pour le compte de la Société, sont par la présente, autorisés à payer tous les frais, dépenses et taxes nécessaires ou résultant de l'organisation de la Société, de l'exécution de divers accords, de la publication ou l'enregistrement de documents et tous les autres frais et dépenses encourus dans le cadre de l'exploitation et de la gestion quotidiennes des affaires de la Société.

### 13.2.    Prochaine réunion du CA

Le prochain Conseil d'Administration est prévu le jeudi 8 décembre 2022 à 10h00.



23

# UNIVERSAL INVEST
## Société d'Investissement à Capital Variable
### 287, route d'Arlon L-1150 Luxembourg
### R.C.S. Luxembourg B 47.025

Plus rien n'étant à l'ordre du jour, la séance est levée à 11h45.


_____        _____        _____
S. CAMMAERT                     P. HAVAUX                       A. CALVISI

24

# Exhibit G

# UNIVERSAL INVEST
**Variable Capital Investment Company**
**287, route d'Arlon L-1150 Luxembourg**
**Luxembourg Trade and Companies Register B 47,025**

The Board of Directors **IS INFORMED** that Caisse d'Epargne des Hautes de France (Natixis Life) executed initial investments during the second quarter of 2022 (around €5 million).

PH requests tracking the performance of the investments through this new distributor in terms of return.

The Board of Directors **IS INFORMED** that we have informed Deutsche Bank of our decision to not abide by the request for a distribution agreement. The clients holding D shares have been transferred to A shares.

| 12. Action points |
|---|

The Board of Directors **NOTES** the action points to consider for the next Board Meeting:

| Action Points | Status |
|---|---|
| Discuss the distributor relationship with ING | Evaluate after the on-site visit |
| Track the EIB bond price (page 8 of the minutes) | Monitor |

| 13. Miscellaneous |
|---|

### 13.1. Delegation of powers

The Board of Directors **NOTES** that according to the articles of association, the Company shall be bound by the joint signature of two directors or by the joint or single signature of any director or officer to whom the power has been delegated by the board.

AS A RESULT, the BOARD OF DIRECTORS **DECIDES** that two Officers of CADELUX S.A. acting on behalf of the Company are hereby authorized to pay all costs, expenses and taxes necessary or resulting from the organization of the Company, from the execution of various agreements, from the publication or registration of documents and all other costs and expenses incurred in the context of the daily operation and management of the Company's affairs.

### 13.2. Next Board of Directors Meeting

The next Board of Directors Meeting is scheduled for Thursday, December 8, 2022 at 10:00 a.m.

[initials] 23

# UNIVERSAL INVEST
**Variable Capital Investment Company**
**287, route d'Arlon L-1150 Luxembourg**
**Luxembourg Trade and Companies Register B 47,025**

Having no further agenda items to discuss, the meeting is adjourned at 11:45 a.m.

[signature]                    [signature]                    [signature]
S. CAMMAERT                    P. HAVAUX                      A. CALVISI

24



City of New York, State of New York, County of New York

I, Jacqueline Yorke, hereby certify that the document "**Universal Invest delegation of power**" is, to the best of my knowledge and belief, a true and accurate translation from French into English.

Jacqueline Yorke

Sworn to before me this
March 10, 2025

Signature, Notary Public

WENDY POON
Notary Public - State of New York
No. 01PO0000184
Qualified in Queens County
My Commission Expires February 02, 20 27

Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001 | T 212.400.8840 | F 212.689.1059 | WWW.TRANSPERFECT.COM
OFFICES IN 90 CITIES WORLDWIDE

# Exhibit H

**DELEGATIONS OF AUTHORITY**

**CADELUX S.A.**

In accordance with Article 16 of the Articles of Association of CADELUX S.A.,

and pursuant to a decision of the Board of Directors dated 27 March 2024,

The trustees, mentioned below, have the authority to represent CADELUX S.A. (the Company).

1.  These powers of representation come into force on 27 March 2024 and terminate on the same date all powers previously granted previously by the Board of Directors.

2.  The delegations of authority shall relate to the operations referred to in point 4 below and will be determined for each type of operation:
    - the class of servants of the Corporation who are duly authorized to represent the Corporation;
    - the powers of these officers to act either alone or in pairs.

3.  The different categories of employees of the Company are covered by different categories of powers, namely A, B, C and D. An agent of a higher class is always authorized to represent the Company in transactions that require powers of representation of a lower class.

4.  The transactions, categories of staff involved and minimum signature requirements are determined as follows:

The Board of Directors

Luxembourg, the 27ᵗʰ March 2024.

DELEN PRIVATE BANK
LUXEMBOURG S.A.
CERTIFIED DOCUMENT

DELEN PRIVATE BANK
LUXEMBOURG S.A.
Claudia GENY
Chief Compliance Officer

1

| DEFINITION OF POWERS | |
|---|---|
| **OPERATIONS** | **Minimum signature(s) required**<br>**A>B>C** |
| • Give and sign all payment orders whose amount per transaction does not exceed the limits provided for opposite, depending on the risk of the underlying act; | • Up to EUR 50,000: B + B<br>• up to EUR 250,000: A + B<br>• Beyond: A + A |
| • Commit any charge or expense to the Company whose amount per commitment or expenditure does not exceed the limits provided for opposite, depending on the risk of the underlying act; | • Up to EUR 50,000: B + B<br>• up to EUR 250,000: A + B<br>• Beyond: A + A |
| • Undertake all steps (other than commitments of expenditure or payments; these being subject to the above-mentioned principles) necessary for the operation and exercise of the Company's activity, with the competent administrations, and in particular the CSSF; | C |
| • Enter into all agreements and make all arrangements relating to the delegation of certain functions devolved to the Company in accordance with its appointment as "Management Company" of the various investment funds. | B + B |
| • Represent the Company in its relations with any public administration or private body (including external auditors) and in particular with the tax and VAT administration; | C |
| • Exercise all other powers relating to the day-to-day management of the Corporation; | B |
| • To receive for the Company all shipments, registered and registered parcels, to sign all documents, all minutes, all complaints, all acknowledgements of receipt; | D |
| • Ordinary, non-binding correspondence | D |

2

**AUTHORISED SIGNATURES**
**- A -**

| BRUYNSEELS<br>Chris | |
|---|---|
| LAHAYE<br>Yves | |
| VAN HOVE<br>Daniel | |

**AUTHORISED SIGNATURES**
**- B -**

| PEIFFER<br>Philippe | |
|---|---|
| KEMPENEER<br>Pierre | |
| WERA<br>Gilles | |

**SIGNATURES AUTORISEES**
**AUTHORISED SIGNATURES**
**- C -**

| CLAREN<br>Olivier | |
|---|---|

3

**SIGNATURES AUTORISEES**
**AUTHORISED SIGNATURES**
- D -

| | |
|---|---|
| SCHEER<br>Laurent | *cheer* |

4

# Exhibit I

**CERTIFICATION**

Universal Invest (Universal Invest Dynamic, Universal Invest High, Universal Invest Medium and Universal Invest Low) ("Universal Invest" or "Plaintiff") declares as to the claims asserted under the federal securities laws that:

1.  Plaintiff did not purchase the securities that are the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

2.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary, and will actively monitor and vigorously pursue this action for the benefit of the class.

3.  Plaintiff's Class Period purchase and sale transactions in the AstraZeneca PLC securities that are the subject of this action are attached in Schedule A.

4.  The signatories below are authorized to execute this Certification on behalf of Universal Invest.

5.  Plaintiff has reviewed the facts and allegations of a complaint filed in this action and has authorized the filing of the motion for appointment as Lead Plaintiff on its behalf in this action.

6.  Plaintiff has not sought to serve or served as a representative party for a class action filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*In re Nike Inc. Sec. Litig.*, No. 3:24-cv-00974 (D. Or.)

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses

(including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

We declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

UNIVERSAL INVEST

Signed: _____

Print Name: _____

Digitaal ondertekend door
Gilles Wera
(gilles.wera@cadelux.lu)
Datum: 19/02/2025 08:56:40
Ondertekend met eenmalig
e-mailwachtwoord: 756288

Title: _____

Date: _____

UNIVERSAL INVEST

Signed: _____

Print Name: _____

Title: _____

Digitaal ondertekend door
Pierre Kempeneer
(pierre.kempeneer@cadelux.lu)
Datum: 20/02/2025 10:12:56
Ondertekend met eenmalig
e-mailwachtwoord: 945591

Date: _____

AstraZeneca PLC.

| Schedule A |
| :---: |
| Universal Invest |
| (Universal Invest Dynamic) |
| Transactions in AstraZeneca PLC Spons ADR |

| Spons ADR Purchases |
| :---: |

| Date | Shares | Price |
| :--- | ---: | :---: |
| 03/02/22 | 9,532 | $62.2573 |
| 03/15/22 | 21,999 | $60.9795 |
| 06/14/22 | 5,896 | $60.0100 |
| 08/24/23 | 12,595 | $68.6652 |
| 12/11/23 | 2,821 | $63.4044 |
| 12/13/23 | 12,750 | $65.3958 |
| 12/20/23 | 10,453 | $66.3972 |
| 12/28/23 | 21,240 | $67.5156 |
| 01/02/24 | 12,561 | $68.4276 |
| 02/20/24 | 14,501 | $65.3223 |
| 05/23/24 | 19,460 | $79.1308 |
| 05/24/24 | 18,985 | $78.4418 |
| 05/28/24 | 6,717 | $76.8631 |
| 05/30/24 | 19,382 | $75.9214 |
| 05/30/24 | 19,564 | $76.7954 |
| 06/03/24 | 19,191 | $79.2653 |
| 06/04/24 | 15,324 | $79.6190 |
| 06/05/24 | 18,761 | $80.4902 |
| 06/06/24 | 21,857 | $80.6303 |
| 06/07/24 | 18,657 | $80.2525 |
| 07/17/24 | 19,846 | $79.5592 |
| 07/19/24 | 19,760 | $78.2819 |
| 07/22/24 | 15,039 | $79.2356 |
| 07/30/24 | 19,490 | $78.7608 |
| 07/31/24 | 29,452 | $79.2415 |
| 08/19/24 | 37,230 | $85.0992 |
| 08/26/24 | 22,157 | $86.6167 |
| 09/09/24 | 7,214 | $83.0580 |
| 11/12/24 | 6,642 | $64.3734 |
| 12/04/24 | 17,040 | $66.7869 |

| Spons ADR Sales | | |
|---|---|---|
| **Date** | **Shares** | **Price** |
| 03/28/22 | 24,321 | $65.1274 |
| 04/13/22 | 4,388 | $68.5417 |
| 05/13/22 | 7,186 | $62.7530 |
| 05/18/22 | 8,845 | $63.6553 |
| 05/20/22 | 8,670 | $66.1748 |
| 06/14/22 | 20,235 | $59.3250 |
| 06/22/22 | 3,490 | $63.9670 |
| 06/23/22 | 100 | $64.4750 |
| 06/23/22 | 100 | $64.4750 |
| 06/23/22 | 200 | $64.4750 |
| 06/23/22 | 100 | $64.4750 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 42 | $64.4800 |
| 06/23/22 | 477 | $64.4800 |
| 06/23/22 | 600 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 400 | $64.4800 |
| 06/23/22 | 100 | $64.4800 |
| 06/23/22 | 200 | $64.4800 |
| 06/23/22 | 100 | $64.4900 |
| 03/24/23 | 9,170 | $67.6027 |
| 03/20/24 | 11,067 | $65.3866 |
| 06/24/24 | 94,900 | $77.5000 |

## Universal Invest
### (Universal Invest High)
### Transactions in AstraZeneca PLC Spons ADR

### Spons ADR Purchases

| Date | Shares | Price |
|---|---|---|
| 03/17/22 | 10,083 | $62.74 |
| 11/30/22 | 13,887 | $66.79 |
| 02/13/23 | 12,571 | $69.22 |
| 06/01/23 | 14,399 | $72.65 |
| 08/03/23 | 2,968 | $69.53 |
| 08/04/23 | 6,197 | $69.82 |
| 09/14/23 | 15,412 | $67.50 |
| 12/06/23 | 5,126 | $64.21 |
| 12/27/23 | 11,169 | $67.30 |
| 12/28/23 | 14,211 | $67.52 |
| 01/02/24 | 9,442 | $68.43 |
| 02/06/24 | 4,586 | $66.50 |
| 02/08/24 | 9,584 | $62.07 |
| 03/04/24 | 12,002 | $64.53 |
| 05/23/24 | 14,745 | $79.13 |
| 05/24/24 | 13,952 | $78.44 |
| 05/30/24 | 14,698 | $75.92 |
| 05/30/24 | 14,722 | $76.80 |
| 06/03/24 | 14,440 | $79.27 |
| 06/04/24 | 8,916 | $79.62 |
| 06/05/24 | 14,109 | $80.49 |
| 06/06/24 | 15,986 | $80.63 |
| 06/07/24 | 14,064 | $80.25 |
| 07/17/24 | 15,469 | $79.56 |
| 07/19/24 | 15,380 | $78.28 |
| 07/22/24 | 9,505 | $79.24 |
| 07/30/24 | 15,140 | $78.76 |
| 07/31/24 | 22,856 | $79.24 |
| 08/19/24 | 28,978 | $85.10 |
| 08/26/24 | 17,255 | $86.62 |
| 09/09/24 | 8,148 | $83.06 |
| 10/17/24 | 8,080 | $78.10 |

| | | |
|---|---:|---:|
| 11/04/24 | 7,148 | $71.72 |
| 11/21/24 | 16,568 | $63.79 |

| **Spons ADR Sales** |
|---|

| Date | Shares | Price |
|---|---:|---:|
| 05/17/22 | 9,890 | $65.56 |
| 06/08/22 | 6,017 | $65.22 |
| 06/14/22 | 7,870 | $59.33 |
| 03/20/24 | 5,176 | $65.39 |
| 06/24/24 | 38,700 | $77.50 |

**Schedule A**
**Universal Invest**
**(Universal Invest Medium)**
**Transactions in AstraZeneca PLC Spons ADR**

**Spons ADR Purchases**

| Date | Shares | Price |
|---|---|---|
| 03/15/22 | 8,281 | $60.98 |
| 05/19/22 | 6,758 | $64.29 |
| 07/12/22 | 6,983 | $66.96 |
| 07/12/23 | 3,113 | $66.69 |
| 11/17/23 | 6,888 | $64.10 |
| 12/12/23 | 7,090 | $63.95 |
| 12/20/23 | 7,022 | $66.40 |
| 12/22/23 | 2,297 | $66.63 |
| 12/28/23 | 4,653 | $67.52 |
| 12/29/23 | 3,545 | $67.48 |
| 01/02/24 | 8,243 | $68.43 |
| 01/10/24 | 3,666 | $69.42 |
| 01/12/24 | 2,631 | $69.39 |
| 05/23/24 | 12,478 | $79.13 |
| 05/24/24 | 13,112 | $78.44 |
| 05/30/24 | 12,500 | $75.92 |
| 05/30/24 | 12,522 | $76.80 |
| 06/03/24 | 12,284 | $79.27 |
| 06/04/24 | 12,146 | $79.62 |
| 06/05/24 | 12,009 | $80.49 |
| 06/07/24 | 11,915 | $80.25 |
| 07/17/24 | 12,590 | $79.56 |
| 07/19/24 | 12,556 | $78.28 |
| 07/22/24 | 12,413 | $79.24 |
| 07/30/24 | 12,406 | $78.76 |
| 07/31/24 | 18,768 | $79.24 |
| 08/19/24 | 23,626 | $85.10 |
| 08/26/24 | 14,052 | $86.62 |
| 09/09/24 | 5,957 | $83.06 |
| 10/17/24 | 6,487 | $78.10 |

| Spons ADR Sales | | |
| --- | --- | --- |
| **Date** | **Shares** | **Price** |
| 02/24/22 | 5,200 | $57.29 |
| 03/18/22 | 5,364 | $63.16 |
| 03/22/22 | 7,982 | $63.48 |
| 03/24/22 | 11,092 | $64.20 |
| 03/24/22 | 7,491 | $64.91 |
| 03/28/22 | 5,123 | $65.06 |
| 03/28/22 | 3,633 | $65.13 |
| 03/30/22 | 6,030 | $66.84 |
| 04/08/22 | 4,015 | $70.90 |
| 04/13/22 | 5,397 | $68.54 |
| 04/14/22 | 9,455 | $68.84 |
| 04/27/22 | 4,502 | $65.95 |
| 05/18/22 | 5,718 | $63.66 |
| 05/20/22 | 7,075 | $66.17 |
| 05/31/22 | 9,661 | $66.08 |
| 06/03/22 | 6,189 | $66.01 |
| 06/08/22 | 5,943 | $65.22 |
| 06/22/22 | 6,044 | $63.97 |
| 08/24/22 | 10,465 | $67.13 |
| 12/28/22 | 4,030 | $67.85 |
| 01/11/23 | 3,802 | $71.16 |
| 02/16/23 | 6,892 | $67.81 |
| 03/24/23 | 5,846 | $67.60 |
| 03/14/24 | 14,247 | $67.09 |
| 03/20/24 | 7,226 | $65.39 |
| 06/24/24 | 68,000 | $77.50 |
| 12/16/24 | 3,719 | $66.97 |

**Schedule A**
**Universal Invest**
**(Universal Invest Low)**
**Transactions in AstraZeneca PLC Spons ADR**

**Spons ADR Purchases**

| Date | Shares | Price |
|---|---|---|
| 12/12/22 | 5,709 | $69.44 |
| 01/10/23 | 5,882 | $72.01 |
| 12/12/23 | 1,072 | $63.95 |
| 12/20/23 | 1,074 | $66.40 |
| 01/02/24 | 1,267 | $68.43 |
| 01/12/24 | 1,767 | $69.39 |
| 05/23/24 | 1,818 | $79.13 |
| 05/24/24 | 1,825 | $78.44 |
| 05/28/24 | 768 | $76.86 |
| 05/30/24 | 1,859 | $75.92 |
| 05/30/24 | 1,865 | $76.80 |
| 06/03/24 | 1,825 | $79.27 |
| 06/04/24 | 1,808 | $79.62 |
| 06/05/24 | 1,788 | $80.49 |
| 06/07/24 | 1,769 | $80.25 |
| 07/17/24 | 1,863 | $79.56 |
| 07/19/24 | 1,861 | $78.28 |
| 07/22/24 | 708 | $79.24 |
| 07/25/24 | 2,622 | $77.34 |
| 07/30/24 | 1,844 | $78.76 |
| 07/31/24 | 2,784 | $79.24 |
| 09/04/24 | 2,034 | $85.81 |
| 09/11/24 | 3,109 | $79.79 |
| 10/25/24 | 1,270 | $75.44 |
| 11/05/24 | 1,786 | $65.63 |
| 12/10/24 | 2,058 | $67.44 |

| Spons ADR Sales | | |
|---|---|---|
| Date | Shares | Price |
| 03/18/22 | 11,343 | $63.16 |
| 03/31/22 | 3,662 | $66.88 |
| 04/12/22 | 7,320 | $68.91 |
| 04/28/22 | 5,893 | $65.55 |
| 06/08/22 | 4,213 | $65.22 |
| 08/18/22 | 5,924 | $66.31 |
| 11/28/22 | 3,158 | $66.77 |
| 12/14/22 | 2,444 | $70.45 |
| 01/24/23 | 1,991 | $66.06 |
| 01/31/23 | 4,457 | $65.17 |
| 03/02/23 | 1,999 | $64.82 |
| 04/03/23 | 2,011 | $69.54 |
| 05/22/23 | 3,540 | $74.76 |
| 03/05/24 | 1,652 | $64.93 |
| 03/20/24 | 1,082 | $65.39 |
| 04/08/24 | 3,817 | $67.53 |
| 06/24/24 | 10,300 | $77.50 |
| 09/12/24 | 1,288 | $79.15 |
| 11/06/24 | 2,086 | $64.16 |
| 11/25/24 | 2,736 | $66.35 |