UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JERIES SALEH, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>ASTRAZENECA PLC, PASCAL SORIOT, ARADHANA SARIN, WANG LEI (aka LEON WANG), and DAVID FREDRICKSON,<br><br>Defendants. | Civil Action No. 1:25-cv-04088 (VSB)<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

# Table of Contents


I. INTRODUCTION ....................................................................................................1

A. AstraZeneca's Chinese Scandal: A Comprehensive Critical Analysis of Systemic Corporate Wrongdoing Leading to Unconscionable Impact on Lung Cancer Patients and Violations of Federal Securities Laws ..........................2

B. Tagrisso, Its Market, and the Mechanics of Illegally Increasing Tagrisso Sales ....................................................................................................4

C. Defendants' Scheme to Fraudulently Increase Tagrisso Sales Ignored the Unconscionable Harm to Lung Cancer Patients ...........................................7

D. The Tagrisso Insurance Fraud Scheme Began in January 2019 and Expanded Throughout China ..............................................................9

E. AstraZeneca Conceals the Sweeping Criminal Investigation into Fraudulent Misconduct Revealed by the Shenzhen Whistleblower ......................16

F. Contrary to AstraZeneca's Response to the Shenzhen Investigation, the Chinese Anti-Corruption Crackdown Implicated AstraZeneca in a Country-wide Conspiracy to Illegally Increase Tagrisso Drug Sales....................19

G. AstraZeneca is Forced to Acknowledge the Scope and Devastating Impact of the Tagrisso Insurance Fraud.......................................................22

II. JURISDICTION AND VENUE .......................................................................24

III. PARTIES .......................................................................................................25

A. Lead Plaintiffs..........................................................................................25

B. Defendants ..............................................................................................25

IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................................................................32

A. Defendants' Actionable Misstatements and Omissions During the Company's February 10, 2022 Conference Call..............................................33

B. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K, Filed on February 10, 2022, and During the Company's February 10, 2022 Conference Call ..........................................................37

C. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 10 and 22, 2022 ...................................39

D. Defendants' Actionable Misstatements and Omissions on the Company's Form 6-K, Filed on April 29, 2022, and During the Company's April 29, 2022 Conference Call ....42

E. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 29, 2022 ....49

F. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed November 10, 2022 ....51

G. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 9 and 21, 2023 ....53

H. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on April 27, 2023 ....58

I. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 28, 2023 ....59

J. Defendants' Actionable Misstatements and Omissions on the Company's Form 6-K, Filed on November 9, 2023, and During the Company's November 9, 2023 Conference Call ....61

K. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 8 and 20, 2024 ....63

L. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on April 25, 2024 ....68

M. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 25, 2024 ....70

N. Defendants' Actionable Misstatements and Omissions During Soriot's September 10, 2024 Interview with *Bloomberg* ....71

V. THE TRUTH BEGINS TO EMERGE ....74

VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER ....76

A. Defendant Wang's Senior Position and Involvement in the Fraud is Evidence of Scienter ....77

B. The Individual Defendants' Public Statements and Filings Confirm that They Had Knowledge of the Investigation and True Scope of the Fraud ....81

C. The Fraud Was Pervasive and Widespread and Involved Senior Managers and Other High-Level AstraZeneca Personnel ....83

D. The Company Went to Great Lengths to Hide Its Executives' Involvement in the Fraud ....................86

E. The Development and Sale of Tagrisso in China Was a Core Operation..............89

VII. LOSS CAUSATION/ECONOMIC LOSS ....................92

VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ....................99

IX. NO SAFE HARBOR ....................99

X. CONTROL PERSON ALLEGATIONS....................100

XI. CLASS ACTION ALLEGATIONS ....................102

XII. CLAIMS FOR RELIEF ....................105

XIII. PRAYER FOR RELIEF ....................109

XIV. JURY DEMAND....................109

Lead Plaintiffs Universal Invest (Universal Invest Dynamic, Universal Invest High, and Universal Invest Medium) ("Universal") and C+F (C+F Global, C+F Global Route, C+F Very Low, and C+F World Equities) ("C+F") (collectively, "Lead Plaintiffs"), individually and on behalf of all others similarly situated, allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based upon, *inter alia*, their counsel's investigation.[1]

## I. INTRODUCTION

1. Lead Plaintiffs bring this federal securities class action for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, on behalf of themselves and all other similarly situated persons or entities (the "Class") who purchased or otherwise acquired the publicly traded securities of AstraZeneca between February 10, 2022 and November 5, 2024, inclusive (the "Class Period").

2. AstraZeneca is a global biopharmaceutical company, headquartered in Cambridge, the United Kingdom, that focuses on the discovery, development, manufacturing and commercialization of prescription medicines, primarily for the treatment of diseases in three main

---

[1] Counsel's investigation included, but was not limited to, a review and analysis of: (i) AstraZeneca PLC's ("AstraZeneca" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) transcripts of AstraZeneca's public conference calls and presentations; (iii) AstraZeneca's press releases and media, and research reports regarding AstraZeneca; (iv) information about AstraZeneca's publicly-traded securities, including pricing and volume data for AstraZeneca's publicly traded American Depository Receipts ("ADRs") traded on the Nasdaq Stock Market ("NASDAQ"); (v) interviews with former AstraZeneca employees who were at the Company during the Class Period, including former employees who were detained and/or convicted for their involvement in AstraZeneca's scheme; and (vi) other publicly available material and data identified herein. Counsel's investigation is ongoing, and many of the facts supporting the allegations contained herein are known only to the Defendants named herein or are exclusively within their custody and control. Lead Plaintiffs believe and are informed by their interviews with former AstraZeneca employees that substantial additional evidentiary support exists for the allegations set forth herein and will be confirmed after a reasonable opportunity for discovery.

therapy areas: (i) Oncology, (ii) Cardiovascular, Renal & Metabolism, and (iii) Respiratory & Immunology. AstraZeneca is active in over 125 countries worldwide, with major research and development centers in China, Japan, Sweden, the United Kingdom (the "UK"), and the United States (the "U.S.").

3. AstraZeneca first entered the Chinese market in 1993 and has since become the largest multinational pharmaceutical company in the country, with its headquarters in Shanghai and regional headquarters in cities, including Beijing and Guangzhou. By 2021, the British manufacturer had become the largest foreign pharmaceutical company in China. Under the leadership of Defendant Leon Wang, President of AstraZeneca China, China sales grew from just 7% of the Company's total revenues in 2013 to 20% at its peak in 2019.

4. This case arises out of a widespread fraudulent scheme to illegally boost revenue from Tagrisso, AstraZeneca's best-selling drug worldwide, a blockbuster lung cancer treatment, which was responsible for over 40% of its revenue in China. The Chinese market for Tagrisso was a massive and tempting opportunity for the Company because the sheer number of new lung cancer patients eligible for the drug is estimated to be 200,000 to 300,000 annually. Defendants illegally increased Tagrisso sales in China in various ways, including by falsifying genetic testing results so that more patients in China could obtain the drug. This scheme not only allowed patients to be reimbursed by China's national medical insurance fund when they were not otherwise entitled to such reimbursement, but even worse, subjected patients to unnecessary, expensive, and potentially harmful treatment with no clinical benefit.

### A. AstraZeneca's Chinese Scandal: A Comprehensive Critical Analysis of Systemic Corporate Wrongdoing Leading to Unconscionable Impact on Lung Cancer Patients and Violations of Federal Securities Laws

5. The AstraZeneca Chinese scandal, revealed in late 2024, is a case study in how systemic corporate wrongdoing, a toxic sales culture, and the corporate-wide flouting of

compliance designed to keep pharmaceutical sales legal can converge to produce widespread harm. Defendants' unchecked commercial ambition caused a triumvirate of wrongdoing and legal consequences as follows:

(a) **Unconscionable Impact on Patients**: AstraZeneca trained its sales organization to illegally qualify lung cancer patients for treatment with Tagrisso by tampering with genetic test results crucial to determine whether the drug would even be efficacious;

(b) **Embezzlement**: AstraZeneca's illegal tampering allowed the Company to siphon millions from China's national medical insurance system by improperly claiming insurance reimbursement for patients who did not qualify; and

(c) **Federal Securities Law Violations**: AstraZeneca and the Individual Defendants violated the federal securities laws by falsely stating and omitting material information they were required to disclose that the Company: (i) engaged in a country-wide scheme to illegally increase Tagrisso sales; (ii) as a result of the scheme was subject to a massive criminal investigation; (iii) was misleading investors that previous reports of falsified genetic test reports by sales representatives were isolated incidents limited to a few individuals; (iv) did not have a strong compliance department to prevent and correct these fraudulent activities; and (v) was impacted by the anti-corruption crackdown in China.

6. The truth, however, was that AstraZeneca's illegal Tagrisso scheme and subsequent cover up was actually a sprawling, multi-province criminal enterprise implicating every level of AstraZeneca's China organization. Far from adhering to compliance programs and standards, AstraZeneca covered up the fraud and left lower-level employees to bear the brunt of criminal prosecution. While AstraZeneca reaped enormous profits and the benefits of the fraud by

increasing Tagrisso sales, Lead Plaintiffs and other AstraZeneca investors who are members of the class, suffered enormous losses when the fraud was revealed.

### B. Tagrisso, Its Market, and the Mechanics of Illegally Increasing Tagrisso Sales

7. Lung cancer is the most common malignant tumor and the leading cause of cancer-related deaths worldwide. In China, lung cancer is a major public health concern, with over 700,000 lung cancer-related deaths and 800,000 to 1 million new cases per year. About 80% to 85% of all lung cancer cases are non-small cell lung cancer ("NSCLC"), making it the most common type of lung cancer. People diagnosed with NSCLC have a very low 5-year survival rate of approximately 25% (5-15% in advanced stages), as over half of all NSCLC patients die within one year of diagnosis.

8. Amongst patients with NSCLC, a mutation in their epidermal growth factor receptor ("EGFR") gene may develop, which can drive cancer cell growth. The most common EGFR mutations are the exon 19 deletion and the exon 21 (L858R) point mutation, which make up about 90% of EGFR mutations. EGFR-mutation-positive lung cancer represents about 10-15% of all lung cancers in the U.S., while about 30%-40% of cases in Asian countries. EGFR mutations are even more common in East Asian populations such as in China, with rates reported as high as 40% to 50%. These EGFR mutations impact approximately 200,000 to 300,000 new NSCLC patients annually.

9. Tagrisso is the brand name for the drug "osimertinib," a third-generation EGFR tyrosine kinase inhibitor ("EGFR TKI"), a targeted therapy for NSCLC patients only if they have specific EGFR mutations. EGFR TKIs, such as Tagrisso, are used to reverse the effects of genetic mutations that drive cancer. Tagrisso blocks the activity of the EGFR protein by interfering with the signals that the abnormal EGFR protein sends to cancer cells to grow and multiply.

Consequently, Tagrisso and other EGFR TKIs can control the cancer for several months or even multiple years depending on the patient. However, it will not cure the cancer. Ultimately, the cancer learns a way around these treatments, which is called "acquired resistance."

10. While Tagrisso is now commonly used as a first-line treatment for initial EGFR mutations, including the exon 19 deletion and exon 21 (L858R) point mutations, its initial scope was much more limited. Tagrisso was first approved and strategically designed as a second-line treatment to overcome an acquired resistance mutation known as the T790M mutation. Specifically, about half of patients of first- and second-generation EGFR medications develop a T790M mutation, in addition to, or on top of, the initial mutations as a mechanism of acquired resistance. The T790M "secondary" mutation is just one of the many different mechanisms and types of resistance that can develop in EGFR patients. In November 2015, Tagrisso was approved by the U.S. FDA for treatment solely for patients with the T790M resistance mutation, providing a treatment option for patients who developed resistance to prior EGFR TKI therapy.

11. In 2017, China first approved Tagrisso as a second-line treatment. In 2018, Tagrisso was added to China's National Reimbursement Drug List ("NRDL"), providing insurance coverage if a patient could show: (1) disease progression after first-line therapy; and (2) a positive genetic test for the T790M mutation. Tagrisso was not eligible for insurance reimbursement for first-line treatment for patients who only harbored the initial EGFR mutations and did not undergo any prior treatment. Nor was Tagrisso approved or eligible for insurance reimbursement for the other half of patients who developed other kinds of resistance to prior EGFR TKI therapy besides the T790M mutation. For those patients who developed other forms of resistance, Tagrisso had no clinical benefit and was not medically recommended. The inclusion of Tagrisso in the NRDL was a watershed moment for AstraZeneca in China as it made the drug accessible to a much larger

patient population than in the U.S. NRDL inclusion, however, initially created two dilemmas for AstraZeneca.

12. First, immediately after NRDL inclusion, Tagrisso sales actually declined in China because the Company was forced to discount the drug more than any other cancer drug approved to be on the NRDL in 2018. Thus, revenue declined while the Company ramped drug sales to a larger population.

13. Second, the Company was well aware of the growth limitations of Tagrisso with NRDL inclusion for only second-line treatment. The real opportunity was in treating first-line patients because in China 40%-50% of lung cancer patients have EGFR mutations, 4-5 times higher than Caucasian populations. Patients meeting the criteria for second-line insurance reimbursement were a much smaller subset of the patient market according to a former sales representative. As Defendant Fredrickson, AstraZeneca's Executive Vice President, Oncology Business Unit, explained to *FiercePharma* in an article published on October 24, 2019, "[b]ecause Tagrisso's front-line use is not limited to T790M mutation—as its second-line [] is—twice as many patients would be eligible for treatment." Fredrickson further acknowledged, first-line patients are by definition treated earlier, providing a significantly longer cycle for Tagrisso sales per patient compared to second-line treatment. The duration of treatment for first-line patients has been measured to be about 80% longer than second-line treatment for the T790M mutation. The number of "first-time patients" was quantified as 200,000 to 300,000 per year by detained former director of AstraZeneca's Eastern Region Chen Bin, who was convicted for his role in organizing the Tagrisso insurance fraud in Fujian and Jiangxi.

14. Defendant Wang oversaw every aspect of AstraZeneca China's operations, taking an active, hands-on management approach that included personally interviewing sales

representatives. He was responsible for increasing revenue in China from 7% of the Company's overall revenue in 2013 to 20% in 2019. To address the initial dip in revenue from NRDL inclusion and the untapped opportunity in first-line sales, Wang put tremendous pressure on the entire Tagrisso sales organization with 1,700 employees. The message carried down from senior management was clear—increase Tagrisso sales immediately after listing on the NRDL rather than wait for the lumbering bureaucratic process to play out.

### C. Defendants' Scheme to Fraudulently Increase Tagrisso Sales Ignored the Unconscionable Harm to Lung Cancer Patients

15. The most egregious aspect of the insurance fraud was its impact on patients. Tagrisso is only effective for NSCLC patients with specific EGFR mutations. By falsifying test results, AstraZeneca's scheme subjected patients without these mutations to a powerful, expensive drug with no clinical benefit—potentially exposing them to unnecessary side effects, false hope, and delayed access to appropriate therapies.

16. Court documents and media reports detail cases where patients, desperate for treatment, were manipulated into believing they were eligible for Tagrisso, and that it would be effective even if they did not have the specific kind of resistance Tagrisso was designed and approved to treat. AstraZeneca's sales representatives were pressured to falsify genetic test results to increase Tagrisso sales.

17. Defendants' scheme to inflate Tagrisso sales was both simple and audacious. Under immense pressure to meet ever-increasing sales targets, AstraZeneca sales representatives, often in collusion with third-party genetic testing companies, systematically falsified genetic test reports to show false positive T790M mutations. This allowed ineligible patients to obtain Tagrisso at the expense of the national insurance fund. The mechanics included:

- ***Collusion with Testing Labs***: District managers—with direct encouragement from Eastern region director Chen Bin—were constantly looking at ways to increase the

positivity rate through genetic testing companies in order to increase Tagrisso sales. Certain labs, such as Suzhou Jianlu Genetic Testing, agreed to provide positive results for samples marked with a star, in exchange for kickbacks to AstraZeneca managers and sales representatives. This arrangement, known internally as the "Star Project," allowed sales representatives to guarantee positive results for patients who would otherwise be ineligible for Tagrisso. The "Star Project" was implemented across the entire Fujian region. According to court documents, all employees in Fujian were encouraged to cooperate with testing companies to facilitate the tampering of genetic results. Executives from these testing companies, several of whom are former AstraZeneca executives, have also been detained in the Tagrisso investigation.

- ***Free Genetic Testing***: AstraZeneca sales representatives, as directed by senior managers, used free genetic testing as a means to unlawfully increase sales volumes. Sales representatives, in violation of the Company's compliance rules and industry norms, directly collected patient samples, submitted them for testing, and ensured they received the results. Free tests were used in abundance to ostensibly determine whether patients qualified for second-line treatment with the T790M mutation. By inserting themselves into the testing process, it created ample opportunity for tampering so if the test was negative, the sales representatives would employ free retesting and magically produce a positive result. The free tests were easily manipulated and allowed AstraZeneca to inflate the positivity rate of patients with the T790M mutation to as high as 80-90% in certain instances. In some cases, they even issued positive test reports without actual sample submission.

- ***Direct Falsification***: Sales representatives altered digital or paper test reports, sometimes using basic editing software, to change results from negative to positive. In some cases, they simply modified the test reports themselves, replacing names on positive test reports or using templates to create fake reports. A Shenzhen sales representative described converting reports to editable formats and changing patient names. Luo Jinsheng, a convicted team leader in the south Fujian province, testified that the nationwide tampering of tests reports was a widespread phenomenon at AstraZeneca.

- ***Prescription Forgery and Identity Theft***: In some cases, sales representatives forged prescriptions or used the identities of real patients to obtain Tagrisso, which was then resold or distributed to others.

- ***Indoctrination and Brainwashing***: In addition to immense sales pressure, sales representatives were indoctrinated by upper management to wrongly believe that they were enabling more patients to benefit, despite committing clear insurance fraud. This was embodied in the Company's slogan used in corporate training: "Life does not choose one in four." The message sent to sales representatives was clear—while only 25% of non-small lung cancer patients harbor the T790M acquired resistance mutation, 100% of patients could benefit. Although the slogan

defied the medical science, it became the foundation of the sales representatives' training program.

### D. The Tagrisso Insurance Fraud Scheme Began in January 2019 and Expanded Throughout China

18. The Company's health insurance scheme began shortly after Tagrisso was included on the NRDL for second-line treatment. By January 2019, just four months after the NDRL listing price cut, AstraZeneca employees were already falsifying genetic test reports and establishing improper benefit-sharing arrangements with testing companies. AstraZeneca's Tagrisso sales organizations began training the sales representatives to illegally increase Tagrisso sales throughout China. Several examples include:

- June–July 2019: Zuo Yingquan, Southern China Sales Director, begins instructing subordinates to falsify lung cancer patients' genetic test reports, resulting in ¥3.56 million in overbilling to the China's national insurance. Court evidence showed he, via team meetings, ordered teams to: "Flexibly handle genetic reports," "Use any means to get it done" and "Help ineligible patients access the drug."
- August 2019: Huang Wei, a former AstraZeneca manager in the Quanzhou/Fuzhou province partnered with Suzhou Jianlu Genetic Testing to initiate Project Star. When a patient's name on genetic testing requisition form was marked with a five-pointed star, the lab guaranteed positive results. Sales representatives earned 60% kickbacks per falsified test. Chen Bin, AstraZeneca's China Eastern Region Director, endorsed the practice to boost Tagrisso sales.
- August 14, 2019: At a Fuzhou sales meeting, Huang Wei promoted the Jianlu testing lab's reliable positive results as part of the Star Project. Chen Bin suggested "sending samples to partnered genetic testing institutions to convert them into T790M-positive results, thus enabling reimbursement for Tagrisso and increasing its sales."
- November 2019: From a criminal judgment, a convicted sales representative testified that she asked her superior the "master" for advice and was instructed to change the patient's test result from negative to positive.

19. From media reports and the criminal judgments handing down jail sentences and monetary fines, it is clear that AstraZeneca's instructions to illegally increase Tagrisso sales were heeded throughout China:

- October–November 2019: AstraZeneca sales representatives in Yibin (Sichuan) and Beijing, forged prescriptions.

- April 11, 2023: AstraZeneca sales representative Du Xianqing was convicted of falsifying genetic test reports from August to December 2020, defrauding ¥112,238 from national medical funds. Xianqing was sentenced to two years in prison and fined ¥10,000.

- July 10, 2023: AstraZeneca sales representative Hou was convicted of falsifying patient records in April 2021 and submitting it to the Baotou Tumor Hospital, defrauding ¥40,382 from national medical funds. Hou was sentenced to 10 months in prison and fined ¥5,000.

- October 30, 2023: AstraZeneca sales representative Wan was convicted of falsifying genetic test reports in August 2021, defrauding ¥68,299 from national medical funds. Wan was sentenced to three years in prison and fined ¥20,000.

- December 12, 2023: AstraZeneca sales representative Guo was convicted of falsifying genetic test reports in January 2021, defrauding ¥33,408 from national medical funds. Guo was sentenced to 14 months in prison and fined ¥30,000.

- January 22, 2024: AstraZeneca sales representatives Teng Wenjun and Wu Yuyao were convicted of falsifying genetic test reports since late 2020, defrauding ¥246,500 from national medical funds. Wenjun was sentenced to one year and 10 months in prison and fined ¥9,000. Yuyao was sentenced to three years in prison and fined ¥20,000.

- February 18, 2024: AstraZeneca sales representative Cao was convicted of falsifying genetic test reports from October 2020 to February 2021, defrauding ¥49,572 from national medical funds. Cao was sentenced to one and a half years in prison and fined ¥5,000.

- February 18, 2024: AstraZeneca sales representative Liu was convicted of falsifying genetic test reports from September 2020 to January 2021, defrauding ¥212,464 from national medical funds. Liu was sentenced to two and a half years in prison and fined ¥40,000.

- April 7, 2024: AstraZeneca sales representative Ma was convicted of falsifying genetic test reports for four lung cancer patients from 2020 to 2021, defrauding ¥220,091 from national medical funds. Ma was sentenced to three years in prison and fined ¥5,000.

- April 15, 2024: AstraZeneca sales representative Li was convicted of falsifying genetic test reports for one cancer patient, defrauding ¥52,228 from national medical funds. Li was sentenced to three years in prison and fined ¥10,000.

- April 17, 2024: AstraZeneca sales representative Yan was convicted of falsifying genetic test reports for two cancer patients between August and December 2020 to increase Tagrisso sales, defrauding ¥41,628 from national medical funds. Yan was sentenced to eight months in prison and fined ¥5,586.

- June 5, 2024: AstraZeneca sales representatives Wang and Zhang, who were instructed by Zhai a sales director in Qinghai, were convicted of falsifying genetic test reports for four cancer patients, defrauding ¥206,583 from national medical funds. Zhai was sentenced to three years in prison and fined ¥20,000. Wang was sentenced to two years and six months in prison and fined ¥20,000. Zhang was sentenced to one year and six months in prison and fined ¥5,000.

- June 6, 2024: AstraZeneca sales representative Yu was convicted of falsifying genetic test reports for three patients in 2020, defrauding ¥188,190 from national medical funds. Yu was sentenced to two years in prison and fined ¥20,000.

- August 12, 2024: AstraZeneca sales representative Zhang was convicted of falsifying genetic test reports between April to December 2020 to boost Tagrisso sales, defrauding ¥43,599 from national medical funds. Zhang was sentenced to 18 months in prison and fined ¥10,000.

- August 22, 2024: AstraZeneca sales representative Chen was convicted of fraudulently using an identifier to obtain Tagrisso for 5 ineligible patients, defrauding ¥45,738 from national medical funds. Chen was sentenced to 8 months in prison and fined ¥2,000.

- August 27, 2024: AstraZeneca sales representative Wen was convicted of falsifying genetic test reports for three cancer patients, defrauding ¥206,260 from national medical funds. Wen was sentenced to one year and four months in prison and fined ¥15,000.

- October 8, 2024: AstraZeneca sales representative Xu was convicted of falsifying genetic test reports for two cancer patients, defrauding ¥109,094 from national medical funds. Xu was sentenced to three years in prison and fined ¥20,000.

- December 20, 2024: AstraZeneca sales representative Wang was convicted of knowingly falsifying genetic test reports for patients, defrauding more than ¥100,000 from national medical funds. Wang was sentenced to one and a half years imprisonment and fined ¥5,000. Another employee, sales representative Tan, was convicted for the same misconduct the same day and sentenced to one year and five months in prison and fined ¥5,000.

20. The geographic breadth of the Tagrisso insurance fraud became staggering. The fraud was not limited to a single city or province; it spread across at least eight provinces and municipalities, including Guangdong, Fujian, Sichuan, Chongqing, Jiangxi, Shenzhen, and

Shanghai. As a convicted sales representative testified, "Across the country, it was a widespread phenomenon for AstraZeneca sales reps to tamper with test reports." Chinese media further reported that the volume of falsified reports was "massive."

21. Sales representatives were the foot soldiers of the fraud, executing the mechanics of falsification and patient contact. Many were young, recent graduates, lured by the promise of high bonuses. Sales representatives were under immense pressure to meet sales targets that were often unattainable through legitimate means.

22. The Company's bonus system, while complex, was structured in such a way that performance was heavily weighted, with compliance playing a secondary role. Sales representatives admitted to modifying patient reports and the overwhelming evidence points to a system where commercial pressure, not patient welfare, was paramount. AstraZeneca's China operation was notorious for its aggressive sales culture. Performance targets were set at levels that could not be achieved through legitimate means, and employees faced constant threats of demotion or dismissal for underperformance. The Company implemented strict ranking systems, with the lowest performers routinely eliminated.

23. Compliance was an afterthought; performance was everything. At AstraZeneca, only lip service was paid to compliance which no one took seriously, not even the leaders. During large sales training meetings, when illegal methods to increase sales were discussed, compliance employees in attendance would leave the training session and go out for a smoke break.

24. The fraud was not a matter of a few rogue sales representatives responding to intense pressure to perform. Managers at every level transmitted this pressure downward, creating a climate where, hitting performance targets "at all costs," was not just encouraged, but required. The clear pattern was that regional managers, provincial directors, and even national sales directors

organized and encouraged the scheme. Court documents and testimony reveal that these managers not only condoned but actively encouraged fraudulent practices and held meetings where sales representatives were trained in the mechanics of falsification. For example,

- **Zuo Yingquan**, AstraZeneca's Regional Sales Director for Southern China: In January 2022, Zuo Yingquan was arrested by Shenzhen police following the Healthcare Security Bureau of Shenzhen's investigation into the AstraZeneca insurance fraud case. Zuo Yingquan instructed subordinates to alter genetic test reports of lung cancer patients who did not meet the insurance reimbursement criteria for purchasing Tagrisso. Specifically, Zuo Yingquan told his subordinates to "[f]lexibly handle genetic reports" and "[u]se any means to get it done," including using Amoy Diagnostics Co. Ltd. ("AmoyDx"), a Xiamen, Fujian-based testing company. Zuo Yingquan was one of seven national directors, overseeing Tagrisso commercialization across five provinces, including Guangdong, Guangxi, Hunan, Hainan, and Yunnan. Court evidence shows the insurance fraud perpetrated by Zuo Yingquan and his subordinates began as early as mid-2019 and resulted in a loss of over ¥3.56 million in insurance funds. In August 2023, a district court in Shenzhen convicted and sentenced Zuo Yingquan to 11.5 years, along with 13 members of his sales team. In September 2024, Zuo Yingquan was convicted in a second trial after he appealed his first conviction and again was sentenced to 11.5 years.

- **Chen Bin**, AstraZeneca's Regional Sales Director for Eastern China in charge of Fujian and Jiangxi Provinces: Accused of endorsing and promoting the use of labs that would guarantee positive results and instructing staff to "convert more negative-testing patients into positive-testing patients." At an August 2019 meeting, Chen Bin endorsed and acknowledged the Star Project and urged everyone to continue following the approach by seeking more T790M-negative patients and converting them into positives. Chen Bin specifically traveled to the Fujian Province to "solve the 'issue' of patients' relatively low positive rate." When the positivity rate increased exponentially to as high as 80% in collusion with testing labs, Chen Bin was reportedly satisfied, praising the approach of the regional managers. Chen Bin is currently in custody while his first trial is ongoing.

- **Zhu Jiakang**, former Vice President of AstraZeneca China, Head of the Business Unit of Targeted Therapy for Lung Cancer and Tumor Immunotherapy: In July 2024, Zhu Jiakang was detained for questioning concerning the insurance fraud scheme. Zhu directly supervised directors of five regions of Greater China, including eastern China regional director Chen Bin. According to court records, as far back as 2022, investigative authorities were seeking documents sent by Zuo Yingquan to Zhu Jiakang detailing the medical insurance fraud, but the Company refused to provide the documents on grounds they involved "trade secrets." During her employment at AstraZeneca, Zhu Jiakang reported directly to Yin Min, the General Manager of AstraZeneca's Oncology Business Unit in China, who reported directly to Defendant Wang. Zhu Jiakang's detention marked the first time the

AstraZeneca insurance fraud probe implicated AstraZeneca China's senior leadership.

- **Yin Min**, former General Manager of AstraZeneca's Oncology Business Unit in China: One of the core executives of AstraZeneca China and reported directly to Defendant Wang. Yin Min oversaw AstraZeneca's growing oncology department during the insurance fraud scheme and was Zhu Jiakang's direct supervisor. On October 25, 2024, five days before Defendant Wang was arrested, Yin Min was detained for questioning by Chinese regulatory authorities.

- **Xie Qiong**, AstraZeneca China's Vice President and Head of Urology Oncology, Gynecology and Female Oncology Business Units, was taken away from AstraZeneca's Shanghai headquarters at the same time as Yin Min.

- **Shi Yuanjie**, Lung Cancer Division Marketing Director, was detained in Shenzhen in July 2024. Shi was responsible for market execution of the lung cancer business unit.

- **Ouyang Haolei**, China Hematology Division Director was detained in Shenzhen in July 2024. Ouyang was previously the head of the County-level Oncology Business Department.

- **Xue Yuwei**, former Deputy Director of Marketing (Lung Cancer Screening/Innovation) of AstraZeneca China: Employed at AstraZeneca during the insurance fraud scheme. Xue subsequently joined Shanghai Ruiang Gene Technology Co., Ltd. ("Ruiang Gene"), a leading third-party genetic testing company, of which AstraZeneca is one of its top five customers. In July 2024, Xue, along with several other Ruiang Gene executives, were placed under residential surveillance at a designation location for suspicion of illegal business operation relating to AstraZeneca's insurance fraud scheme. In October 2024, Xue was criminally detained and charged with the crime of fraud.

- **Huang Wei**, AstraZeneca's Regional Sales Manager for Quanzhou and Fuzhou: urged that AstraZeneca's eastern region to "constantly look" for ways to "increase the positivity rate through genetic testing companies." To this end, Huang recommended that by colluding with Jianlu Genetic Testing Company ("Jianlu Company"), AstraZeneca could increase the positivity rate of T790M mutations to over 80%, thereby providing a much greater opportunity for Tagrisso sales. In January 2019, Huang contacted the Jianlu Company and devised the Star Project. On August 14, 2019, at a Fuzhou sales meeting attended by Chen Bin, the East China Regional Sales Director for AstraZeneca, Huang promoted the Star Project and it was endorsed by Chen Bin. Huang was sentenced to ten years and eight months in prison at the conclusion of his first trial.

- **Wang Gang**, AstraZeneca Regional Sales Manager for Jiangxi: In October 2023, Wang was implicated in AstraZeneca's insurance fraud scheme, following a sweeping investigation in the Jiangxi region in May 2023.

- **Kang Yuling**, AstraZeneca General Sales Manager for Fujian: In September 2022, Kang was arrested as part of the investigation into AstraZeneca's insurance fraud scheme. Kang was responsible for Tagrisso sales in Fujian and reported to Chen Bin. According to court documents, in May 2022, shortly before the Fujian raid, Kang organized a mock interrogation of Fuzhou sales representatives during which Kang instructed subordinates that "no matter shall be admitted when there is no conclusive evidence." On June 28, 2024, the Jin'an District People's Court of Fuzhou City sentenced Kang to 13.5 years for fraud.

- **Diao Liuyin**, AstraZeneca Team Leader for Tagrisso Sales in Fuzhou: In October 2022, Diao, who reported to Chen Bin, was arrested in connection with AstraZeneca's insurance fraud scheme. On June 28, 2024, the Jin'an District People's Court of Fuzhou City convicted Diao, along with 19 other people, of fraud and sentenced him to 11.5 years in prison. In September 2024, Diao's family posted "An open letter to the president of AstraZeneca: The Company makes money, but the employees go to jail?" on various social platforms. In the letter, Diao's family asked why AstraZeneca had not taken legal responsibility for training sales representatives how to illegally increase Tagrisso sales by forging genetic test reports. The family also revealed that AstraZeneca China opted to conceal relevant facts, after the Shenzhen raid, by requiring employees to delete *WeChat* groups and other evidence favorable to employees.

- **Luo Jinsheng**, former Sales Manager of AstraZeneca in the Southern Fujian Region: was sentenced to 10 years and six months and fined 300,000 yuan. In his criminal trial, Luo testified that "[a]cross the country, it was a widespread phenomenon for AstraZeneca sales reps to tamper with test reports." Luo further explained that the Company's "[c]ompliance policies were just for show" and that after the Shenzhen case, the Company required all personnel to conduct compliance self-inspections, disband all work *WeChat* groups, delete group chat content, and destroy relevant evidence. He also explained how the Company took further action to insulate itself from the Tagrisso fraud investigation by training sales representatives "how to respond to external investigations."

25. At the apex of the hierarchy stood Leon Wang, President of AstraZeneca China and later Global Executive Vice President. Wang presided over a decade of explosive growth, transforming China into AstraZeneca's second-largest market worldwide. Under his leadership, the Company became notorious for its "wolfish style" and "radical culture" consisting of aggressive sales targets, elimination of underperformers, and a relentless focus on market share. Multiple sources, including industry insiders and former employees, described a culture where compliance was a facade and performance was everything. Internal training sessions allegedly

included explicit instructions from management to hit targets "at all costs," including falsifying reports. The court documents also directly implicated Defendant Wang with at least one employee in Fuzhou stating that Wang "was aware of the abnormally high positive rate and encouraged the first-line drug representatives to increase the positive rate."

### E. AstraZeneca Conceals the Sweeping Criminal Investigation into Fraudulent Misconduct Revealed by the Shenzhen Whistleblower

26. Unbeknownst to investors, from 2021 onwards, the Company became embroiled in a massive, ever-expanding criminal investigation over its fraudulent manipulation of testing results. For more than three and a half years, the criminal fraud investigation spread dramatically from lower-level employees to regional managers to directors to top leadership, becoming what a source described as the "the largest insurance fraud among pharmaceutical industry in recent years."

27. More than 100 employees have been arrested and prosecuted; key executives at partner labs were detained; and the Company's top leadership was brought under scrutiny. The insurance fraud investigation became an "avalanche," roiling entire regions and implicating every level of AstraZeneca's China operation. And yet, Defendants concealed the extent and severity of the investigation from everyone including AstraZeneca shareholders.

28. In July 2021, the Shenzhen Municipal Health Insurance Bureau uncovered insurance fraud after a whistleblower alerted Chinese authorities that AstraZeneca employees in Shenzhen were falsifying patients' genetic test results. Subsequently, the police launched a special investigation in conjunction with the Ministry of Public Security, conducted joint investigations, held disciplinary talks with AstraZeneca, and demanded internal reforms. The Shenzhen Medical Security Bureau, acting on whistleblower tips, played a pivotal role in uncovering the fraud and initiating criminal proceedings.

29. In September 2021, more than 10 sales representatives from Shenzhen, who reported to Zuo Yingquan, the former sales director of AstraZeneca's southern team, were investigated and detained. In January 2022: Zuo Yingquan, former sales director of AstraZeneca's southern region, was detained and court evidence shows he ordered teams to "[f]lexibly handle genetic reports" and "[h]elp ineligible patients access the drug." Although the whistleblower came forward in July 2021, the investigation was not revealed until late January 2022.

30. The Company's response to the initial discovery of fraud was to conceal, deflect responsibility and destroy evidence. After the initial arrests in Shenzhen in July 2021, on January 28, 2022, the Company issued a brief statement that AstraZeneca had self-reported the Tagrisso insurance fraud to the authorities. The statement also pledged that the Company would "fully cooperate" with authorities and strengthen its compliance with Chinese law.

31. AstraZeneca's statement, which only remained accessible on its website for one month, was untrue. First, the Shenzhen insurance fraud was revealed to Chinese authorities via a whistleblower and not by AstraZeneca. Second, in reality, the internal reaction belied the Company's promise to strengthen compliance and instead focused on destroying evidence to hide the fact that senior management instructed the sales representatives to commit the fraud. When the Shenzhen investigation started, regional managers went to Shenzhen to round up the sales representatives, one by one, because senior executives at AstraZeneca immediately ordered a nationwide deletion of *WeChat* groups, files, message histories, and other evidence instructing sales representatives to initiate and track patients, and to intervene to increase positive tests and alter results. The regional managers watched the sales representatives delete all work-related *WeChat* groups and ordered them to completely uninstall and reinstall the *WeChat* app as opposed to just removing them from the group. Senior managers "relaxed" their strict testing requirements

and testing quotas disappeared entirely from AstraZeneca's tracking systems. In this manner, AstraZeneca ensured that there was no evidence that the sales representatives were instructed to commit fraud.

32. Senior management at AstraZeneca took their efforts to insulate the Company from the Tagrisso fraud further by subsequently ordering all Shenzhen employees, regional managers, district managers and sales representatives, to appear in Shenzhen in batches to have interviews with AstraZeneca's legal department. The purpose of the interviews was to give the fake appearance of compliance and to get these employees to admit under legal supervision that no wrongdoing had occurred. The legal department asked all these employees whether they falsified genetic test reports, followed up on genetic tests or deleted any evidence. When all the employees denied everything, it provided AstraZeneca with the cover that any violations discovered were individual employees acting improperly and not corporate-level misconduct.

33. Following the detainment of Zuo Yingquan in January 2022, investigative authorities naturally sought to obtain relevant documents from the Company to substantiate the accusation that management ordered sales representatives to "[f]lexibly" alter genetic testing results. These key documents included communications sent to Zhu Jiakang, Vice President of China, and internal reports maintained by Zuo Yingquan. However, contrary to its prior promise to cooperate, the Company refused to provide the relevant information hiding behind the guise of "trade secrets." It was around this time that documents, including *WeChat* records were mysteriously deleted and the lower level employees were forced to bear the brunt of the criminal prosecution.

### F. Contrary to AstraZeneca's Response to the Shenzhen Investigation, the Chinese Anti-Corruption Crackdown Implicated AstraZeneca in a Country-wide Conspiracy to Illegally Increase Tagrisso Drug Sales

34. For nearly three years, AstraZeneca's senior management maintained a wall of silence. No executive was disciplined, no public apology was issued, and no meaningful reforms were implemented. Despite their knowledge of widespread instructions to commit the Tagrisso insurance fraud and that the Company's compliance was a hollow-shell, AstraZeneca made no public disclosures about the true scope, depth, and gravity of the ongoing investigations, arrests, or the expanding scope of the scandal. Investors were kept in the dark. Following the Shenzhen raid and investigation, a special task force was formed that traveled throughout the Country and trained law enforcement in different regions how to investigate and uncover the Tagrisso fraud. When questioned by investors in February 2022—the beginning of the Class Period—Defendants Fredrickson and Wang falsely claimed the Shenzhen investigation was limited in scope, did not involve many employees, and assured investors that the Company was committed to strong compliance in the face of blatantly illegal conduct.

35. Later, on April 29, 2022, Defendant Wang falsely told securities analysts that the Shenzhen wrongdoing was limited to "the individual's behavior" and would be resolved in Q2 2022. The Tagrisso scandal was not limited to the individuals implicated in Shenzhen. The geographic breath of the criminal fraud investigation is staggering as over 100 AstraZeneca employees have been jailed throughout eight provinces and regions in China and many trials are on-going. The evidence points to a culture where district managers, regional managers, and senior executives, were actively complicit in the Tagrisso scandal. This includes Leon Wang and his direct subordinates, Yin Min, Zhu Jiakang, and Xie Qiong. Internal training sessions included explicit instructions to falsify reports and managers openly discussed the mechanics of fraud. Further, AstraZeneca was not committed to strong compliance as promised by Defendant Wang.

Instead, senior management directed a nationwide purge of *WeChat* groups used to direct the sales force to illegally increase Tagrisso sales and other evidence that would implicate senior management and the Company.

36. After Defendant Wang's April 29, 2022 statements, Defendants maintained a wall of absolute silence, even though the investigation was spreading throughout China. Defendants never disclosed (as they were obligated to do) that the risk of government investigation of AstraZeneca's sales and marketing practices had materialized. Instead, Defendants continued to make false and misleading statements and omit material information they were required to disclose in quarterly and annual statements filed with the SEC throughout the Class Period.

37. Later, on November 9, 2023, Defendant Fredrickson, while discussing Q3 2023 results, stated that: "In China, we saw some market impact from the anticorruption campaign, but we have already observed recovery into the fourth quarter." This statement was false and misleading when made because Defendants never disclosed that the Chinese anticorruption campaign including the investigation into the illegal Tagrisso scheme to increase sales had in fact expanded and went far beyond a single city or province and had spread across at least eight provinces and municipalities, including Guangdong, Fujian, Sichuan, Chongqing, Jiangxi, Shenzhen, and Shanghai. Defendants also omitted that the scope of the investigation had grown to examine what roles were played by not only AstraZeneca's sales representatives, but also by district and regional managers all the way up to senior executives.

38. Defendants were well aware that Defendant Fredrickson's statement was false and misleading and omitted material information because by November 2023, the investigation's scope had increased substantially and that AstraZeneca sales representatives, district and regional

managers and more senior executives were implicated. As noted in the timeline below, by November 2023, Defendants knew the following:

- June 2022: Twenty Fujian staff involved in "Project Star" from sales representative to regional managers were arrested.
- September 2022: Kang Yuling, who was in charge of Tagrisso sales in Fujian, was arrested.
- October 2022: Diao Liuyin, who was in charge of Tagrisso sales in Fuzhou, was arrested.
- May 2023: The Jiangxi region underwent a sweeping investigation, resulting in the arrest of numerous frontline medical representatives, regional managers and directors. Even some former employees who had already left the Company were brought in for questioning.
- June 2023: Chen Bin, AstraZeneca's Regional Director for East China, was arrested related to his role endorsing Project Star to increase Tagrisso sales.
- August 2023: Zuo Yingquan, responsible for five regions, was convicted in Shenzhen and sentenced to 11.5 years. 13 members of his Shenzhen sales team were also convicted. He appealed this conviction.
- October 2023: Arrested sales representatives from the Jiangxi region implicated Wang Gang, AstraZeneca's Jiangxi Regional Manager, in the Tagrisso insurance fraud scheme.
- November 2023: Chen Bin is indicted for medical insurance fraud amounting to ¥6.6 million RMB.
- By late 2023, several sales representatives who falsified genetic test reports had been convicted after trial.

*See* ¶160.

39. Throughout 2024, Defendants continued to maintain a wall of silence even though the investigation spread further in China. Defendants continued to conceal that the risk of government investigation had materialized, that it was expanding, and how high up the scandal reached at AstraZeneca. Therefore, Defendants continued to make false and misleading statements and omit material information they were required to disclose in quarterly and annual public filings

with the SEC. Defendants knew that the anti-corruption crackdown by the Chinese government was directly impacting the Company and not merely a market impact implied by Defendant Fredrickson during the November 9, 2023 conference call. For example, further developments in the Tagrisso fraud investigation included:

- June 28, 2024: Kang Yuling, AstraZeneca's North Fujian Director and Diao Liuyin, AstraZeneca's Team Leader in North Fujian were sentenced to 13.5 years (¥500K fine) and 11.5 years (¥200K fine), respectively, for their roles in the Fujian Project Star scheme.

- July 22, 2024: Ruiang Gene announced that Xue Yuwei, chairperson Xiong Hui and others were under residential surveillance for alleged illegal operations.

- July 2024: Zhu Jiakang, AstraZeneca China Vice President, Shi Yuanjie, Lung Cancer Division Marketing Director, and Ouyang Haolei, China Hematology Division Director, were taken into custody.

- September 2024: Zuo Yingquan was convicted at his second trial and again sentenced to 11.5 years.

- October 25, 2024: Yin Min, former AstraZeneca China Oncology Head who directly reported to Leon Wang was taken away for the investigation. Yin Min was taken into custody, despite leaving AstraZeneca in December 2021. Along with Yin Min, multiple other executives were taken away from AstraZeneca's Shanghai headquarters, including Xie Qiong, China Vice President. On the same day, charges for the Ruiang Gene employees were upgraded to fraud and all four were criminally detained.

### G. AstraZeneca is Forced to Acknowledge the Scope and Devastating Impact of the Tagrisso Insurance Fraud

40. After more than three years of the ever-increasing scope of the investigation, including over 100 sales representatives, district and regional managers, and head of practice groups having been arrested, convicted, and given lengthy prison sentences and fines, the severity and enormity of the Tagrisso insurance fraud scandal began to be revealed. In September 2024, it was reported that Zuo Yingquan was convicted and sentenced to 11.5 years in prison. The lengthy sentence compared to lower-level managers reflects the severity and involvement of more mid- to senior-level management.

41. Initially, Defendants still refused to admit the severity and scope of the scandal. On September 10, 2024, *Bloomberg* interviewed Defendant Soriot and asked: "Pascal, several AstraZeneca employees have also been detained in China in relation to two probes. Are you aware of AstraZeneca actually breaking any laws in relation to those investigations?" Soriot continued to downplay the investigation and stated: "Yeah it's something we take very seriously of course. It's important though to remember the context of it. It's a small number, eight, nine employees that were affected by this investigation." Soriot's response was false and misleading when made because the investigation was not limited to eight or nine employees. Instead, the investigations had uncovered that the illegal marketing of Tagrisso was actually a sprawling, multi-province criminal enterprise implicating every level of AstraZeneca's China organization—from frontline sales staff to district and regional managers, more senior executives and third-party testing labs that were operated by former AstraZeneca executives. Soriot was well aware or severely reckless in stating the investigation was so limited given that the fraud was not limited to a single city or province; it spread across at least eight provinces and municipalities, including Guangdong, Fujian, Sichuan, Chongqing, Jiangxi, Shenzhen, and Shanghai.

42. On October 30, 2024, AstraZeneca posted an announcement on its website under the heading "AstraZeneca China President currently under investigation," and informed investors for the first time that the Tagrisso marketing scandal investigation had ensnared Defendant Wang who was "cooperating" with the investigation. This revelation also caused the price of AstraZeneca ADRs to decline $2.39 per ADR, or 3.1%, to close at $72.83 on October 30, 2024. The next day, AstraZeneca ADRs declined a further $1.68 per ADR, or 2.3%, to close at $71.15 on October 31, 2024.

43. Further details about the enormous scope of the Tagrisso insurance fraud were revealed for the first time on November 5, 2024, when *Yicai Global*[2] published an article entitled "AstraZeneca Insurance Fraud Involves Dozens of Senior Executives in China, Source Says." It was also revealed for the first time that over 100 AstraZeneca employees have been jailed in connection with the Tagrisso scandal. Until the early November 2024 disclosures in the media, investors were unaware of the timeline of events reflecting the large-scale scope of the multi-year investigation. Throughout the Class Period, Defendants never disclosed the scale of the illegal Tagrisso marketing or the expanding investigation in the Company's Contingent Liability discussions of ongoing litigation or in the Company's risk disclosures.

44. When the true scope of the wrongdoing and investigation hidden by Defendants was revealed and that senior AstraZeneca management was involved, Lead Plaintiffs and the Class suffered massive losses. Also on November 5, 2024, *Reuters* published an article entitled "AstraZeneca shares fall on report of potential China probe fallout" and noted in the article that the Company's "shares on Tuesday recorded their worst day since March 2020." As a result, AstraZeneca's ADRs declined a further $5.16 per ADR, or 7.2%, to close at $66.27 per ADR on November 5, 2024. The next day, they declined a further $2.42 per ADR, or 3.65%, to close at $63.85 per ADR on November 6, 2024.

## II. JURISDICTION AND VENUE

45. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5, promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

[2] *Yicai Global* is the English-language news service of Yicai Global Media Group, the financial news arm of Shanghai Media Group, which is one of China's largest state-owned media conglomerates.

46. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

47. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because the statements that form the subject of this Complaint were disseminated into this District, Defendants conduct substantial business in this District, the AstraZeneca ADRs that are the subject of this action were traded on The Nasdaq Stock Market LLC (the "NASDAQ") in this District, under the symbol "AZN."

48. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate wire and telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

49. Universal Invest was appointed Lead Plaintiff on March 21, 2025. As set forth in its certification (ECF No. 24-2), Universal Invest purchased AstraZeneca ADRs on the NASDAQ during the Class Period at artificially inflated prices and was damaged by Defendants' violations of the federal securities laws alleged herein.

50. C+F was appointed Lead Plaintiff on March 21, 2025. As set forth in its certification (ECF No. 24-2), C+F purchased AstraZeneca ADRs on the NASDAQ during the Class Period at artificially inflated prices and was damaged by Defendants' violations of the federal securities laws alleged herein.

### B. Defendants

51. AstraZeneca is a global biopharmaceutical company that focuses on the discovery, development, and commercialization of prescription medicines in Oncology, Rare Diseases, and

BioPharmaceuticals. AstraZeneca is headquartered in Cambridge, the United Kingdom, and maintains offices in this District at 430 East 29 Street, New York, New York. Since 1993, AstraZeneca has maintained an extensive presence in China, which was frequented by senior executives, with its Chinese headquarters and a Research & Development Center in Shanghai, global supply sites in Wuxi, Taizhou, and Qingdao providing high quality medicines to over 70 global markets, and regional headquarters in Beijing, Guangzhou, Hangzhou, Chengdu and Qingdao. At all relevant times throughout the Class Period, certain of the Company's securities were traded in the United States and the Company's ADRs were listed and traded on the NASDAQ, an efficient market, under the ticker symbol "AZN." As of December 31, 2024, there were more than 538,000,000 AstraZeneca ADRs outstanding.[3]

52. Defendant Pascal Soriot ("Soriot") served as the Chief Executive Officer ("CEO") of AstraZeneca and as a member of the Company's Board of Directors (the "Board") throughout the Class Period. Defendant Soriot has served as CEO of the Company and a member of the Board since October 1, 2012.

(a) As AstraZeneca's CEO, Soriot was the senior-most officer of the Company, with ultimate responsibility for the Company's performance and operations and for communicating with the Board. Soriot also had approval authority over and was a signatory to AstraZeneca's SEC reporting, submitted certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") affirming the accuracy of the financial statements and adequacy of the Company's

[3] Through December 31, 2024, the Company's ADR program was administered by Deutsche Bank Trust Company Americas ("DBTCA"), as the depositary bank. On February 6, 2025, the Company entered into an agreement with JPMorgan Chase Bank, N.A. ("JPMorgan"), to take over as the depository bank for AstraZeneca's ADR program.

internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CEO and a member of the Board, Soriot was responsible for directing AstraZeneca's business development, public statements, and financial and business affairs. Specifically, during conference calls with analysts and investors, Soriot repeatedly held himself out as knowledgeable about the Company's Chinese operations, and at no time during the Class Period did Soriot assert that he was not aware of AstraZeneca's efforts to expand Tagrisso sales. Defendant Soriot is very close with Defendant Wang, as he frequently traveled to China to stay familiar with the Company's operations in China and meet with Defendant Wang. In a recent interview, Defendant Soriot said he spends 15% to 20% of his time in China. Defendant Soriot was a continuous sponsor of Defendant Wang as President of AstraZeneca's Chinese operations.

53. Defendant Aradhana Sarin ("Sarin") served as the Company's Chief Financial Officer ("CFO") and as a member of the Board throughout the Class Period. Defendant Sarin has served as CFO of the Company and a member of the Board since August 1, 2021.

(a) As AstraZeneca's CFO, Sarin was the Company's senior-most financial officer, responsible for overseeing its financial, accounting, audit, treasury, and tax functions and the development and implementation of internal financial controls. Sarin also signed and had approval authority over AstraZeneca's SEC reporting, submitted SOX certifications affirming the accuracy of the financial statements and adequacy of the Company's internal financial controls, and communicated directly with shareholders and market analysts through the Company's earnings calls and other market-related events.

(b) As CFO, Sarin was responsible for directing all of AstraZeneca's financial aspects related to the Company's business development, public statements, and financial and

business affairs. Specifically, during conference calls with analysts and investors, Sarin repeatedly held herself out as knowledgeable about the Company's Oncology business and Chinese operations, including sales of Tagrisso, and at no time during the Class Period did Sarin assert that she was not aware of AstraZeneca's Chinese operations including the impact of investigations into the Company's sales and marketing practices in China.

54. Defendant Leon Wang, also known as Wang Lei, served as President of AstraZeneca China from 2014 to November 2024. Wang joined AstraZeneca in March 2013 and was elevated to President of AstraZeneca China the following year. In 2017, he was promoted to executive Vice President International, overseeing strategic and business developments in the Asia-Pacific region. Wang is one of only a handful of Chinese nationals to achieve a top global management position in a multinational pharmaceutical company.

(a) As President of AstraZeneca China, Defendant Wang was intimately involved in every aspect of the operations all the way down to actually interviewing sales representatives. Wang attended every quarterly conference call with securities analysts during the Class Period and was often called upon by Defendant Soriot and others to answer questions from analysts about the Company's financial results in China and elsewhere. Defendant Wang held himself out as knowledgeable regarding Tagrisso sales and the various factors that impacted the demand for that drug.

(b) Wang's importance to AstraZeneca and its operations in China is well known. For example, *The Wall Street Journal* reported that:

> "Wang is among AstraZeneca's most important and visible executives, regularly appearing on the company's quarterly earnings calls with analysts. He is also a key lieutenant to AstraZeneca CEO Pascal Soriot, who has long been bullish on expanding inside China . . . . Wang appeared at an event in the country to celebrate AstraZeneca's decades-long presence in the country. Following 30 years of growth

> in China, [Wang] said, 'we have deeply fulfilled our commitment of "rooted in China while benefiting China.'""

In addition, Defendant Wang is one of the most widely revered figures in China's pharmaceutical industry, who is known to have controlled the general direction of AstraZeneca's operations in China throughout the Class Period.

(c) Since joining AstraZeneca in 2013, Wang grew the Company's China sales from just 7% of total revenue to 20% at its peak in 2019, giving AstraZeneca the highest exposure to China among its peers. One industry insider stated, after Defendant Wang was detained in 2024, that if Wang were to be found guilty, "given his seniority and how much he's represented [AstraZeneca], it might as well be the Company."

(d) On October 30, 2024, AstraZeneca announced Wang was "cooperating with an ongoing investigation" by Chinese authorities. This announcement came only five days after it was revealed that Yin Min, who reported directly to Wang, and Ruaing Gene, a genetic testing company, were being investigated by Chinese regulatory authorities. Attempting to assuage the market's concerns over the growing probes in China, AstraZeneca and its executives repeatedly insisted that Wang was cooperating with Shenzhen authorities in "an unknown investigation," the investigation concerned a "small number" of "low-level employees," and that they "ha[ve] not been informed of specific charges against" Wang. Despite the narrative offered by AstraZeneca, Chinese media outlets reported that numerous sources with knowledge of the matter stated that Wang was cooperating with Chinese authorities' investigation into the AstraZeneca insurance fraud. On November 5, 2024, it was confirmed that Wang was arrested and that hundreds of former AstraZeneca employees have been convicted in relation to the Tagrisso fraud investigation.

55. Defendant David Fredrickson ("Fredrickson") served as the Company's Executive Vice President, Oncology Business Unit throughout the Class Period. Prior to his role as

AstraZeneca's Executive Vice President for the Oncology Business Unit, Defendant Fredrickson served as President of AstraZeneca K.K. in Japan, and Vice President, Specialty Care in the United States.

(a) As AstraZeneca's Executive Vice President for the Oncology Business Unit, Fredrickson was responsible for driving growth and maximizing the commercial performance of the Company's global Oncology portfolio, and has global accountability for marketing, sales, medical affairs and market access in Oncology.

(b) As head of AstraZeneca's Oncology Business Unit, Fredrickson played a critical leadership role in setting the Oncology portfolio and product strategy during the Class Period. Specifically, during conference calls with analysts and investors, Fredrickson repeatedly held himself out as knowledgeable about, and at no time during the Class Period did Fredrickson assert that he was not aware of, AstraZeneca's Chinese operations, including the Company's sales and marketing practices to increase the revenue of AstraZeneca's Oncology portfolio and how investigations into such practices would affect the Company.

56. The individuals identified above in ¶¶52-55 are collectively referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "Defendants."

57. Each of the Individual Defendants, because of his or her respective senior position within the Company, possessed the power and authority to control the contents of AstraZeneca's quarterly and annual reports, shareholder letters, releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each of the Individual Defendants was provided with copies of the Company's financial reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity

to prevent their issuance or cause them to be corrected. Throughout the Class Period (and for Defendant Wang, until his arrest and incarceration on October 30, 2024), each of the Individual Defendants, as senior executive officers of AstraZeneca, was directly involved in the management and day-to-day operations of the Company at the highest levels; as further detailed herein; was privy to confidential and proprietary information concerning the Company and was involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein, was aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

58. Each of the Individual Defendants had access to non-public information about the Company and its current business, operations, services, competition, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings, and via reports and other information provided to them in connection therewith. Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew of and participated in the fraudulent scheme alleged herein, knew and/or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew and/or recklessly disregarded that the affirmative representations being made were then materially false and misleading.

59. As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the

Company's operations, business, services, markets, competition, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares and ADRs would be based upon truthful, accurate, and complete information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

60. The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

61. The Defendants identified above in ¶¶52-55 are collectively referred to herein as the "Individual Defendants." The Individual Defendants and the Company are referred to herein as "Defendants."

## IV. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

62. Throughout the Class Period, Defendants made materially false and misleading statements in furtherance of their scheme and to hide the true scope, nature, and gravity of China's criminal investigation into AstraZeneca's fraud, including material omissions concerning: (1) the breadth and scope of AstraZeneca's illegal manipulation of genetic testing and theft of millions

from China's national medical insurance system (2) China's sprawling investigation of the Tagrisso insurance fraud; (3) AstraZeneca's Form 6-Ks and 20-Fs containing false Tagrisso information; and (4) AstraZeneca's Form 6-Ks and 20-Fs containing false information about the Company's litigation, investigations and contingent liabilities.

### A. Defendants' Actionable Misstatements and Omissions During the Company's February 10, 2022 Conference Call

63. The Class Period begins on February 10, 2022, when AstraZeneca announced its financial and operational results for the full year and fourth quarter of 2021, and held a conference call for investors and analysts. During the Question and Answer portion of the Q4 and FY 2022 conference call, which was led by Soriot, Soriot directed Wang to respond to analyst questions about the Company's involvement "in this fraud case for a number of months now:"

> **Wang**: But still, we need to digest our biggest product like Pulmicort and also [inaudible] mature portfolio, which we're doing very well and going VBP. So this is something we have to digest in short term. So—and I think ***the fraud case in Shenzhen is really an individual case, and we have been working closely with a Central Government and National Medical Insurance Bureau already for 6 to 8 months***. So we ***proactively take responsibility to claim internally and making sure we have all the measures to make sure that we don't have a similar individual cases again***. So to minimize the risk for the Company, I think ***it's still a more individual client risk rather than the Company risk***. We don't think this has any kind of similarity to the kind of GSK bribery in 2014.

64. And Soriot and Wang continued, answering another analyst question about the scope and magnitude of the Company's fraud being investigated by China:

> **Question**: Yes, sure. So in China, on the health insurance fraud case, could you perhaps indicate the amount that these individuals have defrauded from reimbursement payments just to get a feel for the extent of this?
>
> **Soriot**: Thanks, Viktor. Leon, do you want to cover this? ***I mean the amount of money involved is extremely small***. Leon, over to you, 2 questions.
>
> **Wang**: Yes. I think the first question, I think ***the fraud, it is—the amount is very, very small***. I think—and also ***the number of people involved is also very limited***. And I think it's really the one indication approved for reimbursement and the other indication is not. So some patients are asking and also the—I think ***it's very, very***

***small. I think minimal, right? So let's go this way. So we don't know because it's still investigation is ongoing. But as far as we know, the amount is very, very small.***

65. Defendant Wang's February 10, 2022 statements (¶¶63-64) that "the fraud case in Shenzhen is really an individual case," that AstraZeneca has "all the measures to make sure that we don't have a similar individual cases again," and "the number of people involved is also very limited," as well as Soriot's statement that "the amount of money involved is extremely small" were false and misleading and omitted to disclose that the Company's Tagrisso fraud was carried out throughout China in multiple provinces, involved hundreds of employees in the Company's Tagrisso sales organization and AstraZeneca did not enhance compliance. In fact, senior leadership, in response to the Shenzhen investigation that was ongoing at the time of Soriot's and Wang's February 2022 statements, sent out nationwide instructions to destroy evidence showing the role district managers, regional managers and senior management played in training the sales force to illegally increase Tagrisso sales. Defendants failed to disclose that by February 2022:

(a) A regional manager involved in the Tagrisso fraud case in Fujian testified that after Kang Yuling was promoted to head of Fujian operations in January 2019, coinciding with Tagrisso's inclusion in China's national reimbursement drug list, she faced immense pressure as "sales targets surged dramatically" to unattainable levels and claimed that "under threat of accountability or even dismissal for slow growth, Kang demanded subordinates boost performance at all costs." Orders to boost sales at all costs came from district and regional managers and not from a few rogue sales representatives acting alone. Company-wide pressure to boost Tagrisso sales caused sales representatives, district managers and regional managers to cross legal boundaries.

(b) Throughout the country, sales representatives were told to illegally boost sales. In June and July 2019, Zuo Yingquan, Southern China Sales Director at AstraZeneca,

allegedly began instructing subordinates in Shenzhen to falsify lung cancer patients' genetic test reports, leading to ¥ 3.56 million in medical fund losses. Court evidence indicates that he, via team meetings, ordered teams to: "Flexibly handle genetic reports" and "Use any means to get it done" to "Help ineligible patients access the drug." It was also reported in the media that Wang Xi (an alias), a pharmaceutical industry insider, revealed that she had heard from multiple sources about AstraZeneca's Tagrisso team holding internal training sessions where management allegedly instructed employees to alter genetic test reports to fraudulently secure insurance reimbursements, all in the name of hitting sales targets. "To them, it was standard practice, completely normal," she said.

(c) Company managers also instructed sales representatives to use certain labs they knew would give positive results. For example, at an August 2019 meeting chaired by Chen Bin, East China Regional Director, and attended by 12 others, two sales reps shared their experiences on how partnering with Genowise Corp., a Suzhou-based testing company, could secure positive T790M test results that meant patients would qualify for Tagrisso with insurance coverage. Around the same time, during a Tagrisso sales performance meeting for key hospitals in Fuzhou on August 14, 2019, regional manager Huang Wei in Fujian publicly promoted the use of Suzhou Jianlu Genetic Testing Company for retesting, claiming it could produce positive results as part of the Star Project which Huang established. East China Regional Director Chen Bin also endorsed the Star Project at the meeting, instructing staff to implement this method to "convert more negative-testing patients into positive- testing patients" and thereby boost Tagrisso sales.

(d) It is clear that AstraZeneca's much-touted compliance culture was, in practice, a hollow shell—incapable or unwilling to confront the reality of systemic criminality. Compliance officers, when confronted with evidence of fraud at sales meetings, reportedly left the

room rather than intervene which left district and regional managers free to explore illegal practices with the sales force to boost Tagrisso sales. As Luo Jinsheng testified in his criminal trial, the Company's "[c]ompliance policies were just for show." AstraZeneca sales representatives were trained to collude with third-party genetic testing companies to systematically falsify genetic test reports to show false positive T790M mutations which allowed ineligible patients to obtain Tagrisso at the expense of the national insurance fund. It bears emphasis that for patients who developed resistance without the T790M mutation, the drug offered patients no benefit. Sale representatives were also trained to put their names on testing requisition forms so they could access the results. Even worse, in many cases, the patient's sample was collected by the sales representative himself, and after the sample was sent to the testing institution, the electronic copy of the genetic test report issued by the testing institution was directly sent to the sample sender, that is, the sales representative, and the patient through *WeChat*. After finding that the results did not match the expectations, the sales representative directly revised the electronic version of the test report, and the patient printed it and sent the paper version to the doctor. Other methods were used throughout China to improperly boost Tagrisso sales.

(e) Besides the jarring geographic scope of the fraud and large number of AstraZeneca frontline sale representatives, regional managers and directors implicated in the fraud, perhaps the most damning proof that compliance was an empty shell at the Company are the steps the AstraZeneca took to minimize its exposure to the blatant illegal sales practices it systematically ordered its sales representatives to carry out from 2018 to 2022. After a whistleblower alerted authorities that genetic test results were being altered in Shenzhen, instead of increasing compliance aimed at instructing sales representatives to promote Tagrisso legally, AstraZeneca ordered the nationwide destruction of evidence. The Company ordered Shenzhen employees to

go to a law firm, not to enhance compliance, but to destroy evidence by deleting the relevant *WeChat* groups and clearing the chat groups, chat records, pictures, videos, forms, and all evidence relating to illegally increasing Tagrisso sales including information demonstrating that sales representatives were following instructions.

(f) In addition, the same middle managers who instructed sales representatives to alter genetic testing results were also implicated in deleting Company emails to hide their involvement in the insurance fraud.

**B. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K, Filed on February 10, 2022, and During the Company's February 10, 2022 Conference Call**

66. AstraZeneca's Form 6-K, filed with the SEC on February 10, 2022, announced the Company's financial and operational results for the full year and Q4 2021. In the Form 6-K, the Company described the "Key elements of Total Revenue performance in FY 2021," and noted that "***Among AstraZeneca's thirteen blockbuster medicines in 2021, five medicines crossed new thresholds: Tagrisso ($5bn+). . . .***" And the Company described Tagrisso's emerging market and China sales, stating:

> ***Tagrisso sales in Emerging Markets increased by 11% in the year*** (6% at CER) to $1,336m; the performance was impacted by the admission of the medicine to the China NRDL in March 2021 for the first-line setting and the renewal in the 2nd-line setting. During the year, rising demand from increased patient access in China almost completely offset the NRDL price reduction. Emerging Markets sales in Q4 increased by 26% (23% at CER) to $325m, driven by growth in both China and other Emerging Markets.

67. And during the accompanying conference call, which was led by Soriot, Fredrickson and Wang addressed the Company's Tagrisso sales and growth and the Chinese market. Fredrickson stated:

> In emerging markets, Tagrisso growth for the year was 6% after a third quarter that was impacted by inventory movements in China, EM growth in Q4 accelerated to 23% versus the same quarter last year and as anticipated, demand growth in ***China***

> ***for the quarter is now fully compensating for the lower NRDL price based on increasing first-line use and strong second line share performance. . . .***

68. And Wang continued:

> Yes. ***So the China growth actually, we are gradually getting out of NRDL price cuts in exchange for volume. So Tagrisso volume has been more than doubled***. I think—and also Lynparza, Imfinzi has been also capturing volume quite good growth, Imfinzi even self-pay. We have a new indication launch one after another. So I think oncology side gives us quite good confidence to grow. But at the same time, we are hit by a VBP price cut and the tender loss. So if you put all these things together. But in the long run—mid-long run, so we're having lots of new product indication approval ahead of us. So we are still quite confident of the good part of the China business doing quite well. But the mature products, we have been quite successful in the past but are suffering for the next one or two years.

69. Defendants' February 10, 2022 statements (¶¶66-68) reporting on Tagrisso sales for FY 2021, where the Company reported: "***Tagrisso sales in Emerging Markets increased by 11%***," Fredrickson highlighted: "***Tagrisso growth for the year was 6% [and] demand growth in China for the quarter is now fully compensating for the lower NRDL price***," and Wang stated: "***So the China growth actually, we are gradually getting out of NRDL price cuts in exchange for volume. So Tagrisso volume has been more than doubled***" were false and misleading and omitted information Defendants were obligated to disclose. Because Defendants chose to report and comment on increasing Tagrisso sales for FY 2021, they were obligated to disclose that Tagrisso sales in 2021 had increased because the Tagrisso scheme to increase drug sales which began in 2019, was ongoing through 2021. The judgments reflecting the criminal convictions of AstraZeneca sales representatives clearly show the scheme to illegally increase Tagrisso sales was ongoing in 2021:

- AstraZeneca sales representative Liu was convicted on February 18, 2024, of falsifying genetic test reports from ***September 2020 to January 2021*** in order to boost Tagrisso sales, defrauding ¥212,464 from national medical funds. Liu was sentenced to 2.5 years in prison and fined ¥40,000.

- AstraZeneca sales representative Cao was convicted on February 18, 2024, of falsifying genetic test reports ***from October 2020 to February 2021*** to boost

Tagrisso sales, defrauding ¥49,572 from national medical funds. Cao was sentenced to 1.5 years in prison and fined ¥5,000.

- AstraZeneca sales representative Ma was convicted on April 7, 2024, of falsifying genetic test reports for four lung cancer patients ***from 2020 to 2021*** to enable fraudulent Tagrisso insurance claims, defrauding ¥220,091 from national medical funds. Ma was sentenced to three years in prison and fined ¥5,000.

- AstraZeneca sales representative Guo was convicted on December 12, 2023, of falsifying genetic test reports in ***January 2021*** to boost Tagrisso sales, defrauding ¥33,408 from national medical funds. Guo was sentenced to 14 months in prison and fined ¥30,000.

- AstraZeneca sales representative Hou was convicted on July 10, 2023, of falsifying patient records in ***April 2021*** and submitting it to the Baotou Tumor Hospital, defrauding ¥40,382 from national medical funds. Hou was sentenced to 10 months in prison and fined ¥5,000.

- AstraZeneca sales representative Wan was convicted on October 30, 2023, of falsifying genetic test reports in ***August 2021*** to boost Tagrisso sales, defrauding ¥68,299 from national medical funds. Wan was sentenced to three years in prison and fined ¥20,000.

### C. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 10 and 22, 2022

70. The Company's February 10, 2022, Form 6-K also described the Company's "***Legal proceedings and contingent liabilities***," stating that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices." AstraZeneca, however, made no mention of China's ongoing Tagrisso insurance fraud investigation.

71. In addition, On February 22, 2022, after market hours, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Soriot and Sarin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over

financial reporting, and the disclosure of all fraud. The 2021 Annual Report contained the following "***Legal, regulatory and compliance risks***" disclosure:

> Adverse outcome of litigation and/or governmental investigations
>
> ***We may be subject to various legal proceedings and governmental investigations***. Our many business operations are subject to a wide range of laws, rules and regulations from around the world. ***Any failure to comply with these applicable laws, rules and regulations may result in AstraZeneca being investigated by relevant governmental agencies and authorities*** and/or subject to legal proceedings brought by private citizens. Relevant authorities have wide-ranging administrative powers to deal with any failure to comply with continuing regulatory oversight, and this could affect us, whether such failure is our own or that of our contractors or external partners. In particular, the manufacturing, marketing, exportation, promotional, clinical, pharmacovigilance, and pricing practices of pharmaceutical manufacturers, as well as the manner in which manufacturers interact with regulatory agencies, purchasers, prescribers and patients, are subject to extensive regulation, litigation and governmental investigation. Moreover, such laws, rules and regulations are subject to change.
>
> Impact
>
> Many companies, including AstraZeneca, have been subject to legal claims asserted by federal and state governmental authorities and private payers and consumers, which have resulted in substantial expense and other significant consequences. Governmental investigations or proceedings could result in us becoming subject to civil or criminal sanctions and/or being forced to pay fines or damages. Civil litigation, particularly in the US, is inherently unpredictable and unexpectedly high awards for damages can result from an adverse result. In many cases, litigation adversaries may claim enhanced damages in extremely high amounts. Government investigations, litigations, and other legal proceedings, regardless of their outcome, could be costly, divert management attention, or damage our reputation and demand for our products. [. . .]

72. Defendants' February 10 and 22, 2022, statements (¶¶70-71) detailing the Company's litigations and contingent liabilities, and describing the Company's "Legal, regulatory and compliance risks" were materially false and misleading at the time it was made and omitted information Defendants were required to disclose. The Company failed to disclose that AstraZeneca was then the subject of a massive Chinese criminal investigation into the Company's widespread insurance fraud carried out in eight provinces and regions throughout China, and the

Company's risk disclosures had understated the risk of an adverse outcome of a government investigation. As such, in listing the Company's litigation and contingent liabilities, and in cautioning that "[w]e may be subject to various legal proceedings and governmental investigations," a disclosure that remained unchanged throughout the Class Period, Defendants failed to disclose that the risk of a governmental investigation had already materialized.

73. Defendants knew they had failed to disclose that they were subject to additional undisclosed contingent liabilities and that they had understated the risk of a government investigation because the Company had carried out the Tagrisso insurance fraud throughout China, beginning in early 2019, after the drug was listed on the NRDL. And when the Shenzhen criminal investigation started, senior executives at AstraZeneca ordered a nationwide destruction of evidence showing that sales representatives were trained to illegally increase Tagrisso sales and how they were instructed to ignore all compliance rules to increase those sales. And regional managers were sent to Shenzhen to round up the sales representatives, one by one, and watch them clear their *WeChat* groups, files, and message histories because these records contained evidence that sales representatives were required to initiate and track patient testing to ensure positive results and even alter results. After the file groups were deleted, the regional managers watched the sales representatives completely uninstall and reinstall the *WeChat* app as opposed to just removing them from the group. Senior managers also "relaxed" their strict testing requirements and testing quotas disappeared entirely from AstraZeneca's tracking systems. In this manner, AstraZeneca ensured that there was no evidence that the sales representatives were instructed to commit fraud.

74. Senior management at AstraZeneca took their efforts to insulate the Company from the Tagrisso fraud further by subsequently ordering all Shenzhen employees, regional managers, district managers and sales representatives, to appear in Shenzhen in batches to have interviews

with AstraZeneca's legal department. The purpose of the interviews was to give the fake appearance of compliance and to get these employees to admit under legal supervision that no wrongdoing had occurred. The legal department asked all these employees whether they falsified genetic test reports, followed up on genetic tests or deleted any evidence. When all the employees denied everything, it provided AstraZeneca with the false narrative that any uncovered violations were individual employees acting improperly and not corporate-level misconduct.

75. Defendants' February 10 and 22, 2022, statements (¶¶63-64, 66-68, 70-71), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### D. Defendants' Actionable Misstatements and Omissions on the Company's Form 6-K, Filed on April 29, 2022, and During the Company's April 29, 2022 Conference Call

76. On April 29, 2022, AstraZeneca filed its Form 6-K with the SEC and announced its financial and operational results for Q1 2022. In the filing, which highlighted that the Company's "Product Sales from Oncology increased 18%," the Company described its revenue attributed to oncology, stating that "Total Revenue increased by 21% (25% at CER) in Q1 2022 to $3,644m and represented 32% of overall Total Revenue (Q1 2021: 41%)," and "Product Sales increased by 14% (18% at CER) in Q1 2022 to $3,388m, reflecting new launches and increased patient access for Tagrisso, Imfinzi, Lynparza, Calquence and Enhertu partially offset by declines in legacy medicines and an adverse gross-to-net movement from the seasonal increase in Part-D related deductions typically seen in the first quarter." And with respect to AstraZeneca's Tagrisso sales in China, the Company stated:

> **Emerging Markets**
>
> Increased first-line use in China and continued growth in other Emerging Markets.

> Tagrisso was admitted to the China NRDL in March 2021 for the first-line setting and renewed in the 2nd-line setting, resulting in an adverse effect on the comparator period from lower sales to distributors prior to the change and stock compensation payments.
>
> Rising demand from increased patient access in China has now offset the impact of the March 2021 NRDL price reduction.

77. Also on April 29, 2022, in connection with the Form 6-K and Q1 2022 results, AstraZeneca held a conference call for investors and analysts during which they addressed Tagrisso and the Chinese market. During the conference call, attended by Defendants Soriot, Wang, Sarin and Fredrickson, Defendants discussed Tagrisso and Fredrickson highlighted the "strong start to the year in China with increasing demand in the front line and a good competitive performance maintained as Tagrisso's standard of care position in second line." Ruud Dobber, AstraZeneca's Executive Vice President of Biopharmaceuticals, continued, stating:

> As Dave mentioned, both Tagrisso and Lynparza continued to benefit from increased patient access due to the inclusion on to China's NRDL for March 2021 and from launches across Ex-China Emerging Markets.

78. During the Question and Answer portion of the conference call, Defendants Soriot and Wang answered questions about the fraud investigation in China:

> **Question**: Thank you. If I could just stay on China for a minute. Last quarter, you were asked if China would grow in 2023. And I wasn't sure if Leon just answered that. Are you guys saying you will have positive growth in China in 2023 and you're confident about that? And then second, China question, just an update on the fraud investigation, please?
>
> **Soriot**: So on the first question, actually, Tim, we don't give guidance beyond 2022, except for the fact that we said that over the next few years, we believe the Emerging Markets together, China and non-China Emerging Markets will grow at a high single digit rate. So beyond this, we haven't given any indication outside of '22.
>
> The second question, Leon, do you want to cover this one on the investigation?
>
> **Wang**: ***Yes. The [fraud] case in Shenzhen is actually limited to the individual's behavior. And I think the investigation will be soon concluded in quarter 2. So I think the company always have a very high standard on compliance, and***

> ***definitely forbid illegal behavior within the company. So we are very confident about our system. And of course, we will learn from this case, try to make sure that this kind of case will not happen in the future.***

79. Wang continued, responding to a question about Tagrisso's market penetration:

> **Question**: It's on Tagrisso in China. You mentioned in the press release that the volume expansion has made up for the price reduction that you faced in March last year. I just wondered if you could give us an idea what that means in terms of penetration rates?
>
> **Soriot**: Thanks, Simon. So the China question, Leon, do you want to cover? And Dave, you cover the Rest of The World, is that okay?
>
> **Wang**: Yes. I think the first question is about Tagrisso penetration. So with an idea of price cuts, and we get the first-line indication also approved in China with a quite significant price cuts. But we get into the first-line market, I think, with a 30%, 40% share in value already. And we are still getting new patients in the first line. And also, even though we are having ADAURA indication in China, and with this price level, even self-pay, many patients can really be affordable. So we are also starting to get into ADAURA patients—adjuvant patients.
>
> So—and in second line, we are maintaining 2/3 of the patients, more than 2/3 of the patients still using Tagrisso as the second-line treatment.

80. Defendants' April 29, 2022 statements (¶¶76-79) concerning Tagrisso's market penetration and increased demand and patient access where the Company reported: "***Product Sales increased by 14% (18% at CER) in Q1 2022 to $3,388m, reflecting new launches and increased patient access for Tagrisso***," Defendant Fredrickson highlighted: the "***strong start to the year in China with increasing demand in the front line and a good competitive performance maintained as Tagrisso's standard of care position in second line***," Dobber reiterated: "***Tagrisso and Lynparza continued to benefit from increased patient access due to the inclusion on to China's NRDL for March 2021***," and Defendant Wang stated that Tagrisso has "***a 30%, 40% share in***" "***the first-line market***," and similar statements concerning AstraZeneca's oncology and Tagrisso growth and sales, were false and misleading and omitted information Defendants were obligated to disclose, including that the Tagrisso insurance fraud investigation in China was expanding.

Having chosen to speak about Tagrisso results, demand, and sales growth, Defendants were required to disclose the ongoing criminal investigation into the Company's widespread Tagrisso-related insurance fraud, which had expanded beyond Shenzhen. Indeed, by April 29, 2022, Chinese regulatory authorities had created a special task force that traveled throughout the country, training law enforcement in different regions how to investigate and uncover the Tagrisso fraud.

81. Defendant Wang's April 29, 2022 statements that "***the [fraud] case in Shenzhen is actually limited to the individual's behavior***," "***the investigation will be soon concluded in quarter 2***," and AstraZeneca "***always ha[d] a very high standard on compliance***" were false and misleading and omitted information Wang was obligated to disclose, including that the Company's Tagrisso fraud was carried out throughout China in multiple provinces, involved hundreds of employees in the Company's Tagrisso sales organization and AstraZeneca did not enhance compliance. In fact, senior leadership, in response to the Shenzhen investigation that was ongoing at the time of Wang's April 29, 2022 statements, sent out nationwide instructions to destroy evidence showing the role district managers, regional managers, and senior management played in training the sales force to illegally increase Tagrisso sales. Defendants failed to disclose that by April 2022:

(a) A regional manager involved in the Tagrisso fraud case in Fujian testified that after Kang Yuling was promoted to head of Fujian operations in January 2019, coinciding with Tagrisso's inclusion in China's national reimbursement drug list, she faced immense pressure as "sales targets surged dramatically" to unattainable levels and claimed that "under threat of accountability or even dismissal for slow growth, Kang demanded subordinates boost performance at all costs." Orders to boost sales at all costs came from district and regional managers and not from a few rogue sales representatives acting alone. Company-wide pressure to illegally boost

Tagrisso sales caused sales representatives, district managers and regional managers to cross legal boundaries.

(b) Throughout the country, sales representatives were told to boost sales. In June and July 2019, Zuo Yingquan, Southern China Sales Director at AstraZeneca, allegedly began instructing subordinates in Shenzhen to falsify lung cancer patients' genetic test reports, leading to ¥ 3.56 million in medical fund losses. Court evidence indicates that he, via team meetings, ordered teams to: "Flexibly handle genetic reports" and "Use any means to get it done" to "Help ineligible patients access the drug." It was also reported in the media that Wang Xi (an alias), a pharmaceutical industry insider, revealed that she had heard from multiple sources about AstraZeneca's Tagrisso (a lung cancer drug) team holding internal training sessions where management allegedly instructed employees to alter genetic test reports to fraudulently secure insurance reimbursements, all in the name of hitting sales targets. "To them, it was standard practice, completely normal," she said.

(c) Company managers also instructed sales representatives to use certain labs they knew would give positive results. For example, at an August 2019 meeting chaired by Chen Bin, East China Regional Director, and attended by 12 others, two sales reps shared their experiences on how partnering with Genowise Corp., a Suzhou-based testing company, could secure positive T790M test results that meant patients would qualify for Tagrisso with insurance coverage. Around the same time, during a Tagrisso sales performance meeting for key hospitals in Fuzhou on August 14, 2019, regional manager Huang Wei in Fujian publicly promoted the use of Suzhou Jianlu Genetic Testing Company for retesting, claiming it could produce positive results as part of the Star Project. East China Regional Director Chen Bin reportedly endorsed the Star

Project at the meeting, instructing staff to implement this method to "convert more negative-testing patients into positive- testing patients" and thereby boost Tagrisso sales.

(d) After authorities were alerted to the fraud in Shenzhen, instead of increasing compliance aimed at instructing sales representatives to promote Tagrisso legally, AstraZeneca ordered the nationwide destruction of evidence including information demonstrating that sales representatives were just following instructions.

(e) It is clear that AstraZeneca's much-touted compliance culture was, in practice, a hollow shell—incapable or unwilling to confront the reality of systemic criminality. Compliance officers, when confronted with evidence of fraud at sales meetings, reportedly left the room rather than intervene which left district and regional managers free to explore illegal practices with the sales force to boost Tagrisso sales. As Luo Jinsheng testified in his criminal trial, the compliance the Company's "[c]ompliance policies were just for show." AstraZeneca sales representatives were trained to collude with third-party genetic testing companies to systematically falsify genetic test reports to show false positive T790M mutations which allowed ineligible patients to obtain Tagrisso at the expense of the national insurance fund. It bears emphasis that for patients who developed resistance without the T790M mutation, the drug offered patients no benefit. Sales representatives were also trained to put their names on testing requisition forms so they could access the results. Even worse, in many cases, the patient's sample was collected by the sales representative himself, and after the sample was sent to the testing institution, the electronic copy of the genetic test report issued by the testing institution was directly sent to the sample sender, that is, the sales representative, and the patient through *WeChat*. After finding that the results did not match the expectations, the sales representative directly revised the electronic

version of the test report, and the patient printed it and sent the paper version to the doctor. Other methods were used throughout China to improperly boost Tagrisso sales.

82. Additionally, as it had done in its each of its other Forms 6-K issued throughout the Class Period, AstraZeneca's April 29, 2022, Form 6-K, described the Company's "Legal proceedings and contingent liabilities" but omitted any mention of the ongoing criminal investigation into the Company's widespread insurance fraud that was occurring throughout multiple provinces in China, and had, by April 29, 2022, implicated AstraZeneca employees of all levels, including more than 10 sales representatives, the former AstraZeneca Sales Director for the Southern Region of China (comprising Guangdong, Guangxi, Hunan, Hainan, and Yunnan Provinces), and the former Vice President of AstraZeneca China. Indeed, though Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices," and discussed Tagrisso patent proceedings and government proceedings concerning vaccine supplies, Defendants hid the widespread investigation by multiple Chinese regulatory authorities, who, by April 29, 2022, had created a special task force that traveled throughout the country, training law enforcement in different regions how to investigate and uncover the Tagrisso fraud.

83. Defendants' April 29, 2022 statements (¶¶76-79, 82) concerning Tagrisso's market penetration, increased demand and patient access, the limited scope of the insurance fraud investigation, the Company's compliance, and the Company's legal proceedings and contingent liabilities, which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### E. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 29, 2022

84. On July 29, 2022, AstraZeneca filed its Form 6-K with the SEC and announced its financial and operational results for the second quarter and first half of 2022. In the Form 6-K, the Company described its Tagrisso sales in China sales, explaining that key drivers were "Increased first-line use in China and continued growth in other Emerging Markets" and "Rising demand from increased patient access in China continues to offset the impact of the March 2021 NRDL price reduction." The Company's July 29, 2022, Form 6-K also contained the Company's "Legal proceedings and contingent liabilities" discussion but omitted disclosing the ongoing criminal investigation into AstraZeneca's fraudulent health insurance scheme.

85. Defendants' statements describing the drivers of Tagrisso sales in China being increased first-line use and rising demand from increased patient access (¶84) and similar statements concerning AstraZeneca's oncology and Tagrisso growth were materially false and misleading at the time they were made because they misrepresented and failed to disclose that the investigation was expanding. Having chosen to speak about Tagrisso sales growth and results, Defendants were obligated to disclose the ongoing criminal investigation into the Company's widespread Tagrisso-related insurance fraud, which had expanded beyond Shenzhen. Indeed, in June 2022, authorities arrested 20 Fujian-based AstraZeneca staff, including sales representatives involved in the Star Project. The Fujian investigation implicated AstraZeneca employees of all levels and revealed collusion between AstraZeneca China sales representatives and Suzhou Jianlu Genetic Testing to perpetrate the Star Project.

86. Further, in the legal proceedings and contingent liabilities discussion, the Form 6-K stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices,"

discussed Tagrisso patent proceedings and government proceedings concerning vaccine supplies among other proceedings, but Defendants hid the massive Tagrisso fraud investigation that by July 29, 2022, had expanded because Shenzhen investigators created a special task force that traveled throughout the country training law enforcement in different regions how to investigate and uncover the Tagrisso fraud.

87. Defendants were aware that the Tagrisso fraud investigation was a massive problem for AstraZeneca because in early 2019, the Company trained sales representatives to take measures to illegally increase Tagrisso sales in early 2019 and the fraud, which expanded to eight provinces and regions throughout China, continued into 2021. In addition, Defendants were aware of the enormous scope of the fraud and resulting investigation because evidence presented during criminal trials related to the Tagrisso insurance fraud indicated that senior executives at the Company took steps to resist or undermine the criminal investigation. For example, in response to the Shenzhen investigation, senior management ensured, one-by-one, that all sales representatives in Shenzhen destroyed any evidence that would implicate senior management or the Company and in fact senior management ordered the destruction of evidence throughout China. Indeed, according to evidence presented during a trial by Huang Wei, a former regional manager in Fuzhou and Quanzhou, in May 2022, one month before the government raid in Fujian, Kang Yuling, a former regional manager of Fujian Minbei's northern region, organized mock interrogation training for sales representatives in Fujian and trained them that "no matter shall be admitted when there is no conclusive evidence."[4]

[4] On June 28, 2024, Kang Yuling, who reported to Chen Bin was convicted for her role in the Tagrisso scheme and sentenced to 13½ years in prison and fined ¥500,000.

88. Defendants' July 29, 2022, statements concerning the Company's legal proceedings and contingent liabilities and the key drivers of Tagrisso sales in China (¶¶84-86), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

**F. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed November 10, 2022**

89. On November 10, 2022, AstraZeneca filed its Form 6-K and announced its financial and operational results for Q3 2022. The Form 6-K addressed the Companies "Key elements of Total Revenue performance in Q3 2022" for China, stating that "Q3 2021 was negatively impacted by Tagrisso inventory phasing and stock compensation following NRDL changes." And the Company described its revenue attributed to oncology sales, stating that "Product Sales increased by 14% (20% at CER) in YTD 2022 to $10,885m, reflecting new launches and increased patient access for Tagrisso, Imfinzi, Lynparza and Calquence partially offset by declines in some older medicines." Defendants also noted the following key drivers of Tagrisso growth in China:

- Increased first-line use in China and continued growth in other Emerging Markets.
- Rising demand from increased patient access in China continues to offset the impact of the March 2021 NRDL price reduction

90. Defendants' statements describing the drivers of Tagrisso sales in China being increased first-line use and rising demand from increased patient access (¶89) and similar statements concerning AstraZeneca's oncology and Tagrisso growth were materially false and misleading at the time they were made because they misrepresented and failed to disclose that the Chinese governments' Tagrisso fraud investigation was expanding and examining the role played by AstraZeneca sales representatives and their superiors. Having chosen to speak about Tagrisso sales growth and results, Defendants were obligated to disclose the ongoing criminal investigation

into the Company's widespread Tagrisso-related insurance fraud, which had expanded to the Fujian province beyond Shenzhen. The government was investigating the collusion of AstraZeneca and a third-party genetic testing labs related to the Star Project.

91. The Company's November 10, 2022, Form 6-K also described the Company's "Legal proceedings and contingent liabilities," noting that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations, including Government investigations, relating to . . . sales and marketing practices." AstraZeneca failed to disclose the ongoing criminal investigation into the Company's widespread insurance fraud that was occurring throughout multiple provinces in China, and had, by November 10, 2022, spread to the Fujian province and implicated AstraZeneca employees of all levels. Specifically, the Fujian investigation was focused on a regional manager and a sales team leader who instructed sales representatives to increase sales by falsifying genetic test reports.to increase Tagrisso sales. The investigation was also focused on the partnership between AstraZeneca China's sales representatives and regional managers and Suzhou Jianlu Genetic Testing to perpetrate Project Star.

92. Defendants were aware that the Tagrisso fraud investigation had expanded and was focused on AstraZeneca employees' involvement with the Star Project, because in September 2022, Chinese authorities arrested Kang Yuling, the Fujian regional manager who took steps to undermine the investigation into the Star Project by conducting interrogation drills with sale representative before the Fujian raid in June 2022. Furthermore, in October 2022, Chinese authorities arrested another team leader, Diao Liuyin, in Fujian who was also implicated in the Star Project.

93. Defendants' November 10, 2022, statements concerning the key drivers of Tagrisso sales in China (¶¶89, 91) and the Company's legal proceedings and contingent liabilities, which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### G. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 9 and 21, 2023

94. On February 9, 2023, AstraZeneca filed a Form 6-K and released its "Final Results" for full year 2022. In the Form 6-K, the Company reported on the revenue attributed to oncology, noting that "***Product Sales increased by 13% (19% at CER) in FY 2022 to $14,631m, reflecting new launches and increased patient access for Tagrisso***, Imfinzi, Lynparza and Calquence partially offset by declines in some older medicines." AstraZeneca also highlighted that "***Rising demand from increased patient access in China*** continues to offset the impact of the March 2021 NRDL30 price reduction" as a key driver of the Company's Tagrisso business in China.

95. The Company's February 9, 2023 Form 6-K further described the Company's legal proceedings and contingent liabilities, stating that the Company's "***Legal proceedings and contingent liabilities***" but omitted any mention of criminal or regulatory proceedings being conducted by the Chinese government. Indeed, while Defendants stated that "***AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices***," and discussed Tagrisso patent proceedings and government investigations in the U.S. and Brazil, Defendants hid the massive investigations into the Company's insurance fraud in China.

96. Then, on February 21, 2023, AstraZeneca filed its Annual Report on Form 20-F for the year ended December 31, 2022 ("2022 Annual Report"). Attached to the 2022 Annual Report

were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Soriot and Sarin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. The 2022 Annual Report described AstraZeneca's "2022 in brief," highlighting the Company's oncology sales, noting:

> Tagrisso sales in Emerging Markets increased by 17% (CER: 22%) to $1,567 million (2021: $1,336 million; 2020: $1,208 million). Sales performance was impacted by the admission to China NRDL in March 2021 for the first-line setting and the renewal in the 2nd-line setting. However, ***the rising demand from increased patient access in China continues to offset the impact of the March 2021 NRDL price reduction***.

97. AstraZeneca's 2022 Annual Report also provided an update on the Company's "***Developments in Legal Proceedings***" and "***Commitments and contingent liabilities***," but like the Company's prior disclosures, omitted any mention of the ongoing Chinese government's criminal investigation into the Company's insurance fraud. Indeed, while Defendants stated that "***AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices***," and discussed Tagrisso patent proceedings and other government proceedings, Defendants again hid the massive investigations into the Company's insurance fraud in China and stated simply:

> **Additional government inquiries**
>
> As is true for most, if not all, major prescription pharmaceutical companies, AstraZeneca is currently involved in multiple inquiries into drug marketing and pricing practices. In addition to the investigations described above, various law enforcement offices have, from time to time, requested information from the Group. There have been no material developments in those matters.

98. Similarly, AstraZeneca's Form 20-F provided the Company's risk disclosures concerning "***Adverse outcome of litigation and/or governmental investigations***," stating:

> *Legal, regulatory and compliance risks*

> Our business is subject to a wide range of laws and regulations around the world. ***We have been, and may continue to be, subject to various legal proceedings and governmental investigations***.
>
> Actual or perceived failure to comply with laws or regulations has historically and may in the future result in AstraZeneca and/or its employees being investigated by government agencies and authorities and/or in civil legal proceedings. Relevant authorities have wide-ranging administrative powers to deal with any failure to comply with laws, regulations or continuing regulatory oversight, and this could affect us, whether such failure is our own or that of our contractors or external partners. In particular, the manufacturing, marketing, exportation, promotional, clinical, pharmacovigilance, and pricing practices of pharmaceutical manufacturers, as well as the manner in which manufacturers interact with regulatory agencies, purchasers, prescribers and patients, are subject to extensive regulation, litigation and governmental investigation. Moreover, such laws, rules and regulations are subject to change. . . .
>
> *Impact*
>
> Many companies, including AstraZeneca, have been subject to legal claims asserted by federal and state governmental authorities and private payers and consumers, which have resulted in substantial expense and other significant consequences. Governmental investigations or proceedings could result in us becoming subject to civil or criminal sanctions and/or being forced to pay fines or damages. Civil litigation, particularly in the US, is inherently unpredictable, and unexpectedly high awards for damages can result from an adverse result. In many cases, litigation adversaries may claim enhanced damages in extremely high amounts. Government investigations, litigations, and other legal proceedings, regardless of the outcome, could be costly, divert management attention, or damage our reputation and demand for our products.
>
> Unfavourable resolutions to current and similar future proceedings against us that could subject us to criminal liability, fines, penalties or other monetary or non-monetary remedies, including enhanced damages, require us to make significant provisions in our accounts relating to legal proceedings and could materially adversely affect our business or results of operations.

99. Defendants' February 9 and 21, 2023 statements reporting oncology and Tagrisso sales and growth drivers (¶94) were false and misleading and omitted information Defendants were obligated to disclose. Having chosen to report on the oncology and Tagrisso business, Defendants were obligated to disclose the ongoing, widespread criminal investigation into the Company's

insurance fraud scheme to illegally falsify patients' genetic test results and increase Tagrisso drug sales, as detailed above. *See*, *e.g.*, ¶65.

100. Defendants' additional statements on February 9 and 21, 2023 (¶¶95-98) detailing the Company's litigations and contingent liabilities, and describing the Company's "Legal, regulatory and compliance risks" were also materially false and misleading at the time it was made and omitted information Defendants were required to disclose. The Company failed to disclose that AstraZeneca was then the subject of a massive ongoing Chinese criminal investigation into the Company's widespread insurance fraud carried out in eight provinces and regions throughout China, and the Company's risk disclosures had understated the risk of an adverse outcome of a government investigation. As such, in listing the Company's litigation and contingent liabilities, and in cautioning that "[w]e may be subject to various legal proceedings and governmental investigations," a disclosure that remained unchanged throughout the Class Period, Defendants failed to disclose that the risk of a governmental investigation had already materialized and had, in fact, expanded. For example, the following additional events had occurred since Defendants issued the same statements in the Company's February 2022 Form 20-F:

- June 2022: Twenty Fujian staff involved in "Project Star" from sales representatives to regional managers were arrested;
- September 2022: Kang Yuling, a regional manager who was in charge of Tagrisso sales in northern Fujian, was arrested; and
- October 2022: Diao Liuyin, a team leader in the northern Fujian region, who was in charge of Tagrisso sales in Fuzhou, was arrested.

101. Defendants knew they had failed to disclose that they were subject to additional undisclosed contingent liabilities and that they had understated the risk of a government investigation because the Company had carried out the Tagrisso insurance fraud throughout China, beginning in early 2019, after the drug was listed on the NRDL. And when the Shenzhen criminal

investigation started, senior executives at AstraZeneca ordered a nationwide destruction of evidence showing that sales representatives were trained to illegally increase Tagrisso sales and how they were instructed to ignore all compliance rules to increase those sales. And regional managers were sent to Shenzhen to round up the sales representatives, one by one, and watch them clear their *WeChat* groups, files and message histories because these records contained evidence that sales representatives were required to initiate and track patient testing to ensure positive results and even alter results. After the files and groups were deleted, the regional managers watched the sales representatives completely uninstall and reinstall the *WeChat* app as opposed to just removing them from the group. In this manner, AstraZeneca ensured that there was no evidence that the sales representatives were instructed to commit fraud.

102. Senior management at AstraZeneca took their efforts to insulate the Company from the Tagrisso fraud further by subsequently ordering all Shenzhen employees, regional managers, district managers and sales representatives, to appear in Shenzhen in batches to have interviews with AstraZeneca's legal department. The purpose of the interviews was to give the fake appearance of compliance and to get these employees to admit under legal supervision that no wrongdoing had occurred. The legal department asked all these employees whether they falsified genetic test reports, followed up on genetic tests or deleted any evidence. When all the employees denied everything, it provided AstraZeneca cover that any violations discovered were individual employees acting improperly and not corporate-level misconduct.

103. Defendants' statements on February 9 and 21, 2023 (¶¶94-98), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### H. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on April 27, 2023

104. On April 27, 2023, AstraZeneca filed its Form 6-K with the SEC and announced its financial and operational results for Q1 2023. In its Form 6-K, the Company described its revenue attributed to oncology, stating:

**Emerging Markets**

- Rising demand from increased patient access in China continues to offset NRDL renewal price reductions.

The Company's April 27, 2023, Form 6-K also contained the Company's "Legal proceedings and contingent liabilities" discussion but omitted disclosing the ongoing criminal investigation into AstraZeneca's fraudulent health insurance scheme.

105. Defendants' April 27, 2023, statements in (¶104) and similar statements concerning AstraZeneca's oncology and Tagrisso growth and sales, were materially false and misleading at the time they were made because they misrepresented and failed to disclose that the investigation was expanding. Having chosen to speak about Tagrisso sales growth and results, Defendants were obligated to disclose the ongoing criminal investigation into the Company's widespread Tagrisso-related insurance fraud, which had expanded beyond Shenzhen and Fujian. The Tagrisso fraud task force formed in Shenzhen in late 2021 following the whistleblower revelations that AstraZeneca sales representatives were altering genetic test results to increase Tagrisso sales had been training law enforcement throughout China how to investigate the fraud.

106. The Company also described its "Legal proceedings and contingent liabilities," but omitted any mention of the ongoing Chinese criminal investigation into AstraZeneca's insurance fraud. Indeed, while Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices," and discussed Tagrisso patent proceedings and Brazilian government

proceedings, Defendants omitted any mention of the ongoing Chinese government's criminal investigation into the Company's insurance fraud. At the time of the Company's statements, the investigation had materially grown from the July 2021 whistleblower revelations to the September and October 2022 arrests of Kang Yuling and Diao Liuyin for their roles in the Star Project. In addition, by late April 2023, the first criminal trials of sales representatives for falsifying genetic test reports were underway and on April 11, 2023, AstraZeneca sales representative Du Xianqing was convicted of falsifying reports from August to December 2020.

107. Defendants' April 27, 2023, statements (¶104), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### I. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 28, 2023

108. On July 28, 2023, AstraZeneca filed its Form 6-K and announced its financial and operational results for the first half and Q2 2023. In the filing, the Company described its revenue attributed to oncology, and noted the drivers for sales growth in China for Tagrisso, noting:

**Emerging Markets**

- Growing demand in adjuvant and first-line settings in China, partially offset by impact of first full quarter of NRDL34 renewal price effective March 2023 and competition.

The Company's July 28, 2023 Form 6-K also contained the Company's "Legal proceedings and contingent liabilities" discussion but omitted disclosing the ongoing criminal investigation into AstraZeneca's fraudulent health insurance scheme.

109. Defendants' July 28, 2023 statement in (¶108) describing the growing demand in adjuvant and 1st-time settings and similar statements concerning AstraZeneca's oncology and Tagrisso growth and sales were materially false and misleading at the time they were made because

they misrepresented and failed to disclose that the investigation was expanding. Having chosen to speak about Tagrisso sales growth and results, Defendants were obligated to disclose the ongoing criminal investigation into the Company's widespread Tagrisso-related insurance fraud, which had expanded beyond Shenzhen and Fujian. Indeed, in May 2023, the Jiangxi region underwent a sweeping investigation resulting in the arrest of numerous frontline sales representatives, regional managers and directors. Even former employees who had moved on from their positions in the Tagrisso sales organization were brought in for questioning.

110. After detained sales representatives in the Fujian raid, they revealed Chen Bin's involvement in the Tagrisso scheme. As AstraZeneca's Regional Director for East China, he was responsible for both the Fujian and Jiangxi regions and was involved in approving certain genetic testing labs for sales representative to use to ensure a positive result. In fact, Chen Bin approved the use of Suzhou Jianlu Genetic testing lab to perpetrate Project Star. In June 2023, following the Jiangxi raid, Chen Bin was arrested.

111. AstraZeneca's July 28, 2023, Form 6-K also described the Company's "Legal proceedings and contingent liabilities," but omitted any mention of the ongoing criminal investigation into the Company's widespread insurance fraud in China. Indeed, while Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices," and discussed Tagrisso patent proceedings and Brazilian government proceedings, Defendants hid the massive scope and seriousness of the criminal investigation. By July 2023, the investigation had materially grown because of the Jiangxi raid and the subsequent arrest of Chen Bin for his role in the fraud. Further developments in the Tagrisso investigation include:

- April 2023: AstraZeneca sales representative Du Xianqing was convicted of falsifying genetic test reports from August to December 2020, defrauding ¥112,238

from national medical funds. Xianqing was sentenced to two years in prison and fined ¥10,000; and

- July 10, 2023: AstraZeneca sales representative Hou was convicted of falsifying patient records in April 2021 and submitting it to the Baotou Tumor Hospital, defrauding ¥40,382 from national medical funds. Hou was sentenced to 10 months in prison and fined ¥5,000.

112. Defendants' July 28, 2023 statements (¶108), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### J. Defendants' Actionable Misstatements and Omissions on the Company's Form 6-K, Filed on November 9, 2023, and During the Company's November 9, 2023 Conference Call

113. On November 9, 2023, AstraZeneca filed its Form 6-K and announced its financial and operational results for Q3 2023. In the filing, the Company described its revenue attributed to oncology, stating:

**Emerging Markets**

- Growing demand in adjuvant and first-line settings offset by impact of NRDL renewal price in China effective March 2023, some additional impact in China in the third quarter resulting from reduced promotional activities following the government campaign announced at the end of July 2023.

On the same day, AstraZeneca held a conference call for investors and analysts, during which the Company discussed its financial and operational results. During the conference call, Fredrickson addressed the "anticorruption campaign" in China, stating:

> Turning now to our key medicines. In the third quarter, ***Tagrisso global revenues grew 6%***, fueled by continued demand for ADAURA and FLAURA. ***In China, we saw some market impact from the anticorruption campaign, but we have already observed recovery into the fourth quarter***.

114. Defendants' November 9, 2023 statement (¶113) that growing demand for adjuvant and first-line treatment drove Tagrisso sales and Defendant Fredrickson's statement that the anticorruption campaign was having "some market impact" in China, were false and misleading

when made and omitted information Defendants were required to disclose because the Company's efforts to illegally increase Tagrisso sales was a wide-spread concerted effort across multiple provinces that began in 2019 shortly after Tagrisso was added to the NRDL and as a result, the Chinese investigation was expanding and having a direct impact on AstraZeneca. Having chosen to speak about Tagrisso sales growth and results, Defendants were obligated to disclose the ongoing criminal investigation into the Company's widespread Tagrisso-related insurance fraud, which had expanded beyond Shenzhen, Fujian and Jiangxi.

115. Defendants were well aware that the anticorruption campaign was directly threatening to expose the Company's illegal activities to increase Tagrisso sales and not merely having a general "market impact" on the overall pharmaceutical industry. Defendant Fredrickson's statement was false and misleading and omitted material information and Defendants were aware by November 2023, that the scope of the investigation specifically targeting AstraZeneca's health insurance fraud had increased substantially and that AstraZeneca sales representatives, district and regional managers were implicated. In fact, by November 2023, a Shenzhen task force had trained law enforcement in other regions of China how to investigate and uncover the Company's illegal efforts to increase Tagrisso sales. And the task force's efforts were successful and resulted in the following new developments as the investigation continued:

- August 2023: Zuo Yingquan, responsible for five regions, was convicted in Shenzhen and sentenced to 11.5 years. 13 members of his Shenzhen sales team were also convicted. He appealed this conviction.
- October 2023: Arrested sales representatives from the Jiangxi region implicated Wang Gang, AstraZeneca's Jiangxi Regional Manager, in the Tagrisso insurance fraud scheme.
- October 30, 2023: AstraZeneca sales representative Wan was convicted of falsifying genetic test reports in August 2021 to boost Tagrisso sales, defrauding ¥68,299 from national medical funds. Wan was sentenced to three years in prison and fined ¥20,000.

- November 2023: Chen Bin was indicted for medical insurance fraud amounting to ¥6.6 million.

116. AstraZeneca's November 9, 2023 Form 6-K also described its "Legal proceedings and contingent liabilities," but omitted any mention of the ongoing governmental investigation into insurance fraud involving Tagrisso in China. AstraZeneca's "Legal proceedings and contingent liabilities" statement was false and misleading because while Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices," and discussed other government proceedings, Defendants concealed China's massive criminal investigation into the Company's illegal Tagrisso scheme to increase sales.

117. Defendants' November 9, 2023 statements (¶¶113, 116), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### K. Defendants' Actionable Misstatements and Omissions in the Company's Forms 6-K and 20-F, Filed on February 8 and 20, 2024

118. On February 8, 2024, AstraZeneca filed its Form 6-K and announced its financial results for the first quarter and full year 2023. In the filing, the Company reported its oncology revenue growth and described the drivers for Tagrisso sales growth in emerging markets.

119. The Company's February 8, 2024 Form 6-K also disclosed the Company's "***Legal proceedings and contingent liabilities***," stating that "***AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices***." While the Form 6-K discussed Tagrisso patent proceedings and various government proceedings, Defendants did not disclose the massive criminal investigation into the illegal Tagrisso insurance fraud scheme.

120. Then, on February 20, 2024, AstraZeneca filed its Annual Report on Form 20-F for the year ended December 31, 2023 ("2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Soriot and Sarin attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud. Reporting on the Company's oncology business and Tagrisso sales, the Company highlighted the following:

> **Oncology**
>
> Oncology sales in Emerging Markets increased by 8% (CER: 16%) to $3,828 million (2022: $3,537 million; 2021: $3,222 million).
>
> Tagrisso sales in Emerging Markets increased by 3% (CER: 10%) to $1,621 million (2022: $1,567 million; 2021: $1,336 million), as a result of continued demand growth partly offset by anticipated seasonality from hospital ordering dynamic in China.

121. The Company's 2023 Annual Report provided the Company's risk disclosures related to "***Adverse outcome of litigation and/or governmental investigations***," stating:

> *Legal, regulatory and compliance risks*
>
> Our business is subject to a wide range of laws and regulations around the world. ***We have been, and may continue to be, subject to various legal proceedings and governmental investigations.***
>
> Actual or perceived failure to comply with laws or regulations may result in AstraZeneca and/or its employees being investigated by government agencies and authorities and/ or in civil legal proceedings. Relevant authorities have wide-ranging administrative powers to deal with any failure to comply with laws, regulations or continuing regulatory oversight, and this could affect us, whether such failure is our own or that of our contractors or external partners. In particular, the manufacturing, marketing, exportation, promotional, clinical, pharmacovigilance and pricing practices of pharmaceutical manufacturers, as well as manufacturer interaction with regulatory agencies, purchasers, prescribers and patients, are subject to extensive regulation, litigation and governmental investigation. Moreover, such laws, rules and regulations are subject to change. Details of material litigations and governmental investigations can be found in "Financial Statements—Notes to the Group Financial Statements—Note 30—

> Commitments, contingent liabilities and contingent assets" on pages 204 to 210 of AstraZeneca's "Annual Report and Form 20 F Information 2023" included as exhibit 15.1 to this Form 20 F dated February 20, 2024.
>
> *Impact*
>
> Many companies, including AstraZeneca, have been subject to legal claims asserted by federal and state governmental authorities and private payers and consumers, which have resulted in substantial expense and other significant consequences. Governmental investigations or proceedings could result in civil or criminal sanctions and/or the payment of fines or damages. Civil litigation, particularly in the US, is inherently unpredictable, and unexpectedly high awards for damages can result from an adverse result. In many cases, litigation adversaries may claim enhanced damages in extremely high amounts. Government investigations, litigations, and other legal proceedings, regardless of the outcome, could be costly, divert management attention, or damage our reputation and demand for our products.
>
> Unfavourable resolutions to current and similar future proceedings against us that could subject us to criminal liability, fines, penalties or other monetary or non-monetary remedies, including enhanced damages, require us to make significant provisions in our accounts relating to legal proceedings and could materially adversely affect our business or results of operations.

122. AstraZeneca's 2023 Annual Report also provided an update on the Company's "Developments in Legal Proceedings" and "Commitments and contingent liabilities," describing the Company's "Legal proceedings and contingent liabilities" but omitting any mention of the ongoing governmental investigation into insurance fraud involving Tagrisso in China. Indeed, while Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices," and discussed Tagrisso patent proceedings and various government proceedings, Defendants hid that it was currently subject to a massive Chinese criminal investigation into the illegal Tagrisso insurance fraud scheme to increase sales, disclosing only the following:

> **Additional government inquiries**
>
> As is true for most, if not all, major prescription pharmaceutical companies, AstraZeneca is currently involved in multiple inquiries into drug marketing and pricing practices. In addition to the investigations described above, various law

> enforcement offices have, from time to time, requested information from the Group. There have been no material developments in those matters.

While AstraZeneca discussed ongoing and concluded US patent proceedings relating to Tagrisso, the Company remained silent as to any criminal or regulatory proceedings being conducted by the Chinese government relating to "sales and marketing practices."

123. Defendants' February 8 and 22, 2024 statements reporting on Tagrisso sales and drivers for growth (¶¶118, 120) were false and misleading and omitted information Defendants were obligated to disclose. Having chosen to report on the Tagrisso business, Defendants were obligated to disclose the ongoing, widespread criminal investigation into the Company's insurance fraud scheme to illegally falsify patients' genetic test results and increase Tagrisso drug sales, as detailed above.

124. Defendants' additional statements on February 8 and 20, 2024, (¶¶119, 121-122) detailing the Company's litigations and contingent liabilities, and describing the Company's "***Legal, regulatory and compliance risks***" were also materially false and misleading at the time it was made and omitted information Defendants were required to disclose. The Company failed to disclose that AstraZeneca was then the subject of a massive ongoing Chinese criminal investigation into the Company's widespread insurance fraud carried out in eight provinces and regions throughout China, and the Company's risk disclosures had understated the risk of an adverse outcome of a government investigation. As such, in listing the Company's litigation and contingent liabilities, and in cautioning that ***"[w]e may be subject to various legal proceedings and governmental investigations***," a disclosure that remained unchanged throughout the Class Period, Defendants failed to disclose that the risk of a governmental investigation had already materialized and had, in fact, expanded.

125. Defendants were well that China's anticorruption campaign was directly threatening to expose the Company's illegal activities to increase Tagrisso sales and not merely having a generic impact on the pharmaceutical industry. In addition, Defendants were aware that by February 2024, the investigation's scope had increased substantially and that AstraZeneca sales representatives, district and regional managers were implicated. The Tagrisso investigation had spread as the Shenzhen task force trained law enforcement in other regions of China how to investigate and uncover the illegal efforts to increase Tagrisso sales.

126. By February 2024, dozens of AstraZeneca sales representatives had been arrested and convicted and the investigation had expanded to other regions. The following new developments occurred since Defendants issued its prior periodic filing with the SEC (¶100):

- December 2023: AstraZeneca sales representative Guo was convicted of falsifying genetic test reports in January 2021 to boost Tagrisso sales, defrauding ¥33,408 from national medical funds. Guo was sentenced to 14 months in prison and fined ¥30,000.

- January 2024: AstraZeneca employees Teng Wenjun and Wu Yuyao were convicted of falsifying genetic test reports since late 2020 to enable fraudulent Tagrisso sales, defrauding ¥246,500 from national medical funds. Wenjun was sentenced to 1 year and 10 months in prison and fined ¥9,000. Yuyao was sentenced to three years in prison and fined ¥20,000.

- February 2024: AstraZeneca sales representative Liu was convicted of falsifying genetic test reports from September 2020 to January 2021 in order to boost Tagrisso sales, defrauding ¥212,464 from national medical funds. Liu was sentenced to 2.5 years in prison and fined ¥40,000.

- February 2024: AstraZeneca sales representative Cao was convicted of falsifying genetic test reports from October 2020 to February 2021 to boost Tagrisso sales, defrauding ¥49,572 from national medical funds. Cao was sentenced to 1.5 years in prison and fined ¥5,000.

127. Defendants' statements on February 8 and 20, 2024 (¶¶118-122), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which

continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### L. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on April 25, 2024

128. On April 25, 2024, AstraZeneca filed its Form 6-K and announced its financial and operational results for Q1 2024. As it had in each of its prior Form 6-K filings, the Company described its oncology business and described the drivers of Tagrisso revenue growth in China. The Company also described its "Legal proceedings and contingent liabilities," but omitted any mention of the ongoing Chinese criminal investigation into AstraZeneca's insurance fraud. Indeed, while Defendants stated that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices"—a statement Defendants repeated each quarter without change—but did not disclose the size and scope of the massive criminal investigation, disclosing only the following:

> **Other**
>
> <u>Additional government inquiries</u>
>
> As is true for most, if not all, major prescription pharmaceutical companies, AstraZeneca is currently involved in multiple inquiries into drug marketing and pricing practices. In addition to the investigations described above, various law enforcement offices have, from time to time, requested information from the Group. There have been no material developments in those matters.

129. Defendants' April 25, 2024 statements (¶128) were false and misleading when made and omitted information Defendants were required to disclose because the Company's efforts to illegally increase Tagrisso sales was a wide-spread concerted effort across multiple provinces that began in 2019 shortly after Tagrisso was added to the NRDL. Defendants further failed to disclose that sales force training to increase sales including altering genetic test results was overseen by district and regional managers and all the way up to senior executives. In

addition, Defendants never disclosed that the Chinese anticorruption campaign including the investigation into the illegal Tagrisso scheme to increase sales had in fact expanded and went far beyond a single city or province and had spread across at least eight provinces and municipalities, including Guangdong, Fujian, Sichuan, Chongqing, Jiangxi, Shenzhen, and Shanghai. Defendants also omitted that the scope of the investigation had grown to examine what roles were played by AstraZeneca's sales representatives, district and regional managers and all the way up to senior executives.

130. Defendants were well aware that the anticorruption campaign and criminal investigation was directly threatening to expose the illegal activities to increase Tagrisso sales. Indeed, by April 25, 2024, the Tagrisso investigation had grown further and resulted in the following new developments:

- April 7, 2024: AstraZeneca sales representative Ma was convicted of falsifying genetic test reports for four lung cancer patients from 2020 to 2021 to enable fraudulent Tagrisso insurance claims, defrauding ¥220,091 from national medical funds. Ma was sentenced to three years in prison and fined ¥5,000.

- April 15, 2024: AstraZeneca sales representative Li was convicted of falsifying genetic test reports for one cancer patient to enable fraudulent Tagrisso insurance claims, defrauding ¥52,228 from national medical funds. Li was sentenced to three years in prison and fined ¥10,000.

- April 17, 2024: AstraZeneca sales representative Yan was convicted of falsifying genetic test reports for two cancer patients between August and December 2020 to enable fraudulent Tagrisso insurance claims, defrauding ¥41,628 from national medical funds. Yan was sentenced to eight months in prison and fined ¥5,586.

131. Defendants' April 25, 2024, statements (¶128), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### M. Defendants' Actionable Misstatements and Omissions in the Company's Form 6-K, Filed on July 25, 2024

132. On July 25, 2024, AstraZeneca filed its Form 6-K and announced its financial and operational results for Q1 2024. In the filing, the Company described its revenue attributed to oncology and the drivers for Tagrisso sales growth, noting "Strong global demand for Tagrisso" and "Encouraging demand growth across markets despite local competition in China." The Company's July 25, 2024, Form 6-K also contained a discussion of the Company's "Legal proceedings and contingent liabilities," but omitted to disclose the ongoing criminal investigation into AstraZeneca's widespread fraudulent health insurance scheme.

133. Defendants' July 25, 2024 statement (¶132) was false and misleading when made and omitted information Defendants were required to disclose because the Company's efforts to illegally increase Tagrisso sales was a wide-spread concerted effort across multiple provinces that began in 2019 shortly after Tagrisso was added to the NRDL. In addition, Defendants never disclosed that the Chinese anticorruption campaign including the investigation into the illegal Tagrisso scheme to increase sales had in fact expanded and went far beyond a single city or province and had spread across at least eight provinces and municipalities, including Guangdong, Fujian, Sichuan, Chongqing, Jiangxi, Shenzhen, and Shanghai.

134. Defendants were well aware that the anticorruption campaign and criminal investigation was directly threatening to expose the illegal activities to increase Tagrisso sales Indeed, by July 25, 2024, the Tagrisso investigation had and resulted in the following new developments:

- June 5, 2024: AstraZeneca sales representatives Wang and Zhang, who were instructed by sales representative Zhai, were convicted of falsifying genetic test reports for four cancer patients to enable fraudulent Tagrisso insurance claims, defrauding ¥206,583 from national medical funds. Zhai was sentenced to three years in prison and fined ¥20,000. Wang was sentenced to two years and six

months in prison and fined ¥20,000. Zhang was sentenced to 1 year and six months in prison and fined ¥5,000.

- June 6, 2024: AstraZeneca sales representative Yu was convicted of falsifying genetic test reports for three patients in 2020 to enable fraudulent Tagrisso insurance claims, defrauding ¥188,190 from national medical funds. Yu was sentenced to two years in prison and fined ¥20,000.

- June 28, 2024: Kang Yuling, AstraZeneca's North Fujian Director and Diao Liuyin, AstraZeneca's Team Leader in North Fujian were sentenced to 13.5 years (¥500,000 fine) and 11.5 years (¥200,000 fine), respectively, for their roles in the Fujian Project Star scheme.

135. Defendants' July 25, 2024, statement (¶132), which was false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

### N. Defendants' Actionable Misstatements and Omissions During Soriot's September 10, 2024 Interview with *Bloomberg*

136. On September 10, 2024, Pascal Soriot appeared on *Bloomberg TV*'s *The Pulse with Francine Lacqua*, and discussed, among other issues, Chinese government probes and the Company's Chinese business. Soriot downplayed the scope and seriousness of the investigation and highlighted the Company's compliance programs:

> **Bloomberg**: Pascal, several AstraZeneca employees have also been detained in China in relation to two probes. Are you aware of AstraZeneca actually breaking any laws in relation to those investigations?
>
> **Soriot**: Yeah it's something we take very seriously of course. It's important though to remember the context of it. ***It's a small number, eight, nine employees that were affected by this investigation***. We have 12,000 field-based employees in China. It's a big country, as we all know. We are the largest pharmaceutical company in China. We have 16, almost 17,000 employees, 12,000 in the field. ***So we are looking at a smaller number of people. We have strong policies, compliance policy. We train people. We, of course, investigate***. But it's impossible to have a compliance officer being each and every one of our field-based employees. So we are working very closely with the authorities. And I think, actually, ***what the government is doing is not affecting us only, it's affecting all the companies.*** And it's a good thing because we need to really make sure that we can operate in a very compliant environment in China, like everywhere else in the world.

**Bloomberg**: But what are some of the key threats for AstraZeneca in relation to doing business in China? And how can you actually mitigate some of those risks?

**Soriot**: Yeah, of course we are all aware of the geopolitical tensions between the US and China in particular. So ***what we have been doing is of course follow the laws and regulations in the US and China very well***. But also, we've been building our supply chain in China so we can supply China from China and also supply some emerging markets from China. So, we have several new investments, manufacturing investments in China for many of our new medicines and in part added to this, we're investing in the U.S. Recently, we invested in a cell therapy manufacturing plant in in the US in Maryland. So you can see we are building two supply chains that are going to be independent from each other and enabling us to supply China on the one hand and the Western world on the other hand.

137. Defendants Soriot's September 10, 2024 statements (¶136) that "***It's a small number, eight, nine employees that were affected by this investigation***," that "***we are looking at a smaller number of people. We have strong policies, compliance policy. We train people. We, of course, investigate***" and that "***what the government is doing is not affecting us only, it's affecting all the companies***," were materially false and misleading at the time they were made because they misrepresented and failed to disclose the massive size and scope of China's widespread criminal investigation into the Company's Tagrisso-related insurance fraud scheme. In addition, the Company's scheme was carried out throughout China in multiple provinces including Guangdong, Fujian, Sichuan, Chongqing, and Shanghai, and resulted in hundreds of employees in the Company's Tagrisso sales organization being investigated and dozens being charged and convicted. In fact, shortly before Soriot stated that "***It's a small number, eight, nine employees that were affected by this investigation***" and that "***we are looking at a smaller number of people***," three more AstraZeneca employees were convicted and sentenced:

- August 12, 2024: AstraZeneca sales representative Zhang was convicted of falsifying genetic test reports between April to December 2020 to boost Tagrisso sales, defrauding ¥43,599 from national medical funds. Zhang was sentenced to 18 months in prison and fined ¥10,000.
- August 22, 2024: AstraZeneca sales representative Chen was convicted of fraudulently using an identifier to obtain Tagrisso for five ineligible patients,

defrauding ¥45,738 from national medical funds. Chen was sentenced to eight months in prison and fined ¥2,000.

- August 27, 2024: AstraZeneca sales representative Wen was convicted of falsifying genetic test reports for three cancer patients to enable fraudulent Tagrisso insurance claims, defrauding ¥206,260 from national medical funds. Wen was sentenced to one year and four months in prison and fined ¥15,000.

138. Moreover, Soriot's statements that "***We have strong policies, compliance policy. We train people***" was materially misleading because AstraZeneca's much-touted compliance culture was, in practice, a hollow shell. Compliance officers, when confronted with evidence of fraud at sales meetings, reportedly left the room rather than intervene which left district and regional managers free to explore illegal practices with the sales force to boost Tagrisso sales. As Luo Jinsheng testified in his criminal trial, the Company's "[c]ompliance policies were just for show." And AstraZeneca sales representatives were trained to collude with third-party genetic testing companies to systematically falsify genetic test reports to show false positive T790M mutations which allowed ineligible patients to obtain Tagrisso at the expense of the national insurance fund. It bears emphasis that for patients who developed resistance without the T790M mutation, the drug offered patients no benefit. Sale representatives were also trained to put their names on testing requisition forms so they could access the results. And the same middle managers who instructed sales representatives to alter genetic testing results were also implicated in deleting Company emails to hide their involvement in the insurance fraud.

139. Further, Defendant Soriot's statements that AstraZeneca had strong compliance was false because in response to the Shenzhen raid, the Company ordered the nationwide destruction of evidence. For example, after authorities were alerted to the fraud in Shenzhen, instead of increasing compliance aimed at instructing sales representatives to promote Tagrisso legally, AstraZeneca ordered employees to go to a law firm in Shenzhen for a meeting in the name of compliance, but the result of the meeting was that the Company disbanded the relevant *WeChat*

groups and deleted the chat groups, chat records, pictures, videos, forms, and other evidence showing that sales representatives were just following instructions. In addition, just before their arrest during the Fujian raid, Company officials took steps to stymie the insurance fraud investigation when Fujian Northern Regional Director Kang Yuling organized interrogation drills for her Fuzhou team to coach sales representatives how to respond to investigators' questions by subjecting them to mock criminal interrogations during which they were told that "no matter shall be admitted when there is no conclusive evidence."

140. Defendant Soriot's September 10, 2024 statements (¶136), which were false and misleading when made, had a direct effect on the price of AstraZeneca securities, which continued to trade at artificially inflated levels as a result of Defendants' material misstatements and omissions.

## V. THE TRUTH BEGINS TO EMERGE

141. On October 30, 2024, AstraZeneca posted an announcement on its website under the heading "AstraZeneca China President currently under investigation," which stated the following:

> Leon Wang, Executive Vice President International and AstraZeneca China President, is cooperating with an ongoing investigation by Chinese authorities.
>
> Our China operations continue under the leadership of the current General Manager of AstraZeneca China.

142. On this news, the price of AstraZeneca ADRs fell $2.39 per ADR, or 3.1%, to close at $72.83 on October 30, 2024. The next day, AstraZeneca ADRs fell a further $1.68 per ADR, or 2.3%, to close at $71.15 on October 31, 2024.

143. Investors learned more about the widespread nature of the Company's misconduct on November 5, 2024, when *Yicai Global*, reported that the "AstraZeneca Insurance Fraud Involves Dozens of Senior Executives in China, Source Says." In contrast to AstraZeneca's claims

that the probe was limited in nature, the article stated that the Company's practices "amount to the largest insurance fraud in the nation's pharmaceutical sector for years" adding that "dozens of AstraZeneca staff have been convicted of fraud, with the main offenders receiving prison sentences of over 10 years." The article also provided details of the Company's misconduct in China, stating AstraZeneca representatives were "found to have faked prescriptions for the lung cancer drug Tagrisso so that patients could buy it through insurance." The same day, *Yicai* published an article in China titled "AstraZeneca Insurance Fraud Scandal Deepens: China President Leon Wang Under Investigation, Supervisory Authorities Involved." The article published in China provided additional detail regarding the insurance fraud.

144. On this news, AstraZeneca ADRs fell $5.16 per ADR, or 7.2%, to close at $66.27 per ADR on November 5, 2024. The next day, they fell a further $2.42 per ADR, or 3.65%, to close at $63.85 on November 6, 2024.

145. Then, on November 6, 2024, Defendant Sarin and AstraZeneca's Head of Investor Relations, Andy Barnett, held a conference call to discuss the Chinese fraud crackdown, the investigation into the Company's health insurance fraud, and "the media communications that have caused some turmoil in the markets and our share price over the last couple of days." During the conference call, Sarin confirmed that Wang had been under investigation and was now in detention.

146. Sarin also admitted that (i) the insurance fraud scheme was perpetrated to increase Tagrisso sales before the drug had been approved for reimbursement as a first line treatment, (ii) that from the time the Company "became aware of these medical insurance fraud investigations" in late 2021, Defendants had been tracking the investigation both by gathering information "from public sources" (*e.g.*, criminal dockets) and by maintaining contact with "family members of

detained former employees"; (iii) that they had watched the investigation "increase[] over the last 3 years" and despite their statements during the Class Period that the "number of people were very limited, they were aware of the massive size and scope of the investigation and "***around a hundred individual ex-employees have been sentenced in relation to medical insurance fraud***"; and (iv) as a result of "***our own investigation and compliance, and we have changed most of the senior management in oncology***."

> ***Around a hundred individual ex-employees have been sentenced in relation to medical insurance fraud***. However, we cannot validate the exact number. As this information has been gathered by us from public sources, or from what we have heard from family members of detained former employees.
>
> *  *  *
>
> ***In late 2021***. As I mentioned, ***we became aware of investigations*** which involved a limited number of individuals. and ***the number of individuals increased over the last 3 years***. Again, these ***were specifically related to Tagrisso for falsifying genetic data, and this was during the period where Tagrisso did not have a broad reimbursement in the first line***.
>
> *  *  *
>
> ***Since the time we became aware of these medical insurance fraud investigations, we've obviously continued to do our own investigation and compliance, and we have changed most of the senior management in oncology***, and all of them are relatively new.

## VI. ADDITIONAL INDICIA OF DEFENDANTS' SCIENTER

147. As detailed herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company, or in their own name, were materially false and misleading; knew or recklessly disregarded that such false and misleading statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance of such false and misleading statements or documents as primary violations of the federal securities laws.

### A. Defendant Wang's Senior Position and Involvement in the Fraud is Evidence of Scienter

148. Defendant Wang joined AstraZeneca in March 2013. Shortly thereafter, in 2014, Soriot promoted him to President of AstraZeneca China. Then, in 2017, Wang was promoted to Executive Vice President – International and he began overseeing AstraZeneca's strategic and business development in the Asia-Pacific region. From his appointment as President of AstraZeneca China in 2014 through the time he was detained in relation to his involvement in the insurance fraud scheme in October 2024, Defendant Wang was considered Soriot's right-hand man at the Company.

149. At the helm of AstraZeneca's operations in China, Wang oversaw explosive growth in the country by successfully adapting to and navigating Beijing's abrupt regulatory shifts. Under Wang's stewardship, AstraZeneca's China sales grew from just 7% of the Company's total revenues in 2013 to 20% at its peak in 2019. When China radically reformed its generic drug market in 2019, pushing to replace expensive foreign brands of off-patent medications with cheap domestic generics, AstraZeneca lost substantial revenue. The Company's asthma treatment Pulmicort suffered the biggest blow, with sales plummeting from $1.46 billion in 2019 to $645 million in 2022. Defendant Wang seized on the opportunity presented by the regulatory change and shifted the Company's focus to innovative medications, including Tagrisso, which was approved by China's drug regulator as a second line treatment in just six months. Further committing to Chinese sales, AstraZeneca agreed to cut Tagrisso's price by nearly 71% in order to get onto China's national insurance reimbursement list – a tactic at which pharmaceutical industry peers balked. Wang publicly boasted about this success, stating on an investor call that China has "solid no. 1 position in China" and "will definitely be able to scale up volume much faster than the other companies in China."

150. After being promoted to President of AstraZeneca China, Defendant Wang began steering the operational direction of AstraZeneca in China. He pushed for AstraZeneca's involvement in all aspects of patient care, including patient screening, diagnosis, treatment, disease management solutions, and treatment plans to increase the Company's market share in China. Defendant Wang's ambitions were to triple the size of AstraZeneca China in four years, a plan that Defendant Soriot endorsed. Indeed, in an interview with *The Times*, Defendant Soriot described Wang as "very competitive, wants to be [number one] in every single country," "[a]nd in every single country, he wants to be [number one] in every therapy area where we operate." Focused on becoming number one and achieving such rapid growth, Defendant Wang deployed a massive salesforce to win over doctors and patients. This drive for success created immense pressure within AstraZeneca to perform, particularly in the Company's Oncology Unit. Defendant Wang not only controlled the general direction of AstraZeneca's development in China, but he also directly influenced the Company's corporate culture. According to a former AstraZeneca employee, Defendant Wang, who was close with and recruited by Soriot to serve as his right-hand man at AstraZeneca, oversaw all aspects of China as he set forth the entire framework and direction of the business.

151. Wang adopted an extremely "hands on" approach with all employees across all operations of the Company's China business. And Wang personally interacted regularly with director level staff or above in China, even though the Company had over 100 directors in China in 2022. In fact, Wang personally interviewed and vetted the seven sales representatives covering the Macau market. Wang would also regularly sit in on the quarterly meetings for all of the departments in China. For example, Wang would participate in sales and promotional work, including personally interviewing prospectives sales representatives and sitting in on departmental

quarterly meetings during which he would actively engage in discussions and offer his input. And in the Innovation Committee meetings, Wang would not only attend the meeting but would actively give his input and was highly engaged.

152. Wang's success in China was accomplished through an "iron-fisted" leadership style and by implementing AstraZeneca's notorious "wolfish style" and "radical culture" of setting aggressive sales targets, eliminating underperformers, and focusing on winning market share at all costs. Wang was often described throughout China's pharmaceutical industry as "radical," "extremely strong," or "iron-fisted," personally drove the "wild culture" and aggressive sales tactics employed throughout AstraZeneca's operations in China. Employees stated Wang encouraged internal competition and even infighting between departments at AstraZeneca China to squeeze every last drop out of employees. Sales representatives stated that Wang would pay lip service to compliance and justify actions of sales representatives by saying that what they are doing is good for the patient and good for society.

153. Wang's success in China led to country-wide reverence, making him one of China's most high-profile pharmaceutical executives. Defendant Wang would regularly appear on the Company's quarterly earnings calls with analysts, holding himself out to be the most knowledgeable person to speak about the Company's operations in Emerging Markets, and specifically about the Company's business in China. In fact, after the insurance fraud scheme was made public, Defendant Wang was tasked with fielding analysts' questions about the case to which he repeatedly assured investors that the misconduct was limited to a few individuals and "very, very small" in scope. Wang was so integral to AstraZeneca's operations in China that after he was detained, an industry insider explained that if Wang were to be found guilty, "given his seniority and how much he's represented [AstraZeneca], it might as well be the Company." Some

employees even joked that AstraZeneca should be referred to as "Wang-Zeneca" given the control he had in China.

154. AstraZeneca's "wild" and "radical culture," and the resulting abnormally high pressure the Company's salesforce was under, was well-known in the Chinese pharmaceutical industry. One industry insider explained multiple sources knew of AstraZeneca's Tagrisso team holding internal training sessions where management allegedly instructed employees to alter genetic test reports to fraudulently secure insurance reimbursements, all in the name of hitting sales targets. The insider added: "[t]o them, it was standard practice, completely normal." Though Wang's "iron-fisted" leadership style and "radical culture" culture drove the AstraZeneca on the prosperous road of rapid growth, his methods and tactics also resulted in the road ending with what has been widely recognized in China as "the largest insurance fraud among pharmaceutical industry in recent years." This outcome was predictable in a case like this, where insider knowledge and court documents suggest that Wang, and other management-level employees, were aware of the abnormally high positive rate and encouraged frontline sales representatives to increase the positive rate. Indeed, one insider described the insurance fraud investigation as "inevitable" given Leon Wang's "wild" leadership style.

155. On October 30, 2024, as part of China's investigation into the Company's falsification of genetic test results for patients who otherwise would not have otherwise qualified for the drug under insurance, Defendant Wang was detained and taken away by Chinese authorities. In December, AstraZeneca placed Wang on "extended leave" and appointed Iskra Reic as Wang's replacement. Eight months after his arrest in Shenzhen, Defendant Wang is on bail awaiting trial. As noted below, Defendant Wang was implicated by at least one senior

manager in criminal proceedings as having known and directed the genetic testing fraud for Tagrisso, which explains his arrest by Chinese authorities.

### B. The Individual Defendants' Public Statements and Filings Confirm that They Had Knowledge of the Investigation and True Scope of the Fraud

156. The Individual Defendants served as the Company's CEO (Soriot), Executive Vice President International and AstraZeneca China President (Wang), Chief Financial Officer (Sarin) and Executive Vice President, Oncology Business Unit (Fredrickson). Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading and omitted such information.

157. In addition, because of their high-ranking positions with the Company, each of the Individual Defendants was responsible for, and remained well-informed of, issues critical to the Company's success, including the status and success of one of their best-selling drugs, Tagrisso. As a result, each of the Defendants was responsible for the accuracy of AstraZeneca's corporate statements and each is therefore responsible and liable for the misrepresentations in and omission from such statements.

158. In conference calls with investors during the Class Period, the Individual Defendants repeatedly held themselves out as being familiar with the scope of the Company's involvement in the national healthcare fraud and China's investigation of the Company and its personnel.

(a) Defendant Soriot, as AstraZeneca's CEO, attested to the accuracy of the Company's periodic filings and disclosure submitted to the SEC. Soriot also spoke frequently about AstraZeneca's business, leading each conference call in which he participated, and

describing the Oncology business, Tagrisso sales, and what he claimed to be the small scope and impact of the Chinese criminal investigation.

(b) Defendant Sarin, as AstraZeneca's CFO, attested to the accuracy of the Company's periodic filings and disclosure submitted to the SEC. Sarin also held herself out as knowledgeable on conference calls, acknowledging that Defendants had been asked for data requests about the criminal insurance fraud investigations and admitting that they had been fully aware of the criminal insurance fraud investigations, that it involved an increasingly larger number of employees as the investigation grew over the preceding three years, and that the insurance fraud was pursued in order to make Tagrisso available to patients to whom the drug was not otherwise available for reimbursement.

(c) Defendant Fredrickson, as AstraZeneca's Executive Vice President, Oncology Business Unit, frequently spoke about Tagrisso's revenue and sales growth, including in China, and discussed the Chinese "anticorruption campaign."

(d) Defendant Wang, who was President of AstraZeneca China, also spoke frequently about AstraZeneca's business on conference calls with investors, including about the Company's Oncology business and Tagrisso sales. Wang held himself out as knowledgeable about the Chinese criminal investigation, answering questions during investor conference calls, and falsely stating that the investigation was limited to a few individuals and that the Company had a "very high standard of compliance" that "definitely forbid[s] illegal behavior." And other senior executives routinely looked to Wang to discuss and describe the Company's China operations, specifically as to the Oncology business, Tagrisso, and the criminal investigation.

### C. The Fraud Was Pervasive and Widespread and Involved Senior Managers and Other High-Level AstraZeneca Personnel

159. The pervasiveness of the fraud also raises a strong inference of scienter, as more than one hundred AstraZeneca employees across nearly every AstraZeneca office and large province in China, including Jiangsu, Baotou, Henan, Hubei, Heilongjiang, Inner Mongolia Autonomous Region, Jilin, Sichuan, Zhejiang, Anhui, Shandong, Qinghai, Fujian, and Jiangxi, have been arrested on suspicion of forging gene testing reports to defraud the Chinese national Medicare fund. AstraZeneca has headquarters in Zhejiang (Hangzhou), Jiangsu (Wuxi and Yixing), and Sichuan (Chengdu), among other places.

160. So far, more than 100 sales representatives and high-level managers have been convicted of fraud in connection with the sale of Tagrisso in China, with principal criminals receiving sentences of more than 10 years. A partial list of these convictions include:

- **April 11, 2023**: AstraZeneca sales representative Du Xianqing was convicted of falsifying genetic test reports from August to December 2020, defrauding ¥112,238 from national medical funds. Xianqing was sentenced to two years in prison and fined ¥10,000.
- **July 10, 2023**: AstraZeneca sales representative Hou[5] was convicted of falsifying patient records in April 2021 and submitting it to the Baotou Tumor Hospital, defrauding ¥40,382 from national medical funds. Hou was sentenced to 10 months in prison and fined ¥5,000.
- **August 2023**: Zuo Yingquan, responsible for five regions, was convicted in Shenzhen and sentenced to 11.5 years. 13 members of his Shenzhen sales team were also convicted. Zou appealed.
- **October 30, 2023**: AstraZeneca sales representative Wan was convicted of falsifying genetic test reports in August 2021 to boost Tagrisso sales, defrauding ¥68,299 from national medical funds. Wan was sentenced to three years in prison and fined ¥20,000.

---

[5] Many of the sales representatives' names have been partially redacted in each sales representative's respective convictions or court documents.

- **December 12, 2023**: AstraZeneca sales representative Guo was convicted of falsifying genetic test reports in January 2021 to boost Tagrisso sales, defrauding ¥33,408 from national medical funds. Guo was sentenced to 14 months in prison and fined ¥30,000.

- **January 22, 2024**: AstraZeneca employees Teng Wenjun and Wu Yuyao were convicted of falsifying genetic test reports since late 2020 to enable fraudulent Tagrisso sales, defrauding ¥246,500 from national medical funds. Wenjun was sentenced to 1 year and 10 months in prison and fined ¥9,000. Yuyao was sentenced to three years in prison and fined ¥20,000.

- **February 18, 2024**: AstraZeneca sales representative Liu was convicted of falsifying genetic test reports from September 2020 to January 2021 in order to boost Tagrisso sales, defrauding ¥212,464 from national medical funds. Liu was sentenced to two and half years in prison and fined ¥40,000.

- **February 18, 2024**: AstraZeneca sales representative Cao was convicted of falsifying genetic test reports from October 2020 to February 2021 to boost Tagrisso sales, defrauding ¥49,572 from national medical funds. Cao was sentenced to one and a half years in prison and fined ¥5,000.

- **April 7, 2024**: AstraZeneca sales representative Ma was convicted of falsifying genetic test reports for four lung cancer patients from 2020 to 2021 to enable fraudulent Tagrisso insurance claims, defrauding ¥220,091 from national medical funds. Ma was sentenced to three years in prison and fined ¥5,000.

- **April 15, 2024**: AstraZeneca sales representative Li was convicted of falsifying genetic test reports for one cancer patient to enable fraudulent Tagrisso insurance claims, defrauding ¥52,228 from national medical funds. Li was sentenced to three years in prison and fined ¥10,000.

- **April 17, 2024**: AstraZeneca sales representative Yan was convicted of falsifying genetic test reports for two cancer patients between August and December 2020 to enable fraudulent Tagrisso insurance claims, defrauding ¥41,628 from national medical funds. Yan was sentenced to eight months in prison and fined ¥5,586.

- **June 5, 2024**: AstraZeneca sales representatives Wang and Zhang, who were instructed by sales representative Zhai, were convicted of falsifying genetic test reports for four cancer patients to enable fraudulent Tagrisso insurance claims, defrauding ¥206,583 from national medical funds. Zhai was sentenced to three years in prison and fined ¥20,000. Wang was sentenced to two years and six months in prison and fined ¥20,000. Zhang was sentenced to one year and six months in prison and fined ¥5,000.

- **June 6, 2024**: AstraZeneca sales representative Yu was convicted of falsifying genetic test reports for three patients in 2020 to enable fraudulent Tagrisso

insurance claims, defrauding ¥188,190 from national medical funds. Yu was sentenced to two years in prison and fined ¥20,000.

- **June 28, 2024**: a former sales manager at AstraZeneca surnamed Diao Liuyin was sentenced to 11 years and six months in prison and fined ¥200,000, while his direct superior Kang Yuling got 13 years and six months and a ¥500,000 fine. In their defense, another team medical representative who was sentenced with Diao asserted that Defendant Wang and the head and director of the marketing department, Chen, were aware of the abnormally high EGFR positive rate for genetic mutations and encouraged the front line to increase the positive rate. As noted above, Defendant Wang is suspected of committing a crime and has been arrested.

- **August 12, 2024**: AstraZeneca sales representative Zhang was convicted of falsifying genetic test reports between April to December 2020 to boost Tagrisso sales, defrauding ¥43,599 from national medical funds. Zhang was sentenced to 18 months in prison and fined ¥10,000.

- **August 22, 2024**: AstraZeneca sales representative Chen was convicted of fraudulently using an identifier to obtain Tagrisso for five ineligible patients, defrauding ¥45,738 from national medical funds. Chen was sentenced to eight months in prison and fined ¥2,000.

- **August 27, 2024**: AstraZeneca sales representative Wen was convicted of falsifying genetic test reports for three cancer patients to enable fraudulent Tagrisso insurance claims, defrauding ¥206,260 from national medical funds. Wen was sentenced to one year and four months in prison and fined ¥15,000.

- **September 2024**: Zuo Yingquan was convicted at his second trial and again sentenced to 11.5 years in prison.

- **October 8, 2024**: AstraZeneca sales representative Xu was convicted of falsifying genetic test reports for two cancer patients to enable fraudulent Tagrisso insurance claims, defrauding ¥109,094 from national medical funds. Xu was sentenced to three years in prison and fined ¥20,000.

- **December 20, 2024**: AstraZeneca sales representative Wang was convicted of knowingly falsifying genetic test reports for patients to enable fraudulent Tagrisso insurance claims, defrauding more than ¥100,000 from national medical funds. Wang was sentenced to one and a half years imprisonment and fined ¥5,000. Another employee and sales representative, Tan, was convicted for the same misconduct the same day and sentenced to one year and five months in prison and fined ¥5,000.

- **2024**: Luo Jinsheng, former Sales Manager of AstraZeneca in the Southern Fujian Region: was sentenced to 10 years and six months and fined ¥300,000. In his criminal trial, Luo testified that "[a]cross the country, it was a widespread

phenomenon for AstraZeneca sales reps to tamper with test reports." Luo further explained that the Company's "[c]ompliance policies were just for show" and that after the Shenzhen case, the Company required all personnel to conduct compliance self-inspections, disband all work *WeChat* groups, delete group chat content, and destroy relevant evidence. He also explained how the Company took further action to insulate itself from the Tagrisso fraud investigation by training sales representatives "how to respond to external investigations."

- Additional criminal convictions are almost certain, as Chinese authorities continue their investigation into AstraZeneca executives.
- Chen Bin, AstraZeneca China East Region's Directo, who was responsible for the Fujian and Jiangxi regions, is currently in custody and his first trial is underway. Prosecutors are seeking a 14.5 year sentence.
- **July 2024**: Zhu Jiakang, formerly Vice President of AstraZeneca China, was detained.
- **October 25, 2024**: Xie Qiong, another AstraZeneca Vice President in China, was taken away the investigation from AstraZeneca's Shanghai headquarters along with multiple other individuals.
- **October 25, 2024**: Yin Min, former Vice President of AstraZeneca China and general manager of AstraZeneca's oncology unit, had been held by Chinese regulatory authorities. One of two general managers, Yin Min reported directly to Defendant Wang.
- **October 30, 2024**: Defendant Wang was arrested and is currently awaiting trial.

### D. The Company Went to Great Lengths to Hide Its Executives' Involvement in the Fraud

161. Contrary to the Company's public statements, numerous high-level executives were involved in the fraud, and the Company made substantial private efforts to create the impression that the fraud was the result of the independent actions of just a handful of rogue employees.

162. The Chinese criminal fraud investigation began in July 2021, when the Shenzhen Municipal Health Insurance Bureau suspected that AstraZeneca staff were engaged in health insurance fraud and misconduct. By September 2021, over 10 AstraZeneca staff in Shenzhen were investigated. Court evidence showed that Zuo Yingquan, who oversaw AstraZeneca's sales in China and was later convicted of fraud and sentenced to 11.5 years in prison, via team meetings

had directed the creation of fraudulent genetic testing reports. Zuo had ordered his AstraZeneca teams to "Flexibly handle genetic reports"; "Use any means to get it done"; and "Help ineligible patients access the drug." At least 12 people in Shenzhen under Yingquan's supervision were convicted of fraud, with a maximum sentence of four years and ten months, a minimum sentence of one year and six months, and a two-year suspended sentence. As noted above, the investigation has implicated at least four high-level executives, including Leon Wang, Zhu Jiakang, Yin Min and Xie Qiong.

163. As the investigation began uncovering evidence implicating upper-level managers and executives, the Company began to cover up their involvement.

164. When Chinese authorities began investigating the fraud, the Company's legal team reached out to the local investigation center to claim the Company's sales representatives had acted on their own. Thereafter, around July 2022, AstraZeneca's compliance department sent out a mass email to every sales representative and their managers, demanding that they sign a "pledge" stating they had voluntarily chosen to contact patients. The email claimed that because their names were listed as contacts on the genetic testing submission forms, they had violated patient interaction protocols. The pledge the employees were compelled to sign stated that Company training had clearly forbidden patient contact, framing the sales representatives' actions as policy violations. Sales representatives were forced to sign this pledge even though the Company explicitly taught the sales representatives to place orders in the system for blood tests so that all of the testing materials were shipped to the representative and instructed the representatives to provide their personal phone numbers and names to ensure that they would get the test results immediately. The punishment for refusing to sign the "pledge" was structured as a reduction of the employees'

quarterly bonus. Under pressure from their district and regional managers, most representatives signed the pledge.

165. ***AstraZeneca Gave Employees Interrogation Training and Instructed Them to Destroy Communications***. Around the same time, Company representatives also organized and directed the deletion of voluminous records reflecting the fraud. AstraZeneca organized employees to go to a law firm in Shenzhen for a meeting in the name of compliance. According to Company representatives, AstraZeneca's systems allowed the Company to track internal information by, for example, monitoring emails and expenses, and sales representatives' use of credit cards and meeting and lunch places. The result of the Shenzhen meeting was that the Company dissolved and cleared the chat groups, chat records, pictures, videos, and forms related to work. Among the materials that were deleted was a *WeChat* group relevant to the Tagrisso fraud, which was national in scope and included 500 members. In the chats, AstraZeneca staff shared daily updates about Tagrisso testing – tests submitted at which hospitals, how many free tests were processed and other project tracking information.

166. As soon as the Shenzhen fraud broke out in July 2021, the senior executives of the Company immediately ordered a "nationwide clearing" of all *WeChat* groups, files and message histories, according to a former employee. Corroborating these observations, media reports and evidence during criminal trials reported the Company's order to delete chat records and other evidence. One employee mentioned that "the company had deleted part of the data of the company's mailbox from the background." Further corroborating the cover-up, as reported by the media, the verdict of Luo Jinsheng, from Fujian, cited his testimony stating: "After the Shenzhen case was exposed, the company ordered all staff to conduct internal compliance reviews, disbanded all *WeChat* workgroups considered risky (legally or in terms of compliance), required the deletion

of group chat content and destruction of related evidence, and instructed sales reps on how to respond to external investigations."

167. According to one verdict, when the police went to AstraZeneca in April 2022 to obtain relevant documents sent by Zuo Yingquan to Zhu Jiakang, Vice President of AstraZeneca China, the Company refused to provide the relevant information on the grounds that it involved trade secrets.

168. Senior management at AstraZeneca took further efforts to cover-up the Tagrisso fraud by ordering all employees, regional managers, district managers and sales representatives to appear in Shenzhen "in batches" to have interviews with AstraZeneca's legal department. The purpose of the interviews was to give the fake appearance of compliance and to get these employees to admit under legal supervision that no wrongdoing had occurred. The legal department asked employees whether they falsified genetic test reports, followed up on genetic tests or deleted any evidence. When all the employees denied everything, it provided AstraZeneca cover that any violations discovered were individual employees acting improperly and not corporate-level misconduct. In Fujian, senior management took further steps to stymie the insurance fraud investigation by organizing "interrogation drills." The interrogation drills organized by AstraZeneca Fujian Northern Regional Director Kang Yuling coached her Fuzhou team how to respond to investigators' questions by subjecting them to mock criminal interrogations during which they were told that "no matter shall be admitted when there is no conclusive evidence."

**E. The Development and Sale of Tagrisso in China Was a Core Operation**

169. Defendants' knowledge of or reckless disregard of the Tagrisso genetic testing fraud discussed herein can readily be inferred because these operations were existential to the Company's business.

170. AstraZeneca's business is the discovery, development, and commercialization of prescription medicines, particularly in oncology. AstraZeneca focuses on several key therapeutic areas, including oncology, cardiovascular, renal and metabolism, respiratory and immunology, and rare diseases.

171. During the relevant period, AstraZeneca's oncology portfolio was by far the biggest contributor to its revenue and featured several important drugs and developments. In 2022, sales of its oncology products were responsible for 34% of the Company's revenue. One year later, oncology's share of the Company's revenue had ballooned to 40%. In its 2022 Annual Report, AstraZeneca attributed its financial performance to the success of its oncology portfolio, stating that "[p]erformance [was] driven by rapid and broad market penetration of our oncology medicines." The Company's "impressive business performance [was] underpinned by exceptional Total Revenue growth" for Tagrisso and several other oncology drugs. In a May 6, 2022 report, Berenberg's analyst noted that "[t]he key drivers of near-term sales growth are the [Company's] oncology assets (Tagrisso, Lynparza and Calquence), which require limited incremental investment."

172. Tagrisso was one of the Company's best-selling drugs. In 2022, it generated $5.4 billion in revenue, more than double its oncology drugs Imfinzi and Lynparza. In 2023, it generated $5.8 billion in 2023. In 2024, it generated $6.6 billion in revenue, representing a 13% increase from the previous year. In emerging markets, Tagrisso generated approximately $1.6 billion in sales annually in 2022 and 2023, with 50% coming from China.

173. In addition to its significant revenue contribution, Tagrisso was an increasingly important part of the Company's growth plan, for several reasons.

174. First, for years Tagrisso was initially only approved as a second-line treatment (in March 2017). In January 2019, Tagrisso was added to China's NRDL as a second-line treatment. Inclusion on the NRDL is crucial for pharmaceutical companies, as it determines which drugs will be reimbursed by China's national health insurance system and significantly impacts market access and sales in China. However, to secure its place on the NDRL, AstraZeneca offered a 71% discount, significantly cutting into its profits for second-line patients – then its only market in China. Indeed, immediately after NRDL inclusion, Tagrisso revenue dropped, because the Company was forced to discount the drug more than any other cancer drug approved to be on the NRDL in 2018. Thus, AstraZeneca experienced a revenue decline while the Company began to ramp up drugs sales to a larger population.

175. In 2020, the Company began planning for Tagrisso's expansion into a first-line treatment, which would significantly expand its market. If Tagrisso could be used in first-line treatment, the Company could sell Tagrisso to all EGFR mutation patients and significantly expand its market share. Internally, the Company developed the slogan "Life does not choose one in four," which became the foundation of the Company's entire training program and was frequently referenced by the team, including regional and district managers. Its core purpose was to expand treatment access for more first-line patients, and Tagrisso was the drug that would allow the Company to do that. As AstraZeneca's Executive Vice President Dave Fredrickson put it, "twice as many patients would be eligible" for first-line treatment, "[b]ecause Tagrisso's front-line use is not limited to T790M mutation—as its [] second-line" is. A former sales representative further acknowledged that patients that met the criteria for second-line insurance reimbursement—a much smaller subset of the patient market.

176. Second, in Asian populations, including Chinese patients, the rate of EGFR mutations in non-small cell lung cancer is significantly higher compared to Western populations, with estimates ranging from approximately 40% to 50%. This made Tagrisso, an EGFR-targeted therapy, particularly relevant for this patient group.

177. Third, two of AstraZeneca's other big oncology drugs (Imfinzi and Lynparza) were facing pressure from competitors and thus underperforming. This made the Company more dependent on Tagrisso to drive revenue growth.

178. Projections indicated that Tagrisso would be a pivotal contributor to AstraZeneca's portfolio, with anticipated sales surpassing $7 billion and holding a significant market share in small molecule lung cancer treatments by 2029.

## VII. LOSS CAUSATION/ECONOMIC LOSS

179. At all times during the Class Period, the market for AstraZeneca securities was open, well-developed, and efficient. Throughout the Class Period, AstraZeneca ADRs traded at artificially inflated prices as a direct result of Defendants' scheme and materially false and misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. Lead Plaintiffs and other Class members purchased or otherwise acquired AstraZeneca securities, including ADRs, relying upon the integrity of the market price of AstraZeneca securities and market information relating to AstraZeneca, and have been damaged thereby.

180. During the Class Period, Defendants publicly disseminated materially false and misleading statements and omitted material facts concerning the true nature of the Company's business and operations. Defendants engaged in a course of conduct that artificially inflated the price of AstraZeneca ADRs and operated as a fraud or deceit on members of the Class who

purchased AstraZeneca ADRs by misrepresenting and omitting material information about the true nature of the Company's operations in China.

181. Defendants' false and misleading statements and omissions, identified herein at §IV, had the intended effect and caused AstraZeneca's ADRs to trade at artificially inflated levels throughout the Class Period.

182. And when Defendants' misrepresentations and omissions were disclosed or otherwise revealed to the market, beginning on October 30, 2024, and further revealed in successive disclosures on November 5, 2024, AstraZeneca's ADR price declined significantly, as the prior inflation was removed from the price of the Company's ADRs. As a result of their purchases of AstraZeneca ADRs during the Class Period, Lead Plaintiffs and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

183. On October 30, 2024, AstraZeneca posted an announcement on its website under the heading "AstraZeneca China President currently under investigation." The announcement revealed that "Leon Wang, Executive Vice President International and AstraZeneca China President, is cooperating with an ongoing investigation by Chinese authorities. Our China operations continue under the leadership of the current General Manager of AstraZeneca China."

184. On this news, the price of AstraZeneca ADRs fell $2.39 per ADR, or 3.1%, to close at $72.83 on October 30, 2024. The next day, AstraZeneca ADRs fell a further $1.68 per ADR, or 2.3%, to close at $71.15 on October 31, 2024.

185. The financial media connected the Tagrisso fraud investigation to the decline in the Company's ADR price. For example, the *Financial Times* stated, "The pharmaceutical chief [Wang] has been crucial to AstraZeneca's fortunes in China, where it generated $5.9bn in revenues last year, making it the largest overseas drugmaker by sales in the country," adding that

"AstraZeneca shares fell" when the news was released. In an article titled "AstraZeneca's China Legal Woes Follow Push For Market Share," *Bloomberg* reported that "***China's probe into AstraZeneca Plc has reached its uppermost echelons, ensnaring local president Leon Wang and throwing into question the future of the most successful Western pharmaceutical company in the country***." *Bloomberg* further stated, "[t]he investigation is focused on aggressive sales tactics used in at least two of its oncology drugs, the lung cancer treatment Tagrisso and the immunotherapy Imjudo" and "***Wang's detention signals that authorities suspect that Astra's China top management were aware of, or sanctioned, breaches that include doctoring patient results for insurance reimbursement***." *Bloomberg* also tied the news to the subsequent decline in the Company's ADR price, noting "***[t]hat China is now disciplining one of its staunchest foreign corporate allies has sent shockwaves through the industry, with AstraZeneca's stock down as much as 5.5% on Wednesday [October 30]***."

186. Investors learned more about the widespread nature of the Company's misconduct on November 5, 2024, when *Yicai Global*, reported "AstraZeneca Insurance Fraud Involves Dozens of Senior Executives in China, Source Says." In contrast to AstraZeneca's claims that the probe was limited in nature, the article stated that the Company's practices "amount to the largest insurance fraud in the nation's pharmaceutical sector for years," adding that "dozens of AstraZeneca staff have been convicted of fraud, with the main offenders receiving prison sentences of over 10 years." The article also provided details of the Company's misconduct in China, stating AstraZeneca representatives were "found to have faked prescriptions for the lung cancer drug Tagrisso so that patients could buy it through insurance. To boost sales of Tagrisso, staff forged positive genetic testing reports to defraud the health insurance fund, even colluding with genetic testing companies to funnel benefits." The article also reported: "Leon Wang, President of

AstraZeneca China, is cooperating with the investigation by Chinese authorities, which has now expanded to include the public security bureau, supervisory commission, and other relevant bodies." Discussing the widespread nature of the fraud, the article reported "insurance fraud cases involving AstraZeneca have surfaced in Shenzhen as well as the provinces of Fujian and Jiangxi. Employees implicated in these have pointed the finger at regional managers, district managers, and even senior executives." The article also noted that "[a]n insider at a drugmaker noted that AstraZeneca's high sales targets put extreme pressure on medical reps, which has been a major factor in the firm's compliance issues."

187. The same day, *Yicai* published an article in China titled "AstraZeneca Insurance Fraud Scandal Deepens: China President Leon Wang Under Investigation, Supervisory Authorities Involved." The article published in China provided additional detail regarding the insurance fraud. For example, the article stated that "From Shenzhen to Fujian and Jiangxi, a web of fraud emerged. Lower-level employees implicated regional managers, directors, and eventually top leadership, including Leon Wang himself." Concerning the Tagrisso fraud, the article stated that "With only a limited number of patients testing positive in genetic screenings sales representatives, under intense performance pressure, resorted to 'converting' negative-testing patients into positive ones as a way to boost their sales performance." Furthermore, the article described the "blatant" nature of the fraud, stating: "a staggering number of genetic test reports passed through AstraZeneca showed blatant, sloppy alterations. 'The volume of falsified reports was massive, and the edits were shockingly careless, many reports had identical genetic similarity percentages down to four decimal places,' revealed one insider."

188. The *Yicai* article further noted that "a pharmaceutical industry insider, revealed that she had heard from multiple sources about AstraZeneca's Tagrisso (a lung cancer drug) team

holding internal training sessions where management allegedly instructed employees to alter genetic test reports to fraudulently secure insurance reimbursements, all in the name of hitting sales targets. 'To them, it was standard practice, completely normal,' she said." Describing certain mechanics of the fraud, the article stated that: "in several of AstraZeneca's insurance fraud cases, sales representatives - who are strictly prohibited from patient contact - not only interacted with patients but also handled their test samples. In some extreme cases, they even issued positive test reports without actual sample submission. These details suggest the involvement of parties beyond AstraZeneca in the criminal scheme, which may explain why supervisory commissions have intervened."

189. The *Yicai* article also reported that "[a]s investigations deepened, a pattern of accusations emerged where detained employees began implicating higher-level managers for condoning or encouraging the fraudulent practices." For example, "a regional manager involved in the Fujian insurance fraud case testified that after Kang Yuling was promoted to head of Fujian operations in January 2019, coinciding with Tagrisso's inclusion in China's national reimbursement drug list, she faced immense pressure," adding "[t]he manager claimed that 'under threat of accountability or even dismissal for slow growth, Kang demanded subordinates boost performance at all costs.'" Similarly, the article stated that according to an industry insider, "among multinational pharmaceutical companies, AstraZeneca has long been known for its aggressive sales tactics, including implementing strict performance ranking systems with elimination of bottom performers," adding "This relentless sales pressure ultimately pushed employees to cross legal boundaries, resorting to increasingly risky measures." The article further stated that "The scandal evolved from individual wrongdoing to organized local schemes, with exposed fraudulent methods growing more sophisticated and implicated personnel occupying

increasingly senior positions. Health News Consulting's investigation into AstraZeneca's 'falsified genetic test reports' insurance fraud case reveals a pattern of systemic collapse within the pharmaceutical giant."

190. On this news, AstraZeneca ADRs fell $5.16 per ADR, or 7.2%, to close at $66.27 per ADR on November 5, 2024. The next day, AstraZeneca ADR declined $2.42 per ADR, or 3.65%, to close at $63.85 on November 6, 2024.

191. The financial media connected the news to the Company's stock price decline. For example, *Reuters* published an article entitled "AstraZeneca shares fall on report of potential China probe fallout." It discussed the *Yicai Global* article and stated the following: "[AstraZeneca] shares on Tuesday recorded their worst day since March 2020 after a report that dozens of the drugmaker's senior executives in China could be implicated in the largest insurance fraud case in the country's pharma sector in years." Noting the importance of China to AstraZeneca, *Reuters* also stated that "AstraZeneca is one of the biggest multinational drugmakers in China, which accounts for 13% of its overall revenue. It said last year it would build a $450 million factory in the country." Similarly, *Bloomberg* stated that "[t]raders cited a report from the *Yicai Global* news service released earlier in the day, with the stock's losses snowballing during afternoon trading." A *Financial Times* article titled "AstraZeneca shares fall as China probe intensifies" reported that "AstraZeneca shares fell . . . as a corruption purge involving its China chief risked spiraling wider, clouding the outlook in the UK drugmaker's second-largest market," adding: "Chinese publication *Yicai* reported that dozens of executives have been implicated in an investigation of medical insurance fraud." The article further noted that the "share price drop led to a more than $14bn fall in AstraZeneca's market capitalisation and highlights the importance of its Chinese operations." AstraZeneca is quoted in the *Financial Times* article stating: "We have strong compliance policies

in place and we expect our employees to operate fully in line with the rules and regulations in China." Another *Bloomber*g report published on November 6, 2024, noted that a "report from the *Yicai Global* news service . . . sent the Company's stock plunging," adding that the Company's "shares closed down" on November 6 in addition to November 5.

192. Securities analysts similarly connected the news to the share price decline. For example, securities analyst BMO Capital Markets stated that "AZN shares are down as more headlines emerge on the scope of the ongoing China investigation of AZN's China President. The new articles state that dozens of senior executives at AZN are expected to be implicated, which is creating an overhang on the stock." BofA Global Research stated there was a "Big share move on China concerns," noting that "AZN stock is down >10% in the last few days on the back of China concerns around the ongoing insurance fraud investigation."

193. Defendants themselves have acknowledged that news of the Company's wrongdoing in China caused its stock price to decline. On November 6, 2024, Andy Barnett, AstraZeneca's Head of Investor Relations, told analysts "[w]e feel as though it was important to respond to some of the media communications that have caused some turmoil in the markets and our share price over the last couple of days."

194. It was entirely foreseeable that Defendants' materially false and misleading statements and omissions discussed herein would artificially inflate the price of AstraZeneca's ADRs. It also was foreseeable to Defendants that the revelation of the truth concerning the Chinese government's investigation into the Company's wide-spread scheme to falsity genetic tests and inflate Tagrisso sales would cause the price of the Company's ADRs to fall as the artificial inflation caused by Defendants' misstatements and omissions was removed. Thus, the ADR price declines

described above were directly and proximately caused by Defendants' materially false and misleading statements and omissions.

## VIII. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

195. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that: (i) Defendants made public misrepresentations or failed to disclose material facts during the Class Period; (ii) the omissions and misrepresentations were material; (iii) AstraZeneca's securities, including the Company's ADRs, traded in an efficient market; (iv) the Company's ADRs are liquid and were heavily traded during the Class Period; (v) the Company's ADRs were traded on the NASDAQ, an efficient market, and the Company's securities were covered by multiple analysts; and (vi) Lead Plaintiffs and members of the Class purchased, acquired, and/or sold AstraZeneca's securities, including the Company's ADRs, between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

196. Based on the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

197. Lead Plaintiffs and the members of the Class are also entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants issued half-truths and omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX. NO SAFE HARBOR

198. The federal statutory "safe harbor" for certain forward-looking statements that are accompanied by meaningful, cautionary language does not apply to any of the allegedly false and misleading statements pleaded here. Many of the specific allegations pleaded herein are based on

half-truths and omissions of a material fact, and Defendants' statements pleaded herein were not identified as "forward-looking statements" when made. And, in any case, any "forward-looking" statements were not accompanied by meaningful, cautionary language. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from any forward-looking statement. This type of cautionary language was absent from AstraZeneca's Class Period public disclosures.

199. The Company's generic, boiler-plate risk warnings failed to meaningfully warn the market of the risks detailed here. They were not meaningfully different quarter-to-quarter, they failed to disclose that certain risks had already begun to materialize, and they altogether failed to disclose other risks.

200. Accordingly, the "cautions" were untethered from known problems at hand, which rendered them meaningless. Further, given that Defendants were embroiled in some of the circumstances about which they warned, and Defendants had adverse knowledge undermining the warnings, the risk warnings were themselves false and misleading, and they do not shield Defendants from liability.

201. Moreover, Defendants are liable for any forward-looking statements pleaded here because, at the time each was made, the speaker knew it was false or misleading for the reasons discussed in this Complaint, and/or because the statement was authorized or approved by an executive officer of AstraZeneca who knew that it was false or misleading.

## X. CONTROL PERSON ALLEGATIONS

202. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels. The Individual Defendants participated in drafting, preparing, and/or approving the public statements and communications

complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

203. The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to AstraZeneca during the Class Period. The Individual Defendants were provided with copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public reports, releases, and other statements detailed herein and are primarily liable for the misrepresentations and omissions contained therein. Moreover, each of the Individual Defendants is liable for the other Individual Defendants' statements or omissions made at conference calls in which they participated.

204. The Individual Defendants, because of their positions of control and authority as senior executive officers and directors, had access to the adverse undisclosed information about AstraZeneca's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees, attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

205. As senior officers and controlling persons of a publicly held company whose ADRs were, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to AstraZeneca's operations and business, and to correct any

previously issued statements that were or had become materially misleading or untrue, so that the market price of AstraZeneca's ADRs would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

206. The Individual Defendants are liable as primary participants in a fraudulent scheme and course of business that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired AstraZeneca securities during the Class Period, which included the dissemination of materially false and misleading statements (both affirmative statements and statements rendered misleading because of material omissions and half-truths) concerning the Chinese government's investigation into the Company's wide-spread scheme to falsity genetic tests and inflate Tagrisso sales.

207. The scheme: (i) deceived the investing public regarding AstraZeneca's operations and the true value of AstraZeneca's securities, including its ADRs, and (ii) caused Lead Plaintiffs and other members of the Class to purchase or otherwise acquire AstraZeneca securities at artificially inflated prices.

208. In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of AstraZeneca, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XI. CLASS ACTION ALLEGATIONS

209. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased or otherwise acquired publicly traded AstraZeneca securities, including the Company's ADRs, during the Class Period (the "Class"). Excluded from the Class are Defendants and their families,

the officers and directors of AstraZeneca, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

210. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AstraZeneca ADRs were actively traded on the NASDAQ, one of the largest stock exchanges in the world. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are thousands of members in the proposed Class. During the Class Period, there were more than 573 million shares of AstraZeneca ADRs outstanding and the average daily trading volume was over 5.5 million shares. Record owners and other members of the Class may be identified from records maintained by AstraZeneca or its transfer agent(s) and may be notified of the pendency of this action using the form of notice similar to that customarily used in securities class actions.

211. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

212. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained competent counsel with extensive experience in class action securities litigation. Lead Plaintiffs have no material interests antagonistic to or in conflict with those of the Class.

213. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

214. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts, omissions, and common scheme to defraud as alleged herein;

(b) whether Defendants' publicly disseminated statements to the investing public during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(d) whether the price of AstraZeneca securities was artificially inflated during the Class Period due to the material nondisclosures and/or misrepresentations alleged herein; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

215. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for all members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XII. CLAIMS FOR RELIEF

**COUNT I**
**For Violation of §10(b) of the Exchange Act and Rule 10b-5**
**(Against All Defendants)**

216. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. Count I is brought pursuant to §10(b) of the Exchange Act (15 U.S.C. §78j(b)), and Rule 10b-5 promulgated by the SEC thereunder (17 C.F.R. §240.10b-5).

217. During the Class Period, AstraZeneca, through its officers, management and agents, including Defendants Soriot, Sarin, Wang, and Fredrickson made, disseminated, approved or were responsible for the statements specified in §IV., which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

218. Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of AstraZeneca securities during the Class Period.

219. Defendants and the Company's officers, management, and agents, directly and indirectly, violated §10(b) of the Exchange Act and Rule 10b-5 in that they, by the use of means and instrumentalities of interstate commerce, the mails and/or the facilities of a national securities exchange:

(a) employed devices, schemes and artifices to defraud;

(b) made misleading statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of AstraZeneca securities during the Class Period.

220. All Defendants are sued as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below.

221. Defendants and the Company's officers, management and agents did not have a reasonable basis for their alleged false statements and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AstraZeneca securities during the Class Period.

222. AstraZeneca is liable for all materially false and misleading statements and omissions made during the Class Period, as alleged above, including the false and misleading statements made by the Company's officers and agents, as alleged above, as the maker of such statements and under the principle of *respondeat superior*.

223. Defendants and the Company's officers, management, and agents, individually and in concert, directly and indirectly, engaged and participated in a continuous course of conduct to conceal adverse material information about the Chinese government's investigation into the Company's wide-spread scheme to falsity genetic tests and inflate Tagrisso sales.

224. The allegations above establish a strong inference that AstraZeneca, as an entity, acted with corporate scienter throughout the Class Period, as its officers and agents had actual

knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing the truth about the Chinese government's investigation into the Company's wide-spread scheme to falsity genetic tests and inflate Tagrisso sales. By concealing these material facts from investors, the price for AstraZeneca's securities was artificially inflated during the Class Period.

225. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth about the Chinese government's investigation into the Company's wide-spread scheme to falsity genetic tests and inflate Tagrisso sales and artificially inflating the price of AstraZeneca's securities, including the Company's ADRs.

226. Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AstraZeneca securities, including the Company's ADRs. Lead Plaintiffs and the Class would not have purchased AstraZeneca securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and omissions.

227. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of AstraZeneca securities during the Class Period.

**COUNT II**
**For Violation of §20(a) of the Exchange Act**
**(Against All Defendants)**

228. Lead Plaintiffs repeat, incorporate, and reallege each and every allegation set forth above as if fully set forth herein.

229. Defendants Soriot, Sarin, Wang, and Fredrickson acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein. The Company controlled the Individual Defendants and all of its employees. By reason of such conduct, Defendants are liable pursuant to §20(a) of the Exchange Act.

230. By virtue of their high-level positions with the Company, participation in and/or awareness of the Company's operations in China, including the performance of the Oncology division and sales of Tagrisso, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance as well as their power to control public statements about AstraZeneca, Defendants Soriot, Sarin, Wang, and Fredrickson had the power and ability to influence and control, directly or indirectly, the Company's decision-making, including the content and dissemination of the various statements which Lead Plaintiffs contend are false and misleading. Defendants Soriot, Sarin, Wang, and Fredrickson participated in interviews and conference calls with investors and analysts, and/or prepared and approved the Company's public statements, SEC filings and press releases, described herein at §IV., alleged by Lead Plaintiffs to be misleading.

231. In particular, Defendants had direct and supervisory involvement in the Company's day-to-day operations and, therefore, are presumed to have had the power to control or influence

the particular transactions giving rise to the securities violations as alleged herein and exercised the same. By reason of such conduct, Defendants are liable pursuant to §20(a).

232. As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of their positions as controlling persons, Defendants are also liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of AstraZeneca securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for relief and judgment, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiffs as `Class representatives and Lead Plaintiffs' counsel as Class Counsel under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable, injunctive, or other and further relief as the Court may deem just and proper.

## XIV. JURY DEMAND

Lead Plaintiffs demand a trial by jury.

DATED: July 24, 2025

*s/ Jarett Sena*

JARETT SENA

Jarett Sena
**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY 10017
Tel.: 646-933-1000
jsena@dicellolevitt.com

Patrick W. Daniels (*pro hac vice* forthcoming)
Henry Rosen (*pro hac vice* forthcoming)
Brian O. O'Mara (*pro hac vice* forthcoming)
Ruben Peña (*pro hac vice* forthcoming)
Kelsey Anderson (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA 92121
pwdaniels@dicellolevitt.com
hrosen@dicellolevitt.com
briano@dicellolevitt.com
rpena@dicellolevitt.com
kanderson@dicellolevitt.com

Roxana Pierce (*pro hac vice* forthcoming)
**DICELLO LEVITT LLP**
801 17th Street, NW, Suite 430
Washington, DC 20006
Tel.: 202-975-2288
rpierce@dicellolevitt.com

***Lead Counsel for Lead Plaintiffs and the Proposed Class***

# CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on July 24, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List.

s/ Jarett Sena
JARETT SENA

**DICELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY 10017
Tel.: 646-933-1000
jsena@dicellolevitt.com