UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x

JERIES SALEH, Individually and on Behalf of : 　Civil Action No. 1:25-cv-04088 (VSB)
All Others Similarly Situated, 　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 : 　PLAINTIFFS' MEMORANDUM OF LAW
　　　　　　　　　　　　　　　　　　　　　 : 　IN OPPOSITION TO DEFENDANTS'
　　　　　　　　　　　　 Plaintiff, 　　　　 : 　MOTION TO DISMISS THE AMENDED
　　　　　　　　　　　　　　　　　　　　　 : 　COMPLAINT
　　　　　vs. 　　　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
ASTRAZENECA PLC, PASCAL SORIOT, 　 :
ARADHANA SARIN, WANG LEI (aka 　　 :
LEON WANG), and DAVID 　　　　　　　 :
FREDRICKSON, 　　　　　　　　　　　　 :
　　　　　　　　　　　　　　　　　　　　　 :
　　　　　　　　　　　 Defendants. 　　　 : 　ORAL ARGUMENT REQUESTED
　　　　　　　　　　　　　　　　　　　　　 :

——————————————————————— x

# Table of Contents

I.  INTRODUCTION ................................................................................................1

II.  LEGAL STANDARD........................................................................................6

III.  DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED..................7

    A.  Plaintiffs Allege Actionable False and Misleading Statements and Omissions....................................................................................................7

        1.  Defendants' False Statements About the Tagrisso Criminal Investigation are Actionable ...........................................................8

        2.  AstraZeneca's Risk Disclosures and Compliance Statements Were Misleading Half-Truths............................................................10

        3.  Defendants' Contingent Liability and Tagrisso Sales Statements Were Misleading.................................................................................12

    B.  Defendants' False and Misleading Statements Were Material..............15

        1.  Qualitative Factors, Not Just Revenue Percentages, Determine Materiality......................................................................................15

        2.  The Market Reaction Confirms Materiality...................................17

    C.  Plaintiffs' Scienter Allegations Are Cogent, Compelling, and More than Sufficient Under *Tellabs*........................................................................18

        1.  Both Direct and Circumstantial Evidence of Each Individual Defendant's Conscious Misbehavior or Recklessness Is Plead.................19

        2.  Additional Allegations Supplementing the Inference of Scienter .............22

        3.  Plaintiffs Need Not Plead Their Sources ......................................23

    D.  The Complaint Plausibly Pleads Loss Causation....................................24

    E.  The Complaint Establishes Control Person Liability..............................27

IV.  CONCLUSION................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
  19 F.4th 145 (2d Cir. 2021) ...............................................................................................7

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)................................................................................................7

*In re AppHarvest Sec. Litig.*,
  684 F. Supp. 3d 201 (S.D.N.Y 2023)............................................................................24, 26

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)................................................................................................20

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).....................................................................21

*Bajjuri v. Raytheon Techs. Corp.*,
  641 F. Supp. 3d 735 (D. Ariz. 2022) .................................................................................17

*City of N. Mia. Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen.
  Holdings Corp.*, 2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .................................................20

*In re BioScrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)..............................................................................12, 26

*In re Braskem S.A. Sec. Litig.*,
  246 F. Supp. 3d 731 (S.D.N.Y. 2017)................................................................................26

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996)...............................................................................................21

*City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*,
  2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024).....................................................................27

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
  587 F. Supp. 3d 56 (S.D.N.Y. 2022)..................................................................................19

*Dura Pharms., Inc. v. Broudo*,
  544 U.S. 336 (2005).........................................................................................................24

*ECA, Loc. 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................................19

*In re Estee Lauder Co., Inc. Sec. Litig.*,
  2025 WL 965686 (S.D.N.Y. Mar. 31, 2025).......................................................................20

*Fila v. Pingtan Marine Enter. Ltd.*,
 195 F. Supp. 3d 489 (S.D.N.Y. 2016)....................................................................26, 27

*Freudenberg v. E\*Trade Fin. Corp.*,
 712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................................24

*Gimpel v. Hain Celestial Grp., Inc.*,
 156 F.4th 121 (2d Cir. 2025) ...........................................................................18, 20, 23

*In re Glob. Crossing, Ltd. Sec. Litig.*,
 322 F. Supp. 2d 319 (S.D.N.Y. 2004)..............................................................................7

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
 818 F.3d 85 (2d Cir. 2016).................................................................................15, 16, 20

*Karimi v. Deutsche Bank Aktiengesellschaft*,
 607 F. Supp. 3d 381 (S.D.N.Y. 2022).............................................................................24

*Litwin v. Blackstone Grp., L.P.*,
 634 F.3d 706 (2d Cir. 2011).............................................................................8, 15, 16, 17

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
 797 F.3d 160 (2d Cir. 2015)........................................................................................7, 24

*Marsh & Mclennan Companies, Inc. Sec. Litig.*,
 501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................................................20, 21

*Matrixx Initiatives, Inc. v. Siracusano*,
 563 U.S. 27 (2011).........................................................................................................6, 15

*Meyer v. Jinkosolar Holdings Co.*,
 761 F.3d 245 (2d Cir. 2014)...........................................................................................8, 12

*Micholle v. Ophthotech Corp.*,
 2019 WL 4464802 (S.D.N.Y. Sept. 17, 2019)...........................................................18, 22

*New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*,
 122 F.4th 28 (2d Cir. 2024) ...............................................................................................15

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
 455 F. App'x 10 (2d Cir. 2011) ...........................................................................................7

*Novak v. Kasaks*,
 216 F.3d 300 (2d Cir. 2000)...............................................................................................21

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
 367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................................8, 17

*In re Omnicom Grp., Inc. Sec. Litig.*,
 597 F.3d 501 (2d Cir. 2010)...........................................................................................26, 27

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004).................................................................................23

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)...............................................................................................12

*Ronzani v. Sanofi S.A.*,
   899 F.2d 195 (2d Cir. 1990)...............................................................................................28

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024).......................................................................7, 21, 23

*Saraf v. Ebix, Inc.*,
   2024 WL 1298246 (2d Cir. Mar. 27, 2024)........................................................................21

*Sjunde AP-Fonden v. The Goldman Sachs Grp. Inc.*,
   545 F. Supp. 3d 120 (S.D.N.Y. 2021)...............................................................19, 23, 24, 27

*Solomon v. Sprint Corp.*,
   2022 WL 889897 (S.D.N.Y. Mar. 25, 2022) ........................................................................8

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)..........................................................................23

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)........................................................................................................7, 18

*United States v. Litvak*,
   808 F.3d 160 (2d Cir. 2015)..................................................................................................8

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................................14

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   195 F. Supp. 3d 528 (S.D.N.Y. 2016)............................................................................14, 27

*In re Vivendi, S.A. Sec. Litig.*,
   838 F.3d 223 (2d Cir. 2016)................................................................................................24

- iv -

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §77z-1 ...................................................................................................................7
    §78j(b).................................................................................................................6
    §78t(a) ................................................................................................................1

Federal Rules of Civil Procedure
    Rule 9(b) .............................................................................................................7
    Rule 10b-5(a) ......................................................................................................6
    Rule 10b-5(b) ......................................................................................................6
    Rule 10b-5(c) ......................................................................................................6
    Rule 12(b)(6).......................................................................................................7
    Rule 15(a)..........................................................................................................28

17 C.F.R.
    §240.10b-5(a)-(c) ...............................................................................................7

Lead Plaintiffs respectfully submit this Memorandum in Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Motion") (ECF 79).[1]

## I.     INTRODUCTION

This class action is brought on behalf of investors who purchased or otherwise acquired AstraZeneca's publicly traded securities between February 10, 2022 and November 5, 2024 (the "Class Period"), to recover damages caused by Defendants' violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act").

The Motion rests on an untenable narrative: that the Tagrisso-related insurance fraud investigation in China was minor, geographically isolated, and involved only a handful of employees. That version is flatly contradicted by the Complaint's detailed chronology and factual allegations. Indeed, the scheme to illegally boost Tagrisso sales and hide the sprawling criminal investigation in China—originating in early 2019 and continuing through 2024—was not some rogue operation by a handful of wayward sales representatives. Rather, it was a widespread criminal enterprise that spread across at least eight Chinese provinces and municipalities. And when a whistleblower reported Defendants' scheme to Shenzhen criminal investigators, AstraZeneca circled the wagons and ordered the destruction of evidence. Ultimately, the illegal sales practices implicated over 100 AstraZeneca employees from frontline sales staff to regional directors, vice presidents, and the President of AstraZeneca China himself, Defendant Wang. ¶¶16-17, 24, 27, 40-41, 160.

---

[1]  Defined terms have the meaning ascribed to them in the Amended Complaint for Violations of the Federal Securities Laws ("Complaint") (ECF 62). The Complaint was filed against AstraZeneca PLC ("AstraZeneca" or the "Company"), Pascal Soriot ("Soriot"), Aradhana Sarin ("Sarin"), Leon Wang ("Wang"), and David Fredrickson ("Fredrickson"). Soriot, Sarin, Wang and Fredrickson are also referred to as the "Individual Defendants." All factual allegations are taken from Complaint and cited as "¶__" or "¶¶__." All emphasis added and citations omitted unless otherwise noted.

Rather than confront these facts, however, Defendants argue that they had no duty to disclose China's investigation. Further, Defendants assert that: no false statements were made; the Complaint does not establish materiality; vague boilerplate risk disclosures that AstraZeneca may be subject to governmental investigations immunizes them, no Defendant knew anything about what was driving sales in their flagship product in AstraZeneca's second-largest market, and Plaintiffs have not adequately alleged that the corrective disclosures caused their losses. Each of Defendants' arguments fails.

*First*, the Complaint adequately pleads that Defendants' statements were materially false and misleading. For example, by February 10, 2022, Wang assured investors that the investigation involved only "individual" behavior affecting a "very limited" number of people in "Shenzhen" (¶¶63-65), despite that the fraud had spread across eight provinces, involved organized schemes and partnerships with genetic testing labs with code names like "Project Star," and involved illegal conduct by regional managers, provincial directors, and sales teams throughout China. ¶¶7, 20-25. Similarly, by September 2024, when Soriot told *Bloomberg* that only "eight, nine employees" were "affected by this investigation" (¶136), over 100 employees had been arrested, dozens had been convicted with sentences exceeding ten years, and the investigation had reached AstraZeneca's Vice President of China, Zhu Jiakang, who had been detained just months earlier in 2024. ¶¶24, 160. And, Defendants continued to report Tagrisso growth driven by "increased patient access" without disclosing that the increased "access" was procured through fraud. ¶¶80, 84-85, 89-90, 104-105.

*Second*, Defendants' materiality argument fundamentally misapprehends materiality under the securities laws. Defendants focus myopically on the dollar amount of the insurance fraud

(approximately $1.7 million) as a percentage of total revenue. Mem. at 16-17.[2] However, materiality is determined also by qualitative factors. Here, the fraud implicated AstraZeneca's best-selling drug worldwide—Tagrisso—a lung cancer therapy that accounted for over 40% of the Company's revenue in China. ¶4. The investigation threatened the Company's entire China operation, its second-largest market globally, where the rate of patients with the kind of cancer relevant to Tagrisso quadrupled that of Western populations. ¶¶8, 13, 25, 191. The expanding investigation ensnared the President of AstraZeneca China, one of the Company's most visible executives who appeared on every quarterly earnings call and spoke about the Company's business in China. ¶¶35, 54, 155, 160. And the market's reaction—a drop that erased more than $14 billion in market capitalization—demonstrates that investors considered this information material. ¶¶190-191.

*Third*, Defendants' hypothetical risk warnings that "failure to comply" with laws "may result" in investigations and generic contingent liability statements about governmental investigations were also affirmatively misleading. Defendants knew those risks had already materialized in the form of a massive and expanding criminal investigation. ¶¶71, 98, 121. Generic risk warnings become actionable when defendants possess actual knowledge that the warned-of risks have materialized. ¶146 (admitting that they had been tracking the criminal proceedings since "late 2021").

*Fourth*, the Complaint pleads a compelling inference of scienter and alleges far more than motive and opportunity or that senior executives "must have known" of the fraud.  Documents from the Chinese criminal proceedings directly implicated Wang as having been "aware of the

---

[2]  Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Mem.") (ECF 80).

abnormally high positive rate" of genetic tests and having "encouraged the first-line drug representatives to increase the positive rate." ¶¶25, 160. Wang was detained and subsequently arrested by Chinese authorities and remains under arrest, a fact that alone gives rise to a strong inference of conscious misbehavior. ¶¶54, 160. And the scheme was pervasive and organized, not isolated: managers at every level held training sessions where employees were explicitly instructed to falsify genetic testing results to boost sales. ¶¶17, 24-25, 155, 160.

- Sales representatives were trained to collude with testing companies to systematically falsify genetic test reports. ¶¶17, 65.

- Where test results did not "match expectations," representatives directly revised digital reports by using basic editing software, replacing names or creating fake reports. In other instances, they forged prescriptions or repurposed identities of real patients to obtain Tagrisso for resale. ¶¶17, 19, 65.

- Managers indoctrinated sales teams with slogans that contradicted science—*e.g.*, "Life does not choose one in four"—to justify expanding "benefit" to all patients, even though only roughly 25% harbor the T790M mutation. ¶¶17, 175.

This is not an *ad hoc* or accidental deviation from policy. It is a top-down commercialization strategy aligned with AstraZeneca's aggressive volume-based approach after deep price cuts to secure limited National Reimbursement Drug List ("NRDL") coverage—engineered to grow Tagrisso in the first- and second-line settings through illicit means. The amplitude of convictions across numerous provinces, the involvement of regional directors and vice presidents, and the creation of "Project Star" in Fujian to coordinate lab collusion underscore breadth and organization.

Defendants are silent on the Complaint's detailed allegations that senior management responded to the Shenzhen probe by ordering destruction of evidence and stage-managing internal "compliance" sessions to obtain blanket denials. These are not speculative claims; they are specific acts described in the Complaint:

- 4 -

- Nationwide deletion of WeChat groups, chat histories, files, images, and videos used to train, direct, and track patient testing interventions. Regional managers were dispatched to observe sales representatives deleting groups and fully uninstalling and reinstalling WeChat—deliberate steps to obliterate audit trails rather than remove participants. ¶¶31, 73.

- Relaxation of strict testing requirements and removal of testing quotas from tracking systems—structural changes timed to frustrate investigatory scrutiny and erase metrics showing abnormal testing rates or positive mutation rates. ¶¶31, 73.

- Mandatory "legal department" interviews in batches in Shenzhen, orchestrated to produce uniform denials under "legal supervision," thereby creating a record that violations were merely rogue acts by individuals, rather than company-wide misconduct directed from above. ¶¶32, 74, 168.

- Refusal to produce key documents to authorities—such as communications to the China vice president (Zhu Jiakang) and internal reports maintained by the detained Southern Region sales director—under the pretext of "trade secrets," while relevant WeChat records disappeared. ¶¶24, 33, 167.

These coordinated and deliberate acts are entirely inconsistent with an innocent misunderstanding and are directly probative of knowledge and an intent to conceal. Defendants' failure to address these allegations is telling, and fatal to their attempt to recast the investigation as trivial and not probative of scienter.

Defendant Wang personally oversaw the China operation, appearing on earnings calls to frequently discuss the Company's China strategy, and Tagrisso, which was the Company's best-selling drug worldwide and responsible for over 40% of China revenue. ¶¶4, 54, 68-69, 79, 153-154. This was not some peripheral business; it was central to the Company's growth story and is indisputably a "core operation." ¶¶171-178. As one industry insider put it, if Wang were found guilty, "given his seniority and how much he's represented [AstraZeneca], it might as well be the Company." ¶54(c). And Sarin's November 6, 2024 confirmation of Wang's arrest and admission that the Company "became aware of investigations" in "late 2021," conducted its own investigation, and monitored as the number of individuals involved "increased over the last 3 years," conclusively demonstrates scienter. ¶146.

*Fifth*, the Complaint adequately pleads loss causation. The disclosures in October and November 2024 were not mere "recharacterizations" of previously disclosed information—they confirmed that the investigation had in fact reached the very top of AstraZeneca China; that Wang himself was implicated, under investigation, arrested, and then detained; and that the scope of the fraud was far more extensive than Defendants had ever disclosed. ¶¶141-143, 179-192. The contemporaneous price declines—as noted by *Reuters* and *Bloomberg*—are classic loss causation. Indeed, news reports explicitly connected these revelations to the decline in AstraZeneca's stock price, and AstraZeneca's own Head of Investor Relations acknowledged that "media communications" had caused "turmoil in the markets and our share price." ¶193. And securities analysts likewise tied the price decline to revelations about the "scope of the ongoing China investigation." ¶192.

In the end, this is not a case of "fraud by hindsight" as Defendants claim. The Complaint alleges a detailed, well-documented scheme involving criminal conduct across multiple Chinese provinces, systematic and pervasive falsification of medical testing records, a deliberate corporate cover-up, and repeated (and contemporaneous) false assurances to investors that the investigation was limited and under control when it decidedly was not.

## II.    LEGAL STANDARD

To state a claim for securities fraud under §10(b) of the 1934 Act and SEC Rule 10b-5(b), a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). To state a claim for securities fraud under Rule 10b-5(a) and (c), the complaint must allege that the defendant (1) committed a manipulative or deceptive act (2) in furtherance of the alleged scheme to defraud, (3)

scienter, and (4) reliance. 17 C.F.R. §240.10b-5(a), (c); *In re Glob. Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 336 (S.D.N.Y. 2004). Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA") "do not require the pleading of detailed evidentiary matter in securities litigation." *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 15 (2d Cir. 2011). Rather, an "alleged fraud need only be ***plausible*** based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original).[3]

## III.    DEFENDANTS' MOTION TO DISMISS SHOULD BE DENIED

### A.    Plaintiffs Allege Actionable False and Misleading Statements and Omissions

Defendants' Motion rests on the false premise that the Complaint fails to plead falsity with adequate particularity. That premise is wrong. The Complaint pleads three principal categories of falsity: (1) statements minimizing and misdescribing the Chinese criminal investigations and the scope of AstraZeneca's internal findings; (2) false risk and compliance disclosures; and (3) contingent liability—and Tagrisso sales statements that omitted the scheme's role in driving performance and the related financial exposure. And for each, the Complaint "(1) specif[ies] the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the statements were fraudulent." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 313 (S.D.N.Y. 2024).

---

[3] On a Rule 12(b)(6) motion, courts must "consider the complaint in its entirety" and "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 309-10 (2007). Courts must also "draw all reasonable inferences in favor of the plaintiff." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). "Fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (cleaned up).

Defendants' Motion also relies on the assertion that they had no obligation to disclose details about the Chinese investigation. However, "Second Circuit law is clear that once a corporation chooses to speak on an issue, 'there is a duty to tell the whole truth.'" *Solomon v. Sprint Corp.*, 2022 WL 889897, at *6 (S.D.N.Y. Mar. 25, 2022) (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Defendants cannot hide from the fact that on January 28, 2022, they issued a press release claiming that they self-reported the fraud uncovered in Shenzhen and that they would fully cooperate with authorities and strengthen AstraZeneca's compliance. ¶30. Although the press release was a lie, it did, however, obligate Defendants to tell the whole truth. ¶31. When they chose to speak about the Chinese investigation during the Class Period, they failed in their duty to tell the whole truth. Where, as here, a company does not disclose information "necessary to prevent existing disclosures from being misleading," a §10(b) claim exists. *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715-16 (2d Cir. 2011). "Such misleading statements are actionable if there is a 'substantial likelihood that a reasonable investor would find the . . . [omitted information] important in making an investment decision.'" *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 30 (S.D.N.Y. 2019) (quoting *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015)).

### 1.  Defendants' False Statements About the Tagrisso Criminal Investigation are Actionable

By late 2021, Defendants were aware of  the criminal scheme, the investigation, and that employees altered or participated in altering genetic testing reports to qualify patients for Tagrisso reimbursement—a core element of the illegal scheme. ¶146. Yet Defendants' subsequent public statements significantly downplayed the issue, obscured the scope and geographic breadth (multiple provinces) of the criminal conduct, and hid the severity of the Company's criminal exposure. Plaintiffs identify discrete misstatements regarding the criminal investigation

Defendants made during specific forums and earnings calls. For example, the Shenzhen Municipal Health Insurance Bureau initiated a criminal fraud investigation in July 2021, leading to the detention of over 10 AstraZeneca staff in Shenzhen, including Zuo Yingquan, AstraZeneca's former sales director of China's southern region. He ordered teams to "[f]lexibly handle genetic reports" and "[h]elp ineligible patients access the drug." ¶¶24, 65. On February 10, 2022—the start of the Class Period—Wang falsely characterized the Shenzhen matter as an "individual case," with "very limited" involvement and "extremely small" amounts at issue, and suggested the Company had "all the measures" to prevent recurrences. With this context, Wang's statements were materially misleading. ¶¶63-65.

Defendants continued to make false statements regarding the size and scope of the criminal investigation:

(a)    On April 29, 2022, Wang described the case as "limited to the individual's behavior," predicted conclusion in Q2 2022, and stated the Company had a high compliance standard which forbad illegal activity. ¶78. Wang's statements were false when made because neither the illegal conduct—carried out in multiple provinces in China—nor the investigation were limited. By April 29, 2022, a special task force traveled throughout the country training law enforcement how to uncover AstraZeneca's fraud. ¶80. Wang's statements that the Company had a high compliance standard were also false because, as Luo Jinseng testified in his criminal trial, AstraZeneca's "[c]ompliance policies were just for show." ¶81. Further, when AstraZeneca's was alerted to the fraud after a whistleblower contacted Chinese law enforcement, senior management ordered the nationwide destruction of evidence. ¶81.

(b)    On November 9, 2023, Fredrickson downplayed the anticorruption campaign as "some market impact," and claimed recovery. ¶113. By then, the investigation had led to Chen Bin's arrest and indictment for fraud, and had spread to Jiangxi and other provinces,

- 9 -

with multiple convictions for falsifying 2020–2021 test reports. ¶¶114-115. Portraying the matter as generic industry headwinds omitted material facts about AstraZeneca's specific, widening exposure. ¶115.

(c)     On September 10, 2024, Soriot publicly claimed "a small number, eight, nine employees" were affected by "two probes" and extolled "strong policies." ¶136. Those statements were inconsistent with the growing tally of convictions—including three additional convictions in August 2024—and with contemporaneous enforcement reaching vice presidents and regional directors. ¶¶137, 160. The representation of strong compliance is particularly misleading given the earlier orchestrated evidence deletions, scripted denials, and refusal to produce key materials. ¶¶138-139. Soriot's statements that only eight or nine employees were implicated is shocking given Defendants' admissions they were tracking the cases since late 2021 and by September 2024, over 100 AstraZeneca employees had been detained with dozens convicted. ¶¶146, 160.

Far from forward-looking opinions or puffery, Defendants' statements were present-tense, concrete (but false) assertions about scope, impact, and compliance—made while arrests and prosecutions were escalating and senior executives were actively obstructing the investigations. Defendants' statements, entirely inconsistent with the facts that existed at the time they were made, are decidedly actionable: once they spoke on scope, impact, and compliance, they were required to tell the whole truth, including about the expanding scope and the Company's efforts to destroy evidence and hide its criminal activity.

### 2. AstraZeneca's Risk Disclosures and Compliance Statements Were Misleading Half-Truths

The Company's purported warnings that "*[w]e may be subject to various legal proceedings and governmental investigations*" were also false and misleading and are actionable.

*See* ¶¶71, 98, 121. For example, by February 22, 2022, when AstraZeneca filed its 2021 annual report, the Shenzhen Municipal Health Insurance Bureau had already uncovered and launched an investigation into AstraZeneca employees in Shenzhen falsifying patients' genetic tests. ¶28. Yet, Defendants failed to update the Company's risk disclosures to include any details of the criminal investigation, including its size, scope, or even its existence. ¶¶72-73. And failing to update the Company's risk disclosures to account for, *e.g.*, investigative authorities' request for documents (which the Company refused to comply with) and the arrest of at least twenty Fujian staff involved in "Project Star," including managers (¶¶24, 38), the Company's 2022 annual report, filed February 21, 2023, was also devoid of any details of the criminal investigation. ¶¶97-98.

Similarly, Defendants failed to provide the requisite disclosure in its 2023 annual report filed on February 20, 2024, despite being aware that: (i) the criminal investigation had expanded beyond Shenzhen and into Fujian and Jiangxi provinces (¶38); (ii) law enforcement was being deployed in other Chinese regions to investigate and uncover the Company's illegal efforts to increase Tagrisso sales (¶115); and (iii) dozens of sales representative had been arrested and convicted for their role in the Tagrisso insurance fraud, including Chen Bin, AstraZeneca's Regional Director for East China, who was arrested for his role in endorsing Project Star. ¶¶24, 38, 115, 125-126. Still, despite all these developments, the vague description of "[l]egal, regulatory and compliance risks" in AstraZeneca's annual reports remained unchanged from the earlier ones and they all failed to disclose that: (i) AstraZeneca was then the target of a massive criminal investigation into widespread insurance fraud carried out in eight provinces and regions throughout China, (ii) the risk of an adverse outcome of a government investigation was materially understated; and (iii) the risk of a governmental investigation had already materialized and had, in fact, expanded. ¶¶71-72, 98-100, 121, 123-126.

Defendants' generic boilerplate caution that AstraZeneca "may be subject to" investigations and that noncompliance "could" occur also does not immunize them. Risk language is actionable where the warned-of risk has already materialized, yet the company speaks as if it were hypothetical. *See Meyer*, 761 F.3d at 251 ("[a] generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability") (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.")); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 725-27 (S.D.N.Y. 2015) (risk disclosure that the company, "from time to time, [] responds to subpoenas and requests for information from Governmental agencies," is misleading when it failed to disclose that it had received a civil subpoena from the Department of Justice because a "reasonable investor could have read them to mean that BioScrip was not already in receipt of just such a request for information.").

### 3. Defendants' Contingent Liability and Tagrisso Sales Statements Were Misleading

The Complaint also sets forth all falsity elements of Defendants' statements about contingent liability and Tagrisso sales. Specifically, in its periodic filings, AstraZeneca stated in the "[l]egal proceedings and contingent liabilities" discussion that "AstraZeneca is involved in various legal proceedings considered typical to its business, including litigation and investigations relating to . . . sales and marketing practices." ¶¶70, 82, 86-87, 91, 95-97, 106, 108, 111, 116, 119, 122, 128, 132. For each, the Complaint describes the recent investigatory developments, including the raids, arrests, and convictions, and explains how each statement was misleading because, *e.g.*, Defendants failed to even mention the ongoing criminal investigation in China. ¶¶72-74, 82-83, 86-87, 91-92, 95-97, 100-102, 106, 111, 116-117, 124-126, 128-130, 133-134. For example, the legal proceedings and contingent liabilities discussion in AstraZeneca's April 29, 2022, Form 6-K

fails to even mention the Chinese investigation even though the criminal investigation had already expanded throughout several provinces in China and had implicated AstraZeneca employees of all levels, including: (i) more than 10 sales representatives; (ii) Zuo Yingquan, AstraZeneca's former Sales Director for China's Southern Region, and (iii) Zhu Jiakang, the former Vice President of AstraZeneca China. ¶¶24, 29, 33, 81.

The legal proceedings and contingent liabilities discussions in AstraZeneca's other public filings were similarly misleading, omitting mention of the criminal investigation and failing to disclose (i) in the July 28, 2023, Form 6-K, the expansion of the investigation from Shenzhen and Fujian into the Jiangxi region or the detention of Chen Bin, AstraZeneca's Regional Director for East China (¶111), or (ii) in the April 25, 2024, Form 6-K, the further expansion of the criminal investigation across at least eight provinces and municipalities, including into Guangdong, Fujian, Sichuan, and Chongqing, and the resulting convictions of sales representatives, district and regional managers, and even senior executives. ¶¶128-129.[4]

Defendants' additional contention that Plaintiffs do not challenge AstraZeneca's Tagrisso sales or financial results as inaccurate misstates Plaintiffs' allegations. Plaintiffs allege that statements attributing Tagrisso's performance to legitimate commercial drivers omitted the material fact that the Company's results had been artificially—and unlawfully—boosted by a scheme to falsify genetic tests and obtain reimbursement, and that as a consequence of this scheme the Company faced probable, quantifiable exposure in China and was the subject of ongoing criminal and administrative proceedings. ¶¶15-25. Defendants' statements regarding Tagrisso sales are actionable because Defendants repeatedly spoke about then-current information but

---

[4] Only in its April 25, 2024 Form 6-K did AstraZeneca modify its boilerplate language, but even then, Defendants' disclosure remained exceedingly vague and lacked any detail concerning the criminal investigation. ¶128.

omitted the most important and damaging facts that were responsible for the Company's success in China (the Company's most important geographic region) and Tagrisso's growth (the Company's most important drug). For example, Fredrickson's statement on February 10, 2022, that "as anticipated, [Tagrisso] demand growth in China for the quarter [4Q 2021] is now fully compensating for the lower NRDL price based on increasing first-line use and strong second line share performance" (¶67) failed to disclose that Tagrisso sales in 2021 had increased because AstraZeneca's insurance fraud scheme to increase Tagrisso sales that began in 2019 was ongoing through 2021. ¶69. And the Company claimed that its Q1 2022 results were due to "increased patient access for Tagrisso" (¶76), while failing to disclose that the growth was the result of widespread insurance fraud. ¶¶80-81. Those omissions rendered Defendants' statements about financial results, drivers of performance, and contingent liabilities materially misleading. *See In re Virtus Inv. Partners, Inc. Sec. Litig*., 195 F. Supp. 3d 528, 536 (S.D.N.Y. 2016) (statements are actionable where a defendant "puts the reasons for its success at issue, but fails to disclose that a material source of its success is the use of improper or illegal business practices"); *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 401 (S.D.N.Y. 2005) (finding the requisite connection where company discussed sources of revenue while omitting that the "true source" of such revenue was illegal trading).

Defendants' statements about then-current performance drivers, risk posture, and legal contingencies are actionable misstatements and half-truths. Once AstraZeneca spoke about the causes of Tagrisso's success (*e.g.*, demand, "increased patient access," first-line use, and share gains in China) and about "legal proceedings and contingent liabilities," it had a duty to disclose sufficient material and contemporaneous facts regarding the scope and seriousness of the expanding criminal investigation to make those statements not misleading.

**B.      Defendants' False and Misleading Statements Were Material**

Defendants' materiality argument fails at the threshold. At the pleading stage, dismissal on materiality grounds is proper only where the alleged misstatements are "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 122 F.4th 28, 53 (2d Cir. 2024). Defendants cannot meet that standard here.

**1.      Qualitative Factors, Not Just Revenue Percentages, Determine Materiality**

Defendants' fixation on a simplistic "percentage-of-revenue" test and an exceedingly narrow view of what a reasonable investor considers to be material ignores settled law. The Supreme Court has rejected "a bright-line rule" for materiality (*Matrixx*, 563 U.S. at 39), and the Second Circuit has explained that courts must fully analyze "all relevant considerations" when assessing materiality. *Litwin*, 634 F.3d at 717. Under the Second Circuit's holistic analysis, sufficiently strong ***qualitative*** evidence can establish materiality as a matter of law. *Litwin*, 634 F.3d at 717-18.

The Second Circuit's holding in *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 89 (2d Cir. 2016) is instructive. In *SAIC*, two employees in charge of a contract with New York City became involved in an "elaborate kickback scheme" with an outside contractor, in which the contractor illegally paid the SAIC employees to hire the contractor on behalf of SAIC, incur unnecessary costs from the contractor's artificially inflated bills, and offload cost overruns to the City. *See SAIC*, 818 F.3d at 89. As the scheme unraveled, SAIC removed one of the employees and hired an outside law firm to conduct an internal investigation of possible fraud. *See id*. Meanwhile, SAIC "touted its commitment to high standards of ethical performance and integrity," and it was only after federal criminal charges were filed against the SAIC employees and the outside contractor

that SAIC disclosed to investors the details of the kickback scheme. *See id*. at 89-90. The Second

Circuit rejected the argument that the project at issue was immaterial due to a lack of quantitative

materiality, because such an approach would require the court to "consider quantitative factors

only in the narrowest light in determining the financial impact of losing the [project] due to the

fraud, and to otherwise ignore qualitative factors." *Id*. at 96 (citing *Litwin*, 634 F.3d at 717-18).

Due to the "seriousness of the [] fraud and the alleged importance of the [] project," the court was

"reluctant to conclude . . . that the alleged misstatements were 'so obviously unimportant' either

quantitatively or qualitatively that they could not be material." *SAIC*, 818 F.3d at 96.

Here, like in *SAIC*, the qualitative significance of Defendants' scheme is overwhelming:

(a)     **Flagship Product**. Tagrisso was AstraZeneca's best-selling drug

worldwide, responsible for over 40% of China revenue. ¶4. And the fraud directly targeted the

product's reimbursement pathway (¶¶10-14, 17), information investors would consider critical to

assessing future sales and margins.

(b)     **Critical Growth Market**. While Defendants argue that China is "only one

of 130 countries," China was AstraZeneca's second-largest market globally. ¶25. The investigation

spread across eight provinces, implicated over 100 employees at every level, and reached the

President of AstraZeneca China. ¶¶40, 160. This was not a minor compliance issue in a peripheral

market—it was a pervasive fraud that threatened the Company's entire China operation.

(c)     **Egregious Criminal Conduct**. The scheme involved systematic

falsification of genetic test results—core clinical diagnostics—to secure insurance reimbursement

for ineligible patients. ¶¶12-19. This was not a technical reporting error; it was organized fraud

that exposed patients to unnecessary treatment and the Company to criminal sanctions.

(d)     **Senior Executive Involvement and Cover-Up**. The investigation

ultimately ensnared Wang, one of AstraZeneca's most visible executives, who appeared on every

quarterly earnings call. ¶¶54, 141. An industry insider explained: "given his seniority and how much he's represented [AstraZeneca], it might as well be the Company." ¶54(c).

### 2. The Market Reaction Confirms Materiality

When the truth emerged in October and November 2024, AstraZeneca's stock suffered a massive decline, losing over $14 billion in market capitalization in just days. ¶¶42-44, 191. Securities analysts explicitly tied the "[b]ig share move" and price decline to revelations about the "scope of the ongoing China investigation" and that "dozens of senior executives at [AstraZeneca] are expected to be implicated." ¶192. And AstraZeneca's own Head of Investor Relations acknowledged that the recent "media communications" discussing the fraud crackdown and criminal investigation had caused "turmoil in the markets and our share price." ¶145. Reasonable investors *did* plainly consider this information material and the market's reaction eliminates any doubt about materiality. *Lexmark*, 367 F. Supp. 3d at 30.[5]

In sum, the Complaint alleges actionable misstatements that concealed a multi-province criminal investigation into systematic fraud involving the Company's best-selling drug, ultimately resulting in Wang's arrest. No court could conclude that such information was "so obviously unimportant" to investors that reasonable minds could not differ.

---

[5] Defendants' reliance on *Litwin* and *Hutchison* is misplaced. *Litwin*, for example, expressly cautions that the 5% threshold is merely a "preliminary assumption" that must yield to qualitative considerations. *See Litwin*, 634 F.3d at 717-18. And neither case involved allegations of organized criminal fraud targeting a flagship product in a company's second-largest market, executive detentions, or a multi-province investigation implicating over 100 employees. *Bajjuri v. Raytheon Techs. Corp.*, 641 F. Supp. 3d 735, 756 (D. Ariz. 2022) turned on vague allegations lacking the particularized facts present here. Here, Plaintiffs allege a detailed, province-by-province chronology of arrests and convictions, and a coordinated cover-up, all with management's involvement. ¶¶14-44, 159-168. Moreover, *Bajjuri* itself recognized that materiality "should ordinarily be left to the trier of fact"—a point weighing against dismissal. 641 F. Supp. 3d at 754.

### C.    Plaintiffs' Scienter Allegations Are Cogent, Compelling, and More than Sufficient Under *Tellabs*

Scienter is plead by alleging "motive and opportunity to commit fraud, **or** (2) strong circumstantial evidence of conscious misbehavior or recklessness." *Gimpel v. Hain Celestial Grp., Inc.*, 156 F.4th 121, 144 (2d Cir. 2025). Courts are to consider allegations holistically and to credit the most cogent inference. *Id*. at 143-44 (citing *Tellabs*, 551 U.S. at 314, 323-26). The inference need not be "of the 'smoking-gun genre,' or even the 'most plausible of competing inferences.'" *Id*. at 143-44 (citing *Tellabs*, 551 U.S. at 324). A "tie on scienter goes to the plaintiff." *Micholle v. Ophthotech Corp*., 2019 WL 4464802, at *15 (S.D.N.Y. Sept. 17, 2019).

Viewed holistically, the Complaint pleads a strong inference of scienter because: (i) Defendants confirmed that they were aware of the scheme and the criminal investigation "[i]n late 2021" (¶146), well before its "proactive" disclosure; (ii) senior executives—including Individual Defendants Soriot, Sarin, Fredrickson, and Wang—made repeated, affirmative statements about the Chinese Tagrisso investigation and Tagrisso performance that omitted pervasive, known facts necessary to avoid misleading investors (*e.g.*, ¶¶30, 146); (iii) the misconduct centered on Tagrisso, a best-selling oncology drug and core revenue driver as part of a "top-down commercialization strategy" (¶¶169-178); and (iv) detailed role-based and admissions-based allegations place key actors—most critically Wang—at the center of day-to-day operations, training, and sales practices in China. The size and scope of the fraudulent scheme and the illicit measures to achieve it and hide its existence are astonishing. ¶¶18-44, 146, 159-168.

The Complaint alleges each of the Individual Defendants' contemporaneous knowledge of these events based upon, among other facts, their own respective admissions of knowledge of the

investigation both pre-dating and post-dating the Class Period. *See, e.g.*, ¶¶63-64, 136, 146.[6] Indeed, court documents from Chinese criminal proceedings confirm that Wang was "aware of the abnormally high positive rate" of genetic tests and "encouraged the first-line drug representatives to increase the positive rate." ¶25. Tellingly, Sarin admitted on November 6, 2024—***just one day*** after the end of the Class Period—that, by late 2021, the Company was aware of, and tracking, the mounting volume of criminal proceedings as they unfolded and expanded over the subsequent three years. ¶146. Yet, despite their admitted knowledge, Defendants constructed a "wall of silence" during the Class Period (¶39), falsely characterizing the investigation as limited.

These allegations comfortably satisfy, if not exceed, the Second Circuit's four, non-exclusive scienter pathways: (1) concrete benefit, (2) deliberately illegal conduct; (3) knowledge or access to contradictory information; or (4) failure to monitor despite a duty to do so. *See, e.g.*, *Sjunde AP-Fonden v. The Goldman Sachs Grp. Inc.*, 545 F. Supp. 3d 120, 142 (S.D.N.Y. 2021) (noting additional scienter pathway where defendant "***ignored obvious signs of fraud***.") (quoting *ECA*, *Loc. 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)). The Complaint alleges scienter under each of these pathways.

### 1. Both Direct and Circumstantial Evidence of Each Individual Defendant's Conscious Misbehavior or Recklessness Is Plead

Defendants' deliberate illegal behavior amply satisfies conscious misbehavior or recklessness. AstraZeneca and each of the Individual Defendants misleadingly highlighted Tagrisso demand and growth drivers in China and the Company repeatedly issued boilerplate "legal proceedings and contingent liabilities" disclosures that failed to reveal the existing and expanding criminal investigation into insurance fraud—exactly the sort of omission the Second

---

[6] The Individual Defendants' scienter is inputted to AstraZeneca. *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 99-110 (S.D.N.Y. 2022).

Circuit has held supports scienter. *See SAIC, Inc.*, 818 F.3d at 96-97 (delay disclosing false billing practices and kickback scheme provides plausible basis for fraud and scienter). Indeed, the scheme Defendants orchestrated ultimately resulted in Wang's arrest and detention, as well as the incarceration, detainment and/or investigations of several AstraZeneca China executives.[7] *See, e.g.*, ¶¶18-44, 52-55, 146.

Notably, sales of products in an unlawful manner was recently addressed by the Second Circuit in *Gimpel*, holding that such conduct indeed may give rise to scienter. 156 F. 4th 121 at *146-47 ("aggressive sales practices" and "channel-stuffing"); *see also In re Estee Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *9-*10 (S.D.N.Y. Mar. 31, 2025) (scienter alleged as to CEO and CFO for concealment of prohibited grey-market sales—or "*daigou*"—where plaintiffs "highlighted public statements by [defendants] about *daigou* . . . and alleged that Estee Lauder had a whole team whose purpose was to analyze *daigou* sales."). The allegations concerning Tagrisso sales herein are more egregious: it involved falsifying genetic test results to siphon public insurance funds and enhance Tagrisso sales, followed by active concealment.[8]

The present action is also similar to *Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 483 (S.D.N.Y. 2006), wherein this District upheld scienter as to parent and subsidiary where the parent's leadership sought to "calm" markets following a government investigation amid rapid discovery of widespread misconduct—another aspect of the scheme here.

---

[7] Defendants argue that Wang's detainment in 2024 is not a basis to infer scienter. Mem. at 25. Defendants' citation to *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) is unhelpful to their argument, as it offers only the general standard for scienter. Wang's detainment is part of the events playing out at the end of the Class Period that corroborate the Class Period allegations and it was a consequence of the widespread criminal scheme. The Court may consider these matters when conducting its holistic review.

[8] Nor do Plaintiffs assert simply that Defendants' scienter is based on being "involved in running their business." *See* Mem. at 24 (citing *City of N. Mia. Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021).

*See, e.g.*, *Marsh*, 501 F. Supp. 2d at 482-83.[9] Deliberately illegal behavior is pleaded for both purposes of a scheme to defraud and for the issuance of materially false statements.

> **a.    Each Individual Defendant Knew or Had Access to Information Suggesting that Their Public Statements Were Not Accurate**

Sarin admitted on November 6, 2024, ***just one day*** after the end of the Class Period, that "we became aware" of the investigations—in "late 2021" (several months before Defendants' misstatements began), were tracking the investigations and that the "number of individuals increased over the last 3 years" to "[a]round a hundred" and that the Company had changed "most of the senior management in oncology." ¶146.[10] Defendants have admitted, accordingly, that they contemporaneously knew of the adverse facts and circumstances that they concealed throughout the Class Period. Defendants were "responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Dentsply*, 732 F. Supp. 3d at 320 (post-class period statements supported scienter); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *16, *20 (S.D.N.Y. Nov. 18, 2019) (same).

---

[9] Defendants' citation to *Saraf v. Ebix, Inc.*, 2024 WL 1298246, at *3 (2d Cir. Mar. 27, 2024) does not change the analysis. In *Saraf*, the court, focusing on internal controls, summarily stated that "[f]raud cannot be inferred simply because [a parent company should] have been more curious or concerned about the activity [of its subsidiary]." *Id.* at *3 (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996)). And Defendants' citation to *Chill*, 101 F.3d at 270-71, to assert that misconduct at a subsidiary does not support an inference of scienter at the parent company is unhelpful. Mem. at 19 n.9. *Marsh* aptly distinguished *Chill* as declining to hold a parent company responsible for the "acts of a single employee" at one of the twenty-four subsidiaries of the parent's twelve-subsidiaries. *See Marsh*, 501 F. Supp. 2d at 482. The facts here are also distinguishable, as set forth herein.

[10] Sarin's November 6, 2024 admission is equally shocking when one considers that on September 10, 2024, Soriot had falsely stated that only eight or nine employees were affected even as convictions and arrests mounted. ¶¶136-140.

Far beyond asserting scienter based simply on their corporate positions, Plaintiffs allege that each defendant was aware of the investigations and issues in China. ¶¶146, 156-158. Plaintiffs also allege a trove of information that each of the Individual Defendants could have accessed based on, among other things, the widespread nature of the misconduct. ¶¶159-168. Indeed, when questioned on the potential issues in China, Defendants Soriot and Wang, on the Company's February 2022 analyst conference call, issued what amounts to a public denial that anything occurring in China exceeded the scope of one or two matters and that "we have been working closely" with regulators for "6 to 8 months." ¶¶63-64; ¶¶77-83 (addressing investigation); ¶113 (addressing "anticorruption campaign"); ¶136 (Soriot's false statements on *Bloomberg*). Each of the Individual Defendants, therefore, issued materially misleading statements about the Tagrisso scheme and criminal investigation during the Class Period, and specifically after causing the Company to state half-truths about the purported limited scope of the issues.

Scienter based on knowledge (indeed admitted knowledge) and/or access to information is alleged. Moreover, as a result of these affirmations of knowledge of the investigation, each of the Individual Defendants knew of the actual or potential existence of fraudulent activities. To the extent defendants failed to act in response, they "ignored obvious" signs of fraud.[11]

### 2.    Additional Allegations Supplementing the Inference of Scienter

In addition to Defendants' own admissions and other evidence of Defendants' conscious misbehavior and recklessness, the strong inference of scienter is further bolstered by the core-operations doctrine and detailed allegations about the corporate culture and personnel changes at AstraZeneca as a result of the fraudulent scheme. The core operations doctrine "simply reflects the

---

[11]    While not required in light of Plaintiffs' detailed allegations of conscious misbehavior, *Micholle*, 2019 WL 4464802, at *13, Plaintiffs also sufficiently plead motive and opportunity. *See, e.g.*, ¶¶149-158, 169-178.

common-sense assumption that executives are likely to know more about things central to their business." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5 (S.D.N.Y. Feb. 5, 2024); *see also Dentsply*, 732 F. Supp. 3d at 319-20. And here, Defendants were certainly likely to know, among other things, (i) whether demand for the Company's most important product was driven by a fraudulent scheme, and (ii) the size, scope and severity of a criminal investigation into that fraudulent scheme that led to the arrest and detention of over 100 AstraZeneca employees, including many senior managers and executives. Similarly, "[c]ourts in this district have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter." *Dentsply*, 732 F. Supp. 3d at 321; *see also Gimpel*, 156 F. 4th at 148. Here, Plaintiffs allege facts that further support such an inference of fraud, including systemic corporate wrongdoing, a toxic sales culture, and the corporate-wide flouting of compliance. *See* ¶¶5, 25, 35, 148-154. In addition, personnel changes "[d]uring and [a]fter the Class Period" supplement scienter allegations. *Gimpel*, 156 F.4th at 149-150. As of November 6, 2024, Wang was arrested and detained, as were several other senior executives, managers, and regional directors (¶¶24, 160), and having monitored the criminal investigation since late 2021, the Company had "changed" most of its oncology management. ¶¶145-146. "Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal . . . controls." *Dentsply*, 732 F. Supp. 3d at 321.

### 3.    Plaintiffs Need Not Plead Their Sources

Contrary to Defendants' suggestion, the Court may not simply disregard Plaintiffs' scienter allegations to the extent they are based on confidential witness accounts. Mem. at 20, 24. Plaintiffs are not required to plead sources where a complaint sets forth detailed facts which "'provide an adequate basis for believing that the defendants' statements were false.'" *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004); *see also Sjunde*, 545 F. Supp. 3d at

141 (sustaining claim "based on one account of a single, unidentified source," noting that the Second Circuit "'rejects any notion that confidential sources must be named as a general matter'").[12] Plaintiffs' allegations are proper and support scienter.

### D.      The Complaint Plausibly Pleads Loss Causation

Defendants argue that the Company's October 30, 2024 announcement, the November 5, 2024 *Yicai* article, and the November 6, 2024 conference call failed to "correct" any misstatement because the alleged corrective disclosures were "already in the public sphere." Defendants' alleged fraud could not have caused Plaintiffs' losses. Mem. at 26-28. "These arguments are premised on a too-strict interpretation of the requirements of loss causation, particularly at the pleading stage," and mischaracterize the Complaint's disclosures allegations. *Sjunde*, 545 F. Supp. 3d at 147.

The burden of pleading loss causation is "not a heavy one;" Plaintiffs need only provide "some indication" of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations or omissions. *Loreley*, 797 F.3d at 187; *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Corrective disclosures need not be "mirror image" confessions of fraud, nor are Plaintiffs required to identify a single "smoking gun" corrective statement that explicitly confesses fraud. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261-262 (2d Cir. 2016); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). Rather, it is sufficient that the corrective disclosures "concern[] the same subject as Defendants' prior allegedly false or misleading statements," and "plausibly reveal[] to the market the falsity of those earlier statements." *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 274 (S.D.N.Y 2023). This is precisely the case here.

---

12    As this District stated in rejecting a defendant's challenges to witness information as "speculative," "allegations of scienter need not be supported by documentation, particularly at the pleadings stage." *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 398 (S.D.N.Y. 2022).

The Complaint sufficiently alleges loss causation through a series of disclosures on October 30 and November 5-6, 2024, that revealed previously concealed, specific material facts about the breadth and depth of the criminal Tagrisso investigation—including Wang's arrest and detention, the involvement of dozens of senior executives in the criminal scheme, and that approximately one hundred AstraZeneca employees had been sentenced for their role in the scheme—promptly followed by statistically significant, multi-day price declines as artificial inflation was removed. ¶¶141-146.

Throughout the Class Period, Defendants repeatedly portrayed the investigation as isolated and limited, involving only a "small number" of people. *See, e.g.*, ¶¶63-64, 78, 136-137. However, on October 30, 2024, the truth began to emerge as AstraZeneca disclosed that its China President, Wang, was "cooperating" with an ongoing investigation by Chinese authorities, which investors understood as a significant escalation to the Company's highest leadership in China. ¶141. The Company's ADRs fell immediately, closing down 3.1% on October 30 and falling another 2.3% on October 31. ¶142. One week later, on November 5, 2024, *Yicai Global* reported that the probe implicated dozens of senior executives, that dozens of staff had been convicted, and that AstraZeneca staff had "faked prescriptions" and "forged positive genetic testing reports." ¶¶43, 186. Following these disclosures, the stock fell 7.2% on November 5, 2024. ¶190. And on November 6, 2024, when Sarin revealed during a conference call with investors that Wang had been arrested, disclosed that "around a hundred individual ex-employees have been sentenced in relation to the medical insurance fraud," and admitted that Defendants had monitored the developments in the criminal investigation since late 2021 (¶146), the Company's ADR's fell an additional 3.65%. ¶144.

The material facts disclosed between October 30 and November 6 were not previously public, despite Defendants' insistence that they had disclosed the general existence of an

investigation. Mem. at 28. Indeed, Defendants had actively concealed this information from investors. Not until these disclosures were investors made aware of the size and scope of the criminal investigation, that more than 100 AstraZeneca employees had been arrested, detained, and convicted, or that the criminal scheme had involved the very top of AstraZeneca's executive management in China. Courts routinely reject attempts to defeat causation with boilerplate and generalized risk disclosures, like those raised by Defendants here, that are untethered to the concealed reality, and where the alleged corrective disclosures reveal additional specific, non-public facts contradicting the boilerplate warnings. *BioScrip*, 95 F. Supp. 3d at 734 ("it is premature to determine as a factual matter whether or not the information had become stale"); *AppHarvest*, 684 F. Supp. 3d at 273-74 (rejecting arguments that basis of the fraud was already public information because the complaint alleged corrective disclosures that conveyed new, undisclosed detail and a shift from the defendants' prior messaging); *In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 766 (S.D.N.Y. 2017) (loss causation adequately alleged where the corrective disclosures revealed the company's exposure was far greater than publicly suggested).

Because the corrective disclosures revealed materially previously undisclosed facts, the Court should reject Defendants' assertion that these corrective disclosures were nothing more than a mere negative "recharacterization" of already publicly available information. Mem. at 27. Defendants' argument misplaces reliance upon *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010) and *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489 (S.D.N.Y. 2016). In *Omnicom*, the specific details surrounding the accounting for a particular fraudulent transaction were ***all publicly known for years***. *Id.* at 514. As a result, the Court found that a later disclosure regarding an officer's resignation due to that same accounting transaction could not have been a corrective disclosure. *Id.*; *see also Fila*, 195 F. Supp. 3d at 496 (finding plaintiffs' alleged article did nothing more than spin then-publicly available information in a negative light). Here, unlike

- 26 -

in *Omnicom* and *Fila*, Plaintiffs' allegations do much more than recharacterize or spin already publicly available information in a negative light—they reveal ***new***, specific facts that directly contradict Defendants' prior narrative. ¶¶141-146, 179-194.

Defendants' reliance on *City of Omaha Police & Firefighters Ret. Sys. v. Cognyte Software Ltd.*, 2024 WL 4349289 (S.D.N.Y. Sept. 30, 2024) is also misplaced. There, the alleged disclosures merely reflected materialization of business and reputational risks that had been expressly disclosed and did not reveal additional, contradicting, non-public facts. *Id.* at *9. By contrast, here, AstraZeneca's October 30 and November 5-6 disclosures revealed new, specific, material facts that directly contradict Defendants' repeated assurances that the investigation was limited. ¶¶63-64, 78, 136-137, 179-194. Even if it were a "close call" here "as to whether 'contents of [a] disclosure had already been revealed,'"—and it is not—"it is best 'for the jury to make' that decision." *Sjunde*, 545 F. Supp.3d at 149-50.

Defendants' loss causation arguments should be rejected.

### E.    The Complaint Establishes Control Person Liability

This Court has noted that a §20(a) claim requires allegations of: (1) a primary violation of the securities laws by the controlled person, (2) control of the primary violator by the defendant; and (3) that the defendant "in some meaningful sense" was a culpable participant in the controlled person's fraud. *Sjunde*, 545 F. Supp. 3d at 150. As set forth above, the Complaint alleges with particularity how each of the Individual Defendants violated §10(b) and how each controlled the primary violator and culpably participated in the fraud. *See supra* §III.A-C; s*ee also* ¶¶202-208, 228-232. Therefore, Plaintiffs' §20(a) claim is adequately alleged. *Virtus*, 195 F. Supp. 3d at 542-43 (control person claim upheld on culpable participation where one or more individual defendants tracked due diligence, directed destruction of documents, served as Company spokesperson, signed public filings, and had contact with sales force).

## IV.   CONCLUSION

For these reasons, Defendants' Motion to Dismiss should be denied. Plaintiffs have plausibly alleged that Defendants made materially false and misleading statements and omissions with scienter, causing investor losses.[13]

DATED:  December 9, 2025                        Respectfully submitted,

*s/ Henry Rosen*
HENRY ROSEN

Henry Rosen (admitted *pro hac vice*)
Kathleen A. Herkenhoff (*pro hac vice* forthcoming)
Brian O. O'Mara (admitted *pro hac vice*)
Ruben Peña (admitted *pro hac vice*)
Kelsey Anderson (admitted *pro hac vice*)
**DiCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA  92121
Tel.: (619) 923-3939
hrosen@dicellolevitt.com
kherkenhoff@dicellolevitt.com
briano@dicellolevitt.com
rpena@dicellolevitt.com
kanderson@dicellolevitt.com

Jarett Sena
**DiCELLO LEVITT LLP**
485 Lexington Avenue, Tenth Floor
New York, NY  10017
Tel.: (646) 933-1000
jsena@dicellolevitt.com

Roxana Pierce (*pro hac vice* forthcoming)
**DiCELLO LEVITT LLP**
801 17th Street, NW, Suite 430
Washington, DC  20006
Tel.: (202) 975-2288
rpierce@dicellolevitt.com

***Lead Counsel for Lead Plaintiffs and the Proposed Class***

---

[13]  If the Court grants any part of the motion, Plaintiffs respectfully request leave to amend. *See* Fed. R. Civ. P. 15(a); *Ronzani v. Sanofi S.A.*, 899 F.2d 195, 198 (2d Cir. 1990) ("When a motion to dismiss is granted, 'the usual practice is to grant leave to amend the complaint.'").

## S.D.N.Y. LOCAL CIVIL RULE 7.1(c) WORD COUNT CERTIFICATION

I hereby certify pursuant to Southern District of New York Local Civil Rule 7.1(c) and Rule 4(B) of the Individual Rules & Practices in Civil Cases of the Honorable Vernon S. Broderick. The foregoing Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint was prepared on a computer using Microsoft Word. The total number of words in the brief is 8,557 words, inclusive of point headings and footnotes and exclusive of pages containing the caption, table of contents, table of authorities, signature blocks, and any required certificates.

_s/ Henry Rosen_
HENRY ROSEN

**DiCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA 92121
Tel.: (619) 963-2406
Email: hrosen@dicellolevitt.com

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on December 9, 2025, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Henry Rosen*
HENRY ROSEN

**DiCELLO LEVITT LLP**
4747 Executive Drive, Suite 240
San Diego, CA  92121
Tel.: (619) 963-2406
Email: briano@dicellolevitt.com